# EXHIBIT A

FILED
12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

11432201

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER SOLUTIONS,
INC.,

> Plaintiff,

> v.

SHANE WOLFRAM,

> Defendant,

and

E&I ENGINEERING CORPORTATION,

> Respondent in Discovery

Case No. 2020CH07179

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff, SAI Advanced Power Solutions, Inc. ("SAI"), by and through its attorneys, Aronberg Goldgehn Davis & Garmisa, for its complaint against Shane Wolfram ("Defendant") and E&I Engineering Corporation ("E&I") as a Respondent in Discovery, states as follows:

**NATURE OF THE ACTION**

1.   This is an action by SAI for injunctive relief and monetary damages against its former employee, Shane Wolfram ("Wolfram"), resulting from the wrongful solicitation of SAI customers and use of SAI proprietary information in violation of Wolfram's employment contracts and the Illinois Trade Secrets Act.  In July 2012, SAI entered into a non-compete and non-solicitation agreement with Wolfram, its U.S. Vice President of Sales, that prohibits Wolfram from, among other things, soliciting or contacting any of SAI's top ten revenue-generating clients or soliciting SAI employees to leave their employment with SAI and to join Wolfram at a competitor.  Wolfram resigned from SAI in May 2020 and began employment with E&I, a direct competitor of SAI in the switchgear industry.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

2.      Almost immediately after Wolfram commenced his employment with E&I, E&I's domestic switchgear sales experienced rapid growth, including new contracts and business relations with three of SAI's top revenue-generating clients that Wolfram was prohibited from contacting or soliciting.  The circumstances and timing in which E&I obtained new contracts from SAI customers strongly infers Wolfram's wrongful use of his personal relationships and knowledge of SAI's confidential information in furtherance of E&I's business interests, both during and after his employment with SAI.   Wolfram has also, directly and indirectly, contacted and solicited SAI employees to leave their employment with SAI and join him at E&I.   Wolfram's wrongful and unlawful conduct entitles SAI to monetary damages and injunctive relief enjoining continuing breaches.

## PARTIES, JURISDICTION AND VENUE

3.      SAI is an Illinois corporation with its principal place of business in Franklin Park, Illinois.

4.      Wolfram is an individual who resides in Sun Prairie, Wisconsin.

5.      E&I is a South Carolina corporation with its United States headquarters located in Anderson, South Carolina.

6.      Jurisdiction and venue are proper in Cook County, Illinois, because Wolfram and E&I transact business in Cook County, Illinois and a substantial part of the events giving rise to this action took place in Cook County, Illinois.

## FACTUAL BACKGROUND

**A.      SAI hires Wolfram as U.S. Vice President of Sales**

7.      SAI is a designer, manufacturer, and supplier of custom-made electrical switchgear, with customers including government facilities, health care providers, data centers, Fortune 500 companies, and international OEM customers.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

8.      An electrical switchgear is a centralized collection of circuit breakers, fuses, and switches that protects, controls, and isolates electrical equipment.

9.      SAI hired Wolfram as its U.S. Vice President of Sales in August 2011.

10.     Wolfram's duties and responsibilities as SAI's U.S. Vice President of Sales included, among other things: (a) overseeing the sale of SAI products and services within and outside of the United States; (b) supervising all SAI sales employees, sales managers, and field engineers; (c) developing, maintaining, and servicing new and existing client relations; and (d) interacting with SAI customers to sell and market SAI bids and proposals.

11.     In his capacity as U.S. Vice President of Sales, Wolfram had access to, and acquired knowledge of, SAI's confidential and proprietary business information (the "Confidential Information"), including but not limited to: (a) the contact information for all existing and prospective SAI clients within and outside of the United States, including specific individuals within SAI's customers who had decision-making authority; (b) SAI's proprietary pricing information; (c) SAI's business, marketing, and sales plans and strategies; (d) SAI'S existing and in-development products; (e) the compensation paid to SAI employees; and (f) all other information not generally known outside of SAI relating to its business in the electrical switchgear industry.

12.     Wolfram was the primary point of contact between SAI and its customers during the process in which SAI would respond to a request for a proposal (an "RFP").

13.     Wolfram would ordinarily receive an RFP on behalf of SAI and participate in SAI internal meetings to discuss the scope and specifications of the project.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

14.     Wolfram had knowledge of SAI's pricing formula and procedure for creating a proposal based upon the cost and specifications of a project, and was required to and did review each proposal so that he could interact with customers and answer their questions.

**B.      The Non-Compete and Non-Solicitation Agreement**

15.     On or about July 25, 2012, SAI and Wolfram entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement") whereby Wolfram agreed, among other things, that for a period of six months following the termination of his employment with SAI: (a) not to be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (b) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue-producing client of SAI. A copy of the Non-Solicitation Agreement is attached as **Exhibit A**.

16.     Wolfram also agreed not to, directly or indirectly, use or disclose any Confidential Information obtained during the course of his employment with SAI and to use his best efforts to safeguard such information.

17.     Pursuant to Paragraph 4 of the Non-Solicitation Agreement, the six-month restrictive period does not begin, and is extended, during any period of time in which Wolfram is in breach of any of the restrictive covenants contained in the Non-Solicitation Agreement.

18.     The Non-Solicitation Agreement also included a prohibition not to solicit, encourage, or have contact with any of SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at a competitor for a period of twelve months following Wolfram's termination of employment with SAI.

19.     The Non-Solicitation Agreement acknowledged that the relationship between SAI and its customers is of a near-permanent nature that has been cultivated over a number of years

FILED DATE: 12/9/2020 2:57 PM 2020CH07179

with considerable time, effort, and expense, and that the Confidential Information and the goodwill of SAI are of significant value to SAI.

20. Contemporaneously with and in consideration for the execution of the Non-Solicitation Agreement, Wolfram was offered to, and did, participate in SAI's 2012 Sales Bonus Plan.

C. **SAI is awarded the contract for the Stack Silicon Valley Project**

21. Wolfram remained employed by SAI as the U.S. Vice President of Sales through May 29, 2020, during which time he, among other things, was involved in the cultivation of new and additional business relationships on behalf of SAI and continued to use and obtain additional Confidential Information.

22. In September 2019, SAI received a request for proposal from Holder Construction, LLC ("Holder") to bid on a project for Stack Inc. ("Stack") for the design and manufacture of switchgear for a data center located in Silicon Valley (the "Stack Silicon Valley Project").

23. The specification provided to SAI for the Stack Silicon Valley Project did not list or otherwise identify E&I as a potential switchgear provider.

24. SAI submitted its proposal for the Stack Silicon Valley Project on or around October 2, 2019.

25. Wolfram reviewed and had specific knowledge of SAI's proposal for the Stack Silicon Valley Project and interacted and communicated with Stack representatives about SAI's proposal.

26. In or about February 2020, SAI was advised that it had received the contract for the Stack Silicon Valley Project.

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

27.     Holder informed SAI that it would issue a contract to SAI for the engineering cost of the Stack Silicon Valley Project and it would later issue change orders for the sale of the equipment once the funding for the project was in place.

28.     The issuance of a contract for the engineering cost of the contract with the subsequent issuance of change orders for the equipment is a common arrangement that enables the project to proceed before all funding has been received.

29.     SAI is not aware of a single instance in the switchgear industry in which the recipient of the engineering portion of a contract did not also provide the switchgear equipment for the project.

30.     On or about February 6, 2020, SAI executed a contract in the amount of $26,000 (the "Silicon Valley Contract") to provide the engineering for the Stack Silicon Valley Project.

**D.     SAI and Wolfram respond to RFPs by Cloud and Stack**

31.     In March 2020, SAI received an RFP from CloudHQ LLC ("Cloud") to provide switchgear for a data center located in Manassas, Virginia (the "Cloud Manassas Project").

32.     SAI submitted its proposal for the Cloud Manassas Project in or about April 2020.

33.     Wolfram reviewed and had knowledge of SAI's proposal for the Cloud Manassas Project and interacted and communicated with Cloud representatives about SAI's proposal.

34.     In April 2020, SAI received another RFP from Stack for a data center in Portland, Oregon (the "Stack Portland Project").

35.     The Stack Portland Project includes the exclusive right to provide all equipment for the data center for two years following the execution of a contract.

36.     SAI submitted its proposal for the Stack Portland Project in or about May 2020.

37.     Wolfram reviewed and had knowledge of SAI's proposal for the Stack Portland Project and interacted and communicated with Stack representatives about SAI's proposal.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

**E.**     **Wolfram resigns from SAI**

38.     On May 15, 2020, Wolfram tendered a notice of resignation from his position as SAI U.S. Vice President of Sales, effective May 29, 2020.

39.     Wolfram advised SAI that he had received and accepted an offer from another company for the position of Vice President of Sales for U.S. Operations and reaffirmed in writing his obligation to abide by the Non-Solicitation Agreement. Wolfram requested that SAI provide him a list of SAI's top ten revenue-producing accounts over the previous twelve months pursuant to Paragraph 2(c) of the Non-Solicitation Agreement.

40.     Wolfram thereafter informed SAI that his new employer was E&I, a direct competitor of SAI in the designing and manufacturing of switchgear.

41.     On or about May 28, 2020, SAI and Wolfram executed a separation agreement (the "Separation Agreement") in which SAI agreed to waive its objection to Wolfram working for E&I as a direct competitor, provided that Wolfram abide by Section 2(c) of the Non-Solicitation Agreement not to directly or indirectly solicit, service, or contact any of SAI's top ten revenue-generating clients that were listed on the Separation Agreement ("Restricted Customers"), including but not limited to Holder, Stack, and Cloud. A copy of the Separation Agreement is attached as **Exhibit B**.

**F.**     **Wolfram communications with E&I and Cloud**

42.     Unbeknownst to SAI at the time and based upon a subsequent review of phone records, Wolfram began discussions with E&I as far back as January, 2020.

43.     SAI believes that Wolfram shared SAI Confidential Information with E&I during these phone conversation and while still employed by SAI, including the specifics of SAI's proposals for the Cloud Manassas Project, Stack Portland Project and Stack Silicon Valley Project.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

44.     SAI's review of Wolfram's SAI issued phone also identified numerous calls from Wolfram to Cloud almost immediately after Wolfram spoke to E&I.

45.     SAI believes that Wolfram contacted Cloud to promote, sell or otherwise market E&I's switchgear proposals over that of SAI.

**G.     Wolfram joins E&I and solicits SAI employees**

46.     Wolfram began work as the E&I Vice President of U.S. Sales in June 2020.

47.     Under the terms of the Non-Solicitation Agreement, Wolfram was required to provide, and is believed to have provided, E&I a copy of his Non-Solicitation Agreement and Separation Agreement prior to commencing his employment with E&I.

48.     On or about June 10, 2020, Philip O'Doherty, Managing Director of E&I, called Mr. Wolfram's SAI-issued cell phone unaware that it had been returned to SAI and asked what it would take to get "Bob" to join Wolfram at E&I.

49.     Upon information and belief, Wolfram was and is working with Mr. O'Doherty in soliciting SAI employees to leave their employment with SAI and to join him at E&I.

50.     On or about September 30, 2020, Wolfram met and had dinner with Bob Brown, the SAI Director of Customer Success for, upon information and belief, the intended purpose of convincing Mr. Brown to leave his employment and to join Mr. Wolfram at E&I.

51.     At least six SAI employees have been contacted or otherwise solicited to leave SAI and to join E&I.

52.     Wolfram is believed to be directly or indirectly involved in the solicitation of the SAI employees in violation of the terms of the Non-Solicitation Agreement.

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

**H.    Wolfram's contact and solicitation of Cloud leads to E&I's receipt of the Cloud Manassas Project**

53.    On September 30, 2020, Brian O'Hara, the Cloud Vice President of Electrical Infrastructure, sent a text message to Wolfram's SAI-issued cell phone unaware that it had been returned to SAI, advising Wolfram that E&I was not receiving an unrelated contract from Cloud.

54.    The text message evidences that Wolfram continued to contact, service, and likely solicit Cloud on behalf of E&I.

55.    In late August or early September 2020, Wolfram traveled to Ashburn, Virginia, which is the location of a Cloud data center and, upon information and belief, met with representatives of Cloud and discussed, among other possible topics, E&I's proposal for the Cloud Manassas Project.

56.    Wolfram is believed to have used or otherwise relied upon SAI's Confidential Information, including, but not limited to, the pricing, structure, and specification of SAI's bid for the Cloud Manassas Project in making or otherwise discussing E&I's proposal for the Cloud Manassas Project.

57.    Cloud awarded E&I the contract for the Cloud Manassas Project.

58.    The Cloud Manassas Project has an approximate value of $3.9 million and would generate gross profit in the approximate amount of $1.6 million.

**I.    SAI's expectancy to provide the equipment under the Stack Silicon Valley Contract and to receive the contract for the Stack Portland Project**

59.    In June 2020, Stack requested that SAI expedite the production and delivery of switchgear for a project located in Chicago, Illinois, and advised SAI that if it was able to do so, SAI would be given priority for the Stack Portland Project.

60.    SAI fulfilled Stack's expedited request.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

61.     In July 2020, Holder informed SAI that Stack had made a significant scope change to the Silicon Valley Project that doubled the cost and requested a revised proposal for the cost to provide the switchgear equipment.

62.     SAI submitted its revised proposal to provide the equipment for the Silicon Valley Project.

63.     Holder thereafter requested that SAI reduce its proposal by approximately $600,000 to correspond to the price charged by SAI for the Chicago project, which involved less shipping and other processing charges.

64.     SAI nonetheless accommodated the request by applying certain discounts and reductions.

65.     The revised proposal was submitted as a part of the Silicon Valley Contract that SAI had already received; SAI does not and did not believe that Stack requested proposals to provide the equipment for the Stack Silicon Valley Project from other switchgear providers.

66.     SAI believed that its revised proposal to provide the switchgear for the Stack Silicon Valley Project would be awarded as change orders to the Silicon Valley Contract.

**J.     E&I receives the Stack Portland and Silicon Valley equipment contracts**

67.     In or about September 2020, Stack awarded E&I the Stack Portland Project.

68.     Upon information and belief, Wolfram was instrumental in E&I obtaining the Stack Portland Project by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack on behalf of E&I and using or relying upon the Confidential Information, including SAI's pricing and structure for the Stack Portland Project.

69.     The Stack Portland Project has an initial value of approximately $800,000 and the two-year exclusive right to provide equipment is worth an estimated $20 to $30 million.

10

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

70.     On September 23, 2020, SAI was informed that E&I had been awarded a contract to provide the equipment for the Silicon Valley Project (the "Silicon Valley Equipment Contract").

71.     SAI had been previously advised that it had won and was receiving the entire contract for the Stack Silicon Valley Project, which included both the engineering cost and the sale of equipment.

72.     Upon information and belief, Wolfram was instrumental in E&I obtaining the Silicon Valley Equipment Contract by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack on behalf of E&I and using or relying upon the Confidential Information, including SAI's pricing and structure for the Silicon Valley Equipment Contract.

73.     SAI had never been awarded only the engineering portion of a contract without supplying the equipment for the project.

74.     SAI is not aware of any other instance in the switchgear industry in which a company was awarded only the engineering portion of a contract without supplying the corresponding equipment.

75.     The Silicon Valley Equipment Contract has an approximate value of $14 million and would generate gross profit in the approximate amount of $5.74 million.

76.     Upon information and belief, E&I is using or otherwise relying upon SAI's engineering design for the Silicon Valley Project to fulfill its obligations under the Silicon Valley Equipment Contract.

**K.     The Cease and Desist Letter**

77.     On October 22, 2020, SAI, through its attorneys, sent letters to Wolfram and SAI demanding that each cease and desist from: (a) the solicitation of SAI employees; (b) further solicitation or contact, directly or indirectly, with the Restricted Customers; or (c) otherwise,

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

directly or indirectly, causing a violation of the Non-Compete Agreement and Separation Agreement.  A copy of the October 22, 2020, letters are attached as **Exhibit C**.

78.     Wolfram and E&I, through their attorney, responded to the cease and desist letters by denying any wrongdoing.

**COUNT I**
**Breach of the Contract**
**SAI v. Wolfram**

79.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 78 above, as though fully set forth herein.

80.     The Non-Solicitation and Separation Agreements are valid and enforceable contracts that prohibit Wolfram from, among other things: (a) directly or indirectly soliciting, servicing, or having contact with any of the Restricted Customers, including but not limited to Holder, Stack, and Cloud; (b) directly or indirectly using or disclosing any Confidential Information obtained during the course of his employment with SAI; and (c) soliciting, encouraging, or having contact with any of SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at a competitor.

81.     Wolfram breached the Non-Solicitation Agreement and Separation Agreement by, among other things:

        a.     Using or disclosing, directly or indirectly, Confidential Information obtained during the course of his employment with SAI in furtherance of E&I's efforts to obtain business from Stack, Cloud and Holder.

        b.     Soliciting, encouraging, or having contact with SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at E&I;

12

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

    c.    Soliciting, servicing, or having contact with the Restricted Customers, including but not limited to Holder, Cloud, and Stack;

82.    Wolfram's breaches are continuous and ongoing.

83.    As a result of Wolfram's ongoing breaches, the six-month restrictive period in the Non-Solicitation has been extended and has not yet begun.

84.    SAI has performed its obligations under the Non-Solicitation Agreement and the Separation Agreement.

85.    As a direct and proximate result of Wolfram's continuous breaches of the Non-Solicitation Agreement and the Separation Agreement, SAI has sustained and is likely to continue to sustain damages in the form of lost profits and customer relationships, and has been irreparably injured, including injury to its goodwill and reputation, resulting in, among other things, loss of revenue and profits and diminished goodwill.

86.    SAI has no adequate remedy at law for Wolfram's ongoing and continuous breaches and Wolfram will continue to breach the terms of the Non-Solicitation Agreement and the Separation Agreement unless enjoined by the Court with an order declaring that the six-month restrictive period has yet to begin and has been extended by Wolfram's ongoing breaches.

87.    The threat of future injury to SAI and its business requires the issuance of injunctive relief to prevent Wolfram's continued misconduct.

### COUNT II
### Misappropriation of Trade Secrets in Violation of the
### Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* ("ITSA")
### SAI v. Wolfram

88.    SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 87 above, as though fully set forth herein.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

89.     SAI's Confidential Information, which contains protectable trade secrets, consists of, among other things, the following:

    a.      Customer lists;

    b.      Contact information for SAI customers, including specific individuals within SAI's customers who had decision-making authority;

    c.      SAI existing and in-development products;

    d.      SAI formulas for pricing and proposals;

    e.      SAI business/marketing plans and strategies; and

    f.      Profit margins, pricing, and financial information of SAI and its customers.

90.     The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

91.     SAI has made reasonable efforts to preserve the secrecy of its Confidential Information, including but not limited to, requiring employees who have access to Confidential Information to sign an employment agreement that includes confidentiality, non-solicitation, and non-competition provisions.   Additionally, SAI restricts access to its electronically stored Confidential Information with individualized logins and passwords.

92.     After signing the Non-Solicitation Agreement (which contained the confidentiality provision), Wolfram gained access to SAI's trade secrets in the course of his employment with SAI.

93.     Wolfram misappropriated, used, and/or disclosed the Confidential Information without SAI's authorization in an attempt to benefit himself and E&I.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

94.     Wolfram knew or had reason to know at the time of disclosure or use that the knowledge of the Confidential Information was derived through improper means in violation of Section 2(b)(1) of the ITSA because, among other things, the disclosure occurred after Wolfram's execution of the Non-Solicitation agreement that restricted such disclosure.

95.     Wolfram's misappropriation of SAI's Confidential Information is and was willful and malicious.

96.     Wolfram's misappropriation of SAI's Confidential Information has harmed SAI by diverting or threatening to divert business away from SAI and by diluting the value of SAI's Confidential Information.

97.     As a result of Wolfram actions, SAI has and will continue to suffer lost business opportunities, customers, profits, and goodwill.

**COUNT III**
**Breach of Fiduciary Duty**
**SAI v. Wolfram**

98.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 97 above, as though fully set forth herein.

99.     As an employee of SAI, Wolfram owed a duty of loyalty to his employer and its goodwill and reputation.  Moreover, by virtue of his employment with SAI, Wolfram owed SAI duties of honesty and candor in the performance of his services.

100.    While still employed by SAI, Wolfram breached those duties by, among other things: (1) soliciting or otherwise contacting customers of SAI to promote, market or sell E&I switchgear proposals over that of SAI; (2) disclosing SAI Confidential Information to E&I without authorization; and (3) interfering with SAI's business relationships and expectancies.

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

101.     SAI has incurred and will continue to incur damages as a result of Wolfram's breach of his duty of loyalty and SAI is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to SAI of all compensation paid to Wolfram from the date of his first disloyal act, as well as all other damages suffered by SAI as a result of Wolfram's breach of his duties to SAI.

**COUNT IV**
**SAI v. E&I as a Respondent in Discovery**

102.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 101 above, as though fully set forth herein.

103.     SAI relies upon the provisions of 735 ILCS 5/2-402 with respect to the Respondent in Discovery.

104.     E&I has information which SAI reasonably believes to be necessary to determine which, if any, additional defendants should be named and what, if any additional causes of action should be brought, including but not limited to communications evidencing: (a) E&I's use and employment of SAI's Confidential Information in furtherance of its business interest; (b) E&I's knowledge and inducement of Wolfram to breach the Non-Solicitation Agreement and Separation Agreement by, among other things  employing, directing, encouraging, or otherwise providing Wolfram with the opportunity and platform to, directly or indirectly, solicit, contact, and service the Restricted Customers, including but not limited to Holder, Stack, and Cloud and SAI employees to leave their employment with SAI to join Wolfram at E&I; and (c) E&I's interference with SAI's legitimate business expectations by employing, directing, encouraging, or otherwise providing Wolfram with the opportunity and platform to, directly or indirectly, solicit, contact and service Holder, Stack, and Cloud and using, directly or indirectly, SAI's Confidential Information.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, SAI Advanced Power Solutions, Inc., requests the following relief:

1.      An injunction ordering Defendant Shane Wolfram to immediately cease the ongoing breaches of the Non-Solicitation Agreement and Separation Agreement, and declaring that the six-month restrictive period has not yet begun;

2.      An Order awarding actual and compensatory damages, with pre-judgment and post-judgment interest, for Defendant Shane Wolfram's breach of the Non-Solicitation Agreement and Separation Agreement;

3.      An Order awarding actual and compensatory damages and disgorgement of compensation, with pre-judgment and post-judgment interest, for Defendant Shane Wolfram's breach of fiduciary duties;

4.      An Order awarding the costs and expenses, including reasonable attorneys' fees and costs incurred by SAI in connection with this action against Defendant Shane Wolfram pursuant to the Non-Solicitation Agreement;

5.      An Order awarding actual loss, unjust enrichment, and the costs and expenses of this action, including reasonable attorneys' fees, against Defendant Shane Wolfram for the misappropriation of SAI's trade secrets under the ITSA;

6.      An Order awarding punitive damages against Defendant Shane Wolfram for the willful and malicious misappropriation of SAI's trade secrets under the ITSA and willful breach of fiduciary duty; and

7.      An order enforcing and requiring E&I Engineering Corporation to respond to all discovery issued by SAI;

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

8.    All such other relief as the Court deems just and proper.

SAI ADVANCED POWER
SOLUTIONS, INC.

By:  /s/ *Benjamin E. Haskin*
                One of Its Attorneys

Nathan H. Lichtenstein, Esq.
nlichtenstein@agdglaw.com
Benjamin E. Haskin, Esq.
bhaskin@agdglaw.com
ARONBERG GOLDGEHN DAVIS & GARMISA
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
312-828-9600
Attorney No. 30375
4840-9072-6608v3

4847-6894-1524, v. 2

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

## RULE 222 VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that Pursuant to Illinois Supreme Court Rule 222, the monetary damages sought in this case exceed $50,000.

Dated: December 8, 2020

SAI ADVANCED POWER
SOLUTIONS, INC.

By: _____

Its: _VP - Finance_____

4847-6894-1524, v. 2

36

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
Cook County, IL

FILED
12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179
11432201

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

## CONFIDENTIALITY, NON-COMPETITION AND
## NON-SOLICITATION AGREEMENT

I, Shane Wolfram, hereby enter into this Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement") with SAI Advanced Power Solutions, Inc. (the "Company"). I acknowledge that my position as the Company's Vice President of Sales has given me and will continue to give me access to information which the Company regards as proprietary and/or confidential and which, if disclosed by me in contravention of this Agreement would cause permanent, incalculable and irreparable injury and damage to the Company. I further acknowledge that I also have been given and will continue to be given the opportunity to gain close knowledge of and possible influence over clients and employees of the Company, which I would not have had contact with but for my employment with the Company. I acknowledge that I therefore possess the good will of the Company and that this Agreement is necessary to protect the Company against unfair loss of said confidential information, clients, employees and/or good will. Accordingly, so that there will be no misunderstanding in the future regarding these matters, I have voluntarily entered into this Agreement. I agree that I have received adequate consideration for my agreeing to be bound by the terms of this Agreement, including, but not limited to, my participation in the new 2012 Sales Bonus Plan applicable to my position and my continued employment with the Company.

1.  <u>Non-Disclosure/Confidentiality</u>.  Unless otherwise instructed or authorized in writing by an Executive Officer of the Company, I agree that I will not, at any time during or after the period of my employment, directly or indirectly copy, use, disclose, publish or divulge to any person any Confidential Information (as defined below in this Agreement), and will use my best efforts to safeguard such Confidential Information.

The phrase "Confidential Information" means any and all information disclosed to or known by me as a consequence of or through my employment with the Company, which is not generally known outside the Company, relating to the Company's business in the electrical distribution equipment industry, including but not limited to inventions, products, services, equipment, devices, methods of operations or doing business, processes, formulas, drawings, blueprints, photographs, slides, motion pictures, videotapes, computer software programs, passwords, reports, analyses, data bases, spreadsheets and all related documentation, notes and flow charts, regardless of medium, computer data and storage media, trade secrets, pricing information and lists, clients and prospects, client and prospect lists, proprietary or confidential information pertaining to clients and prospects, vendors and potential vendors, vendor lists, suppliers and potential suppliers, supplier lists, employee and personnel compensation, data, information and files, business and marketing plans, ideas, or strategies, financial performance and projections, financial and accounting information and analyses, financial statements, budget information, purchasing, marketing and analytical studies, and cost data, which I may have previously acquired, accessed or developed or which I may subsequently acquire, have access to or develop in connection with or as a result of my employment with the Company.

Upon termination of my employment with the Company (for any reason), I will, prior to my separation, immediately deliver all Company information, including any and all Confidential Information, to the Company, including any and all copies thereof. I understand that this

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

Agreement shall remain in full force and effect with respect to the clauses which require me to perform or not to perform certain actions after termination of my employment.

      2.    <u>Non-Competition and Non-Solicitation</u>.  I acknowledge and agree that as the Company's Vice President of Sales, my duties and responsibilities include, but are not limited to, overseeing the sale of the Company's products and services within and outside of the United States, and directly supervising all of the Company's sales employees, including, but not limited to the Company's Sales Managers, who are responsible for selling the Company's products and services in the Company's Eastern, Central, and Western sales regions, and the Company's Field Sales Engineers, who are responsible for assisting with the sales of assigned products in all of the Company's sales regions.  I further acknowledge and agree that in my role as the Company's Vice President of Sales, I not only have access to but have acquired and will continue to acquire substantial knowledge regarding the Company's confidential business information, including all of the Company's clients and prospects within and outside of the United States, client and prospect lists, and proprietary or confidential information pertaining to all of the Company's clients and prospects; the Company's pricing information and lists; the Company's business, marketing and sales plans, efforts, ideas, or strategies; the Company's current products and products in development; and the compensation paid to the Company's sales employees; among other confidential information identified in Section 1 above.  I further acknowledge and agree that in my role as the Company's Vice President of Sales, I have gained close knowledge of and influence over the Company's employees and all of the Company's clients within and outside of the United States, which I would not have but for my employment with the Company.

      I therefore further acknowledge and agree that each of the provisions of this Agreement are reasonable and necessary to preserve and protect the legitimate business interests of the Company, including its client and employee relationships, Confidential Information, its present and potential business activities, and the economic benefits derived therefrom.    With these principles in mind, I specifically acknowledge and agree as follows:

      a.    that the relationships between the Company and its clients are of a near permanent nature and have, in most instances, been cultivated over an extensive period of time with considerable time, money and effort expended and that the information which I will have access to is of a confidential and proprietary nature, and the good will of the Company and its client relationships which I have enjoyed or will continue to enjoy while employed by the Company are significant and valuable to the Company.

      b.    that, in light of the previously mentioned provisions in paragraph 2 and 2.a., during my employment by the Company and for a period of six (6) months following my voluntary or mutually agreed termination of employment with the Company, I will not, either directly or indirectly, in any capacity be employed by, perform services for, or have any business interest in any Competing Business if:  (1) my duties or services at the Competing Business are similar to duties or services I performed for the Company;  (2) my duties or services at the Competing Entity involve the sale or marketing of switch gears or other electrical distribution equipment products and services sold by the Company; (3) my duties or services at the Competing Business would include managing or supervising individuals engaged in duties or services similar to the duties and services I performed for the Company; or (4) doing so would involve the actual or threatened unauthorized use or disclosure of the Company's Confidential

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

Information. A "Competing Business" for purposes of this Agreement includes the following entities and any of their current or future parent, sister, affiliated or successor entities: ASCO Power Technologies - Global HQ (a division of Emerson Network Power) currently at 50 Hanover Road, Florham Park, NJ;   the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of GE Zenith Controls currently at 830 W 40th Street, Chicago, IL 60609; IEM / Industrial Electric Manufacturing currently at 48205 Warm Springs Blvd., Fremont, CA;   the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of ISO-Eaton Corporation, Corporate Headquarters currently at 1111 Superior Avenue E, Cleveland, OH;  Russell Electric currently at 1435 Brown Street, Bettendorf, IA ;  and the competing business in the Switchgear lines of products and services of Square D / Schneider Electric currently at 1415 South Roselle Road, Palatine, IL 60067.

        c.    that because of the Company's valuable interest in its client relationships, during my employment and for a period of six (6) months following my termination of employment with the Company (for any reason), I will not directly or indirectly solicit, service, have contact with, or divert any entity which is a client of the Company and among the top ten revenue producing client accounts for the period of the last twelve (12) months of my employment of SAI.

        d.    that in order to protect the Company's relationships with its employees, during my employment with the Company and for a period of twelve (12) months following the termination of my employment (for any reason), I will not solicit, encourage or have contact with any of the Company's employees for the purpose of encouraging them to end their employment with the Company and/or to join me as a partner, agent, employee or otherwise in a Competing Business.

    3.    <u>Injunctive Relief</u>.  I acknowledge that a breach of any of the covenants contained in this Agreement would cause irreparable harm to the Company's business and that monetary damages would be difficult or impossible to ascertain and will not afford an adequate remedy. Therefore, in the event of any such breach or threatened breach, in addition to such other remedies which may be provided by law, the Company shall have the right to enforce this Agreement by way of a temporary and/or permanent injunction, in which case I will be required to pay the Company's legal fees, expenses and costs incurred in bringing such an action against me/or in any action involving the enforcement or validity of this Agreement.

    4.    <u>Extension of Post-Employment Restrictions</u>.  In the event I fail to abide by any of the provisions contained in paragraph 2 above, the six (6)-month time period contained therein shall be extended by the period of time in which I had failed to abide by said paragraph(s).

    5.    <u>Advance Notice of Prospective Employment</u>.  I agree that during the term of my employment with the Company and for a six-month period following the termination of my employment (for whatever reason), prior to accepting employment with, or agreeing to perform services for any Competing Business, I will notify the Company in writing of my intentions in this regard so as to provide the Company with the opportunity to assess whether my prospective employment or retention or any other actions I have taken in conjunction with my prospective

employment may potentially violate any provisions of this Agreement. I further agree to notify any entity to which I am offered employment or retention, of the existence of this Agreement.

6. <u>Employment At-Will</u>. I acknowledge and agree that nothing contained in this Agreement is intended to alter the fact that my employment with the Company is *at-will*, and *I further acknowledge and agree that my employment may be terminated at the will of either party, at any time for any reason not prohibited by law.*

7. <u>No Waiver</u>. I agree, however, that the Company's determination not to enforce this Agreement as to specific violations shall not operate as a waiver or release of my obligations hereunder.

8. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, legal representatives, successors and assigns.

9. <u>Severability</u>. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties, regardless of who drafted the Agreement. The parties believe the time restrictions herein to be reasonable to protect business activity. However, in the event that a court of competent jurisdiction deems any provisions hereof to be unreasonable, void or unenforceable, such provision(s) shall be deemed severed from the remainder of the Agreement, which shall continue in all other respects to be valid and enforceable. Any such provision(s) of this Agreement declared void, unreasonable or unenforceable shall be deemed revised to the minimum amount necessary in order to be valid and enforceable.

10. <u>Applicable Law/Complete Agreement</u>. This Agreement and all of my obligations under it shall be governed by, construed and enforced under the laws of the State of Illinois. This Agreement constitutes the complete Agreement of the parties concerning its subject matter, and may be amended only by a written instrument executed by me and an Executive Officer of the Company hereto or our respective successors, assigns, executors, administrators, legal representatives or heirs.

11. <u>Acknowledgment</u>. I hereby acknowledge that I have read the foregoing Agreement, that I fully understand and accept the terms hereof, and that the Company gave me the opportunity to consult with an attorney or some other third party to explain the meaning of the terms of this Agreement prior to signing the Agreement.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

4

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

IN WITNESS WHEREOF, I and the Company, by its duly authorized representative, have signed this Confidentiality, Non-Competition and Non-Solicitation Agreement.

SHANE WOLFRAM
VICE PRESIDENT OF SALES

By: _____

Date: _____ 7/25/12

SAI ADVANCED POWER SOLUTIONS, INC.

By: _____

Date: _____ 7/25/12

5

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
    Cook County, IL

FILED
12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

11432201

Date:        May 27, 2020

To:          Shane Wolfram, VP Sales

From:       David Martin – VP – Shared Services

Subject:     <u>Terms of Separation for Shane Wolfram from SAI Advanced Power Solutions</u>

1) Confidentiality, Non-Competition and Non-Solicitation - The terms of this final separation agreement are consistent with the Confidentiality, Non-Competition and Non-Solicitation Agreement signed by Shane and the Company on July 25, 2012 (attached) with the following exceptions:

2) The Company agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group) under the following conditions:

    a. Shane will abide by the the Confidentiality, Non-Competition and Non-Solicitation Agreement, Section 2.c:
        i. Holder
        ii. Cloud
        iii. Coresite
        iv. Iron Mountain
        v. Stack
        vi. APC
        vii. Piller
        viii. Capital Power
        ix. BL Harbert
        x. Toshiba

    b. Company Equipment – Shane will return the following equipment in working order along with appropriate passwords and instructions on how to access necessary information:
        i. Computer(s)
        ii. Phone (s)
        iii. Other _____

    c. Final settlement – the company will payout the following to settle all compensation requirements:
        i. All accrued PTO
        ii. Any un-reimbursed expenses

FILED DATE: 12/9/2020 2:57 PM  2020CH07179

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

    iii.  Commission Earned but unpaid - $123,408.26 less $12,000.00 paid in May = $111,408.26.

        1.  This Balance will be paid $12,000 / month until completely paid

        2.  The Company will make its best efforts to repay this balance earlier if possible.

Shane Wolfram

Date: _5/28/2020_

SAI Advanced Power Solutions

Date: _5/28/2020_

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
        Cook County, IL

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179
11432201
FILED

**ARONBERG GOLDGEHN**

Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Ave., Suite 1700
Chicago, Illinois 60611-3586
TEL: 312-828-9600
FAX: 312-828-9635
www.agdglaw.com

SANDRA A. AGUILERA
MARK D. ANDERSON
STACI BALBIRER
CHRISTOPHER J. BANNON
LISA J. BRODSKY
JAMES A. CHRISTMAN
CATHERINE CONNELLY-WARREN
M. CHIP DE PRETER
JAY A. FRANK
AMY RAPOPORT GIBSON
PAUL A. GILMAN
THOMAS K. HANEKAMP
JERRY HOLISKY
DAVID A. JOHNSON
JULIE A. JOHNSON
AMBER O. LAFEVERS
LINDSAY P. LOLLIO

ELIZABETH OLEN LAZZARA
NATHAN H. LICHTENSTEIN
MITCHELL J. MELAMED
DOUGLAS C. MURRAY
CHRISTOPHER W. NIRO
WILLIAM L. NIRO
TIMOTHY R. NELSON
R. TIMOTHY NOVEL
NED S. ROBERTSON
BERNARD A. SCHLIFKE
STEVEN M. SCHOLL
JOHN C. SCIACCOTTA
VANESSA E. SEILER
ROBERT N. SODIKOFF
BLOOMA STARK
SHARON S. ZABAN
MICHAEL A. ZASLAVSKY

MARYAM H. ARFEEN
GENC ARIFI
KRISTINA D. DIESNER
BENJAMIN HASKIN
BLAKE S. KOCIAN
SAMUEL R. LEIST
NICOLE MILLER
MICHAEL S. NELSON
ZACHARIAH SNYDER
MARK A. SWANTEK

OF COUNSEL
WILLIAM J. GARMISA
MITCHELL S. GOLDGEHN
MICHAEL HAYES SR
HENRY M. MORRIS
ALAN S. WERNICK

OUR FILE NUMBER:

WRITER'S DIRECT DIAL NUMBER:

312-755-3184                                   017026.000100

October 22, 2020

**_VIA EMAIL (sswolfram1212@gmail.com)_**

Mr. Shane Wolfram
Vice President of U.S. Sales
E&I Engineering Group

Re:    _Cease and Desist–Breach of Confidentiality, Non-Competition and Non-Solicitation Covenants–and Litigation Hold_

Dear Mr. Wolfram:

This firm represents SAI Advanced Power Solutions, Inc. ("SAI"). The purpose of this letter is to demand that you, individually and on behalf of E&I Engineering Group (E&I), immediately cease and desist from: (1) using or otherwise relying on the information, knowledge, and client relations acquired during your tenure as SAI Vice President of Sales to compete against SAI; and (2) soliciting employees of SAI to join you at E&I. _**This letter shall also serve as formal notice of your legal obligation to take steps to ensure the preservation of all documents and information including, but not limited to, emails and text messages relevant to the matters described below.**_

**Your Breach of the Non-Solicitation and Separation Agreements**

As you may recall, you signed SAI's Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement") whereby you agreed, among other things, not to use or disclose any Confidential Information (as that term is defined in the Non-Compete Agreement) obtained during the course of your employment with SAI to compete against SAI. A copy of the Non-Solicitation Agreement is enclosed for your reference. Moreover, you agreed that for a period of six (6) months following the termination of your employment with SAI: (1) not to be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (2) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 2



FILED DATE: 12/9/2020 2:57 PM   2020CH07179

producing client of SAI. ***Pursuant to Paragraph 4 of the Non-Solicitation Agreement**, **the six-month restrictive period does not begin (and is in fact extended) during any period of time you are in breach of any of the restrictive covenants contained in the Non-Solicitation Agreement***. The Non-Solicitation Agreement also prohibits you from soliciting or encouraging SAI employees to end their employment with SAI and to join you in a competing business.

On May 15, 2020, you resigned as Vice President of Sales of SAI, effective May 29, 2020, and thereafter negotiated and signed a separation agreement (the "Separation Agreement"), in which SAI agreed to waive its objection to you working for E&I, a direct competitor, and identified ten of its top customers (the "Restricted Customers"), including CloudHQ LLC ("Cloud"), Stack Infrastructure Inc. ("Stack"), and Holder Construction Group LLC ("Holder") that were subject to the restrictions in the Non-Solicitation Agreement.  A copy of the Separation Agreement is attached for your reference.

The series of events that began shortly after your departure from SAI and continuing today leaves little doubt that at the time you signed the Separation Agreement that you had, and continue to have, no intention of abiding by the terms of either the Non-Solicitation Agreement or the Separation Agreement (collectively the "Agreements").  Your arrival at E&I conspicuously coincided with the rapid growth of its domestic electrical switchgear operations and development of new client relationships, including Stack, Cloud, and Holder.  The timing of these events is strong evidence that you participated in E&I's successful campaign to obtain new switchgear business from Stack and Cloud given that you were SAI's primary point of contact for each and E&I had no switchgear experience with either company prior to your arrival.

By disregarding your obligations under the Agreements and soliciting or otherwise contacting the Restricted Customers, you have, at a minimum, aided E&I in obtaining: (i) the Stack Portland project; (ii) the Stack Silicon Valley project; and (iii) the MCC6 project from Cloud. Indeed, your involvement in preparing SAI's quotes for each of these projects during you tenure at SAI and E&I's subsequent procurement of these projects leads to the inescapable conclusion that you provided material assistance and guidance to E&I and used SAI's confidential and proprietary information in doing do.  SAI conditioned its approval of your request to join a competitor upon your agreement not to compete and do business with the Restricted Customers and your blatant indifference to upholding your end of the bargain will carry significant legal ramifications.

SAI is also aware of your attempt to solicit SAI employees to leave their employment with SAI and to join you at E&I, which also violates the Non-Solicitation Agreement.  A phone call SAI received from Philip O'Doherty, Managing Director of E&I, on your SAI-issued cell phone shortly after your resignation seeking assistance in recruiting "Bob" provided direct evidence of E&I's strategy: to raid SAI's engineering department and bring a significant portion of them with you to work at E&I.  The sheer number of SAI employees who have been solicited to join E&I further substantiates your involvement, as does your recent encounter with the aforementioned Bob Brown.

FILED DATE: 12/9/2020 2:57 PM  2020CH07179

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 3


ARONBERG
GOLDGEHN

**Demand to Cease and Desist**

On behalf of SAI, we demand that you immediately cease and desist from: (a) soliciting, contacting or otherwise communicating with Stack, Cloud, and Holder, as well as all other Restricted Customers; (b) soliciting SAI employees; and (c) otherwise, directly or indirectly, violating the Non-Solicitation Agreement and the Separation Agreement in any manner. You are required to abide by these obligations for six months following the date you cease the illegal conduct.

Your breaches of the Non-Solicitation Agreement and the Separation Agreement has caused SAI significant monetary damages, including but not limited to lost profits and lost business opportunities. Based upon the value of the contracts E&I has obtained through your wrongful contact with the Restricted Customers and use of SAI's confidential information—$14 million for the Stack Silicon Valley project, $20 million over two years for the Stack Portland project and $3.9 million for the Cloud MCC6 project—SAI has easily sustained damages in excess of $10 million. These damages will continue to increase in the event you do not take immediate corrective action. SAI reserves its right to seek injunctive relief and monetary damages against you for, among other things, breach of contract and a violation of the Illinois Deceptive Trade Practices Act and to pursue any and all other rights and remedies available at law or in equity.

**Litigation Hold**

In light of SAI's claims and causes of action against you, we demand that you, and others acting or purporting to act on your behalf, including counsel and any employees, agents, officers, directors, or shareholders of E&I (collectively, the "Custodians") immediately take steps to ensure the preservation of all documents and information including, but not limited to, electronically-stored information ("ESI"), which is potentially relevant to SAI's claims and causes of action against you. This includes your personal email address, cell phone, and social media activity. You are required to preserve such information in accordance with this litigation hold letter.

Potentially relevant information includes paper records, emails, text message and other ESI that are in any way related to your breaches of the Non-Compete Agreement and the Separation Agreement, which include the following:

1.  All communications by a Custodian: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

2.  All notes and memoranda confirming, summarizing, or reflecting communications a Custodian had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 4



FILED DATE: 12/9/2020 2:57 PM   2020CH07179

3.     All documents, including but not limited to, quotes, proposals, bids, solicitations, meeting requests, marketing materials, or advertisements sent by a Custodian to any of the Restricted Customers.

The timeframe for retention and preservation of the records is <u>January 1, 2019 to the present</u>.

In light of the foregoing, you must take the following affirmative steps to ensure that all potentially relevant documents and ESI are preserved:

1.     Identify the people or entities who have or may have potentially relevant documents or ESI. You should promptly inform those people and entities of their possession of potentially relevant data and instruct them not to delete or alter any such information. If it is possible to segregate such information, that may be preferable. You should also inform appropriate system administrators and other information technology personnel of the necessity of preserving potentially relevant ESI.

2.     Identify sources of potentially relevant documents and ESI and preserve them. When identifying sources of documents and ESI, you should bear in mind that such documents and data may include, but are not limited to, text files, spreadsheets, power points, e-mails, letters, faxes, notes, text messages, meeting agendas and minutes, memoranda, summaries, databases, calendar entries, data from accounting applications (i.e. QuickBooks files), video files, photographs, contact and relationship management data, computer system activity logs, internet usage files, network access information, backup and archival files, data compilations, electronically imaged documents and others. Be sure to identify and review all computers, network servers, removable media, handheld devices, tablets, smartphones, voice mail, and backup tapes which could contain potentially relevant information.

3.     Make copies of any active files containing relevant data and preserve them separately. It is important to segregate relevant data because it will permit us to efficiently image or duplicate the data for discovery purposes at a later date.

4.     If the Custodians use online, cloud storage, and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation.

5.     Discontinue any automatic or routine features or protocols for deletion or modification of ESI in order to avoid the deletion or alteration of data potentially relevant to the Lawsuit. Examples of such automatic or routine features or protocols include, without limitation: (a) purging the contents of e-mail repositories by age, capacity, or other criteria; (b) using data or media wiping, disposal, erasure, or encryption utilities or devices; (c) overwriting, erasing, destroying or discarding back-up media; and (d) running antivirus or other programs effecting wholesale metadata alteration.

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 5



FILED DATE: 12/9/2020 2:57 PM   2020CH07179

     ***Please note that allowing potentially relevant documents or ESI to be destroyed or discarded can subject you to severe civil and/or criminal penalties.  The possible sanctions include both monetary and litigation-specific penalties, such as a finding that the unavailable ESI would have been unfavorable to the defendants' position in any potential lawsuit***.

Sincerely,

ARONBERG GOLDGEHN DAVIS & GARMISA

By: _____

     Benjamin E. Haskin

Encl.

cc:    Jerry Holisky, Esq.
      David Martin

4822-1152-5326v4

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:31 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
       Cook County, IL

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

FILED
12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179
11432201



**ARONBERG GOLDGEHN**

Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Ave., Suite 1700
Chicago, Illinois 60611-3586
TEL: 312-828-9600
FAX: 312-828-9635
www.agdlaw.com

SANDRA A. AGUILERA
MARK D. ANDERSON
STACI BALBIRER
CHRISTOPHER J. BANNON
LISA J. BRODSKY
JAMES A. CHRISTMAN
CATHERINE CONNELLY-WARREN
M. CHIP DE PRETER
JAY A. FRANK
AMY RAPOPORT GIBSON
PAUL A. GILMAN
THOMAS K. HANEKAMP
JERRY HOLISKY
DAVID A. JOHNSON
JULIE A. JOHNSON
AMBER O. LAFEVERS
LINDSAY P. LOLLIO

ELIZABETH OLEN LAZZARA
NATHAN H. LICHTENSTEIN
MITCHELL J. MELAMED
DOUGLAS C. MURRAY
CHRISTOPHER W. NIRO
WILLIAM L. NIRO
TIMOTHY R. NELSON
R. TIMOTHY NOVEL
NED S. ROBERTSON
BERNARD A. SCHLIFKE
STEVEN M. SCHOLL
JOHN C. SCIACCOTTA
VANESSA E. SEILER
ROBERT N. SODIKOFF
BLOOMA STARK
SHARON S. ZABAN
MICHAEL A. ZASLAVSKY

MARYAM H. ARFEEN
GENC ARIFI
KRISTINA D. DIESNER
BENJAMIN HASKIN
BLAKE S. KOCIAN
SAMUEL R. LEIST
NICOLE MILLER
MICHAEL S. NELSON
ZACHARIAH SNYDER
MARK A. SWANTEK

OF COUNSEL
WILLIAM J. GARMISA
MITCHELL S. GOLDGEHN
MICHAEL HAYES SR
HENRY M. MORRIS
ALAN S. WERNICK

WRITER'S DIRECT DIAL NUMBER:

312-755-3184

OUR FILE NUMBER:

017026.000100

October 22, 2020

*VIA EMAIL (philip@e-i-eng.com)*

Mr. Philip O'Doherty
Managing Director
E&I Engineering Group

Re:     *Cease and Desist–Violation of Shane Wolfram Confidentiality, Non-Competition*
        *and Non-Solicitation Agreement–and Litigation Hold*

Dear Mr. O'Doherty:

        This firm represents SAI Advanced Power Solutions, Inc. ("SAI"). The purpose of this
letter is to demand that E&I Engineering Group (E&I) immediately cease and desist from: (1)
tortiously interfering with SAI and Shane Wolfram's Confidentiality, Non-Competition and Non-
Solicitation Agreement (the "Non-Compete Agreement") and May 29, 2020, Separation
Agreement (the "Separation Agreement"); (2) tortiously interfering with SAI's prospective
economic opportunities; and (3) exploiting or otherwise using SAI's confidential trade secrets to
infringe upon SAI's well-developed customer relationships. A separate letter that is being sent to
Mr. Wolfram individually is attached and includes copies of the Non-Compete Agreement and
Separation Agreement. ***This letter shall also serve as formal notice of E&I's legal obligation to
take steps to ensure the preservation of all documents and information including, but not limited
to, emails and text messages relevant to the matters described below***.

### E&I Aids and Induces Shane Wolfram to Breach his Employment Contracts

        It has become apparent that E&I recruited and hired Mr. Wolfram for the purpose of
exploiting Mr. Wolfram's knowledge of SAI employees, operations, and customers in furtherance
of E&I's effort to mimic SAI's switchgear operations and salesforce. The subsequent hiring of
former SAI employees as well as the solicitation of numerous other SAI employees substantiates
E&I's endeavor to model its U.S. switchgear operations after SAI.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 2



    SAI first learned of E&I's objective when you called Mr. Wolfram's cell phone unaware that it had been returned to SAI and asked what it would take to get "Bob" to join Mr. Wolfram at E&I. SAI was unaware at the time, however, that this only scratched the surface of E&I's larger scheme to exploit Mr. Wolfram's internal and external contacts and confidential information to expand E&I's U.S. switchgear operations and pilfer SAI's customers without any concern as to whether doing so breached the Non-Compete Agreement and Separation Agreement. Mr. Wolfram was required to provide E&I a copy of his employment agreements pursuant to Paragraph 5 of the Non-Compete Agreement and we presume that he did, thereby making E&I culpable and liable for all damages caused by his wrongful conduct.

    The circumstances and timing in which E&I secured the Portland and Silicon Valley projects from Stack Infrastructure, Inc. ("Stack"), as well as the MCC6 project from CloudHQ LLC ("Cloud") substantiates E&I's exploitation of Mr. Wolfram's personal relationships and contacts in furtherance of its business interests. Mr. Wolfram was SAI's primary point of contact with Stack, Holder Construction Group, LLC ("Holder"), and Cloud, and was intimately involved in preparing SAI's proposals for each of these projects prior to resigning and joining E&I. Notably, E&I was not listed as a switchgear provider on the initial and subsequent specifications for the Silicon Valley project, which would ordinarily foreclose any possibility of obtaining the equipment portion of the contract. Yet, that is exactly what happened and SAI was justifiably surprised when it was informed that the contract had been awarded to E&I. The fact that Mr. Wolfram left SAI and joined E&I in the period between SAI's proposals—and its award of the engineering portion of the Silicon Valley project—and E&I's unexpected receipt of each of these contracts strongly suggests that E&I has taken advantage of the confidential information and client relationship Mr. Wolfram developed at SAI to cultivate a new relationship with Stack, Holder, and Cloud; a blatant violation of both the Non-Solicitation Agreement and the Separation Agreement.

    It strains credulity to believe that E&I decided to pursue switchgear business with significant new customers (Stack and Cloud) without consulting with, receiving information from, or otherwise soliciting the assistance of the one person now in E&I's organization who had a business relationship with those customers—Shane Wolfram. This conduct not only exposes Mr. Wolfram to liability for monetary damages and injunctive relief for his breach of the Non-Compete Agreement and Separation Agreement, but subjects E&I to the same for, among other wrongful conduct, violation of the Illinois Deceptive Trade Practices Act, tortious interference with contract, and tortious interference with business relations. Moreover, E&I's knowledge of Mr. Wolfram's contractual obligations and willful inducement to breach those obligations is the precise degree of moral culpability that merits an award of punitive damages.

**<u>Demand to Cease and Desist</u>**

    On behalf of SAI, we demand that E&I immediately cease and desist from using Mr. Wolfram in any capacity for: (a) the solicitation of SAI employees; (b) further solicitation or contact, directly or indirectly, with the Restricted Customers; or (c) otherwise, directly or indirectly, causing a violation of the Non-Compete Agreement and Separation Agreement. E&I is obligated to abide by the restrictions in the Non-Compete Agreement and Separation Agreement for six months following the date Mr. Wolfram and E&I cease the illegal conduct.

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 3



Mr. Wolfram's breaches of the Non-Solicitation Agreement and the Separation Agreement in concert with E&I's knowledge and assistance of the same has caused SAI significant monetary damages, including but not limited to lost profits and lost business opportunities. Based upon the value of the contracts E&I has obtained through the wrongful contact with the Restricted Customers and use of SAI's confidential information–$14 million for the Stack Silicon Valley project, $20 million over two years for the Stack Portland project, and $3.9 million for the Cloud MCC6 project–SAI has easily sustained damages in excess of $10 million. These damages will continue to increase in the event that E&I does not take immediate corrective action. SAI reserves its right to seek injunctive relief and monetary damages against E&I for, among other things, violation of the Illinois Deceptive Trade Practices Act, tortious interference with contract, and tortious interference with prospective economic advantage, and to pursue any and all other rights and remedies available at law or in equity.

**Litigation Hold**

In light of SAI's claims and causes of action against E&I, we demand that E&I, and all of its employees, including but not limited to you and David Genson, agents, officers, shareholders, and others acting or purporting to act on its behalf, including counsel (collectively, the "Custodians") immediately take steps to ensure the preservation of all documents and information including, but not limited to, electronically-stored information ("ESI"), which is potentially relevant to SAI's claims and causes of action against E&I. E&I is required to preserve such information in accordance with this litigation hold letter.

Potentially relevant information includes paper records, emails, text messages, and other ESI that are in any way related to E&I and Mr. Wolfram's breach of the Non-Compete Agreement and the Separation Agreement, which include the following:

1.    All communications sent or received by Mr. Wolfram;

2.    All communications by the Custodians: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) which relate to either the Silicon Valley 02 Project or the MCC6 project;

3.    All notes and memoranda confirming, summarizing, or reflecting communications Mr. Wolfram had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

4.    All notes and memoranda confirming, summarizing or reflecting communications the Custodians had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 4



FILED DATE: 12/9/2020 2:57 PM   2020CH07179

     5.     All documents, including but not limited to, quotes, proposals, bids, solicitations, meeting requests, marketing materials, or advertisements sent by Mr. Wolfram or the Custodians to any of the Restricted Customers.

The timeframe for retention and preservation of the records is <u>January 1, 2019 to the present</u>.

In light of the foregoing, E&I must take the following affirmative steps to ensure that all documents and ESI potentially relevant are preserved:

     1.     Identify the people or entities who have or may have potentially relevant documents or ESI. E&I should promptly inform those people and entities of their possession of potentially relevant data and instruct them not to delete or alter any such information. If it is possible to segregate such information, that may be preferable. E&I should also inform appropriate system administrators and other information technology personnel of the necessity of preserving potentially relevant ESI.

     2.     Identify sources of potentially relevant documents and ESI and preserve them. When identifying sources of documents and ESI, E&I should bear in mind that such documents and data may include, but are not limited to, text files, spreadsheets, power points, e-mails, letters, faxes, notes, text messages, meeting agendas and minutes, memoranda, summaries, databases, calendar entries, data from accounting applications (i.e. QuickBooks files), video files, photographs, contact and relationship management data, computer system activity logs, internet usage files, network access information, backup and archival files, data compilations, electronically imaged documents and others. Be sure to identify and review all computers, network servers, removable media, handheld devices, tablets, smartphones, voice mail, and backup tapes which could contain potentially relevant information.

     3.     Make copies of any active files containing relevant data and preserve them separately. It is important to segregate relevant data because it will permit us to efficiently image or duplicate the data for discovery purposes at a later date.

     4.     If the Custodians use online, cloud storage, and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation.

     5.     Discontinue any automatic or routine features or protocols for deletion or modification of ESI in order to avoid the deletion or alteration of data potentially relevant to the Lawsuit. Examples of such automatic or routine features or protocols include, without limitation: (a) purging the contents of e-mail repositories by age, capacity, or other criteria; (b) using data or media wiping, disposal, erasure, or encryption utilities or devices; (c) overwriting, erasing, destroying or discarding back-up media; and (d) running antivirus or other programs effecting wholesale metadata alteration.

FILED DATE: 12/9/2020 2:57 PM    2020CH07179

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 5



*Please note that allowing potentially relevant documents or ESI to be destroyed or discarded can subject you to severe civil and/or criminal penalties. The possible sanctions include both monetary and litigation-specific penalties, such as a finding that the unavailable ESI would have been unfavorable to the defendants' position in any potential lawsuit*.

Sincerely,

ARONBERG GOLDGEHN DAVIS & GARMISA

By: _____
          Benjamin E. Haskin

Encl.
cc:    Jerry Holisky, Esq.
        David Martin

4830-3380-5518v2

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
2/3/2021 7:04 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12091724

SAI ADVANCED POWER
SOLUTIONS, INC.,

      Plaintiff,

  v.

SHANE WOLFRAM,

      Defendant,

and

E&I ENGINEERING CORPORATION

   Respondent in Discovery.

Case No. 2020 CH 07179

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

**DEFENDNAT SHANE WOLFRAM'S MOTION TO DISMISS**
**THE PLAINTIFF'S COMPLAINT PURSUNT TO SECTIONS 2-301 AND 2-619.1 OF**
**THE ILLINOIS CODE OF CIVIL PROCEDURE**

  Defendant, Shane Wolfram ("Wolfram"), submits this Motion to Dismiss the Complaint pursuant to Sections 2-301 and 2-619.1 of the Illinois Code of Civil Procedure. For reasons presented in Wolfram's concurrently-filed Memorandum of Law, Plaintiff SAI Advanced Power Solutions, Inc. has not alleged facts showing that it has standing or any valid claims, or that this Court has personal jurisdiction over Wolfram. Therefore, the Complaint should be dismissed with prejudice.

  WHEREFORE, Wolfram respectfully requests that the Complaint be dismissed in its entirety with prejudice. Wolfram further requests that this Court grant any other relief that it deems just and proper.

Dated: February 3, 2021

        Respectfully submitted,
        **SHANE WOLFRAM**

Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, 28th Floor
Chicago, IL 60601
(312) 527-4000
Firm No. 292143

        */s/ Daniel R. Saeedi*

FILED
2/3/2021 7:04 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12091724

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT / CHANCERY DIVISION**

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC. | |
| Plaintiff, | |
| v. | Case No.: 2020-CH-07179 |
| SHANE WOLFRAM | |
| Defendant, | |
| And | |
| E&I ENGINEERING CORPORATION, | |
| Respondent in Discovery | |

**DEFENDANT SHANE WOLFRAM'S MOTION FOR LEAVE TO FILE A
MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS AND IN
EXCESS OF 15 PAGES *INSTANTER***

Defendant, Shane Wolfram ("Wolfram"), seeks leave to file a memorandum of law in support of his motion to dismiss the Complaint, in excess of 15 Pages *Instanter*, for reasons stated below.

1.      The Motion to Dismiss raises important legal questions that likely will resolve this case entirely. These arguments include the following: (1) this Court lacks personal jurisdiction over Wolfram; (2) SAI lacks standing to bring its claims; (3) SAI's trade secrets claim fails to state a valid claim; and (4) SAI's breach of fiduciary duties claim is preempted by the Illinois Trade Secrets Act, or alternatively, is insufficiently pled.

2.      Given these important legal questions, Wolfram requires an additional five pages (for a total of 20 pages) to establish the factual and legal bases for his Motion to Dismiss. A copy of Wolfram's Memorandum in Support of his Motion to Dismiss is attached hereto as Exhibit A.

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

For the foregoing reasons, Defendant Wolfram respectfully ask for leave to file his memorandum in support of his motion to dismiss in excess of fifteen pages.

Dated: February 3, 2021                         Respectfully submitted,

                                                 SHANE WOLFRAM


                                                 /s/ Daniel R. Saeedi

Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, 28th Floor
Chicago, IL 60601
(312) 527-4000
Firm No. 292143

2

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT / CHANCERY DIVISION**

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC. | |
| Plaintiff, | |
| v. | Case No.: 2020-CH-07179 |
| SHANE WOLFRAM | |
| Defendant, | |
| And | |
| E&I ENGINEERING CORPORATION, | |
| Respondent in Discovery | |

**DEFENDANT SHANE WOLFRAM'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS COMPLAINT PURSUANT TO SECTIONS 2-301 AND 2-619 OF THE ILLINOIS CODE OF CIVIL PROCEURE**

28733696v1

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... I

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

I.     ALLEGATIONS IN THE COMPLAINT .......................................................... 2

II.    FACTS RELATING TO STANDING AND PERSONAL JURISDICTION .................. 3

LEGAL STANDARD .................................................................................................. 3

ARGUMENT ............................................................................................................ 4

I.     SAI'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 2-
301 BECAUSE THIS COURT LACKS JURISDICTION OVER WOLFRAM ............. 4

     A.    SAI Has Not Shown Sufficient Minimum Contacts By E&I With Illinois
For Specific Or General Jurisdiction To Exist Over E&I In Illinois ..................... 5

          1.    Wolfram's Contacts with Illinois Are Insufficient to Establish
General Jurisdiction Over E&I in Illinois ..................................... 5

          2.    Wolfram's Contacts with Illinois Are Insufficient to Establish
Specific Jurisdiction Over Wolfram in Illinois ........................... 5

     B.    SAI Has Not Shown That The Exercise Of Personal Jurisdiction Comports
With Fair Play And Substantial Justice ........................................... 6

II.    SAI'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 2-
619 BECAUSE SAI IS NOT QUALIFIED TO DO BUSINESS IN ILLINOIS
AND THERFORE LACKS STANDING TO BRING THIS ACTION .......................... 7

III.   SAI'S TRADE SECRETS CLAIM SHOULD BE DISMISSED PURSUANT TO
SECION 2-615 ............................................................................. 7

     A.    Count II Should Be Dismissed Pursuant to Section 2-615 because SAI Has
Not Alleged a Valid Trade Secret Under the ITSA ............................. 8

          1.    SAI has not sufficiently alleged information that "is sufficiently
secret to derive economic value, actual or potential, from not being
generally known to other persons who can obtain economic value
from its disclosure or use" ................................................... 8

          2.    SAI has not sufficiently alleged how it safeguards its trade secrets ........ 10

     B.    Pursuant to Section 2-615, Count II Should Be Dismissed because SAI
Has Not Alleged any Facts that show Actual Trade Secrets
Misappropriation ......................................................................... 12

          1.    SAI fails to identify which specific trade secrets were stolen ................. 13

          2.    SAI fails to allege the circumstances of a purported trade secrets
theft ................................................................................. 13

# TABLE OF CONTENTS
(continued)

Page

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

         3.     SAI does not allege that Defendants acted with "improper means." ....... 14

C.    Count II Should Be Dismissed Pursuant to Section 2-615 Because SAI Has Not Alleged that Wolfram Used any of SAI's Trade Secrets ...................... 14

D.    Alternatively, SAI's Trade Secrets Claim Fails Under Section 2-619 Because the ITSA does not Have Extra-Territorial Reach ................................. 14

IV.    SAI'S CLAIM FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED PURSUANT TO SECTION 2-615 ......................................................... 15

A.    SAI's Claim for Breach of Fiduciary Duty Is Preempted by the ITSA .............. 15

B.    SAI Has Failed to Adequately Plead Its Claim for Breach of Fiduciary Duty ...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Chiron Corp.*,
    1997 WL 208369 (N.D. Ill. Apr. 23, 1997) ...........................................................................20

*Abrasic 90 Inc. v. Weldcote Metals, Inc.*,
    364 F. Supp. 3d 888 (N.D. Ill. 2019) ..............................................................................21, 22

*Allied Benefit Sys., Inc. v. Ramirez*,
    188 F. Supp. 3d 704 (N.D. Ill. 2015) ...................................................................................19

*Alpha Sch. Bus Co., Inc. v. Wagner*,
    391 Ill. App. 3d 722 (2009) .......................................................................................... *passim*

*Arcor v. Haas*,
    363 Ill.App.3d 396, 842 N.E.2d 265 (2005) ........................................................................17

*C. Mfg. Co. v. Pure Fishing, Inc.*,
    392 F. Supp. 2d 1046 (N.D. Ill. 2005) .................................................................................13

*Carpenter v. Aspen Search Advisers, LLC*,
    10 C 6823, 2011 WL 1297733 (N.D. Ill. Apr. 5, 2011) ...................................................15, 22

*Commerce Tr. Co. v. Air 1st Aviation Cos., Inc.*,
    366 Ill. App. 3d 135 (2006) .................................................................................................10

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).......................................................................................................10, 11

*Fleetwood Packaging v. Hein*,
    No. 14 C 09670, 2015 WL 6164957 (N.D. Ill. Oct. 20, 2015) ........................................15, 20

*GlobalTap LLC v. Elkay Mfg. Co.*,
    No. 13 C 632, 2015 WL 94235 (N.D. Ill. Jan. 5, 2015) ........................................................15

*Graham v. Gen. U.S. Grant Post No. 2665, V. F. W.*,
    43 Ill. 2d 1 (1969) ...............................................................................................................20

*Hadley v. Doe*,
    2015 IL 118000......................................................................................................................10

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..............................................................................................................12

iii

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

*Inventus Power, Inc. v. Shenzhen Ace Battery Co.*,
  No. 20-CV-3375, 2020 WL 3960451 (N.D. Ill. July 13, 2020).............................................21

*JMP-Newcor Int'l, Inc. v.Sourcing Sol., Inc.*,
  1996 WL 754131 (N.D. Ill. Dec. 31, 1996) ...................................................................15

*Jovanovich v. Ind. Harbor Belt R.R. Co.*,
  2020 IL App (1st) 192550-U .....................................................................................11

*Kean v. Wal-Mart Stores, Inc.*,
  235 Ill. 2d 351 (2009) ............................................................................................10

*Label Printers v. Pflug*,
  206 Ill. App. 3d 483 (1991*)* ...................................................................................16

*Lear Siegler, Inc. v. Glass Plastics Corp.*,
  1987 WL 15749 (N.D. Ill. August 12, 1987)................................................................15

*Merrilees v. Merrilees*,
  2013 IL App (1st) 121897.........................................................................................10

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
  436 F. Supp. 3d 1150 (N.D. Ill. 2020) ........................................................................20

*Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*,
  17 C 923, 2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) ............................................17, 18

*Segerdahl Corp. v. Ferruzza*,
  No. 17 C 3015, 2018 WL 828062 (N.D. Ill. Feb. 10, 2018)....................................15, 19

*Sheikholeslam v. Favreau*,
  2019 IL App (1st) 181703...........................................................................................9

*Spartan Motors, Inc. v. Lube Power, Inc.*,
  337 Ill. App. 3d 556 (2003) ..................................................................................10, 11

*Starsurgical, Inc. v. Aperta, LLC*,
  40 F.Supp.3d 1069 (E.D. Wis. 2014).........................................................................18

*Stenstrom Pet. Servs. Grp., Inc. v. Mesch*,
  375 Ill. App. 3d 1077 (2007) ...................................................................................16

*Sys. Dev. Servs., Inc. v. Haarman*,
  389 Ill. App. 3d 561 (2009) .....................................................................................15

*Thermal Zone Products Corp. v. Echo Eng., Ltd.*,
  No. 93 C 556, 1993 WL 358148 (N.D. Ill. Sept. 4, 1993)...........................................15

28733696v1

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

*Thomas & Betts Corp. v. Panduit Corp.*,
  108 F. Supp. 2d 968 (N.D. Ill. 2000) ...................................................................22

*Tower Commc'ns Expert, LLC v. TSC Constr., LLC*,
  No. 18 C 2903, 2018 WL 5624268 (N.D. Ill. Oct. 30, 2018) ...........................11, 12

*Trailer Leasing Co. v. Assoc. Com. Corp.*,
  1996 WL 450801 (N.D. Ill. Aug.8, 1996) ............................................................16

*Woodard v. Harrison*,
  2008 WL 4724370 (C.D. Ill. Oct. 24, 2008).........................................................20

**Statutes**

765 ILCS 1065/2(a) ...................................................................................................18

765 ILCS 1065/2(b) ...................................................................................................18

765 ILCS 1065/2(d) .......................................................................................14, 16, 17

Code Sections 2-301, 2-615 and 2-619 .......................................................................9

Ill. Comp. Stat. Ann. 5/2-301 ......................................................................................9

Ill. Comp. Stat. Ann. 5/13.70 .....................................................................................13

Illinois Code of Civil Procedure Section 2-619.1 .......................................................7

Illinois Trade Secrets Act............................................................................................7

ITSA ...................................................................................................................*passim*

ITSA.  First ...............................................................................................................21

**Suspects**

Section 2-301 ......................................................................................................9, 10

section 2-615 ......................................................................................................*passim*

Section 2-619 ...........................................................................................10, 13, 20

*Id.* at ¶¶4-5 .................................................................................................................11

*Id.* at ¶6 ......................................................................................................................11

480 U.S. at 113.............................................................................................................12

§1  17

28733696v1

Defendant Shane Wolfram ("Wolfram"), pursuant to Section 2-619.1 of the Illinois Code of Civil Procedure (the "Code") moves to dismiss Plaintiff SAI Advanced Power Solutions, Inc.'s ("SAI") Complaint for the reasons set forth below.

## INTRODUCTION

SAI seeks to prevent Wolfram from pursuing his livelihood and seeking a fresh start with E&I, his new employer, despite Wolfram giving SAI almost a decade of loyalty and dedicated work. In order to accomplish this goal, SAI has brought allegations under the Illinois Trade Secrets Act ("ITSA"), despite failing to sufficiently describe the existence of a trade secret, any allegations of misappropriation, or actual use. Thus, at its heart, SAI's case is one that seeks to enforce a burdensome non-compete against Wolfram, which is disfavored in Illinois, and this Court should reject any attempt by SAI to disguise this reality with other thinly-pled claims, such as "trade secret misappropriation" or a "breach of fiduciary duties."

As an initial matter, SAI's claims should be dismissed because it is not registered with the Secretary of State to do business in Illinois. And, even if SAI cured this deficiency, its claims still fail. This Court lacks personal jurisdiction over Wolfram, who is, and has been a Wisconsin resident at all relevant times, and the projects alleged in SAI's Complaint are not occurring in Illinois. Regarding its ITSA claim, the Complaint fails to allege actual facts showing the existence of a trade secret that has actually been misappropriated, and SAI's conclusions regarding the ITSA's elements should be disregarded. Furthermore, SAI's breach of fiduciary duties claim is preempted by the ITSA, and, alternatively, fails to state a valid claim. Finally, as this Court analyzes the above arguments, it should keep in mind that SAI waited to sue almost *seven months* after Wolfram resigned from SAI, and well after he started working for E&I. Wolfram now

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

attempts to move on with his life, and this Court should reject SAI's deficiently-alleged claims and allow him to do so.

## FACTUAL BACKGROUND

### I.     Allegations in the Complaint.

SAI designs, manufactures, and supplies electrical switchgear.  Complaint ¶7.  It hired Wolfram as Vice President of Sales in August 2011.  *Id.* at ¶9.  Wolfram signed the Agreement, a copy of which is attached to SAI's Complaint, nearly a year later, on July 25, 2012.  *Id.* at ¶15.

On October 2, 2019, SAI submitted a proposal to Holder Construction, LLC ("Holder") for SAI to supply switchgear for a data center located in Silicon Valley for Stack, Inc. (the "Stack SV Project").  In February 2020, SAI learned it was awarded the Stack SV Project.  *Id.* at ¶¶22, 24, 26.  In April and May 2020, SAI submitted proposals to supply switchgear for data centers in Manassas, Virginia (the "Cloud Manassas Project") and Portland, Oregon (the "Stack Portland Project").  Compl. ¶¶31-36.  E&I Engineering Corporation ("E&I") was awarded the Cloud Manassas Project, the Stack Portland Project, and the Stack SV Project.  *Id.* at ¶¶57, 67, 70.

On May 15, 2020, Wolfram tendered his resignation from SAI, effective May 29, 2020. *Id.* at ¶38.  On May 28, 2020, Wolfram and SAI executed a separation agreement (the "Separation Agreement") which is attached to SAI's Complaint.  *Id.* at ¶41.  The Separation Agreement expressly provides that **SAI "agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group)** . . ."  Exh. B to Complaint (emphasis added). Wolfram went to work for E&I Engineering Corporation ("E&I").  *Id.* at ¶40. SAI alleges that "Wolfram is believed to have used or otherwise relied upon SAI's Confidential Information, including, but not limited to, the pricing, structure, and specification of SAI's bid for the Cloud Manassas Project in making or otherwise discussing E&I's proposal for the Cloud Manassas Project."  Complaint ¶56.  It further alleges that "Wolfram was instrumental in obtaining

2

the Stack Portland Project by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack on behalf of E&I and using or relating upon Confidential Information, including SAI's pricing and structure for the Stack Portland Project." *Id.* at ¶68. SAI makes identical allegations regarding the Stack SV Project. *See id.* at ¶72.

## II.    Facts Relating to Standing and Personal Jurisdiction.

SAI is a Wisconsin corporation. *See* SAI Corporate Documents filed with the Wisconsin Department of Financial Institutions, attached hereto as **Exhibit 1**. Although it alleges that its principal place of business is in Illinois, *see* Compl. ¶3, SAI is not registered to do business in Illinois.

Wolfram is and has been citizen and resident of Wisconsin his entire life with the exception of a three year period from 1999 to 2002, when he lived in Illinois. Wolfram Affidavit at ¶2, attached hereto as **Exhibit 2**. He does not own any real or personal property in Illinois. *Id.* at ¶3. Wolfram does not have any offices, statutory agents, telephone listings, mailing addresses, licenses, or other operations in Illinois. *Id.* at ¶¶4-5. He has not paid any income taxes in Illinois since 2002. *Id.* at ¶6. Also, he has not been involved with procuring any of the Projects alleged in the Complaint, or providing E&I with any information relating to those Projects. *Id.* at ¶¶7-8.

## LEGAL STANDARD

Wolfram brings this Motion pursuant to Sections 2-301, 2-615 and 2-619 of the Code. Section 2-301 provides that "[i]n disposing of a motion objecting to the court's jurisdiction over the person of the objecting party, the court shall consider all matters apparent from the papers on file in the case, affidavits submitted by any party, and any evidence adduced upon contested issues of fact." 735 Ill. Comp. Stat. Ann. 5/2-301. SAI bears the burden of making a *prima facie* of personal jurisdiction, which the defendant may overcome by offering uncontradicted evidence that defeats jurisdiction. *Sheikholeslam v. Favreau*, 2019 IL App (1st) 181703, ¶ 17.

3

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

A section 2-615 motion to dismiss "tests the legal sufficiency of a complaint." *Hadley v. Doe*, 2015 IL 118000, ¶ 29. The "plaintiff must allege facts—not simply conclusions—sufficient to bring a claim within a legally recognized cause of action." *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 14. Conclusory factual allegations are not deemed admitted. *Alpha Sch. Bus Co., Inc. v. Wagner*, 391 Ill. App. 3d 722, 735 (2009).

A motion for involuntary dismissal under Section 2-619 admits the legal sufficiency of the complaint, admits all well-pleaded facts and reasonable inferences there from, and asserts that an "affirmative matter" outside the complaint bars or defeats the cause of action asserted. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009).

## ARGUMENT

## I.   SAI'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 2-301 BECAUSE THIS COURT LACKS JURISDICTION OVER WOLFRAM.

Illinois courts have held that the long-arm statute extends to the limits of due process and, therefore, Illinois Courts evaluate whether exercising personal jurisdiction would comport with due process under the Illinois and United States Constitutions. *See Commerce Tr. Co. v. Air 1st Aviation Cos., Inc.*, 366 Ill. App. 3d 135, 140-41 (2006). Federal due process requires that Wolfram must have certain "'minimum contacts' with the forum state such that maintaining the suit there does not offend 'traditional notions of fair play and substantial justice.'" *Spartan Motors, Inc. v. Lube Power, Inc.*, 337 Ill. App. 3d 556, 560 (2003) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction can be either specific or general. *Daimler AG v. Bauman,* 571 U.S. 117 (2014).

4

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

A.    **SAI Has Not Shown Sufficient Minimum Contacts By E&I With Illinois For Specific Or General Jurisdiction To Exist Over E&I In Illinois.**

1.    **Wolfram's Contacts with Illinois Are Insufficient to Establish General Jurisdiction Over E&I in Illinois.**

Wolfram is a Wisconsin resident who has never lived or owned real property in Illinois. Ex. B, ¶¶2-3. He does not have any offices, statutory agents, telephone listings, mailing addresses, bank accounts, licenses, or other operations in Illinois. *Id.* at ¶¶4-5. He has not generated any revenues or paid income taxes in Illinois. *Id.* at ¶6. Clearly, Wolfram is not subject to general jurisdiction in Illinois. *See Jovanovich v. Ind. Harbor Belt R.R. Co.*, 2020 IL App (1st) 192550-U, ¶ 40-41 ("the defendants contacts must be 'so continuous and systematic as to render [it] essentially at home in the forum State.'"); *Daimler AG*, 571 U.S. at 137 ("'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).

2.    **Wolfram's Contacts with Illinois Are Insufficient to Establish Specific Jurisdiction Over Wolfram in Illinois.**

For a court to exercise specific jurisdiction over a defendant, the suit must "directly arise out of the contacts between the defendant and the forum." *Spartan Motors*, 337 Ill.App.3d at 561. Instructive is the nearly on point case of *Tower Commc'ns Expert, LLC v. TSC Constr., LLC*, No. 18 C 2903, 2018 WL 5624268, at *1 (N.D. Ill. Oct. 30, 2018). In *Tower*, a company headquartered in Illinois alleged that its former employees misappropriated confidential information and trade secrets, and solicited contractors and employees in violation of employment agreements. *Id.* at *1. The Court found that the defendants lacked sufficient minimum contacts with Illinois to establish personal jurisdiction because the project at issue was located in North and South Carolina and the former employees had not lived in Illinois for many years. *Id.* at *6 & *10. It was not enough that the employees contracted with a company (the plaintiff) headquartered in Illinois and the contract

28733696v1

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

called for Illinois law. *Id.* at \*6.  Nor was it enough that an Illinois resident allegedly sent the plaintiff's computer files from an Illinois computer to one of the former employees, *see id.* at \*8, or that the plaintiff suffered an injury in Illinois.  *See id.* at \*7.

Just as in *Tower*, "[t]his case involves Defendants and a project located outside of Illinois such that [Wolfram] did not 'purposefully avail' [himself] 'of the privilege of conducting business in Illinois.'"  *Id.* at \*6.  None of the Projects at issue are located in Illinois. (Compl. ¶¶ 22, 31, & 34; Genson Aff. ¶¶ 3-5, attached hereto as **Exhibit 3**.)  They are located across the country – in California, Virginia, and Oregon.  *Id.*  Wolfram was not involved in any of these Projects anyway. Wolfram Aff. at ¶8.  For all of these reasons, there is no specific jurisdiction over Wolfram in Illinois.

**B.**     **SAI Has Not Shown That The Exercise Of Personal Jurisdiction Comports With Fair Play And Substantial Justice.**

Even if there were sufficient minimum contacts (which there are not), the court lacks personal jurisdiction over Wolfram because the exercise of personal jurisdiction does not comport with fair play and substantial justice.  *See International Shoe*, 326 U.S. at 316; *Asahi Metal Industry*, 480 U.S. at 113.  Wolfram and SAI are both Wisconsin residents. SAI is not even registered to do business in Illinois.  Litigating this case by a Wisconsin company against a Wisconsin resident in Illinois State Court would not be efficient or in furtherance of Illinois' interests.  *See Tower*, 2018 WL 5624268, at \*9.  Moreover, since Wolfram is not in Illinois and has no offices in Illinois, the burden on Wolfram to litigate in Illinois would be significant. *See id.*  For these reasons, there is no personal jurisdiction over Wolfram and SAI's Summons and Complaint against Wolfram be dismissed.

6

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

## II.   SAI'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 2-619 BECAUSE SAI IS NOT QUALIFIED TO DO BUSINESS IN ILLINOIS AND THERFORE LACKS STANDING TO BRING THIS ACTION.

As an initial matter, SAI has failed to register with the Illinois Secretary of State.  For this reason, the Complaint in its entirety must be dismissed.  *See* 805 Ill. Comp. Stat. Ann. 5/13.70. ("No foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority."); *see also C. Mfg. Co. v. Pure Fishing, Inc.,* 392 F. Supp. 2d 1046, 1047 (N.D. Ill. 2005) (dismissing claims brought by entity that had not registered to do business with Illinois).

Here, SAI is a foreign corporation within the meaning of 805 Ill. Comp. Stat. Ann. 5/13.70 because it is organized and existing under the laws of Wisconsin.  *See* Ex. 1.  It has transacted business in Illinois, as shown by the corporate records listing an Illinois address as its "Principal Office," *see id.*, and the allegation in the Complaint that SAI's principal place of business is in Illinois.  *See* Complaint at ¶3.  However, SAI has not registered to do business with Illinois as required by 805 Ill. Comp. Stat. Ann. 5/13.70.  Consequently, its claims must be dismissed.

## III.   SAI'S TRADE SECRETS CLAIM SHOULD BE DISMISSED PURSUANT TO SECION 2-615.

SAI's trade secrets claim (Count II) should be dismissed on the additional grounds that SAI has failed to properly plead this claim.  To state a cause of action for misappropriation of trade secrets under the ITSA, "a plaintiff must allege facts that the information at issue was: (1) a trade secret; (2) that was misappropriated; and (3) used in the defendant's business." *Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 740 (1st Dist. 2009).

Here, SAI has not sufficiently alleged a valid trade secret under the ITSA, how it safeguards its purported trade secrets, nor has SAI alleged any facts showing that Wolfram misappropriated any trade secrets, let alone used them in E&I's business. And, to the extent that SAI actually alleges

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

a valid claim, Count II nevertheless fails because the purported wrongful acts all occurred outside of Illinois and the ITSA does not have extraterritorial reach. Thus, Count II should be dismissed.

### A.    Count II Should Be Dismissed Pursuant to Section 2-615 because SAI Has Not Alleged a Valid Trade Secret Under the ITSA.

To establish a trade secret, the ITSA requires that Plaintiffs point to a specific type of information that: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).  SAI has not sufficiently pled either of these elements.

### 1.    SAI has not sufficiently alleged information that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use"

It is not clear what SAI alleges to be the "trade secret" at issue in this case.  SAI alleges that Wolfram "misappropriated, used, and/or disclosed the Confidential Information," that its "Confidential Information" derives independent economic value from not being generally known or readily ascertainable, and that SAI has made reasonable efforts to preserve the secrecy of its "Confidential Information." Compl. ¶¶90-91. SAI's Complaint defines "Confidential Information" as "SAI's confidential and proprietary business information."  Complaint ¶11.  It alleges that the Confidential Information "consists of, among other things," customer contact information, pricing, "business/marketing plans and strategies," "existing and in-development products," profit margins and financial information, and compensation that is paid to employees (hereafter the "Listed Categories"). *Id.* at ¶¶11, 89.  SAI asserts that the Confidential Information "contains protectable trade secrets," but does not identify what those trade secrets are.  It does not even allege that the Listed Categories constitute trade secrets or meet the definition of a trade secret.  Even if it did, these allegations would still be insufficient to plead the existence of a trade secret. *See Alpha Sch.*

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

*Bus Co., Inc,* 391 Ill. App. 3d at 741 ("a vague mention of computer information cannot reasonably be considered a well-pleaded fact" to allege a trade secret under the ILSA).[1]

Furthermore, contact information is not a trade secret since such information is easily ascertainable from the internet, and SAI has not alleged any information regarding how the information was compiled.  See *Alpha Sch. Bus*, 391 Ill. App. 3d at 741 (dismissing complaint because client contact information did not meet the definition of a trade secret); *Sys. Dev. Servs., Inc. v. Haarman*, 389 Ill. App. 3d 561, 575 (2009) ("Locating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information."); *Fleetwood Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, *4 (N.D. Ill. Oct. 20, 2015) (dismissing allegations that customer lists and contribution reports were trade secrets and noting that the plaintiff "has not provided a single detail about how it built the customer list and, more importantly, what steps it takes to keep its customer contacts secret.").

Regarding pricing, SAI has not identified or even generally described any formula or other calculation methods that warrant protection.  Nor has SAI alleged that customers were restricted from disclosing SAI pricing.  The pricing, therefore, is not trade secret.  See *JMP-Newcor Int'l, Inc. v.Sourcing Sol., Inc.,* 1996 WL 754131, at *1 (N.D. Ill. Dec. 31, 1996) ("Additionally, plaintiff has not established how disclosure of information about the identity of the manufacturers and the

---

[1] *See also Carpenter v. Aspen Search Advisers, LLC*, 10 C 6823, 2011 WL 1297733, at *3 (N.D. Ill. Apr. 5, 2011) (dismissing complaint because the plaintiff only alleged broad categories of information as trade secrets); *Segerdahl Corp. v. Ferruzza*, No. 17 C 3015, 2018 WL 828062, at *3 (N.D. Ill. Feb. 10, 2018) (dismissing complaint where the plaintiff only alleged broad areas of technology as trade secrets); *Thermal Zone Products Corp. v. Echo Eng., Ltd.*, No. 93 C 556, 1993 WL 358148, at *5 (N.D. Ill. Sept. 4, 1993) (dismissing complaint that merely referenced "plans" and "specifications" because such "blanket generalizations . . .failed to specify with any exactitude which pieces of information actually constitute trade secrets."); *Lear Siegler, Inc. v. Glass Plastics Corp.*, 1987 WL 15749 (N.D. Ill. August 12, 1987) (granting summary judgment where "Plaintiff's lack of specificity concerning the marketing information it alleges constitutes trade secrets is fatal to that claim"); *GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015 WL 94235, at *6 (N.D. Ill. Jan. 5, 2015) ("The court cannot analyze whether a piece of information was sufficiently secret to derive economic value or whether [the plaintiff] took reasonable efforts to keep information secret without first knowing, with particularity, what information comprises the secret.").

28733696v1

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

price structure for the products enables a competitor to obtain economic advantage or value."); *Label Printers v. Pflug,* 206 Ill. App. 3d 483, 496 (1991*)* (refusing to protect pricing information); *Trailer Leasing Co. v. Assoc. Com. Corp.,* 1996 WL 450801, at *1 (N.D. Ill. Aug.8, 1996).

Regrading SAI's "business/marketing plans and strategies," SAI's description is so vague as to be completely meaningless, and clearly cannot be considered a well-pleaded fact. *See Alpha Sch. Bus Co., Inc,* 391 Ill. App. 3d at 741.

The "existing and in-development products" also are not trade secrets. Products are not "information" and, therefore, could not fit the definition of a trade secret. *See* 765 ILCS 1065/2(d). Moreover, products are sold to the public domain and can often be reverse engineered, facts that eliminate any trade secret protection under the ITSA. Underscoring this point, SAI's website even includes a technical library that contains documents regarding its products.

Similarly, profit margins generally are not trade secrets. *See Stenstrom Pet. Servs. Grp., Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1093 (2007) ("We reject [plaintiff's] argument that its profit margin is a trade secret. The mere knowledge of the profit desired by an employer does not constitute a trade secret."). And, compensation that is paid to employees are not trade secrets, since such information could always be shared by employees. Thus, SAI's attempt to regulate against the ability of employees to communicate such information could violate labor laws. For these reasons, SAI's trade secrets claim should be dismissed.

### 2.      SAI has not sufficiently alleged how it safeguards its trade secrets.

SAI also has failed to sufficiently allege that the alleged trade secret(s) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). SAI alleges merely that employees with access to Confidential Information are required to sign an employment agreement that includes confidentiality, non-solicitation, and non-

competition provision, and that SAI restricts access to its electronically stored Confidential Information with individualized logins and passwords. Complaint ¶91.

However, Wolfram, who was hired as SAI's VP of Sales, was not required to sign such an agreement until nearly a year after he started with E&I. *See id.* at ¶¶9, 15. The face of the Agreement itself acknowledges that Wolfram previously had access to Confidential Information. *See* Agreement at §1. Moreover, even assuming (for purposes of this motion) that the Agreement is enforceable, Illinois law is clear that requiring confidentiality agreements, without more, is insufficient to meet the reasonableness standard of 765 ILCS 1065/2(d). *See Arcor v. Haas*, 363 Ill.App.3d 396, 842 N.E.2d 265, 271 (2005) (holding trial court abused its discretion in granting a preliminary injunction when trade secret holder relied solely on a confidentiality agreement to protect its information); *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 17 C 923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018) ("While 'an agreement restricting the use of information may be considered a reasonable step to maintain secrecy of a trade secret,' such an agreement, without more, is not enough.") (quoting *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 851 (N.D. Ill. 2011)).

Moreover, SAI's allegation that it restricted access to "its electronically stored Confidential Information with individualized logins and passwords" is not sufficient, even combined with the allegation of requiring confidentiality agreements. For one thing, the allegation itself is limited only to "electronically stored Confidential Information," but such measure clearly does not prohibit non-electronically stored information, and there is no allegation that any of the Confidential Information is only stored electronically. Even if this password protection applied to all of the Confidential Information, this allegation would still be insufficient because password protection is nothing more than "normal practices insufficient to meet the statutory definition of

11

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

trade secrets." *Opus Fund Services*, 2018 WL 1156246, at *3; *see also Starsurgical, Inc. v. Aperta, LLC*, 40 F.Supp.3d 1069, 1082 (E.D. Wis. 2014) (noting that "normal business practices like restricting access and requiring passwords" were not enough for trade secret protection).

For example, in *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, the plaintiff alleged that "[i]n addition to storing this information on a password protected and restricted network, [the plaintiff] has also sought to protect its confidential nature by limiting its employees' use of the information through Confidentiality Agreements prohibiting the disclosure of such information to third parties."  2018 WL 1156246, at *3.  The Court agreed with the defendants' argument that these security practices "are normal business practices insufficient to meet the statutory definition of trade secrets" and granted the defendants' motion to dismiss.  *Id.* The Court explained that the plaintiff failed "to differentiate its protective measures for the alleged proprietary trade secrets from those imposed on any other corporate information."  *See id.*

The allegations here fare no better than the allegations in *Opus Fund Services*. Consequently, SAI's trade secrets claim should be dismissed for this additional reason.

**B.       Pursuant to Section 2-615, Count II Should Be Dismissed because SAI Has Not Alleged any Facts that show Actual Trade Secrets Misappropriation.**

Even if Count II alleged valid trade secrets, it would still fail because it does not sufficiently allege the second prong of a misappropriation claim under the ITSA: the actual "misappropriation." The ITSA defines "misappropriation" as the unauthorized acquisition or disclosure of a trade secret with the knowledge that it was acquired with "improper means." *See* 765 ILCS 1065/2(b). "Improper means" under ITSA denotes an egregious act that is more than negligence, and instead rises to the level of "theft," "bribery," "misrepresentation," "breach" of a fiduciary "duty to maintain secrecy," or "espionage."  *See* 765 ILCS 1065/2(a).  Here, the Complaint suffers from three deficiencies: (1) it does not identify the specific trade secrets that

12

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

were actually stolen; (2) it does not provide any facts stating when, where, or how Wolfram conducted his theft; and (3) it does not allege how Wolfram acted with "improper means."

### 1. SAI fails to identify which specific trade secrets were stolen.

As set forth above, the Complaint contains an overly broad definition of "Confidential Information" that allegedly includes, but is not limited to, several categories of information. These allegations are irrelevant. The fact that SAI claims it has trade secrets is not something unique, as most businesses claim the same. Rather, to sustain an ITSA claim, SAI must allege the specific trade secrets that are the subject of any alleged theft. SAI's failure to connect the dots requires dismissal. *See Segerdahl Corp.*, 2018 WL 828062, at *3 ("Although [the plaintiff] makes more definite allegations of what constitutes trade secrets elsewhere in the complaint, none of those allegations relate to the alleged misappropriation by [the defendant]"); *Allied Benefit Sys., Inc. v. Ramirez*, 188 F. Supp. 3d 704, 707 (N.D. Ill. 2015) (dismissing complaint where the plaintiff could not identify any information actually disclosed or used).

### 2. SAI fails to allege the circumstances of a purported trade secrets theft.

The Complaint also does not allege any facts describing when, where, or how Wolfram stole any of SAI's trade secrets. This omission is glaring, given the time and opportunity SAI has had to prepare its case. There are no allegations of theft by Wolfram. According to SAI's timeline, Mr. Wolfram gave his notice of resignation on May 15, 2020, and his last day of work for SAI was on May 29, 2020. Compl. ¶ 38. SAI filed this lawsuit on December 9, 2020, over 6 months after Wolfram resigned. Despite this lengthy amount of time, SAI has not been able to come up with any facts showing how Wolfram stole such secrets. There are no allegations of nefarious downloads or covert acts. In fact, SAI does not even allege that it conducted a forensic examination of any of its electronic devices to determine whether information was improperly downloaded, forwarded or otherwise retained by Mr. Wolfram. Or, more likely given the timeline,

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

SAI took this step and found nothing of note. Either way, the failure to conduct or reference an adequate forensic investigation or the factual basis for any purported theft is itself a reason to foreclose relief under the ITSA. *See, e.g., Hein*, 2014 WL 7146439, at *7.

### 3.      SAI does not allege that Defendants acted with "improper means."

Finally, SAI has not alleged the requisite mens rea that the ITSA requires, i.e., that Wolfram stole its trade secrets with "improper means." As noted above, "improper means" under the ITSA means that one has committed a nefarious act, and any allegation of such wrongful intent and conduct must be couched in actual facts. Here, SAI cannot point to any factual event that supports such an inference. The fact that Wolfram left SAI and went to work for E&I is not enough to support the notion that Wolfram has acted with wrongful intent.

### C.      Count II Should Be Dismissed Pursuant to Section 2-615 Because SAI Has Not Alleged that Wolfram Used any of SAI's Trade Secrets.

The ITSA also requires a plaintiff to allege that the defendant is actually using the plaintiff's trade secrets. SAI merely speculates as to use. *See* Compl. ¶¶2, 68, 72, 76, 93. SAI's conclusions are insufficient. *See Alpha Sch.*, 391 Ill. App. 3d at 746 (dismissing trade secrets claim for failure to allege actual use); *Woodard v. Harrison*, 2008 WL 4724370, at *3 (C.D. Ill. Oct. 24, 2008) (same); *Abbott Labs. v. Chiron Corp.*, 1997 WL 208369, at *3 (N.D. Ill. Apr. 23, 1997) (same). Moreover, SAI has not alleged an inevitable disclosure theory of misappropriation.

### D.      Alternatively, SAI's Trade Secrets Claim Fails Under Section 2-619 Because the ITSA does not Have Extra-Territorial Reach.

Finally, even if SAI had adequately pled an ITSA claim, which it has not, Count II still fails under Section 2-619, because the ITSA, an Illinois statute, does not have extra-territorial reach and cannot be applied to actions occurring outside of Illinois. *See Graham v. Gen. U.S. Grant Post No. 2665, V. F. W.*, 43 Ill. 2d 1, 6 (1969) ("when a statute ... is silent as to extraterritorial effect, there is a presumption that it has none."); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

436 F. Supp. 3d 1150, 1168 (N.D. Ill. 2020) (holding that the ITSA does not have extra-territorial effect); *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-CV-3375, 2020 WL 3960451, at *8 (N.D. Ill. July 13, 2020) (holding the same where plaintiff did not show that "the circumstances relevant to the claim. . . . occurred primarily and substantially in Illinois."). SAI is a Wisconsin corporation, Wolfram is a Wisconsin resident, E&I is a South Carolina corporation, and the projects at issue were located in Virginia, Oregon, and California. *See* Compl. at ¶¶3-5. 22, 31, 34, 43. As such, SAI has not adequately alleged facts that would demonstrate that the ITSA applies in this case, and, therefore, this claim should be dismissed for this additional reason.

## IV. SAI'S CLAIM FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED PURSUANT TO SECTION 2-615.

### A. SAI's Claim for Breach of Fiduciary Duty Is Preempted by the ITSA.

"State law causes of action that are based upon the misappropriation of confidential business information are preempted by ITSA . . . even when the information does not rise to the level of a trade secret." *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 905 (N.D. Ill. 2019). "To the extent that [the plaintiff]'s state law theories of liability are premised on conduct other than the misappropriation of [the plaintiff]'s confidential business information, however, they are not preempted." *Id.* "'[T]he crux of the [preemption] question [is] whether the claim would lie if the information at issue were not confidential.'" *Id.* (quoting *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F.Supp.3d 790, 802 (N.D. Ill. 2016)).

Here, the claim for breach of fiduciary duty is preempted by the ITSA. First, SAI incorporated all of its preceding allegations into its claim for breach of fiduciary duty, including the ITSA claim. *See* Comp. ¶98. Thus, the breach of fiduciary duty claim rests on the same allegations as the ITSA.

28733696v1

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

Moreover, SAI alleges that Wolfram breached a fiduciary duty owed to SAI by "disclosing SAI Confidential Information to E&I without authorization . . ." *Id.* at ¶100; *see also id.* at ¶43. This is the same "Confidential Information" that is alleged in the ITSA claim. *See id.* at ¶¶89-96. There would be no claim for breach of fiduciary duty if the information were not confidential. *See Abrasic 90 Inc.*, 364 F. Supp. 3d at 906 (finding breach of fiduciary duty claim was preempted by the ITSA and noting that "[i]f the information at issue were not confidential—that is, if [the plaintiff] had posted all of the information at issue on its website for the general public's consumption—then it is difficult to imagine how the defendants could be said to have . . . breached the fiduciary duty they owed to [the plaintiff] by copying and referencing the information just as any other member of the public could.").

For these reasons, the claim for breach of fiduciary duty is preempted by the ITSA and should be dismissed. *See Abrasic 90 Inc.*, 364 F. Supp. 3d at 906 (dismissing claim for breach of fiduciary duty as preempted by the ITSA); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968 (N.D. Ill. 2000) (same); *Carpenter*, 2011 WL 1297733, at *2 (same).

### B.     SAI Has Failed to Adequately Plead Its Claim for Breach of Fiduciary Duty.

The breach of fiduciary duty claim should also fail for the additional reason that it is supported by vague and conclusory allegations, rather than specific facts. The only allegations regarding acts taken prior to Wolfram's resignation are that Wolfram spoke with E&I back in January 2020, and that "SAI's review of Wolfram's SAI issued phone also identified numerous calls from Wolfram to Cloud almost immediately after Wolfram spoke to E&I." Comp. ¶¶42, 44. SAI then alleges that it "believes" Wolfram 1) shared Confidential Information with E&I during phone conversations prior to his resignation from SAI, and 2) contacted Cloud to promote E&I's switchgear proposals over SAI. *Id.* at ¶¶43, 45. However, SAI does not allege the substance of

16

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

these calls (because it does not actually know the substance), nor does it point to any exchange of documents between Wolfram and E&I while Wolfram was still employed with SAI.

Neither of the actual facts alleged by SAI are actionable.  The other allegations are nothing more than SAI's unsupported beliefs.  These allegations do not survive Illinois fact pleading requirements, and should be dismissed.

Dated: February 3, 2021

Respectfully submitted,

**SHANE WOLFRAM**

*/s/ Daniel R. Saeedi*

Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, 28th Floor
Chicago, IL 60601
(312) 527-4000
Firm No. 292143

17

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# EXHIBIT 1

DFI/CORP/38
RECORD 2011

United States of America

State of Wisconsin



## DEPARTMENT OF FINANCIAL INSTITUTIONS

**To All to Whom These Presents Shall Come, Greeting:**

    I, Patti Epstein, Administrator, Division of Corporate and Consumer Services, Department of Financial Institutions, do hereby certify that the annexed copy has been compared by me with the record on file in the Corporation Section of the Division of Corporate & Consumer Services of this department and that the same is a true copy thereof and the whole of such record; and that I am the legal custodian of said record, and that this certification is in due form.



    IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the official seal of the Department.

*Patti Epstein*

PATTI EPSTEIN, Administrator Division of Corporate and Consumer Services Department of Financial Institutions

DATE: January 5, 2021

BY: Deidre Taylor

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

c1   S 046332

Imaged

RECEIVED

2013 DEC 13

WISCONSIN DEPT. OF
FINANCIAL INSTITUTIONS

12/13/2013          04:30 PM
DCorp              $40.00
200369      #. 1

12/13/2013          04:30 PM
Expedite           $25.00
200369      #. 2

# EIGHTH AMENDED AND RESTATED ARTICLES OF INCORPORATION

## OF

## SAI ADVANCED POWER SOLUTIONS, INC.

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# Table of Contents

ARTICLE I. NAME ..........................................................................................................1

ARTICLE II. REGISTERED AGENT AND ADDRESS ...........................................1

ARTICLE III. BUSINESS PURPOSE ........................................................................1

ARTICLE IV. AUTHORIZED CAPITAL ..................................................................1

ARTICLE V. COMMON STOCK ...............................................................................2

ARTICLE VI. SERIES A-3 CONVERTIBLE PREFERRED STOCK.......................2

    6.1.        Series A-3 Preferred...........................................................2

    6.2.        Authorized Number...........................................................2

    6.3.        Dividends............................................................................2

    6.4.        Liquidation. .......................................................................3

    6.5.        Voting Rights......................................................................4

    6.6.        Conversion..........................................................................5

    6.7.        Certain Remedies..............................................................9

    6.8.        Preferred Protective Provisions. .......................................9

    6.9.        Reacquired Shares............................................................11

ARTICLE VII. RECAPITALIZATION .......................................................................11

    7.1.        2013 Recapitalization Related to Eighth Amended and Restated Articles. ..........11

ARTICLE VIII. INDEMNIFICATION ........................................................................15

    8.1.        Generally ............................................................................15

    8.2.        Indemnification of Directors and Officers. .......................15

    8.3.        Derivative Actions.. ...........................................................16

    8.4.        Indemnification in Certain Cases......................................16

    8.5.        Procedure............................................................................16

    8.6.        Advances for Expenses. ....................................................16

    8.7.        Rights Not Exclusive..........................................................17

    8.8.        Insurance............................................................................17

    8.9.        Definition of Corporation..................................................17

    8.10.      Survival of Rights. .............................................................17

ARTICLE IX. GENERAL ............................................................................................17

    9.1.        Amendments to Bylaws. ....................................................17

    9.2.        Corporate Books. ...............................................................17

    9.3.        Action by Written Consent Prohibited if Registered.. ......17

ARTICLE X. PREEMPTIVE RIGHTS ........................................................................18

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

| | | |
|---|---|---|
| 10.1. | Generally.. | 18 |
| 10.2. | Expiration of Preemptive Acceptance Period | 18 |
| 10.3. | Sales of Issuance Stock. | 19 |
| 10.4. | Preemptive Rights on IPO. | 19 |
| 10.5. | Waiver.. | 19 |
| ARTICLE XI. PREFERRED SHAREHOLDER DUTIES | | 19 |
| 11.1. | Specified Shareholders. | 19 |
| 11.2. | Specified Directors. | 20 |
| ARTICLE XII. DEFINITIONS | | 20 |

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

## EIGHTH AMENDED AND RESTATED ARTICLES OF INCORPORATION

### OF

### SAI ADVANCED POWER SOLUTIONS, INC.

The following have been adopted as the Eighth Amended and Restated Articles of Incorporation of SAI Advanced Power Solutions, Inc., a Wisconsin corporation f/k/a Soft Switching Technologies Corp. (the "**Corporation**"), organized pursuant to Chapter 180 of the Wisconsin Statutes, and which supersede and replace in their entirety the existing Amended and Restated Articles of Incorporation of the Corporation:

### ARTICLE I.
### NAME

The name of the Corporation is SAI Advanced Power Solutions, Inc.

### ARTICLE II.
### REGISTERED AGENT AND ADDRESS

The address of the Corporation's registered office is 901 South Whitney Way, Madison, Wisconsin 53711. The name of its registered agent at such address is National Corporate Research Ltd. c/o Dane County Title Company, Inc.

### ARTICLE III.
### BUSINESS PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Wisconsin Business Corporation Law, Chapter 180 of the Wisconsin Statutes (the "**WBCL**"). The Corporation shall have, exercise and enjoy all of the general rights, privileges and powers granted to corporations organized under the WBCL.

### ARTICLE IV.
### AUTHORIZED CAPITAL

The total number of all classes of capital stock which the Corporation has authority to issue is 749,827,812 shares, consisting of (i) 512,163,938 shares of Common Stock, par value $0.001 per share (the "**Common Stock**") and (ii) 237,663,874 shares of Preferred Stock, par value $0.001 per share (the "**Preferred Stock**"). The Preferred Stock shall consist of one series, designated as "**Series A-3 Convertible Preferred Stock**" with the designations, rights, preferences and limitations hereinafter described. Except as provided to the contrary in the provisions establishing a class or series of stock, the amount of the authorized stock of this Corporation or any class or classes may be increased or decreased by the affirmative vote of the holders of a majority of the stock in this Corporation entitled to vote without a separate class vote. Defined terms used in these Eighth Amended and Restated Articles of Incorporation shall have the meanings set forth in ARTICLE XII.

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# ARTICLE V.
## COMMON STOCK

All shares of Common Stock outstanding on the effective date of these Eighth Amended and Restated Articles of Incorporation shall be entitled to one vote, subject to the powers, preferences and rights of any Preferred Stock, including any series thereof, having any preference or priority over, or rights superior to, the Common Stock. The holders of Common Stock shall not be entitled to preemptive rights. Election of directors shall be governed by Section 6.5(b).

Any action required to be taken at any annual or special meeting of the shareholders, or any action which may be taken at any annual or special meeting of the shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Action taken by written consent is effective when consents representing the required number of shares are delivered to the Corporation, unless the consent specifies a different effective date. Within ten (10) days after the action taken without a meeting by less than unanimous written consent is effective, the Corporation shall provide notice to those shareholders who have not consented in writing. If not otherwise fixed, the record date for determining shareholders entitled to take action without a meeting is the date that the first shareholder signs the consent.

# ARTICLE VI.
## SERIES A-3 CONVERTIBLE PREFERRED STOCK

6.1.    Series A-3 Preferred. Except as expressly provided for herein, the Series A-3 Convertible Preferred Stock, par value $.001 per share (the "**Series A-3 Preferred**") shall rank, with respect to dividend rights, redemption rights and rights on liquidation, winding-up and dissolution, senior to all classes of Common Stock, as they exist on the date hereof or as such stock may be constituted from time to time, and senior to all other classes of capital stock or series of capital stock issued by the Corporation or established by the Board (collectively, the "**Series A-3 Junior Securities**").

The Corporation elects to have preemptive rights for the holders of the Series A-3 Preferred with respect to certain types of securities of the Corporation, as set forth in ARTICLE X.

6.2.    Authorized Number. The authorized number of shares constituting the Series A-3 Preferred shall be 237,663,874 shares.

6.3.    Dividends.

(a)    Subject to Section 6.7(b)(vii), the Corporation shall pay dividends to the holders of the Series A-3 Preferred as provided in this Section 6.3 when and as declared by the Board out of funds legally available therefore.

2

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

(b) Dividends, if declared in accordance with this Section 6.3, shall be subject to the terms and conditions specified by the Board. Each dividend will be payable to holders of record as they appear on the books of the Corporation at the close of business on a record date (each, a "**Series A-3 Record Date**"), not more than 60 nor less than 15 days before the payment date fixed by the Board. All accrued and unpaid dividends shall be payable in cash upon a liquidation under Section 6.4 or in shares of Common Stock on conversion. If any dividend payment date shall not be a Business Day, payment shall be made on the next succeeding Business Day. Dividends shall cease to be payable once the Series A-3 Preferred has been converted into Common Stock or redeemed by the Corporation.

(c) Prior to any dividend or other distribution to the holders of Common Stock, the holders of Series A-3 Preferred shall have received in cash the full cumulative accrued and unpaid dividends on such shares, and also shall be entitled to participate pro rata in any dividends paid on the Common Stock on an as-if-converted basis. All accrued and unpaid dividends on shares of Series A-3 Preferred shall be payable in cash upon a redemption, dissolution, liquidation, or winding up of the Corporation under Section 6.4, or in shares of Common Stock upon conversion of shares of Series A-3 Preferred.

6.4.    Liquidation.

(a) Upon the dissolution, liquidation or winding up of the Corporation (whether voluntary or involuntary), the holders of Series A-3 Preferred shall be entitled to receive out of the assets of the Corporation available for distribution to shareholders, before any payment or distribution shall be made on any Series A-3 Junior Securities, an amount equal to the Series A-3 Liquidation Value with respect to each outstanding share of Series A-3 Preferred.

(b) For the purposes of this Section 6.4 the following shall be deemed to be a dissolution, liquidation or winding-up, voluntary or involuntary: (i) the sale, license, lease or exchange (for cash, shares of stock, securities or other consideration) of all or substantially all of the assets of the Corporation, or (ii) a merger, consolidation, or any other transaction involving the Corporation that results in the shareholders of the Corporation immediately prior to the transaction beneficially owning, on a fully diluted basis, less than 50% of the issued and outstanding shares of the surviving corporation from such transaction.

(c) The Corporation may not undertake a voluntary liquidation, dissolution or winding up of the Corporation without first obtaining the prior written consent of the holders of Preferred Stock as required by Section 6.8.

(d) In the event of any involuntary liquidation, dissolution, or winding up of the Corporation, the Corporation shall give each holder of shares of Preferred Stock initial written notice of the proposed action within twenty (20) days after the commencement of any involuntary proceeding. Such initial written notice shall describe the material terms and conditions of such proposed action, including a description of the stock, cash, and property to be received by the holders of shares of Preferred Stock upon consummation of the proposed action and the date of delivery thereof. If any material change in the facts set forth in the initial notice shall occur, the Corporation shall promptly give subsequent written notice to each holder of shares of Preferred Stock of such material change.

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

(e)     If any of the assets of the Corporation are to be distributed other than in cash under Section 6.4 or for any purpose, then the Board shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Preferred Stock; provided, however, that in the event the Board and the holders of a majority of the Preferred Stock agree on the value of the non-cash consideration, such value shall be used and an appraiser shall not be engaged. The Corporation shall, upon receipt of such appraiser's valuation or upon the date the valuation is determined by the Board and holders of Preferred Stock, give prompt written notice to each holder of shares of Preferred Stock of the valuation. Notwithstanding the above, any securities to be distributed to the Corporation's shareholders shall be valued as follows:

(i)     if traded on a securities exchange or the NASDAQ Global or Capital Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange, or the last reported sale prices on such market as the case may be, over the 30-day period ending three (3) business days prior to the closing;

(ii)     if actively traded over-the-counter (other than on the NASDAQ Global or Capital Market), the value shall be deemed to be the average of the closing bid prices over the 30-day period ending three (3) business days prior to the closing; and

(iii)     if there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and the holders of not less than a majority of the outstanding shares of Preferred Stock; provided, however, that if the Corporation and the holders of a majority of the outstanding shares of Preferred Stock are unable to reach an agreement, then by independent appraisal by an investment banker hired and paid by the Corporation, but acceptable to the holders of at least a majority of the outstanding shares of Preferred Stock.

(f)     Upon completion of the distribution contemplated pursuant to Section 6.4(e) above, the remaining assets, if any, shall be distributed among the holders of Series A-3 Preferred and Common Stock on a pro-rata basis, with such distribution to the holders of Series A-3 Preferred as would have been payable had each such share been converted to Common Stock immediately prior to such event of liquidation, dissolution, or winding up pursuant to the provisions of Section 6.6 hereof.

6.5.     Voting Rights.

(a)     The holders of shares of Preferred Stock and Common Stock and all other classes and series of capital stock shall vote together as a single class on all matters that require the vote of the shareholders under law, unless the law or the express provisions of these Eighth Amended and Restated Articles of Incorporation require the vote of a separate class. The holder of each share of Preferred Stock shall be entitled to the number of votes equal to the largest number of full shares of Common Stock into which such shares of Preferred Stock could be converted, pursuant to the provisions of Section 6.6 hereof, at the record date for the

4

1300995.9

determination of shareholders entitled to vote on such matters or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited.

(b)     The number of directors on the Corporation's Board of Directors shall be as fixed from time to time in accordance with the Corporation's Bylaws.

(c)     Any action required to be taken, or that may be taken, at any annual or special meeting of all shareholders or of the holders of Preferred Stock may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding Preferred Stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of Preferred Stock entitled to vote thereon were present and voted. Action taken by written consent is effective when consents representing the required number of shares are delivered to the Corporation, unless the consent specifies a different effective date. Within ten (10) days after the action taken without a meeting by less than unanimous written consent is effective, the Corporation shall provide notice to those shareholders who have not consented in writing. If not otherwise fixed, the record date for determining shareholders entitled to take action without a meeting is the date that the first shareholder signs the consent.

6.6.   Conversion.

(a)     Optional Conversion. At the option of the holder, shares of Series A-3 Preferred may be converted at any time or from time to time upon written notice to the Corporation into fully paid and nonassessable shares (rounded up to the nearest whole share) of Common Stock. The number of shares of Common Stock to which a holder of Series A-3 Preferred shall be entitled upon conversion shall be (1) the sum of (i) the product obtained by multiplying the Series A-3 Conversion Rate (determined as provided in this Section 6.6) by the number of shares of Series A-3 Preferred being converted, plus (ii) the aggregate amount of accrued and unpaid dividends on such shares being converted, divided by (2) the Series A-3 Conversion Price then in effect.

(b)     Automatic Conversion. Immediately prior to the consummation of a Qualified IPO, each share of Series A-3 Preferred shall automatically be converted into a fully paid and nonassessable share (rounded up to the nearest whole share) of Common Stock. The number of shares of Common Stock to which a holder of Series A-3 Preferred shall be entitled upon conversion shall be (1) the sum of (i) the product obtained by multiplying the Series A-3 Conversion Rate (determined as provided in this Section 6.6) by the number of shares of Series A-3 Preferred being converted, plus (ii) the aggregate amount of accrued and unpaid dividends on such shares being converted (if any), divided by (2) the Series A-3 Conversion Price then in effect.

(c)     Reservation. The Corporation shall at all times reserve and keep available for issuance upon the conversion of the Series A-3 Preferred, free from any preemptive rights, such number of its authorized but unissued shares of Common Stock as will from time to time be necessary to permit the conversion of all outstanding shares of Series A-3 Preferred into shares of Common Stock, and shall take all action required to increase the authorized number of shares

1300995.9

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

of Common Stock if necessary to permit the conversion of all outstanding shares of Series A-3 Preferred.

(d)    Series A-3 Conversion Rate. The Series A-3 Conversion Rate in effect at any time shall be the quotient obtained by dividing the Series A-3 Stated Value by the Series A-3 Conversion Price, as may be adjusted pursuant to this Section 6.6.

(e)    Series A-3 Conversion Price. The Series A-3 Conversion Price shall equal the Series A-3 Stated Value as of the Eighth Articles Effective Time, and shall be adjusted from time to time for the following events:

(i)    Sale of Common Stock Equivalents Below Conversion Price. In the event the Corporation, any time after the Series A-3 Issue Date issues shares of Common Stock Equivalents other than Excluded Securities for a consideration per share (or exercise price per share, as applicable) less than the Series A-3 Conversion Price then in effect, such Series A-3 Conversion Price thereafter shall be reduced to the price at which such Common Stock Equivalents are issued by the Corporation. An adjustment made pursuant to this Section 6.6(e)(i) shall be made on the next Business Day following the date on which any such issuance shall be made and shall be effective retroactively to the close of business on the date of such an issuance.

(ii)    Reclassification, Exchange or Substitution. If the Corporation shall be a party to any transaction, including without limitation, a merger, consolidation, sale of all or substantially all of the Corporation's assets or a reorganization, reclassification or recapitalization of the capital stock of the Corporation, but excluding any transaction for which provision for adjustment is otherwise made in this Section 6.6 (each of the foregoing being referred to in this Section 6.6(e)(ii) as a "**Transaction**"), in each case, as a result of which shares of Common Stock are converted into the right to receive stock, securities or other property (including cash or any combination thereof), each share of Series A-3 Preferred shall thereafter be convertible into the number of shares of stock or other securities or property to which a holder of the number of shares of Common Stock of the Corporation deliverable upon conversion of such Series A-3 Preferred would have been entitled upon such Transaction; and, in any such case, appropriate adjustment (as determined by the Board) shall be made in the application of the provisions set forth in this Section 6.6(e)(ii) with respect to the rights and interest thereafter of the holders of the Series A-3 Preferred, to the end that the provisions set forth in this Section 6.6(e)(ii) shall thereafter be applicable, as nearly as reasonably may be, in relation to any shares of stock or other property thereafter deliverable upon the conversion of the Series A-3 Preferred. The Corporation shall not effect any Transaction (other than a consolidation or merger in which the Corporation is the continuing corporation) unless prior to or simultaneously with the consummation thereof the Corporation, or the successor corporation or purchaser, as the case may be, shall provide in its charter document that each share of Series A-3 Preferred shall be convertible into such shares of stock, securities or property as, in accordance

1300995.9

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

with the foregoing provisions, each such holder is entitled to receive. The provisions of this Section 6.6(e)(ii) shall similarly apply to successive Transactions.

(iii)    Stock Dividends, Splits, Combinations. In case the Corporation shall at any time, or from time to time, after the Series A-3 Issue Date (A) pay a dividend, or make a distribution, on the outstanding shares of Common Stock in shares of Common Stock, (B) subdivide the outstanding shares of Common Stock, (C) combine the outstanding shares of Common Stock into a smaller number of shares or (D) issue by reclassification of the shares of Common Stock any shares of capital stock of the Corporation, then, and in each such case, the Series A-3 Conversion Price in effect immediately prior to such event or the record date therefor, whichever is earlier, shall be adjusted so that the holder of any shares of Series A-3 Preferred thereafter surrendered for conversion shall be entitled to receive the number of shares of Common Stock or other securities of the Corporation which such holder would have owned or have been entitled to receive after the happening of any of the events described above, had such shares of Series A-3 Preferred been surrendered for conversion immediately prior to the happening of such event or the record date therefor, whichever is earlier. An adjustment made pursuant to this clause (iii) shall become effective (x) in the case of any such dividend or distribution, immediately after the close of business on the record date for the determination of holders of shares of Common Stock entitled to receive such dividend or distribution, or (y) in the case of such subdivision, reclassification or combination, at the close of business on the day upon which such corporate action becomes effective.

(iv)    Aggregate Consideration. For purposes of this Section 6.6(e), the aggregate consideration receivable by the Corporation in connection with the issuance of shares of Common Stock Equivalents shall be deemed to be equal to the sum of the aggregate offering price (before deduction of underwriting discounts or commissions and expenses payable to third parties, if any) of all such Common Stock Equivalents plus the minimum aggregate amount, if any, payable upon conversion, exchange or exercise of any such Common Stock Equivalents. If the consideration received by the Corporation in connection with the sale or issuance of, or exercise for, or conversion or exchange of, Common Stock Equivalents consists, in whole or in part, of property other than cash or its equivalent, the value of such property shall be the Fair Market Value.

(v)    Further Adjustments to the Series A-3 Conversion Price. If the minimum amount of consideration payable to the Corporation upon the exercise of Rights or Options is subsequently changed, then the Series A-3 Conversion Price shall again be recalculated using the new minimum amount of consideration payable to the Corporation upon the exercise of such Rights or Options. No further adjustment of the Series A-3 Conversion Price shall be made as a result of the actual issuance of shares of Common Stock (or other securities of the Corporation, as applicable) on the exercise of any such Rights

1300995.9

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

or Options. If any such Rights or Options shall expire without having been fully exercised, then the Series A-3 Conversion Price then in effect shall be readjusted to the Series A-3 Conversion Price which would have been in effect had an adjustment been made on the basis that only shares of Common Stock (or other securities of the Corporation, as applicable) so issued were the shares of Common Stock (or other securities of the Corporation, as applicable), if any, that were actually issued or sold on the exercise of such Rights or Options.

(f) <u>Adjustments</u>. If the Corporation shall take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or other distribution and shall thereafter, and before such dividend or distribution is paid or delivered to shareholders entitled thereto, legally abandon its plan to pay or deliver such dividend or distribution, then no adjustment in the Series A-3 Conversion Price then in effect shall be made by reason of the taking of such record, and any such adjustment previously made as a result of the taking of such record shall be reversed.

(g) <u>Taxes</u>. The issuance of certificates for shares of Common Stock upon conversion of the Series A-3 Preferred shall be made without charge to the holders thereof for any issuance tax in respect thereof; <u>provided</u>, <u>however</u>, that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the holder of the Series A-3 Preferred which is being converted.

(h) <u>Transfer Books</u>. The Corporation will at no time close its transfer books against the transfer of any Series A-3 Preferred, or of any shares of Common Stock issued or issuable upon the conversion of any shares of Series A-3 Preferred, in any manner which interferes with the timely conversion of such Series A-3 Preferred, except as may otherwise be required to comply with applicable securities laws.

(i) <u>Good Faith</u>. The Corporation will not, by amendment of these Eighth Amended and Restated Articles of Incorporation or through any reorganization, recapitalization, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 6.6 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of the Series A-3 Preferred against impairment.

(j) <u>Surrender of Certificates</u>. Upon the occurrence of any conversion specified in this Section 6.6, the holders of such shares of Series A-3 Preferred being converted shall surrender the certificates representing such shares at the office of the Corporation or of its transfer agent for the Common Stock. Thereupon, there shall be issued and delivered to such holder a certificate or certificates for the number of shares of Common Stock into which the shares of the Series A-3 Preferred surrendered were convertible on the date on which such conversion occurred. The Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless certificates evidencing such shares of the Series A-3 Preferred being converted are either delivered to the Corporation or any

8

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

such transfer agent or the holder notifies the Corporation or any such transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection therewith. If the holder of any shares of Series A-3 Preferred converts less than all such shares then owned by such holder, then upon conversion, the Corporation shall issue such holder a new certificate for any remaining shares of the Series A-3 Preferred. Upon an automatic conversion pursuant to Section 6.6(b), any holder of shares of Series A-3 Preferred shall be deemed to own the shares of Common Stock to be issued upon conversion, even if such holder does not surrender such Series A-3 Preferred certificate as required hereunder. To the extent permitted by law, any conversion of shares of Series A-3 Preferred effected pursuant to this Section 6.6 shall be deemed to have been effected and the Series A-3 Conversion Price shall be determined (i) as of the close of business on the date on which written notices shall have been received by the Corporation (in the case of an optional conversion pursuant to Section 6.6(a)) or (ii) upon the consummation of a Qualified IPO (in the case of an automatic conversion pursuant to Section 6.6(a)), and, in the case of Section 6.6(a), the certificate or certificates for such shares shall have been surrendered as aforesaid, and at such time the rights of the holder of such shares of Series A-3 Preferred shall cease, and the Person or Persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such conversion shall be deemed to have become the holder or holders of record of the shares represented thereby.

(k)     Reports as to Adjustments. Upon any adjustment of the Series A-3 Conversion Price then in effect and any increase or decrease in the number of shares of Common Stock issuable upon the operation of the conversion provisions set forth in this Section 6.6, then, and in each such case, the Corporation shall promptly deliver to the registered holders of the Series A-3 Preferred as shown on the books of the Corporation a, copy of a certificate signed by the President or a Vice President and by the Secretary or an Assistant Secretary of the Corporation, with the original being delivered to the transfer agent for the Series A-3 Preferred, setting forth in detail the event requiring the adjustment and the method by which such adjustment was calculated and specifying the Series A-3 Conversion Price then in effect following such adjustment and the increased or decreased number of shares of Common Stock issuable upon the conversion granted pursuant to this Section 6.6.

6.7.     Certain Remedies. Any registered holder of Series A-3 Preferred may proceed to protect and enforce its rights with any and all remedies available at law or in equity.

6.8.     Preferred Protective Provisions.

(a)     So long as any shares of Preferred Stock are outstanding, the Corporation shall not without first obtaining the approval by vote or written consent of at least the holder or holders of more than 60% of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted basis:

(i)     authorize or issue, or obligate itself to authorize or issue, any other equity security, including any other security convertible into or exercisable for any equity security, having a preference over, or being on parity with, the Series A-3 Preferred with respect to voting or upon liquidation, payment of dividends, redemption or any other rights, preferences or privileges;

9

FILED DATE: 2/3/2021 7:04 PM    2020CH07179

(ii)      issue any additional shares of Series A-3 Preferred;

(iii)     effect any recapitalization of the Corporation in connection with the authorization or issuance of any equity security where such recapitalization includes a provision automatically converting the shares of Series A-3 Preferred into any other class or series of stock of the Corporation;

(iv)     take any corporate action to alter, change, or amend the preferences, privileges or rights of Series A-3 Preferred;

(v)     redeem or convert shares of the Series A-3 Preferred;

(vi)     approve (A) an acquisition of another business or entity or (B) any merger, sale of voting control, sale of substantially all of the assets of the Corporation or any other transaction in which the then existing shareholders of the Corporation beneficially own less than 50% of the outstanding shares of the surviving corporation with a transaction value of less than $10.0 million;

(vii)     declare or pay any dividends on any shares of capital stock of the Corporation;

(viii)     create or authorize the creation of any debt (or guaranty thereof) in excess of $500,000 in a single issuance or a series of issuances;

(ix)     increase or decrease the size of the Board to other than five (5) members;

(x)     dissolve or liquidate the Corporation other than in connection with a consolidation, merger, acquisition, sale of voting control or sale of substantially all of the assets;

(xi)     increasing the shares reserved for issuance under the Corporation's incentive stock option plans in an amount greater than 16% of the Corporation's fully diluted capitalization;

(xii)     amend the percentage of holders of Preferred Stock that must approve the actions set forth in this Section 6.8(a) in the Corporation's Articles of Incorporation or Bylaws;

(xiii)     waive or modify the preemptive rights of the holders of Preferred Stock of the Corporation pursuant to Article X;

(xiv)     amend the Corporation's Articles of Incorporation or Bylaws; or

(xv)     change the nature of the Corporation's business or engage in any new line of business by the Corporation or any subsidiary thereof.

1300995.9

FILED DATE: 2/3/2021 7:04 PM    2020CH07179

6.9.    Reacquired Shares. Any shares of Series A-3 Preferred converted, purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the conversion, purchase or acquisition thereof. None of such shares of Series A-3 Preferred shall be reissued by the Corporation.

**ARTICLE VII.**
**RECAPITALIZATION**

7.1.    2013 Recapitalization Related to Eighth Amended and Restated Articles. Upon the filing of the Eighth Amended and Restated Articles of Incorporation with the Wisconsin Department of Financial Institutions (the "**Eighth Articles Effective Time**"), or upon such other time explicitly set forth below, the following shall occur with respect to the issued and outstanding shares of the Series A-2 Preferred:

(a)    Conversion of Series A-2 Preferred to Series A-3 Preferred Stock or Common Stock.

(i)    Effective upon the filing of these Eighth Amended and Restated Articles, each share of Series A-2 Preferred outstanding at the Eighth Articles Effective Time shall become one (1) share of validly issued, fully paid, and non-assessable share of Series A-3 Preferred. All accrued dividends on the issued and outstanding shares of Series A-2 Preferred and all rights of any holder of shares of Series A-2 Preferred under Section 6.7(e)(ii) of the Seventh Amended and Restated Articles of Incorporation shall be forfeited upon such conversion.

(ii)    For each holder of Series A-2 Preferred that, by December 16, 2013, purchases less than such holder's pro rata percentage (in accordance with Article X of these Eighth Amended and Restated Articles) of the $3,500,000 of shares of Series A-3 Preferred sold pursuant to the Stock Purchase Agreement with the Corporation ("**2013 SPA**") based on such holder's ownership (and any shares beneficially owned by such holder) of the issued and outstanding shares of Series A-2 Preferred held by such holder immediately prior to the closing of the transactions contemplated by the 2013 SPA ("**2013 A-2 Percentage Ownership**"), then, effective as of the close of business on December 16, 2013, such holder (or such beneficial holder) shall have that number of shares of its Series A-3 Preferred equal to the product of (A) the number of shares of Series A-3 Preferred owned by such holder (including beneficial ownership) on December 16, 2013, times (B) one minus the quotient, of which the numerator is the percentage of shares of the first $3,500,000 Series A-3 Preferred purchased by such holder, and the denominator is the holder's 2013 A-2 Percentage Ownership, converted to shares of validly issued, fully paid, and non-assessable Common Stock on a one for one basis.

(iii)    For example, if a holder of Series A-2 Preferred owned 10,000 shares of Series A-2 Preferred which represents 5% of the issued and outstanding shares of Series A-2 Preferred, but purchased 4% of the shares the Series A-3 Preferred Stock in the closing of the transaction contemplated by the

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

2013 SPA, then 2,000 shares of Series A-3 Preferred (10,000* 1 minus (4% divided by 5%)) were converted on a one for one basis into shares of Common Stock.

(iv)     Subject to the timing described in Section 7.1(b) below, if a holder of Series A-2 Preferred does not purchase shares of Series A-3 Preferred pursuant to the 2013 SPA, then each share of Series A-3 Preferred held by such holder (and beneficially owned by such holder) shall become one (1) share of validly issued, fully paid, and non-assessable Common Stock at the 2013 Effective Time.

(v)     Any shares of Series A-2 Preferred that were reserved for the exercise of warrants by certain preferred shareholders shall be exchanged for warrants to purchase shares of Series A-3 Preferred on a one for one basis.

(b)     Fractional Shares of Converted Series A-3 Preferred or Common Stock. If the automatic stock conversions in this Section 7.1 would otherwise create fractional shares of stock, the Corporation shall pay in cash the value of fractions of a share to a holder instead of issuing fractional shares.

(c)     Certificates for Series A-2 Preferred.    Each certificate that prior to conversion set forth in this Section 7.1 represented a share or shares of Series A-2 Preferred shall represent that number of shares of Series A-3 Preferred Stock or Common Stock, as applicable in accordance with this ARTICLE VII, until such certificate is presented to the Corporation or its transfer agent for transfer or reissue in which event the Corporation or its transfer agent shall issue one or more stock certificates representing the appropriate number of shares of Series A-3 Preferred or Common Stock, as applicable.

(d)     Survival. All such changes to the Corporation's capital structure shall survive and continue to exist upon the filing of these Eighth Amended and Restated Articles of Incorporation.

7.2.     2010 Recapitalization Related to Seventh Amended and Restated Articles. Upon the filing of the Seventh Amended and Restated Articles of Incorporation with the Wisconsin Department of Financial Institutions on August 11, 2010 (the "**Seventh Articles Effective Time**"), or upon such other time explicitly set forth below, the following occurred with respect to the issued and outstanding shares of the Series A-2 Preferred:

(a)     Conversion of Series A-2 Preferred to Common Stock for Less Than Pro Rata Participation.

(i)     Subject to the timing described in Section 7.2(b), for each holder of Series A-2 Preferred that did not purchase any shares of Series A-2 Preferred pursuant to and as defined in the Securities Purchase Agreement with the Corporation dated August 12, 2010 ("**2010 SPA**"), then for such holder (or such beneficial holder) each share of Series A-2 Preferred owned by that holder (or such beneficial holder), as of the Seventh Articles Effective Time, became one (1) share of validly issued, fully paid, and non-assessable Common Stock. All

12

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

accrued dividends on the issued and outstanding shares of Series A-2 Preferred were forfeited upon such conversion to Common Stock.

(ii)    Subject to the timing described in Section 7.1(b), for each holder (and beneficial holder) of Series A-2 Preferred that purchased less than such holder's (or such beneficial holder's) A-2 Percentage Ownership of the first $3,000,000 of shares of Series A-2 Preferred sold pursuant to the 2010 SPA, then for such holder (or for such beneficial holder), a pro rata portion of such holder's (or such beneficial holder's) shares were converted into shares of Common Stock. The pro rata portion that were converted hereunder was equal the difference between (A) the number of shares of Series A-2 Preferred owned by such holder (including beneficial ownership) immediately prior to the Closing Date (as defined in the 2010 SPA) (**"2010 Series A-2 Ownership"**), minus (B) the holder's (or such beneficial holder's) 2010 Series A-2 Ownership *times* the quotient, of which the numerator is the amount invested by such holder (or such beneficial holder) pursuant to the 2010 SPA and the denominator is the holder's (or such beneficial holder's) A-2 Percentage Ownership times $3,000,000. The remainder of such holder's (or any beneficial owner's) shares remained validly issued, fully paid, and non-assessable Series A-2 Preferred. All accrued dividends on the issued and outstanding shares of Series A-2 Preferred that were converted to Common Stock hereunder were forfeited upon such conversion.

(iii)    For example, if a holder of Series A-2 Preferred owned 10,000 shares of Series A-2 Preferred, which for purposes of this example represented 5% of the issued and outstanding shares of Series A-2 Preferred, but purchased only $120,000 of Series A-2 Preferred pursuant to the 2010 SPA (80% of such holder's A-2 Ownership Percentage of $150,000 (5% times $3,000,000)), then 2000 shares (or 20%) of the Series A-2 Preferred held by such holder were converted to Common Stock on a one for one basis.

(iv)    **"2010 A-2 Percentage Ownership"** shall mean the percentage obtained by the quotient, the numerator of which is the issued and outstanding shares of Series A-2 Preferred held by such holder immediately prior to the Closing Date as defined in the 2010 SPA, and denominator of which is the aggregate number of issued and outstanding shares of Series A-2 immediately prior to the Closing Date as defined in the 2010 SPA.

(v)    For the purposes of this ARTICLE VII, a "beneficial holder" shall mean an individual or entity who, although is not listed as the owner of record within the Corporation's stock registry, has the indirect or direct power to vote or to direct the voting of shares of the Corporation Stock, or to the power to dispose of shares of Corporation stock. The term "beneficial holder" includes individuals who control shares of Corporation stock held in a trust or through an individual retirement account.

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

(b)     Timing Of Conversion of Series A-2 Preferred for Preferred Shareholders Who Do Not Purchase Shares of Series A-2 Preferred or Purchase less than their A-2 Percentage Ownership.

(i)     If a holder of Series A-2 Preferred affirmatively waived such holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation as amended, and chose not to purchase shares of Series A-2 Preferred pursuant to the 2010 SPA, then each share of Series A-2 Preferred held by such holder (and beneficially owned by such holder) became one (1) share of validly issued, fully paid, and non-assessable Common Stock as of the Seventh Articles Effective Time.

(ii)     If a holder of Series A-2 Preferred did not waive the holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation, as amended, and did not purchase shares of Series A-2 Preferred pursuant to the 2010 SPA within thirty (30) days of the initial closing under the 2010 SPA, then each share of Series A-2 Preferred held by such holder (and beneficially owned by such holder) became one (1) share of validly issued, fully paid, and non-assessable Common Stock at the expiration of such thirty (30) day period.

(iii)     If a holder of Series A-2 Preferred did not waive the holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation, as amended, and purchased some shares of Series A-2 Preferred pursuant to the 2010 SPA within thirty (30) days of the initial closing under the 2010 SPA, but less than such holder's 2010 A-2 Percentage Ownership of the first $3,000,000 sold under the SPA, then the shares of Series A-2 Preferred held by such holder (and beneficially owned by such holder) either remained Series A-2 Preferred or converted into Common Stock pursuant to Section 7.2(a)(ii) at the expiration of such thirty (30) day period.

(c)     Purchase of 2010 A-2 Percentage Ownership.   For each holder (and beneficial holder) of Series A-2 Preferred that purchased such holder's (or such beneficial holder's) 2010 A-2 Percentage Ownership of the first $3,000,000 of shares of Series A-2 Preferred sold pursuant to the 2010 SPA, then for such holder (or for such beneficial holder) none of such holder's shares of Series A-2 Preferred were converted to Common Stock pursuant to this Section 7.2.

(d)     Fractional Shares of Converted Series A-2 Preferred.   If the automatic stock conversions in this Section 7.2 otherwise created fractional shares of stock, the Corporation paid in cash the value of fractions of a share to a holder instead of issuing fractional shares.

(e)     Certificates for Series A-2 Preferred. Each certificate that prior to conversion set forth in this Section 7.2 represented a share or shares of Series A-2 Preferred thereafter represents that number of shares of Common Stock, in accordance with this Section 7.2, until such certificate was presented to the Corporation or its transfer agent for transfer or

14

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

reissue in which event the Corporation or its transfer agent issued one or more stock certificates representing the appropriate number of shares of Common Stock, as applicable.

(f) <u>Survival</u>. All such changes to the Corporation's capital structure survived and continued to exist upon the filing of these Seventh Amended and Restated Articles of Incorporation.

## ARTICLE VIII.
## INDEMNIFICATION

8.1. <u>Generally</u>. No director of the Corporation shall be liable to the Corporation or any of its shareholders for monetary damages for breach of fiduciary duty as a director; <u>provided, however,</u> that this provision does not eliminate the liability of a director (a) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Chapter 180 of the WBCL or (d) for any transaction from which the director derived an improper personal benefit. For purposes of the prior sentence, the term "damages" shall, to the extent permitted by law, include without limitation, any judgment, fine, amount paid in settlement, penalty, punitive damages, excise or other tax assessed with respect to an employee benefit plan, or expense of any nature (including, without limitation, counsel fees and disbursements). Each person who serves as a director of the Corporation while this ARTICLE VIII is in effect shall be deemed to be doing so in reliance on the provisions of this ARTICLE VIII, and neither the amendment or repeal of this ARTICLE VIII, nor the adoption of any provision of these Eighth Amended and Restated Articles of Incorporation inconsistent with this ARTICLE VIII, shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for, arising out of, based upon, or in connection with any acts or omissions of such director occurring prior to such amendment, repeal, or adoption of an inconsistent provision. The provisions of this ARTICLE VIII are cumulative and shall be in addition to and independent of any and all other limitations on or eliminations of the liabilities of directors of the Corporation, as such, whether such limitations or eliminations arise under or are created by any law, rule, regulation, bylaw, agreement, vote of shareholders or disinterested directors, or otherwise. If the WBCL is hereafter amended to permit further elimination or limitation of the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the WBCL as so amended. Any repeal or modification of this ARTICLE VIII by the shareholders of the Corporation or otherwise shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification. For purposes of this ARTICLE VIII, all references to a director shall also be deemed to refer to any person or persons, if any, who, pursuant to a provision of these Eighth Amended and Restated Articles of Incorporation, exercise or perform any of the powers or duties otherwise conferred or imposed upon the Board.

8.2. <u>Indemnification of Directors and Officers</u>. The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise,

15

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding to the fullest extent permitted by law. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the actions or inactions of the person seeking indemnification under this Section 8.2 are not indemnified under this Section 8.2. For purposes of this ARTICLE VIII, any person who, pursuant to a provision in these Eighth Amended and Restated Articles of Incorporation, exercises or performs any of the powers or duties conferred or imposed upon the Board shall be entitled to all the benefits conferred upon directors and officers of the Corporation (including without limitation, the right to indemnification and advancement of expenses) set forth in this ARTICLE VIII.

8.3.   <u>Derivative Actions</u>. The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation; <u>provided</u>, <u>however</u>, that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court or such other court shall deem proper.

8.4.   <u>Indemnification in Certain Cases</u>. To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 8.2 or 8.3 of this ARTICLE VIII, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

8.5.   <u>Procedure</u>. Any indemnification under Sections 8.2 and 8.3 of this ARTICLE VIII (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director or officer is proper in the circumstances because such person has met the applicable standard of conduct set forth in such Sections 8.2 and 8.3. Such determination shall be made (a) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (b) if such a quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so direct, by independent legal counsel in a written opinion, or (c) by the shareholders.

8.6.   <u>Advances for Expenses</u>. Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Corporation as authorized in this ARTICLE VIII.

1300995.9

8.7. <u>Rights Not Exclusive</u>. The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this ARTICLE VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

8.8. <u>Insurance</u>. The Corporation shall purchase and maintain insurance with coverage limits customary for similarly situated companies, but in no event with coverage limits of less than $3,000,000, on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this ARTICLE VIII.

8.9. <u>Definition of Corporation</u>. For the purposes of this ARTICLE VIII, references to "the Corporation" include all constituent corporations absorbed in a consolidation or merger as well as the resulting or surviving corporation so that any person who is or was a director or officer of such a constituent corporation or is or was serving at the request of such constituent corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise shall stand in the same position under the provisions of this ARTICLE VIII with respect to the resulting or surviving corporation as he would if he had served the resulting or surviving corporation in the same capacity.

8.10. <u>Survival of Rights</u>. The indemnification and advancement of expenses provided by, or granted pursuant to this ARTICLE VIII shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such a person. No subsequent amendment of this ARTICLE VIII shall diminish the rights hereunder of any director or officer with respect to any action taken or claim made prior to such amendment.

## ARTICLE IX.
## GENERAL

9.1. <u>Amendments to Bylaws</u>. In furtherance and not in limitation of the power conferred upon the Board by law, the Board shall have the power to make, adopt, alter, amend and repeal from time to time the bylaws of this Corporation subject to Section 6.8 herein. The shareholders shall also have the power to make, adopt, amend, alter, or repeal the Bylaws of the Corporation.

9.2. <u>Corporate Books</u>. The books of this Corporation may (subject to any statutory requirements) be kept outside the State of Wisconsin as may be designated by the Board or in the Bylaws of this Corporation.

9.3. <u>Action by Written Consent Prohibited if Registered</u>. If at any time this Corporation shall have a class of stock registered pursuant to the provisions of the Securities Act

17

1300995.9

of 1934, for so long as such class is so registered, any action by the shareholders of such class must be taken at an annual or special meeting of shareholders and may not be taken by written consent.

## ARTICLE X.
### PREEMPTIVE RIGHTS

The Corporation shall not issue, sell or exchange, or agree to issue, sell or exchange (collectively, "**Issue**," and any issuance, sale or exchange resulting therefrom, an "**Issuance**") any Common Stock Equivalents or any other shares of non-convertible Preferred Stock (other than Excluded Securities) except as authorized by the Board and in accordance with the following procedures:

10.1.  Generally. The Corporation shall deliver (to the last known address on file with the Corporation for such shareholder) to each of the holders of the Preferred Stock a written notice (a "**Preemptive Notice**"), which shall (a) state the Corporation's intention to Issue Common Stock Equivalents to one or more Persons, the amount and type of Common Stock Equivalents to be Issued (the "**Issuance Stock**"), the purchase price therefor and a summary of the other material terms of the proposed Issuance and (b) offer each holder of Preferred Stock the option to acquire up to such holder's pro rata portion of the Issuance Stock (determined in the manner set forth below) (the "**Preemptive Offer**"). The Preemptive Offer shall remain open and irrevocable for the periods set forth below (and, to the extent the Preemptive Offer is accepted during such periods, until the consummation of the Issuance contemplated by the Preemptive Offer). Each holder of Preferred Stock shall have the right and option, for a period of thirty (30) days after delivery of the Preemptive Notice, subject to the extension of such period if approved by the Board in its sole discretion (the "**Preemptive Acceptance Period**"), to accept up to such holder's pro rata portion of the Issuance Stock at the purchase price and on the terms stated in the Preemptive Notice. Such acceptance shall be made by delivering a written notice to the Corporation by the holder of the Preferred Stock within the Preemptive Acceptance Period specifying the maximum number of shares of the Issuance Stock such holder will purchase (the "**Accepted Shares**"). Except as provided herein, no holder of Preferred Stock shall have the right to purchase more than such holder's pro rata portion of the Issuance Stock, such holder's pro rata portion of the Issuance Stock being the number of shares of Preferred Stock owned by such holder in proportion to the total number of outstanding shares of Preferred Stock. If less than all the Issuance Stock is requested for purchase by the holders of Preferred Stock, each such holder may take more than such holder's pro rata portion, but only as agreed by all holders of Preferred Stock who wish to purchase more than their pro rata portion of the Issuance Stock, as agreed in writing prior to the end of the Preemptive Acceptance Period.

10.2.  Expiration of Preemptive Acceptance Period. If effective acceptance shall not be received pursuant to Section 10.1 above with respect to all of the Issuance Stock offered for sale pursuant to the Preemptive Notice, then the Corporation may Issue all or any portion of such Issuance Stock so offered for sale and not so accepted to a third party purchaser, at a price not less than the price, and on terms not more favorable to the purchaser thereof than the terms, stated in the Preemptive Notice at any time within 90 days after the expiration of the Preemptive Acceptance Period (the "**Issuance Period**"). In the event that all of the Issuance Stock is not

18

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

Issued by the Corporation during the Issuance Period, the right of the Corporation to Issue such unsold Issuance Stock shall expire and the obligations hereof shall be reinstated.

10.3. <u>Sales of Issuance Stock</u>. All sales of Issuance Stock to a holder of Preferred Stock subject to any Preemptive Notice shall be consummated contemporaneously at the offices of the Corporation on a mutually satisfactory Business Day within 30 days after the expiration of the Preemptive Acceptance Period, or at such other time and/or place as the Corporation and such holder may agree. The delivery of certificates or other instruments evidencing such Issuance Stock shall be made by the Corporation on such date against payment of the purchase price for such Issuance Stock.

10.4. <u>Preemptive Rights on IPO</u>. The provisions hereof shall not apply to any Issuance by the Corporation in connection with an IPO or any subsequent registered public offering of securities of the Corporation. The preemptive rights contained in this ARTICLE X shall terminate upon the earlier to occur of (a) the completion of a Qualified Public Offering; or (b) such time as the Corporation otherwise becomes subject to the reporting requirements of the Securities Exchange Act of 1934.

10.5. <u>Waiver</u>. Notwithstanding anything herein to the contrary, the rights and obligations of the holders of Preferred Stock and the Company set forth in this ARTICLE X may be waived in the following limited circumstances by obtaining the approval by vote or written consent of at least the holder or holders of more than 60% of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted basis: (a) in connection with the issuance of bonus shares for shareholders who provide collateral for the benefit of the Company which is deemed reasonably necessary by the Board of Directors; (b) in connection with the conversion of (i) the outstanding interest on bridge debt and (ii) the outstanding principal and interest on mezzanine debt; and (c) in connection with the conversion of other similar debt or other non-cash components in a financing round.

## ARTICLE XI.
## PREFERRED SHAREHOLDER DUTIES

The provisions of this ARTICLE XI are set forth to regulate and define the conduct of certain affairs of the Corporation as they may involve the preferred shareholders of the Corporation, and the powers, rights, duties and liabilities of the Corporation and its officers, directors and shareholders in connection therewith; provided, however, that nothing in this ARTICLE XI will prohibit the Corporation's ability to enter into contractual arrangements with a shareholder of the Corporation, which arrangements restrict such shareholder from engaging in activities otherwise allowed by this ARTICLE XI, and the following provisions shall be subject to any such contractual obligation of the Corporation.

11.1. <u>Specified Shareholders</u>. Except as any shareholder may otherwise agree in writing, each holder of shares of Preferred Stock of the Corporation who is not an officer or employee of the Corporation or controlled by an officer or employee of the Corporation (a "**Specified Shareholder**") shall have the right to, and shall have no duty hereunder to refrain from, engaging in the same or similar activities or lines of business as the Corporation, doing business with any potential or actual customer or supplier of the Corporation, or employing or

1300995.9

otherwise engaging any officer or employee of the Corporation. To the fullest extent permitted by law, neither a Specified Shareholder nor any officer or director thereof shall be liable to the Corporation or its other shareholders for breach of any fiduciary duty by reason of any such activities of such shareholder, or the participation therein of such shareholder. In the event that a Specified Shareholder acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both the Specified Shareholder and the Corporation, the Specified Shareholder shall have no duty to communicate or present such corporate opportunity to the Corporation and shall not be liable to the Corporation or its other shareholders for breach of any fiduciary duty by reason of the fact that such Specified Shareholder pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person, or does not communicate information regarding such corporate opportunity to the Corporation.

11.2.   Specified Directors.  To the fullest extent permitted by law, in the event that a director of the Corporation who is also a director, officer or employee of a Specified Shareholder acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both the Corporation and such Specified Shareholder, such director of the Corporation shall not by reason of the fact that such Specified Shareholder or any of its affiliates pursues or acquires such corporate opportunity for itself or directs such corporate opportunity to another person (including, without limitation, such Specified Shareholder or any of its affiliates) or does not communicate information regarding such corporate opportunity to the Corporation: (a) be deemed to have breached the fiduciary duty of such director to the Corporation and its shareholders with respect to such corporate opportunity, (b) be liable to the Corporation or its other shareholders for breach of any fiduciary duty, (c) be deemed to have acted other than in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or (d) be deemed to have breached his or her duty of loyalty to the Corporation or its shareholders or to have derived an improper benefit; provided, however, that such director of the Corporation (i) obtained such knowledge other than in his or her capacity as a director of the Corporation, and (ii) and is not actively and directly involved in such opportunity on behalf of the Specified Shareholder.

## ARTICLE XII.
## DEFINITIONS

12.1.   "**Board**" means the Corporation's Board of Directors.

12.2.   "**Business Day**" means any day that is not a Saturday, Sunday or a day on which banking institutions in Madison, Wisconsin are not required to be open for business.

12.3.   "**Common Stock Equivalents**" means (a) shares of Common Stock; (b) rights, options or warrants of the Corporation convertible or exchangeable into, or exercisable for, shares of Common Stock; (c) equity or debt securities of the Corporation convertible or exchangeable into or exercisable for shares of Common Stock or other securities of the Corporation; or (d) any rights, options or warrants to acquire any such equity or debt securities referred to in (c) above.

12.4.   "**Common Stock Equivalents Outstanding**" means the aggregate of all shares of Common Stock Equivalents then outstanding on an as converted, exchanged or exercised basis,

20

but shall not mean any shares of capital stock then owned or held by or for the account of the Corporation or any of its Subsidiaries.

12.5.  "**Common Stock Equivalent Price**" means, with respect to any Common Stock Equivalents, the per-share issue price of such shares of Common Stock Equivalents.

12.6.  "**Excluded Securities**" means (a) any options to purchase shares of or shares of Common Stock or Common Stock Equivalents issued to employees, advisors or consultants pursuant to the Corporation's stock option plans and equity incentive plans in existence on the Series A-3 Issue Date (and any shares of Common Stock issued upon exercise thereof), which options and shares shall not exceed 165,237,178 shares of Common Stock (each of the plans referred to herein shall be referred to as an "**Approved Plan**"); (b) up to 6,195,346 shares of Common Stock issuable upon exercise of warrants held by Endeavor Capital Management, LLC or any of its affiliated entities; (c) up to 5,419,854 shares of Common Stock issuable upon exercise of warrants held by the Corporation's mezzanine note purchasers as approved by the Board pursuant to the Note Purchase Agreement dated July 16, 2009; (d) up to 713,945 shares of Series A-2 Stock issuable upon exercise of warrants held by certain shareholders; (e) up to 64,210,342 shares of Common Stock issuable upon exercise of warrants issued in connection with that certain Securities Purchase Agreement dated August 11, 2010; (f) up to 755,934 shares of Common Stock issuable upon exercise of warrants held by Madison Development Corporation; (g) shares of Common Stock or shares of Series A-3 Preferred issuable upon conversion, exchange or exercise of any Common Stock Equivalent outstanding as of the Eighth Articles Effective Time; (h) shares of Common Stock issuable upon conversion of the Series A-3 Preferred pursuant to Section 6.6; and (i) any shares of Series A-3 Preferred issuable upon the conversion of any debt financing as approved by the Board.

12.7.  "**Fair Market Value**" of any property means the fair market value of such property as determined (unless expressly otherwise provided herein) by a nationally recognized accounting or appraisal firm selected by the Board.

12.8.  "**IPO**" means an initial public offering of Common Stock.

12.9.  "**Person**" means any individual, company, limited liability corporation, limited or general partnership, joint venture, association, joint-stock company or other business entity, trust, unincorporated organization or government or any agency or political subdivisions thereof.

12.10.  "**Qualified IPO**" means an IPO pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, whereby (a) aggregate net proceeds to the Corporation are at least $25,000,000 (before payment of underwriters' discounts and commissions), (b) an initial offering price per share is equal to or greater than five times the Series A-3 Stated Value, and (c) following the offering the Corporation is listed on a national securities exchange.

12.11.  "**Rights or Options**" means those Common Stock Equivalents described in clauses (b) and (d) of the definition therein.

12.12.  "**Series A-3 Issue Date**" means the first date on which shares of Series A-3 Preferred are issued.

21

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

12.13. **"Series A-3 Liquidation Value"** means an amount per share of Series A-3 Preferred equal to (a) $20,000,000 divided by (b) the total number of issued and outstanding shares of Series A-3 Preferred on the date of the dissolution, liquidation or winding up.

12.14. **"Series A-3 Preferred"** means the Corporation's Series A-3 Convertible Preferred Stock, $0.001 par value.

12.15. **"Series A-3 Stated Value"** means $0.0391 per share.

12.16. **"Subsidiary of any Person"** means any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person.

*[Remainder of page intentionally left blank.]*

1300995.9

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

## CERTIFICATION

The undersigned officer of SAI Advanced Power Solutions, Inc., a Wisconsin corporation, certifies that the foregoing Eighth Amended and Restated Articles of Incorporation of said Corporation, containing amendments requiring shareholder approval, were adopted with the requisite shareholder approval and in accordance with 180.1003 of the Wisconsin Statutes on December 12, 2013.

By: _____

Name:  Brad Bell

Title:   President

This document was drafted by
And should be returned to:

Kari Kaplan
Aronberg Goldgehn
330 N. Wabash, Suite 1700
Chicago, IL 60611

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

RETURN ACKNOWLEDGEMENT TO:

$40.00  +  $25.00

Eop

ADVANCED NATIONWIDE RESEARCH, LLC

PICK UP BASKET

ATTN: TRICIA TRAINOR

▲ Enter your return address within the brackets above
Phone number during the day: (608 ) 251-4712

STATE OF WISCONSIN
FILED

DEC 1 7 2013

DEPARTMENT OF
FINANCIAL INSTITUTIONS

Restated Articles of
Incorporation

Chap. 180

Increases Authorized Shares
From: 621,781,120 shs
( 458,386,542 shs cs @ *.001pv )
( 163,394,578 shs Sees A2 ps @ *.001pv )

To: 749,827,812 shs
( 512,163,938 shs cs @ *.001pv )
( 237,663,874 shs Sees A-3 ps @ *.001pv )

**FILING FEE** **$150.00**
☐ OPTIONAL EXPEDITED SERVICE
**+ $25.00**

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

**DO NOT STAPLE**

Sec. 180.11045
and 180.1105,
Wis. Stats.

State of Wisconsin
## DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Corporate & Consumer Services



## ARTICLES OF MERGER
**Domestic and Foreign For-Profit Corporations**

**1. Non-Surviving Parties to the Merger:**

| Corporation Name: | Organized under the laws of |
|---|---|
| SAI Advanced Power Solutions, Inc. | Wisconsin |
| | (state or country) |

Does the above named non-surviving party have a fee simple ownership interest in any Wisconsin real estate?
☐ Yes   ☒ No

**IMPORTANT:** If you answer yes, the surviving entity is required to file a report with the Wisconsin Dept. of Revenue under sec. 73.14 of the Wis. Stats. within 60 days after the effective date of the merger. **NOTE:** Sec. 73.14(2)(a) provides a penalty of $200 for each day that the report is late, not to exceed $7,500.  You may access the form at: http://ww2.revenue.wi.gov/internet/merger.html

| Corporation Name: | Organized under the laws of |
|---|---|
| | |
| | (state or country) |

Does the above named non-surviving party have a fee simple ownership interest in any Wisconsin real estate?
☐ Yes   ☐ No

**IMPORTANT:** If you answer yes, the surviving entity is required to file a report with the Wisconsin Dept. of Revenue under sec. 73.14 of the Wis. Stats. within 60 days after the effective date of the merger. **NOTE:** Sec. 73.14(2)(a) provides a penalty of $200 for each day that the report is late, not to exceed $7,500.  You may access the form at: http://ww2.revenue.wi.gov/internet/merger.html

Schedule more non-surviving parties as an additional page and indicate whether the non-surviving party has a fee simple ownership interest in any Wisconsin real estate.

**2. Surviving Corporation:**

| Corporation Name: | Organized under the laws of |
|---|---|
| SAI Merger, Inc. | Illinois |
| | (state or country) |

**3.** Indicate below if the surviving corporation is an indirect wholly owned subsidiary or parent:

☐ The surviving corporation is a Domestic or Foreign Business Corporation that is an indirect wholly owned subsidiary or parent and the merger was approved in accordance with sec. 180.11045 and the requirements of sec. 180.11045(2) have been satisfied.

☒ The surviving corporation is not a Domestic or Foreign Business Corporation that is an indirect wholly owned subsidiary or parent.

DFI/CORP/**2001** (05/15)

718924-1    A9395T



FILED DATE: 2/3/2021 7:04 PM  2020CH07179

**4.** The plan of merger has been approved and adopted by each corporation that is a party to the merger as required under sec. 180.1103 or 180.1104, Wis. Stats., as applicable.

**5. A.** The articles of incorporation of the surviving corporation are amended as follows:

Immediately following the Merger, the business of the Surviving Corporation shall operate under the name SAI Advanced Power Solutions, Inc.

## OR

**B.** If there are no amendments, indicate the name of the corporation that is a party to the merger whose articles of incorporation will be the articles of incorporation of the surviving corporation:

**6.** The executed plan of merger is on file at the principal place of business of the surviving corporation.

**7.** The surviving corporation will provide a copy of the plan of merger, upon request and without cost, to any shareholder of a corporation that was a party to the merger or, upon payment to the surviving corporation of an amount equal to the cost of producing the copy, to any other interested person.

**8.** (OPTIONAL)  Effective Date and Time of Merger

These articles of merger, when filed, shall be effective on _____ (date) at _____ (time).

(An effective date declared under this article may not be earlier than the date the document is delivered to the department for filing, nor more than 90 days after its delivery. If no effective date and time is declared, the effective date and time will be determined by sec.180.0123.

**9.** Executed on ___12/19/2017___ (date) by the surviving corporation on behalf of all parties to the merger.

_____
(Signature)

Mark **(X)** below the title of the person executing the document.

_Daviel Martin_
(Printed Name)

Title: ☐ President  OR  ☑ Secretary or other officer title _____

This document was drafted by: _____Laura Geis_____
(Name the individual who drafted the document)

DFI/CORP/**2001** (05/15)                                                                           2

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

RETURN ACKNOWLEDGEMENT TO:

ADVANCED NATIONWIDE RESEARCH, LLC

PICK UP BASKET

ATTN: TRICIA TRAINOR

▲ Enter your return address within the brackets above
   Phone number during the day: (608) 251-4712

## VERY IMPORTANT:
**PLEASE CALL US BEFORE ANY REFUNDS ARE ISSUED. THANK YOU!**
**ADVANCED NATIONWIDE RESEARCH**
**608-251-4712**



For Office



**State of Wisconsin**

**Department of Financial Institutions**

*Endorsement*

**ARTICLES OF MERGER Domestic and Foreign For-Profit Corporations - Ch. 180**

**SAI ADVANCED POWER SOLUTIONS, INC.**

**Received Date: 12/20/2017**          **Filed Date: 12/21/2017**

Filing Fee:      $150.00

Expedited Fee: $25.00          Entity ID#: S046332

**Total Fee:     $175.00**


Merges: SAI ADVANCED POWER SOLUTIONS, INC. (01 S046332)
Into: UNL FGN

PAGE 4/7 REC'D 3/16/2018 4:44:28 PM [Central Daylight Time] PRD 082678813

FILED DATE: 2/3/2021 7:04 PM 2020CH07179



**FILING FEE** ☑ OPTIONAL EXPEDITED SERVICE

See Page 3 for filing fee

**+ $25.00**

**DO NOT STAPLE**

Ss. 178.50,
180.0124, 181.0124
& 183.0112
Wis. Stats.

State of Wisconsin
DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Corporate & Consumer Services



# ARTICLES OF CORRECTION

1. SAI Advanced Power Solutions, Inc.

   (Name of the corporation, limited liability company, or limited liability partnership **before** any correction that may be affected by these articles of correction)

2. Articles of Merger _____ filed with the Department of Financial

   (Describe the document)

Institutions on December 21, 2017 _____ (date) was

☒ Incorrect at the time of filing (*Complete items 1, 2, 3, 4 & 6*)

☐ Defectively executed (*Complete items 1, 2, 3 & 5*)

☐ Defective in attestation, seal, verification or acknowledgment (*Complete items 1, 2, 3 & 6*)

{ ( **X** ) Check any that apply

3. Describe the defect(s): (*Specify the incorrect statement and the reason why it is incorrect, or the manner in which the execution is defective.*)

The incorrect statements are the identification of "SAI Advanced Power Solutions, Inc." as the Non-Surviving Party to the Merger, and "SAI Merger, Inc." as the Surviving Corporation in Items 1 and 2, respectively. These statements were incorrect because the names of the Non-Surviving Party and the Surviving Corporation should have been reversed.

4. Enter the statement in its corrected condition:

Item 1: Corporation Name: SAI Merger, Inc.
        Organized under the laws of: Illinois

Item 2: Corporation Name: SAI Advanced Power Solutions, Inc.
        Organized under the laws of: Wisconsin

DFI/CORP/**53** (04/15)



797420-1    CB628X

03/16/2018 12:55 FAX (FAX) CTC Corp 03/28/18 P005/007

PAGE 5/7 REC'D 3/16/2018 4:44:28 PM [Central Daylight Time] PRD 082676813

FILED DATE: 2/3/2021 7:04 PM [Central Daylight Time] PRD 082676813 2020CH07179

**4.** Enter the statement in its corrected condition (cont'd):

**5.** Make the corrected execution:

Executed on _____
(Date)

_____
(Signature)

Select and mark (X) below the appropriate title
of the person executing the document.

_____
(Printed name)

**For a corporation**
Title: ☐ President ☐ Secretary
or other officer title _____
**OR** ☐ Incorporator

**For a limited liability company**
Title: ☐ Member ☐ Manager **OR** ☐ Organizer

**For a limited liability partnership**
Title: ☐ Partner

**6.** Executed on _Marsh 12, 2018_
(Date)

_____
(Signature)

Select and mark (X) below the appropriate title
of the person executing the document.

_David Martin_
(Printed name)

**For a corporation**
Title: ☐ President ☒ Secretary
or other officer title _____

**For a limited liability company**
Title: ☐ Member **OR** ☐ Manager

**For a limited liability partnership**
Title: ☐ Partner

This document was drafted by _____ **Jerald Hollsky**
(Name the individual who drafted the document)

DFI/CORP/53 (04/15)

2

PAGE 7/7 RECD 3/16/2018 4:44:28 PM  2020CH07179

FILED DATE: 2/3/2021 7:04 PM [Central Daylight Time] PRD 082678813

## ARTICLES OF CORRECTION

⌐                                              ¬

    **Dane County Title Company, LLC**        lsa
    **UCC/Corporate Division**
    901 S Whitney Way
    Madison, WI 53711
    UCC@danecountytitle.com

L                                                ⌟

▲ **Enter your return address within the bracket above.**

**Phone number during the day:** ( 312 )   755   -  3176

DFI/CORP/**53** (04/15)                                                 4

 

For Office

**State of Wisconsin**

**Department of Financial Institutions**

*Endorsement*

**ARTICLES OF CORRECTION - Ch. 180**

**SAI ADVANCED POWER SOLUTIONS, INC.**

**Received Date: 3/16/2018**                    **Filed Date: 3/19/2018**

Filing Fee:         $40.00

Expedited Fee: $25.00                    Entity ID#: S046332

**Total Fee:**      **$65.00**


Corrects the Articles of Merger, correcting the name of the surviving corporation to SAI ADVANCED POWER SOLUTIONS, INC. and the name of the non-surviving corporation to SAI MERGER, INC. effective December 20, 2017.

OOS# 201803165515147

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# EXHIBIT 2

FILED DATE: 2/3/2021 7:04 PM 2020CH07179

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER
SOLUTIONS, INC.,

                Plaintiff,

      v.

SHANE WOLFRAM,                          Case No. 2020 CH 07179

                Defendant,

and

E&I ENGINEERING CORPORATION

            Respondent in Discovery.

### AFFIDAVIT OF SHANE WOLFRAM

Shane Wolfram, first being duly sworn, deposes and says that:

1.    I am employed as Vice President – U.S. Sales of E&I Engineering Corporation ("E&I"). I am over eighteen (18) years of age, and am competent to understand the oath related to this Affidavit. All matters and things contained within this Affidavit are within my personal knowledge or are contained in documents to which I have access in the ordinary course of business.

2.    I am a citizen and resident of Wisconsin. I have lived in Wisconsin my entire life, with the exception of a three year period from 1999 to 2002 when I lived in Illinois.

3.    I do not own any real property or personal property in Illinois.

4.    I do not have any offices, statutory agents, telephone listings, or mailing addresses in Illinois.

5.    I do not have any licenses or other operations in Illinois.

6.    I have not paid any income tax in Illinois, except the 3 years I lived in Illinois from 1999 to 2002.

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

7.     Prior to my employment with E&I, I worked for SAI Advanced Power Solutions, Inc. ("SAI").  It is my understanding that SAI contends in the above-captioned lawsuit that I wrongfully assisted E&I in allegedly obtaining contracts to supply electrical switchgear for three (3) projects – (1) the Stack, Inc. Silicon Valley Project, (2) the CloudHQ, LLC Manassas Project, and (3) the Stack, Inc. Portland Project (collectively, the "Projects").

8.     I was not involved with procuring any of the Projects for E&I, nor did I provide E&I with any information relating to these Projects or these customers.

9.     I have read the foregoing Affidavit of 2 typewritten pages and swear that it is true to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

_____

Shane Wolfram

Sworn to and subscribed before me
this  1  day of  February , 2021.

STEPHANIE JUEDES
Notary Public
State of Wisconsin

NOTARY PUBLIC FOR WISCONSIN

MY COMMISSION EXPIRES:  09/18/2021

Page 2 of 2

FILED DATE: 2/3/2021 7:04 PM   2020CH07179

# EXHIBIT 3

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

SAI ADVANCED POWER
SOLUTIONS, INC.,

                        Plaintiff,

            v.

SHANE WOLFRAM,                                    Case No. 2020 CH 07179

                        Defendant,

and

E&I ENGINEERING CORPORATION

            Respondent in Discovery.

FILED DATE: 2/1/2021 2:04 PM 2020CH07179

## AFFIDAVIT OF DAVID K. GENSON

David K. Genson, first being duly sworn, deposes and says that:

1.      I am the National Sales Manager of E&I Engineering Corporation ("E&I").  I am

over eighteen (18) years of age, and am competent to understand the oath related to this Affidavit.

I am authorized to give this Affidavit in support of E&I's Motion to quash the Summons and

dismiss E&I as a Respondent in Discovery.  All matters and things contained within this Affidavit

are within my personal knowledge or are contained in documents to which I have access in the

ordinary course of business.

2.      It is my understanding that SAI Advanced Power Solutions, Inc. ("SAI") contends

in the above-captioned lawsuit that Shane Wolfram wrongfully assisted E&I in allegedly obtaining

contracts to supply electrical switchgear for three (3) projects – (1) the Stack, Inc. Silicon Valley

Project, (2) the CloudHQ, LLC Manassas Project, and (3) the Stack, Inc. Portland Project

(collectively, the "Projects").

3.      With regard to the Stack, Inc. Silicon Valley Project, that project is located in Silicon Valley, California.  It is not located in Illinois.  In E&I's efforts to solicit this project, no meetings were held in Illinois and no contracts were entered with any individual or entity in Illinois. E&I has not shipped goods to, or provided services in, Illinois in connection with this project.

4.      With regard to the CloudHQ, LLC Manassas Project, that project is located in Manassas, Virginia.  It is not located in Illinois.  In E&I's efforts to solicit this project, no meetings were held in Illinois and no contracts were entered with any individual or entity in Illinois. E&I has not shipped goods to, or provided services in, Illinois in connection with this project.

5.      With regard to the Stack, Inc. Portland Project, that project is located in Portland, Oregon.  It is not located in Illinois.  In E&I's efforts to solicit this project, no meetings were held in Illinois and no contracts were entered with any individual or entity in Illinois. E&I has not shipped goods to, or provided services in, Illinois in connection with this project.

6.      As the National Sales Manager for E&I, I have personal knowledge of E&I's efforts to solicit the Projects.  Shane Wolfram had no involvement in procuring the Projects for E&I, and he did not provide any information to E&I that assisted E&I in procuring the Projects.

7.      E&I employs one (1) individual who works from home and lives in Illinois.  This individual did not have any involvement in E&I's solicitation of the Projects.

8.      As the National Sales Manager for E&I, I am responsible for, in part, hiring individuals for sales positions within E&I.  I have personal knowledge of the discussions between Shane Wolfram and E&I regarding his potential future employment with E&I.   During the discussions between E&I and Shane Wolfram regarding his potential employment with E&I, no meetings occurred between E&I and Shane Wolfram in Illinois. Furthermore, no communications,

FILED DATE: 3/3/2020 7:04 PM 2020CH07079

such as e-mails, texts, or phone calls, originated from Illinois. To the best of my knowledge, E&I did not communicate with Shane Wolfram regarding his potential future employment with E&I while Shane Wolfram was located in Illinois.

9.    I have read the foregoing Affidavit of 3 typewritten pages and swear that it is true to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

David K. Genson

Sworn to and subscribed before me
this 2ᶠᵈ day of February , 2021.


NOTARY PUBLIC FOR MARYLAND

MY COMMISSION EXPIRES: _____

SITI UMRAH RHETT
NOTARY PUBLIC
FREDERICK COUNTY
MARYLAND
MY COMMISSION EXPIRES 07-19-2023

FILED DATE: 2/3/2021 7:04 PM  2020CH07179

Page **3** of **3**

Return Date: No return date scheduled
Hearing Date: 2/11/2021 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED DATE: 2/3/2021 4:15 PM  2020CH07179

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

SAI ADVANCED POWER
SOLUTIONS, INC.,

                Plaintiff,

v.

SHANE WOLFRAM,

                Defendant,

and

E&I ENGINEERING CORPORATION

           Respondent in Discovery.

FILED
2/3/2021 4:15 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12089899

Case No. 2020 CH 07179

## RESPONDENT IN DISCOVERY E&I ENGINEERING CORPORATION
## MOTION TO QUASH THE SUMMONS AND DISMISS E&I ENGINEERING
## CORPORAITON AS A RESPONDENT IN DISCOVERY

      Respondent in Discovery, E&I Engineering Corporation ("E&I"), submits this Motion to

Quash the Summons and Dismiss E&I as a Respondent in Discovery, pursuant to Sections 2-301

and 2-619 of the Illinois Code of Civil Procedure.  For reasons presented in the concurrently-filed

Memorandum of Law, Plaintiff SAI Advanced Power Solutions, Inc. cannot show that it has

standing to bring its claims or that this Court has personal jurisdiction over E&I.  Therefore, the

Summons should be quashed and E&I should be dismissed from this case with prejudice.

      WHEREFORE, E&I respectfully requests that the summons issued to E&I be quashed and

E&I be dismissed with prejudice, and for any other relief that this Court deems just and proper.

Dated: February 3, 2021

                Respectfully submitted,

                **E&I ENGINEERING CORPORATION**

Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, 28th Floor
Chicago, IL 60601
(312) 527-4000
Firm No. 292143

                */s/ Daniel R. Saeedi*

28729544v1

Return Date: No return date scheduled
Hearing Date: 2/11/2021 9:30 AM - 9:30 AM
Courtroom Number:
Location:

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
2/3/2021 4:15 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12089899

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC., | |
| Plaintiff, | |
| v. | |
| SHANE WOLFRAM, | Case No. 2020 CH 07179 |
| Defendant, | |
| and | |
| E&I ENGINEERING CORPORATION | |
| Respondent in Discovery. | |

**RESPONDENT IN DISCOVERY, E&I ENGINEERING CORPORATION'S,
MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH THE SUMMONS AND
DISMISS E&I ENGINEERING CORPORATION AS A RESPONDENT IN DISCOVERY**

Respondent in Discovery, E&I Engineering Corporation ("E&I"), pursuant to Section 2-301 and 2-619 of the Illinois Code of Civil Procedure (the "Code"), moves to quash the Summons and the December 23, 2020 First Request for Production of Documents propounded upon E&I by Plaintiff, SAI Advanced Power Solutions, Inc. ("SAI"), and to dismiss E&I as a Respondent in Discovery ("RID") on the grounds that SAI lacks standing to assert this action, and that E&I is not subject to personal jurisdiction in Illinois.

**INTRODUCTION**

This motion arises from SAI's attempt to drag E&I, a non-resident corporation that is not registered to do business in Illinois, maintains no offices in Illinois, and owns no real or personal property in Illinois, into an Illinois State Court to respond to discovery regarding E&I's alleged wrongful acquisition of three (3) projects, none of which are located in Illinois, through SAI's

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

former employee, who is not a resident of Illinois.  The essence of SAI's contentions in this lawsuit is that its former employee (and current E&I employee), Shane Wolfram, shared SAI's "Confidential Information" with E&I such that E&I effectively stole away three (3) projects that SAI expected to be awarded.  SAI named Shane Wolfram as a defendant in this action and named E&I as a RID, essentially contending that E&I has documents relevant to SAI's potential claims against E&I.

SAI's attempt to hale E&I into an Illinois State Court fails as SAI lacks standing to bring this action, and this Court lacks personal jurisdiction over E&I.  Despite the requirements of 805 Ill. Comp. Stat. Ann. 5/13.70(a), SAI is not registered to do business in Illinois and, therefore, cannot maintain this action. As shown by the Affidavits of E&I's President and National Sales Manager, attached hereto, E&I's contacts with Illinois are tenuous at best and are certainly insufficient to establish general or specific jurisdiction over E&I.  Other than SAI's principal place of business being located in Illinois, the State of Illinois has no connection to the parties or issues involved in this action. Finally, the very fact that E&I has not been named as a defendant underscores that SAI has not found any factual basis to allege wrongdoing by E&I, let alone any acts in Illinois.  Rather, SAI is merely fishing for information from a non-Illinois party, which the Illinois Long Arm Statute does not allow and which the United States Constitution prohibits under the facts here.  Accordingly, E&I respectfully requests that this Court quash the Summons and dismiss E&I as a RID.

## **FACTUAL BACKGROUND**

### 1.    **Background of the Dispute.**

SAI designs, manufactures, and supplies electrical switchgear.  (Compl. ¶ 7.)  It hired Defendant, Shane Wolfram ("Wolfram"), as Vice President of Sales in August 2011.  *Id.* at ¶ 9.

28732166v1

FILED DATE: 2/3/2021 4:15 PM    2020CH07179

Wolfram signed a "Confidentiality, Non-Competition and Non-Solicitation Agreement" ("Agreement") with SAI on July 25, 2012. *Id.* at ¶ 15.

In September 2019, SAI received a request for proposal from Holder Construction, LLC ("Holder") to bid on a project for Stack, Inc. ("Stack") to supply switchgear for a data center located in Silicon Valley, California (the "Stack Silicon Valley Project"). *Id.* at ¶ 22. SAI submitted a proposal on October 2, 2019, and alleges it was advised in February 2020 that it received the contract for the Stack Silicon Valley Project. *Id.* at ¶¶ 24, 26.

In March 2020, SAI received a request for proposal from CloudHQ, LLC ("Cloud") to supply switchgear for a data center located in Manassas, Virginia (the "Cloud Manassas Project"). *Id.* at ¶ 31. In April 2020, SAI received another request for proposal for a data center in Portland, Oregon (the "Stack Portland Project"), which also included the exclusive right to provide all equipment for the data center for two (2) years following the execution of a contract. (Compl. ¶¶ 34-35.) SAI submitted proposals for these projects in April and May 2020, respectively. *Id.* at ¶¶ 32, 36.

On May 15, 2020, Wolfram tendered his resignation from SAI, effective May 29, 2020. *Id.* at ¶ 38. On May 28, 2020, Wolfram and SAI executed a separation agreement (the "Separation Agreement"), which expressly permitted Wolfram to be employed by E&I. *Id.* at ¶¶ 40-41. Thereafter, Wolfram went to work for E&I.

E&I was awarded the Cloud Manassas Project, the Stack Portland Project, and the Stack Silicon Valley Project (collectively "the Projects"). *Id.* at ¶¶ 57, 67, 70. SAI alleges that, while still employed by SAI, Wolfram shared SAI's Confidential Information with E&I regarding SAI's proposals for the Projects. *Id.* at ¶43. SAI contends that E&I has information which SAI reasonably believes to be necessary to determine the existence of additional defendants and causes

28732166v1

of action, including communications allegedly evidencing (a) E&I's alleged use of SAI's "Confidential Information," (b) E&I's alleged knowledge and inducement of Wolfram to breach the Agreement and Separation Agreement and solicit "Restricted Customers," including, but not limited to, Holder, Stack, and Cloud, and SAI employees to leave their employment with SAI and join E&I, and (c) E&I's alleged interference with SAI's "legitimate business expectations" by providing Wolfram the opportunity to solicit Holder, Stack, and Cloud using SAI's "Confidential Information." (Compl. ¶ 104.)

2.     **SAI's Allegations Regarding the Citizenship of the Parties and this Court's Jurisdiction.**

SAI's Complaint alleges that SAI is an Illinois corporation with its principal place of business in Franklin Park, Illinois. *Id.* at ¶ 3. However, according to certified records from the Wisconsin Department of Financial Institutions, SAI is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Illinois. *See* Certified Records from Wisconsin Department of Financial Institutions, attached hereto as **Exhibit A**. Furthermore, SAI is not registered to do business in Illinois.

Wolfram is a citizen and resident of Wisconsin. (Compl. ¶ 4.) E&I is a corporation organized and existing under the laws of the State of South Carolina, with its principal place of business in Anderson, South Carolina. *Id.* at ¶ 5; Harkin Aff. ¶ 2, attached as **Exhibit B**.

SAI's sole allegation regarding this Court's ability to exercise jurisdiction over Wolfram and E&I is as follows: "[j]urisdiction and venue are proper in Cook County, Illinois, because Wolfram and E&I transact business in Cook County, Illinois and a substantial part of the events giving rise to this action took place in Cook County, Illinois." (Compl. ¶ 6.) Other than the foregoing allegation and a passing reference to a past project in Chicago, Illinois between Stack

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

28732166v1

and SAI, (*Id.* at ¶¶ 59, 63), SAI's Complaint is devoid of any allegations regarding actions taken by Wolfram or E&I in, or directed to, Illinois.

**3.      E&I's Contacts (or Lack Thereof) with Illinois.**

As noted above, E&I is a South Carolina entity with its principal, and only, place of business in South Carolina. (Ex. B, ¶ 2.) E&I is a wholly owned subsidiary of E&I Engineering Ireland, Ltd., which is not incorporated in Illinois and does not have its principal place of business there. *Id.* at ¶ 8.  E&I is not registered to do business, has no mailing address, and does not maintain any kind of facility, production or otherwise, in Illinois. *Id.* at ¶ 3.  Additionally, E&I does not own any real or personal property in Illinois. *Id.* at ¶ 4.  While E&I does ship goods into Illinois, in 2020 E&I shipped .001% of its total sales in the United States to Illinois. *Id.* at ¶ 5.  E&I does not have any subsidiaries incorporated, or located, in Illinois, and has no ownership interest in any entity incorporated, or located, in Illinois.  *Id.* at ¶ 7.  Lastly, while E&I has a website, it is not directed, and does not otherwise engage in any internet activities directed, at individuals and/or entities in Illinois.  *Id.* at ¶ 6.

With regard to the Projects at issue, none are located in Illinois. (Compl. ¶¶ 22, 31, 34; Genson Aff. ¶¶ 3-5, attached hereto as **Exhibit C**.)  During the course of E&I's efforts to solicit the Projects, no meetings were held in Illinois and no contracts were entered into with any individual or entity in Illinois.  (Ex. C, ¶¶ 3-5.)  While E&I employs one (1) individual who resides in Illinois and works out of their home, this individual had no involvement in E&I's solicitation of the Projects. *Id.* at ¶ 7.  Since obtaining the Projects, E&I has not shipped goods to, or provided services, in Illinois in connection with the Projects.  *Id.* at ¶¶ 3-7.

28732166v1

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

## **LEGAL STANDARD**

SAI bears the burden of making a *prima facie* showing that the trial court has personal jurisdiction over E&I, a nonresident RID. *Rosier v. Cascade Mountain, Inc.*, 367 Ill.App.3d 559, 561 (2006). "While conflicts in the pleadings and affidavits regarding personal jurisdiction over a nonresident defendant are resolved in the plaintiff's favor, the defendant may overcome the plaintiff's prima facie case by offering uncontradicted evidence that defeats jurisdiction." *Sheikholeslam v. Favreau*, 2019 IL App (1st) 181703, ¶ 17. "'[F]acts contained in an uncontested affidavit denying jurisdiction * * * [must be] accepted as true.'" *Campbell v. Mills*, 262 Ill. App. 3d 624, 627 (1994) (quoting *Johnson v. Ortiz*, 244 Ill.App.3d 384, 388 (1993)). "In disposing of a motion objecting to the court's jurisdiction over the person of the objecting party, the court shall consider all matters apparent from the papers on file in the case, affidavits submitted by any party, and any evidence adduced upon contested issues of fact." 735 Ill. Comp. Stat. Ann. 5/2-301. The court must look to the time plaintiff filed suit and attempted to obtain service to determine if defendant had the necessary minimum contacts with Illinois. *See Reeves v. Baltimore & Ohio R.R. Co.*, 171 Ill. App. 3d 1021, 1027 (1st Dist. 1988); *Morecambe Mar., Inc. v. Nat'l Bank of Greece*, 354 Ill.App.3d 707, 713, (1st Dist. 2004).

## **ARGUMENT**

**1.     SAI IS NOT QUALIFIED TO DO BUSINESS IN ILLINOIS AND, THERFORE, PURSUANT TO SECTION 2-619, LACKS STANDING TO BRING THIS ACTION AND NAME E&I AS A RID.**

"No foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority." 805 Ill. Comp. Stat. Ann. 5/13.70. Where a foreign corporation has failed to obtain such authority but has filed a civil action in a court of Illinois, dismissal of that plaintiff's complaint

FILED DATE: 2/3/2021 4:15 PM 2020CH07179

is the appropriate remedy. *See C. Mfg. Co. v. Pure Fishing, Inc.,* 392 F. Supp. 2d 1046, 1047 (N.D. Ill. 2005) (dismissing claims brought by entity that had not registered to do business with the State of Illinois).

Here, SAI is a foreign corporation within the meaning of 805 Ill. Comp. Stat. Ann. 5/13.70 because it is organized and existing under the laws of Wisconsin. *See* Ex. A. It has transacted business in Illinois, as shown by the corporate records listing an Illinois address as its "Principal Office," *see id.*, and the allegation in the Complaint that SAI's principal place of business is in Illinois. (Compl. at ¶ 3.) However, SAI has not registered to do business with Illinois as required by 805 Ill. Comp. Stat. Ann. 5/13.70. Consequently, SAI's attempt to obtain discovery from E&I must be quashed, and E&I dismissed as a RID.

**2.      E&I, AN OUT OF STATE RESPONDENT IN DISCOVERY, SHOULD BE DISMISSED FROM THIS ACTION PURSUANT TO SECTION 2-301 BECAUSE THIS COURT LACKS JURISDICTION OVER E&I.**

### A.      *General Principles Governing Personal Jurisdiction.*

"Personal jurisdiction is the authority of the court to bring a person into its adjudicative process." *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051, ¶ 11 (citing references omitted). As a named RID, E&I is entitled to the same procedural and discovery rules and safeguards as named defendants, including the ability to challenge personal jurisdiction. *See Coyne v. OSP Healthcare System*, 332 Ill.App.3d 717, 720 (Ill. App. 2002) (analyzing whether a plaintiff established personal jurisdiction over an RID under the Illinois Long Arm Statute). A court can exercise jurisdiction over a person only if that exercise complies with Due Process standards set forth in the United States Constitution. *Suffolk v. Chapman*, 31 Ill. 2d 551, 555–56, (1964) (citing *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)) ("Restrictions on the jurisdiction of State courts arise from territorial limitations on the power of the respective States.")

28732166v1

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

The fact that E&I has not been named as a defendant underscores that SAI has not found any factual basis to allege wrongdoing by E&I, let alone any acts in Illinois.  Rather, SAI is merely fishing for information from a non-Illinois party, which the Illinois Long Arm Statute and United States Constitution prohibit.   Further, the purpose of the Illinois RID statute (735 ILCS 5/2-402) is to permit a plaintiff to conduct discovery of a third-party to see if there are grounds to make the third-party an actual defendant in the case.   However, it is totally inconsistent with this basic purpose of the RID statute to allow discovery of a third-party who ultimately cannot be added as a defendant because the court lacks personal jurisdiction over them.  *See J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576-578 (7th Cir. 2020) (finding no personal jurisdiction over defendant where defendant's alleged wrongful conduct was not connected with Illinois).

In order for this Court to exercise personal jurisdiction over E&I, SAI must establish that the requirements of the Illinois Long Arm Statute (735 Ill. Comp. Stat. Ann.  5/2-209) have been met *and* the requirements of both federal and state due process have been met. *Campbell*, 262 Ill.App.3d at 626.  "[T]he long-arm statute is satisfied when due process concerns are satisfied, regardless of whether the defendant performed any of the acts enumerated in the long-arm statute." *Keller v. Henderson*, 834 N.E.2d 930, 935 (2005).  Accordingly, Illinois Courts evaluate whether exercising jurisdiction over a defendant would comport with Illinois and federal due process concerns instead of conducting an additional analysis under Illinois' Long Arm Statute. See *Commerce Tr. Co. v. Air 1st Aviation Companies*, Inc., 366 Ill. App. 3d 135, 140–41 (2006).

In order for personal jurisdiction to comport with federal due process requirements, E&I must have certain "'minimum contacts' with the forum state such that maintaining the suit there does not offend 'traditional notions of fair play and substantial justice.'"  *Spartan Motors, Inc. v. Lube Power, Inc.*, 337 Ill. App. 3d 556, 560 (2003) (quoting *International Shoe Co. v. Washington*,

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

326 U.S. 310, 316 (1945)).   In other words, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, (1985) (quoting *International Shoe*, 326 U.S. at 320). Personal jurisdiction can be either specific or general. *Daimler AG v. Bauman,* 571 U.S. 117 (2014).

SAI cannot carry its burden of demonstrating that personal jurisdiction over E&I exists in this Court. As discussed below, this Court possesses neither specific nor general jurisdiction over E&I, and exercising any jurisdiction over E&I would violate E&I's due process rights under the United States Constitution. Therefore, this Court should grant E&I's motion to quash the Summons and dismiss E&I as a RID.

**B.** ***SAI Has Not Shown Sufficient Minimum Contacts By E&I With Illinois For Specific Or General Jurisdiction To Exist Over E&I In Illinois.***

The minimum contacts required for personal jurisdiction "must be based on 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Spartan Motors*, 337 Ill.App.3d at 560–61 (quoting *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 109, (1987)). The purposeful availment requirement exists so that an "alien defendant will not be forced to litigate in a distant or inconvenient forum solely as a result of random, fortuitous, or attenuated contacts or the unilateral act of a consumer or some other third person." *Spartan Motors*, 337 Ill.App.3d at 561 (citing *Burger King Corp.*, 471 U.S. at 475).  The "minimum contacts" required for personal jurisdiction differ depending on whether general jurisdiction or specific jurisdiction is being sought. *Spartan Motors*, 337 Ill.App.3d at 561.

28732166v1

1.   E&I's Contacts with Illinois Are Insufficient to Establish General
     Jurisdiction Over E&I in Illinois.

"Where general jurisdiction exists, the plaintiff may pursue a claim against the defendant even if the conduct of the defendant that is being challenged occurred entirely outside the forum state." *Campbell*, 2018 IL App (1st) 173051, ¶ 14 (citing references omitted).  "'[T]he standard for finding general jurisdiction is very high and requires a showing that the nonresident defendant carried on systemic business activity in Illinois not casually or occasionally, but with a fair measure of permanence and continuity.'" *Id.* at ¶ 14 (citing *Russell v. SNFA*, 2013 IL 113909, ¶ 36).  In *Daimler AG v. Bauman*, the United States Supreme Court held that, "'only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there.'" *Jovanovich v. Indiana Harbor Belt R.R. Co.*, 2020 IL App (1st) 192550-U, ¶ 40 (quoting *Daimler*, 571 U.S. at 137).  "Thus, to establish general jurisdiction, it is not enough for a defendant to have 'continuous and systematic' contacts with the forum state . . . .  Rather, the defendants contacts must be 'so continuous and systematic as to render [it] ***essentially at home'*** in the state." *Jovanovich*, 2020 IL App (1st) 192550-U, ¶ 40-41 (quoting *Daimler*, 571 U.S. at 138-9) (emphasis added).  "The *Daimler* Court identified two places in which a corporation is "at home": its state of incorporation and the state in which it has its principal place of business." *Jovanovich*, 2020 IL App (1st) 192550-U, ¶ 40-41 (citing *Daimler*, 571 U.S. at 137, 139 n. 19).

SAI cannot carry its burden of demonstrating that personal jurisdiction over E&I exists in this Court on the basis that Illinois has general jurisdiction over E&I.  The only allegation in SAI's Complaint relating to any alleged general jurisdiction an Illinois Court might have over E&I is that "E&I transact[s] business in Cook County, Illinois."  (Compl. ¶ 6.)  As the Affidavit of Michael Harkin, E&I's President, makes clear, E&I's contacts with Illinois are not so continuous and systematic to render E&I essentially "at home" in Illinois.  E&I is not an Illinois corporation and

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

FILED DATE: 2/3/2021 4:15 PM    2020CH07179

does not maintain its principal place of business, or any other facility, in Illinois. (Ex. B, ¶¶ 2-3.) On that basis alone, this Court lacks general jurisdiction over E&I. *Jovanovich*, 2020 IL App (1st) 192550-U, ¶ 40-41. Even so, E&I's further lack of contacts with Illinois supports the finding that there is no general jurisdiction over E&I in Illinois. E&I is not registered to do business, and does not own any real or personal property, in Illinois. *Id.* at ¶¶ 3-4. E&I is a subsidiary of a company that is not incorporated, or has its principal place of business, in Illinois, and E&I has no ownership interest in any entity incorporated, or located, in Illinois. *Id.* at ¶¶ 7-8. While E&I does ship goods into Illinois (as it does the rest of the United States), it is a minuscule amount –.001%. *Id.* at ¶ 5. Lastly, while E&I has a website, it is not directed, and does not otherwise engage in any internet activities directed, at individuals and/or entities in Illinois. *Id.* at ¶ 6. Based on the foregoing, E&I simply cannot be said to be "at home" in Illinois. Accordingly, there is no general jurisdiction over E&I.

2.      E&I's Contacts with Illinois Are Not Sufficient to Establish Specific Jurisdiction Over E&I in Illinois.

"An Illinois court may assert specific jurisdiction over a nonresident defendant if: (1) the defendant had minimum contacts with Illinois such that it was fairly warned that it may be haled into an Illinois court; (2) the action arose out of or was related to the defendant's contacts with Illinois; and (3) it is reasonable to require the defendant to litigate in Illinois." *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 14. In specific jurisdiction cases, the suit must "directly arise out of the contacts between the defendant and the forum." *Spartan Motors*, 337 Ill.App.3d at 561.

Instructive is the nearly on point case of *Tower Commc'ns Expert, LLC v. TSC Constr., LLC*, No. 18 C 2903, 2018 WL 5624268, at *1 (N.D. Ill. Oct. 30, 2018). Like the case at bar, *Tower* involved an allegation that the corporate defendant poached plaintiff's employees and encouraged

28732166v1

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

them to obtain and disclose plaintiff's confidential information and trade secrets, and encourage the former employees to solicit additional subcontractors and employees of plaintiff. *Id.* at *1.  In finding that the defendants lacked sufficient minimum contacts with Illinois to establish personal jurisdiction, the Court relied on the fact that the project at issue was located in North and South Carolina, defendants had not lived in Illinois for many years, and the lack of evidence that plaintiff's claims directly arose out of corporate defendant's contacts with Illinois as opposed to the Carolinas. *Id.* at *6 & *10.  The fact that the plaintiff was a Nevada limited liability company with its principal place of business in Illinois was, alone, insufficient to establish personal jurisdiction. *Id.* at *10.

In the instant case, none of E&I's actions within, or directed to, Illinois gave rise this action. Like in *Tower*, none of the Projects at issue are located in Illinois. (Compl. ¶¶ 22, 31, 34; Ex. C, ¶¶ 3-5.)  They are located across the county – in California, Virginia, and Oregon.  *Id.*  Also like in *Tower*, there is no evidence that E&I took any actions in Illinois to wrongfully solicit and, ultimately obtain, the Projects.  During the course of E&I's efforts to solicit the Projects, no meetings were held in Illinois and no contracts were entered into with any individual or entity in Illinois.  (Ex. C, ¶¶ 3-5.) While E&I employs one (1) individual who resides in Illinois and works out of their home, this individual had no involvement in E&I's solicitation of the Projects. *Id.* at ¶ 7.  Since obtaining the Projects, E&I has not shipped goods to, or provided services, in Illinois in connection with the Projects.  *Id.* at ¶¶ 3-5.  Based on the foregoing, E&I's almost non-existent contacts with Illinois bear no relation to this action.  E&I's tenuous contacts with Illinois, and certainly those related to the Projects at issue, are simply insufficient to have "fairly warned" E&I "that it may be haled into an Illinois court."  Accordingly, E&I respectfully submits that there is no specific jurisdiction and SAI's Summons should be quashed and E&I dismissed as RID.

28732166v1

C.      *SAI Has Not Shown That The Exercise Of Personal Jurisdiction Comports With Fair Play And Substantial Justice.*

If sufficient minimum contacts are established between the defendant and the forum state, the court must next determine if such contacts comport with the constitutional goals of "fair play and substantive justice." *International Shoe*, 326 U.S. at 316. In making this determination, the court "must consider the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief." *Asahi Metal Industry*, 480 U.S. at 113. In addition, the court must consider the judicial system's interest in the efficient resolution of controversies as well as the shared interest in "furthering fundamental substantive social policies." *Id.*

Even if E&I's very tenuous connections with Illinois could be construed as "minimum contacts," any evidence of the second requirement of "fair play and substantive justice" falls short. Since E&I is a South Carolina entity that is not registered to do business in Illinois, and maintains no office in Illinois, the burden on E&I to litigate in Illinois would be significant. *See Tower*, 2018 WL 5624268, at *9 (finding that individual defendants' burden to litigate in Illinois would be significant since they had no ties to Illinois). Furthermore, the Projects are not located in Illinois and E&I did not utilize any goods or services in Illinois to solicit the Projects. (Genson Aff. ¶¶ 2-5.) Therefore, litigating this case in Illinois State Court would not be efficient or in furtherance of Illinois' interests. *See Tower*, 2018 WL 5624268, at *9 (noting that because the project at issue was outside of Illinois and that the employees defendant allegedly solicited were outside Illinois, "litigating the case in Illinois would not be efficient or in furtherance of Illinois' or the several states' interests.") To require E&I to respond to discovery in an Illinois State Court action where the only connection to Illinois is the presence of SAI's principal place of business, but is not even registered to do business in Illinois, does not further the constitutional goals of "fair play and substantive justice."    Accordingly, E&I

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

28732166v1

respectfully submits that there is no personal jurisdiction and SAI's Summons should be quashed and E&I dismissed as RID.

## **CONCLUSION**

For the foregoing reasons, E&I respectfully requests that this Court quash the Summons and the December 23, 2020 First Request for Production of Documents propounded upon E&I by SAI, and dismiss E&I as a RID.

Dated: February 3, 2021                    Respectfully submitted,

                                        **E&I ENGINEERING CORPORATION**

                                        */s/ Daniel R. Saeedi*

Daniel R. Saeedi (ARDC #6296493)
dsaeedi@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, 28th Floor
Chicago, IL 60601
(312) 527-4000
Firm No. 292143

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

# EXHIBIT A

DFI/CORP/38
RECORD 2011

United States of America

State of Wisconsin



# DEPARTMENT OF FINANCIAL INSTITUTIONS

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

To All to Whom These Presents Shall Come, Greeting:

    I, Patti Epstein, Administrator, Division of Corporate and Consumer Services, Department of Financial Institutions, do hereby certify that the annexed copy has been compared by me with the record on file in the Corporation Section of the Division of Corporate & Consumer Services of this department and that the same is a true copy thereof and the whole of such record; and that I am the legal custodian of said record, and that this certification is in due form.



    IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the official seal of the Department.

*Patti Epstein*

PATTI EPSTEIN, Administrator Division of Corporate and Consumer Services
Department of Financial Institutions

DATE: January 5, 2021

BY: Deidre Taylor

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

c1   S046332

Imaged

RECEIVED

2013 DEC 13

WISCONSIN DEPT. OF
FINANCIAL INSTITUTIONS

12/13/2013        04:30 PM
DCorp           $40.00
200369      #. 1

12/13/2013        04:30 PM
Expedite        $25.00
200369      #. 2

# EIGHTH AMENDED AND RESTATED ARTICLES OF INCORPORATION

## OF

# SAI ADVANCED POWER SOLUTIONS, INC.

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

## Table of Contents

ARTICLE I. NAME............................................................................................1

ARTICLE II. REGISTERED AGENT AND ADDRESS..........................................1

ARTICLE III. BUSINESS PURPOSE ...................................................................1

ARTICLE IV. AUTHORIZED CAPITAL .............................................................1

ARTICLE V. COMMON STOCK .........................................................................2

ARTICLE VI. SERIES A-3 CONVERTIBLE PREFERRED STOCK.......................2

    6.1.      Series A-3 Preferred.......................................................................2

    6.2.      Authorized Number........................................................................2

    6.3.      Dividends.......................................................................................2

    6.4.      Liquidation. ...................................................................................3

    6.5.      Voting Rights.................................................................................4

    6.6.      Conversion.....................................................................................5

    6.7.      Certain Remedies..........................................................................9

    6.8.      Preferred Protective Provisions. ....................................................9

    6.9.      Reacquired Shares.......................................................................11

ARTICLE VII. RECAPITALIZATION .................................................................11

    7.1.      2013 Recapitalization Related to Eighth Amended and Restated Articles. ..........11

ARTICLE VIII. INDEMNIFICATION ...................................................................15

    8.1.      Generally .....................................................................................15

    8.2.      Indemnification of Directors and Officers. .................................15

    8.3.      Derivative Actions.. .....................................................................16

    8.4.      Indemnification in Certain Cases..................................................16

    8.5.      Procedure.....................................................................................16

    8.6.      Advances for Expenses. ...............................................................16

    8.7.      Rights Not Exclusive....................................................................17

    8.8.      Insurance......................................................................................17

    8.9.      Definition of Corporation.............................................................17

    8.10.     Survival of Rights. ......................................................................17

ARTICLE IX. GENERAL ....................................................................................17

    9.1.      Amendments to Bylaws. ..............................................................17

    9.2.      Corporate Books. .........................................................................17

    9.3.      Action by Written Consent Prohibited if Registered.. .................17

ARTICLE X. PREEMPTIVE RIGHTS .................................................................18

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

10.1.     Generally.. ..................................................................................18

10.2.     Expiration of Preemptive Acceptance Period....................................18

10.3.     Sales of Issuance Stock. ...............................................................19

10.4.     Preemptive Rights on IPO.............................................................19

10.5.     Waiver.. .....................................................................................19

ARTICLE XI. PREFERRED SHAREHOLDER DUTIES.......................................19

11.1.     Specified Shareholders.................................................................19

11.2.     Specified Directors......................................................................20

ARTICLE XII. DEFINITIONS ...............................................................20

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

# EIGHTH AMENDED AND RESTATED ARTICLES OF INCORPORATION

## OF

## SAI ADVANCED POWER SOLUTIONS, INC.

The following have been adopted as the Eighth Amended and Restated Articles of Incorporation of SAI Advanced Power Solutions, Inc., a Wisconsin corporation f/k/a Soft Switching Technologies Corp. (the "**Corporation**"), organized pursuant to Chapter 180 of the Wisconsin Statutes, and which supersede and replace in their entirety the existing Amended and Restated Articles of Incorporation of the Corporation:

## ARTICLE I.
## NAME

The name of the Corporation is SAI Advanced Power Solutions, Inc.

## ARTICLE II.
## REGISTERED AGENT AND ADDRESS

The address of the Corporation's registered office is 901 South Whitney Way, Madison, Wisconsin 53711. The name of its registered agent at such address is National Corporate Research Ltd. c/o Dane County Title Company, Inc.

## ARTICLE III.
## BUSINESS PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Wisconsin Business Corporation Law, Chapter 180 of the Wisconsin Statutes (the "**WBCL**"). The Corporation shall have, exercise and enjoy all of the general rights, privileges and powers granted to corporations organized under the WBCL.

## ARTICLE IV.
## AUTHORIZED CAPITAL

The total number of all classes of capital stock which the Corporation has authority to issue is 749,827,812 shares, consisting of (i) 512,163,938 shares of Common Stock, par value $0.001 per share (the "**Common Stock**") and (ii) 237,663,874 shares of Preferred Stock, par value $0.001 per share (the "**Preferred Stock**"). The Preferred Stock shall consist of one series, designated as "**Series A-3 Convertible Preferred Stock**" with the designations, rights, preferences and limitations hereinafter described. Except as provided to the contrary in the provisions establishing a class or series of stock, the amount of the authorized stock of this Corporation or any class or classes may be increased or decreased by the affirmative vote of the holders of a majority of the stock in this Corporation entitled to vote without a separate class vote. Defined terms used in these Eighth Amended and Restated Articles of Incorporation shall have the meanings set forth in ARTICLE XII.

1300995.9

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

## ARTICLE V.
## COMMON STOCK

All shares of Common Stock outstanding on the effective date of these Eighth Amended and Restated Articles of Incorporation shall be entitled to one vote, subject to the powers, preferences and rights of any Preferred Stock, including any series thereof, having any preference or priority over, or rights superior to, the Common Stock. The holders of Common Stock shall not be entitled to preemptive rights. Election of directors shall be governed by Section 6.5(b).

Any action required to be taken at any annual or special meeting of the shareholders, or any action which may be taken at any annual or special meeting of the shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Action taken by written consent is effective when consents representing the required number of shares are delivered to the Corporation, unless the consent specifies a different effective date. Within ten (10) days after the action taken without a meeting by less than unanimous written consent is effective, the Corporation shall provide notice to those shareholders who have not consented in writing. If not otherwise fixed, the record date for determining shareholders entitled to take action without a meeting is the date that the first shareholder signs the consent.

## ARTICLE VI.
## SERIES A-3 CONVERTIBLE PREFERRED STOCK

6.1.    <u>Series A-3 Preferred</u>. Except as expressly provided for herein, the Series A-3 Convertible Preferred Stock, par value $.001 per share (the "**Series A-3 Preferred**") shall rank, with respect to dividend rights, redemption rights and rights on liquidation, winding-up and dissolution, senior to all classes of Common Stock, as they exist on the date hereof or as such stock may be constituted from time to time, and senior to all other classes of capital stock or series of capital stock issued by the Corporation or established by the Board (collectively, the "**Series A-3 Junior Securities**").

The Corporation elects to have preemptive rights for the holders of the Series A-3 Preferred with respect to certain types of securities of the Corporation, as set forth in ARTICLE X.

6.2.    <u>Authorized Number</u>. The authorized number of shares constituting the Series A-3 Preferred shall be 237,663,874 shares.

6.3.    <u>Dividends</u>.

(a)    Subject to Section 6.7(b)(vii), the Corporation shall pay dividends to the holders of the Series A-3 Preferred as provided in this Section 6.3 when and as declared by the Board out of funds legally available therefore.

2

FILED DATE: 2/3/2021 4:15 PM    2020CH07179

(b)     Dividends, if declared in accordance with this Section 6.3, shall be subject to the terms and conditions specified by the Board.  Each dividend will be payable to holders of record as they appear on the books of the Corporation at the close of business on a record date (each, a "**Series A-3 Record Date**"), not more than 60 nor less than 15 days before the payment date fixed by the Board. All accrued and unpaid dividends shall be payable in cash upon a liquidation under Section 6.4 or in shares of Common Stock on conversion. If any dividend payment date shall not be a Business Day, payment shall be made on the next succeeding Business Day. Dividends shall cease to be payable once the Series A-3 Preferred has been converted into Common Stock or redeemed by the Corporation.

(c)     Prior to any dividend or other distribution to the holders of Common Stock, the holders of Series A-3 Preferred shall have received in cash the full cumulative accrued and unpaid dividends on such shares, and also shall be entitled to participate pro rata in any dividends paid on the Common Stock on an as-if-converted basis. All accrued and unpaid dividends on shares of Series A-3 Preferred shall be payable in cash upon a redemption, dissolution, liquidation, or winding up of the Corporation under Section 6.4, or in shares of Common Stock upon conversion of shares of Series A-3 Preferred.

6.4.    Liquidation.

(a)     Upon the dissolution, liquidation or winding up of the Corporation (whether voluntary or involuntary), the holders of Series A-3 Preferred shall be entitled to receive out of the assets of the Corporation available for distribution to shareholders, before any payment or distribution shall be made on any Series A-3 Junior Securities, an amount equal to the Series A-3 Liquidation Value with respect to each outstanding share of Series A-3 Preferred.

(b)     For the purposes of this Section 6.4 the following shall be deemed to be a dissolution, liquidation or winding-up, voluntary or involuntary: (i) the sale, license, lease or exchange (for cash, shares of stock, securities or other consideration) of all or substantially all of the assets of the Corporation, or (ii) a merger, consolidation, or any other transaction involving the Corporation that results in the shareholders of the Corporation immediately prior to the transaction beneficially owning, on a fully diluted basis, less than 50% of the issued and outstanding shares of the surviving corporation from such transaction.

(c)     The Corporation may not undertake a voluntary liquidation, dissolution or winding up of the Corporation without first obtaining the prior written consent of the holders of Preferred Stock as required by Section 6.8.

(d)     In the event of any involuntary liquidation, dissolution, or winding up of the Corporation, the Corporation shall give each holder of shares of Preferred Stock initial written notice of the proposed action within twenty (20) days after the commencement of any involuntary proceeding. Such initial written notice shall describe the material terms and conditions of such proposed action, including a description of the stock, cash, and property to be received by the holders of shares of Preferred Stock upon consummation of the proposed action and the date of delivery thereof. If any material change in the facts set forth in the initial notice shall occur, the Corporation shall promptly give subsequent written notice to each holder of shares of Preferred Stock of such material change.

3

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

(e)     If any of the assets of the Corporation are to be distributed other than in cash under Section 6.4 or for any purpose, then the Board shall promptly engage independent competent appraisers to determine the value of the assets to be distributed to the holders of Preferred Stock; provided, however, that in the event the Board and the holders of a majority of the Preferred Stock agree on the value of the non-cash consideration, such value shall be used and an appraiser shall not be engaged. The Corporation shall, upon receipt of such appraiser's valuation or upon the date the valuation is determined by the Board and holders of Preferred Stock, give prompt written notice to each holder of shares of Preferred Stock of the valuation. Notwithstanding the above, any securities to be distributed to the Corporation's shareholders shall be valued as follows:

        (i)     if traded on a securities exchange or the NASDAQ Global or Capital Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange, or the last reported sale prices on such market as the case may be, over the 30-day period ending three (3) business days prior to the closing;

        (ii)     if actively traded over-the-counter (other than on the NASDAQ Global or Capital Market), the value shall be deemed to be the average of the closing bid prices over the 30-day period ending three (3) business days prior to the closing; and

        (iii)     if there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and the holders of not less than a majority of the outstanding shares of Preferred Stock; provided, however, that if the Corporation and the holders of a majority of the outstanding shares of Preferred Stock are unable to reach an agreement, then by independent appraisal by an investment banker hired and paid by the Corporation, but acceptable to the holders of at least a majority of the outstanding shares of Preferred Stock.

(f)     Upon completion of the distribution contemplated pursuant to Section 6.4(e) above, the remaining assets, if any, shall be distributed among the holders of Series A-3 Preferred and Common Stock on a pro-rata basis, with such distribution to the holders of Series A-3 Preferred as would have been payable had each such share been converted to Common Stock immediately prior to such event of liquidation, dissolution, or winding up pursuant to the provisions of Section 6.6 hereof.

    6.5.     Voting Rights.

(a)     The holders of shares of Preferred Stock and Common Stock and all other classes and series of capital stock shall vote together as a single class on all matters that require the vote of the shareholders under law, unless the law or the express provisions of these Eighth Amended and Restated Articles of Incorporation require the vote of a separate class. The holder of each share of Preferred Stock shall be entitled to the number of votes equal to the largest number of full shares of Common Stock into which such shares of Preferred Stock could be converted, pursuant to the provisions of Section 6.6 hereof, at the record date for the

1300995.9

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

determination of shareholders entitled to vote on such matters or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited.

(b)     The number of directors on the Corporation's Board of Directors shall be as fixed from time to time in accordance with the Corporation's Bylaws.

(c)     Any action required to be taken, or that may be taken, at any annual or special meeting of all shareholders or of the holders of Preferred Stock may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding Preferred Stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of Preferred Stock entitled to vote thereon were present and voted. Action taken by written consent is effective when consents representing the required number of shares are delivered to the Corporation, unless the consent specifies a different effective date. Within ten (10) days after the action taken without a meeting by less than unanimous written consent is effective, the Corporation shall provide notice to those shareholders who have not consented in writing. If not otherwise fixed, the record date for determining shareholders entitled to take action without a meeting is the date that the first shareholder signs the consent.

6.6.   Conversion.

(a)     Optional Conversion. At the option of the holder, shares of Series A-3 Preferred may be converted at any time or from time to time upon written notice to the Corporation into fully paid and nonassessable shares (rounded up to the nearest whole share) of Common Stock. The number of shares of Common Stock to which a holder of Series A-3 Preferred shall be entitled upon conversion shall be (1) the sum of (i) the product obtained by multiplying the Series A-3 Conversion Rate (determined as provided in this Section 6.6) by the number of shares of Series A-3 Preferred being converted, plus (ii) the aggregate amount of accrued and unpaid dividends on such shares being converted, divided by (2) the Series A-3 Conversion Price then in effect.

(b)     Automatic Conversion. Immediately prior to the consummation of a Qualified IPO, each share of Series A-3 Preferred shall automatically be converted into a fully paid and nonassessable share (rounded up to the nearest whole share) of Common Stock. The number of shares of Common Stock to which a holder of Series A-3 Preferred shall be entitled upon conversion shall be (1) the sum of (i) the product obtained by multiplying the Series A-3 Conversion Rate (determined as provided in this Section 6.6) by the number of shares of Series A-3 Preferred being converted, plus (ii) the aggregate amount of accrued and unpaid dividends on such shares being converted (if any), divided by (2) the Series A-3 Conversion Price then in effect.

(c)     Reservation. The Corporation shall at all times reserve and keep available for issuance upon the conversion of the Series A-3 Preferred, free from any preemptive rights, such number of its authorized but unissued shares of Common Stock as will from time to time be necessary to permit the conversion of all outstanding shares of Series A-3 Preferred into shares of Common Stock, and shall take all action required to increase the authorized number of shares

1300995.9

of Common Stock if necessary to permit the conversion of all outstanding shares of Series A-3 Preferred.

(d)     Series A-3 Conversion Rate. The Series A-3 Conversion Rate in effect at any time shall be the quotient obtained by dividing the Series A-3 Stated Value by the Series A-3 Conversion Price, as may be adjusted pursuant to this Section 6.6.

(e)     Series A-3 Conversion Price. The Series A-3 Conversion Price shall equal the Series A-3 Stated Value as of the Eighth Articles Effective Time, and shall be adjusted from time to time for the following events:

(i)     Sale of Common Stock Equivalents Below Conversion Price. In the event the Corporation, any time after the Series A-3 Issue Date issues shares of Common Stock Equivalents other than Excluded Securities for a consideration per share (or exercise price per share, as applicable) less than the Series A-3 Conversion Price then in effect, such Series A-3 Conversion Price thereafter shall be reduced to the price at which such Common Stock Equivalents are issued by the Corporation. An adjustment made pursuant to this Section 6.6(e)(i) shall be made on the next Business Day following the date on which any such issuance shall be made and shall be effective retroactively to the close of business on the date of such an issuance.

(ii)     Reclassification, Exchange or Substitution. If the Corporation shall be a party to any transaction, including without limitation, a merger, consolidation, sale of all or substantially all of the Corporation's assets or a reorganization, reclassification or recapitalization of the capital stock of the Corporation, but excluding any transaction for which provision for adjustment is otherwise made in this Section 6.6 (each of the foregoing being referred to in this Section 6.6(e)(ii) as a "**Transaction**"), in each case, as a result of which shares of Common Stock are converted into the right to receive stock, securities or other property (including cash or any combination thereof), each share of Series A-3 Preferred shall thereafter be convertible into the number of shares of stock or other securities or property to which a holder of the number of shares of Common Stock of the Corporation deliverable upon conversion of such Series A-3 Preferred would have been entitled upon such Transaction; and, in any such case, appropriate adjustment (as determined by the Board) shall be made in the application of the provisions set forth in this Section 6.6(e)(ii) with respect to the rights and interest thereafter of the holders of the Series A-3 Preferred, to the end that the provisions set forth in this Section 6.6(e)(ii) shall thereafter be applicable, as nearly as reasonably may be, in relation to any shares of stock or other property thereafter deliverable upon the conversion of the Series A-3 Preferred. The Corporation shall not effect any Transaction (other than a consolidation or merger in which the Corporation is the continuing corporation) unless prior to or simultaneously with the consummation thereof the Corporation, or the successor corporation or purchaser, as the case may be, shall provide in its charter document that each share of Series A-3 Preferred shall be convertible into such shares of stock, securities or property as, in accordance

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

1300995.9

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

with the foregoing provisions, each such holder is entitled to receive. The provisions of this Section 6.6(e)(ii) shall similarly apply to successive Transactions.

(iii)    Stock Dividends, Splits, Combinations. In case the Corporation shall at any time, or from time to time, after the Series A-3 Issue Date (A) pay a dividend, or make a distribution, on the outstanding shares of Common Stock in shares of Common Stock, (B) subdivide the outstanding shares of Common Stock, (C) combine the outstanding shares of Common Stock into a smaller number of shares or (D) issue by reclassification of the shares of Common Stock any shares of capital stock of the Corporation, then, and in each such case, the Series A-3 Conversion Price in effect immediately prior to such event or the record date therefor, whichever is earlier, shall be adjusted so that the holder of any shares of Series A-3 Preferred thereafter surrendered for conversion shall be entitled to receive the number of shares of Common Stock or other securities of the Corporation which such holder would have owned or have been entitled to receive after the happening of any of the events described above, had such shares of Series A-3 Preferred been surrendered for conversion immediately prior to the happening of such event or the record date therefor, whichever is earlier. An adjustment made pursuant to this clause (iii) shall become effective (x) in the case of any such dividend or distribution, immediately after the close of business on the record date for the determination of holders of shares of Common Stock entitled to receive such dividend or distribution, or (y) in the case of such subdivision, reclassification or combination, at the close of business on the day upon which such corporate action becomes effective.

(iv)    Aggregate Consideration. For purposes of this Section 6.6(e), the aggregate consideration receivable by the Corporation in connection with the issuance of shares of Common Stock Equivalents shall be deemed to be equal to the sum of the aggregate offering price (before deduction of underwriting discounts or commissions and expenses payable to third parties, if any) of all such Common Stock Equivalents plus the minimum aggregate amount, if any, payable upon conversion, exchange or exercise of any such Common Stock Equivalents. If the consideration received by the Corporation in connection with the sale or issuance of, or exercise for, or conversion or exchange of, Common Stock Equivalents consists, in whole or in part, of property other than cash or its equivalent, the value of such property shall be the Fair Market Value.

(v)    Further Adjustments to the Series A-3 Conversion Price. If the minimum amount of consideration payable to the Corporation upon the exercise of Rights or Options is subsequently changed, then the Series A-3 Conversion Price shall again be recalculated using the new minimum amount of consideration payable to the Corporation upon the exercise of such Rights or Options. No further adjustment of the Series A-3 Conversion Price shall be made as a result of the actual issuance of shares of Common Stock (or other securities of the Corporation, as applicable) on the exercise of any such Rights

7

FILED DATE: 2/3/2021 4:15 PM  2020CH07179

or Options. If any such Rights or Options shall expire without having been fully exercised, then the Series A-3 Conversion Price then in effect shall be readjusted to the Series A-3 Conversion Price which would have been in effect had an adjustment been made on the basis that only shares of Common Stock (or other securities of the Corporation, as applicable) so issued were the shares of Common Stock (or other securities of the Corporation, as applicable), if any, that were actually issued or sold on the exercise of such Rights or Options.

(f)     Adjustments. If the Corporation shall take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or other distribution and shall thereafter, and before such dividend or distribution is paid or delivered to shareholders entitled thereto, legally abandon its plan to pay or deliver such dividend or distribution, then no adjustment in the Series A-3 Conversion Price then in effect shall be made by reason of the taking of such record, and any such adjustment previously made as a result of the taking of such record shall be reversed.

(g)     Taxes. The issuance of certificates for shares of Common Stock upon conversion of the Series A-3 Preferred shall be made without charge to the holders thereof for any issuance tax in respect thereof; provided, however, that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the holder of the Series A-3 Preferred which is being converted.

(h)     Transfer Books. The Corporation will at no time close its transfer books against the transfer of any Series A-3 Preferred, or of any shares of Common Stock issued or issuable upon the conversion of any shares of Series A-3 Preferred, in any manner which interferes with the timely conversion of such Series A-3 Preferred, except as may otherwise be required to comply with applicable securities laws.

(i)     Good Faith. The Corporation will not, by amendment of these Eighth Amended and Restated Articles of Incorporation or through any reorganization, recapitalization, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 6.6 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of the Series A-3 Preferred against impairment.

(j)     Surrender of Certificates. Upon the occurrence of any conversion specified in this Section 6.6, the holders of such shares of Series A-3 Preferred being converted shall surrender the certificates representing such shares at the office of the Corporation or of its transfer agent for the Common Stock. Thereupon, there shall be issued and delivered to such holder a certificate or certificates for the number of shares of Common Stock into which the shares of the Series A-3 Preferred surrendered were convertible on the date on which such conversion occurred. The Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless certificates evidencing such shares of the Series A-3 Preferred being converted are either delivered to the Corporation or any

8

1300995.9

FILED DATE: 2/3/2021 4:15 PM  2020CH07179

such transfer agent or the holder notifies the Corporation or any such transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection therewith. If the holder of any shares of Series A-3 Preferred converts less than all such shares then owned by such holder, then upon conversion, the Corporation shall issue such holder a new certificate for any remaining shares of the Series A-3 Preferred. Upon an automatic conversion pursuant to Section 6.6(b), any holder of shares of Series A-3 Preferred shall be deemed to own the shares of Common Stock to be issued upon conversion, even if such holder does not surrender such Series A-3 Preferred certificate as required hereunder. To the extent permitted by law, any conversion of shares of Series A-3 Preferred effected pursuant to this Section 6.6 shall be deemed to have been effected and the Series A-3 Conversion Price shall be determined (i) as of the close of business on the date on which written notices shall have been received by the Corporation (in the case of an optional conversion pursuant to Section 6.6(a)) or (ii) upon the consummation of a Qualified IPO (in the case of an automatic conversion pursuant to Section 6.6(a)), and, in the case of Section 6.6(a), the certificate or certificates for such shares shall have been surrendered as aforesaid, and at such time the rights of the holder of such shares of Series A-3 Preferred shall cease, and the Person or Persons in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such conversion shall be deemed to have become the holder or holders of record of the shares represented thereby.

(k)     Reports as to Adjustments. Upon any adjustment of the Series A-3 Conversion Price then in effect and any increase or decrease in the number of shares of Common Stock issuable upon the operation of the conversion provisions set forth in this Section 6.6, then, and in each such case, the Corporation shall promptly deliver to the registered holders of the Series A-3 Preferred as shown on the books of the Corporation a, copy of a certificate signed by the President or a Vice President and by the Secretary or an Assistant Secretary of the Corporation, with the original being delivered to the transfer agent for the Series A-3 Preferred, setting forth in detail the event requiring the adjustment and the method by which such adjustment was calculated and specifying the Series A-3 Conversion Price then in effect following such adjustment and the increased or decreased number of shares of Common Stock issuable upon the conversion granted pursuant to this Section 6.6.

6.7.     Certain Remedies. Any registered holder of Series A-3 Preferred may proceed to protect and enforce its rights with any and all remedies available at law or in equity.

6.8.     Preferred Protective Provisions.

(a)     So long as any shares of Preferred Stock are outstanding, the Corporation shall not without first obtaining the approval by vote or written consent of at least the holder or holders of more than 60% of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted basis:

(i)     authorize or issue, or obligate itself to authorize or issue, any other equity security, including any other security convertible into or exercisable for any equity security, having a preference over, or being on parity with, the Series A-3 Preferred with respect to voting or upon liquidation, payment of dividends, redemption or any other rights, preferences or privileges;

9

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

(ii)     issue any additional shares of Series A-3 Preferred;

(iii)    effect any recapitalization of the Corporation in connection with the authorization or issuance of any equity security where such recapitalization includes a provision automatically converting the shares of Series A-3 Preferred into any other class or series of stock of the Corporation;

(iv)    take any corporate action to alter, change, or amend the preferences, privileges or rights of Series A-3 Preferred;

(v)     redeem or convert shares of the Series A-3 Preferred;

(vi)    approve (A) an acquisition of another business or entity or (B) any merger, sale of voting control, sale of substantially all of the assets of the Corporation or any other transaction in which the then existing shareholders of the Corporation beneficially own less than 50% of the outstanding shares of the surviving corporation with a transaction value of less than $10.0 million;

(vii)   declare or pay any dividends on any shares of capital stock of the Corporation;

(viii)  create or authorize the creation of any debt (or guaranty thereof) in excess of $500,000 in a single issuance or a series of issuances;

(ix)    increase or decrease the size of the Board to other than five (5) members;

(x)     dissolve or liquidate the Corporation other than in connection with a consolidation, merger, acquisition, sale of voting control or sale of substantially all of the assets;

(xi)    increasing the shares reserved for issuance under the Corporation's incentive stock option plans in an amount greater than 16% of the Corporation's fully diluted capitalization;

(xii)   amend the percentage of holders of Preferred Stock that must approve the actions set forth in this Section 6.8(a) in the Corporation's Articles of Incorporation or Bylaws;

(xiii)  waive or modify the preemptive rights of the holders of Preferred Stock of the Corporation pursuant to Article X;

(xiv)   amend the Corporation's Articles of Incorporation or Bylaws; or

(xv)    change the nature of the Corporation's business or engage in any new line of business by the Corporation or any subsidiary thereof.

10

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

6.9.   Reacquired Shares. Any shares of Series A-3 Preferred converted, purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the conversion, purchase or acquisition thereof. None of such shares of Series A-3 Preferred shall be reissued by the Corporation.

**ARTICLE VII.**
**RECAPITALIZATION**

7.1.   2013 Recapitalization Related to Eighth Amended and Restated Articles. Upon the filing of the Eighth Amended and Restated Articles of Incorporation with the Wisconsin Department of Financial Institutions (the "**Eighth Articles Effective Time**"), or upon such other time explicitly set forth below, the following shall occur with respect to the issued and outstanding shares of the Series A-2 Preferred:

(a)   Conversion of Series A-2 Preferred to Series A-3 Preferred Stock or Common Stock.

(i)   Effective upon the filing of these Eighth Amended and Restated Articles, each share of Series A-2 Preferred outstanding at the Eighth Articles Effective Time shall become one (1) share of validly issued, fully paid, and non-assessable share of Series A-3 Preferred. All accrued dividends on the issued and outstanding shares of Series A-2 Preferred and all rights of any holder of shares of Series A-2 Preferred under Section 6.7(e)(ii) of the Seventh Amended and Restated Articles of Incorporation shall be forfeited upon such conversion.

(ii)   For each holder of Series A-2 Preferred that, by December 16, 2013, purchases less than such holder's pro rata percentage (in accordance with Article X of these Eighth Amended and Restated Articles) of the $3,500,000 of shares of Series A-3 Preferred sold pursuant to the Stock Purchase Agreement with the Corporation ("**2013 SPA**") based on such holder's ownership (and any shares beneficially owned by such holder) of the issued and outstanding shares of Series A-2 Preferred held by such holder immediately prior to the closing of the transactions contemplated by the 2013 SPA ("**2013 A-2 Percentage Ownership**"), then, effective as of the close of business on December 16, 2013, such holder (or such beneficial holder) shall have that number of shares of its Series A-3 Preferred equal to the product of (A) the number of shares of Series A-3 Preferred owned by such holder (including beneficial ownership) on December 16, 2013, times (B) one minus the quotient, of which the numerator is the percentage of shares of the first $3,500,000 Series A-3 Preferred purchased by such holder, and the denominator is the holder's 2013 A-2 Percentage Ownership, converted to shares of validly issued, fully paid, and non-assessable Common Stock on a one for one basis.

(iii)   For example, if a holder of Series A-2 Preferred owned 10,000 shares of Series A-2 Preferred which represents 5% of the issued and outstanding shares of Series A-2 Preferred, but purchased 4% of the shares the Series A-3 Preferred Stock in the closing of the transaction contemplated by the

11

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

2013 SPA, then 2,000 shares of Series A-3 Preferred (10,000* 1 minus (4% divided by 5%)) were converted on a one for one basis into shares of Common Stock.

(iv)     Subject to the timing described in Section 7.1(b) below, if a holder of Series A-2 Preferred does not purchase shares of Series A-3 Preferred pursuant to the 2013 SPA, then each share of Series A-3 Preferred held by such holder (and beneficially owned by such holder) shall become one (1) share of validly issued, fully paid, and non-assessable Common Stock at the 2013 Effective Time.

(v)     Any shares of Series A-2 Preferred that were reserved for the exercise of warrants by certain preferred shareholders shall be exchanged for warrants to purchase shares of Series A-3 Preferred on a one for one basis.

(b)     Fractional Shares of Converted Series A-3 Preferred or Common Stock. If the automatic stock conversions in this Section 7.1 would otherwise create fractional shares of stock, the Corporation shall pay in cash the value of fractions of a share to a holder instead of issuing fractional shares.

(c)     Certificates for Series A-2 Preferred.   Each certificate that prior to conversion set forth in this Section 7.1 represented a share or shares of Series A-2 Preferred shall represent that number of shares of Series A-3 Preferred Stock or Common Stock, as applicable in accordance with this ARTICLE VII, until such certificate is presented to the Corporation or its transfer agent for transfer or reissue in which event the Corporation or its transfer agent shall issue one or more stock certificates representing the appropriate number of shares of Series A-3 Preferred or Common Stock, as applicable.

(d)     Survival. All such changes to the Corporation's capital structure shall survive and continue to exist upon the filing of these Eighth Amended and Restated Articles of Incorporation.

.7.2.     2010 Recapitalization Related to Seventh Amended and Restated Articles. Upon the filing of the Seventh Amended and Restated Articles of Incorporation with the Wisconsin Department of Financial Institutions on August 11, 2010 (the "**Seventh Articles Effective Time**"), or upon such other time explicitly set forth below, the following occurred with respect to the issued and outstanding shares of the Series A-2 Preferred:

(a)     Conversion of Series A-2 Preferred to Common Stock for Less Than Pro Rata Participation.

(i)     Subject to the timing described in Section 7.2(b), for each holder of Series A-2 Preferred that did not purchase any shares of Series A-2 Preferred pursuant to and as defined in the Securities Purchase Agreement with the Corporation dated August 12, 2010 ("**2010 SPA**"), then for such holder (or such beneficial holder) each share of Series A-2 Preferred owned by that holder (or such beneficial holder), as of the Seventh Articles Effective Time, became one (1) share of validly issued, fully paid, and non-assessable Common Stock. All

FILED DATE: 2/3/2021 4:15 PM 2020CH07179

accrued dividends on the issued and outstanding shares of Series A-2 Preferred were forfeited upon such conversion to Common Stock.

(ii)     Subject to the timing described in Section 7.1(b), for each holder (and beneficial holder) of Series A-2 Preferred that purchased less than such holder's (or such beneficial holder's) A-2 Percentage Ownership of the first $3,000,000 of shares of Series A-2 Preferred sold pursuant to the 2010 SPA, then for such holder (or for such beneficial holder), a pro rata portion of such holder's (or such beneficial holder's) shares were converted into shares of Common Stock. The pro rata portion that were converted hereunder was equal the difference between (A) the number of shares of Series A-2 Preferred owned by such holder (including beneficial ownership) immediately prior to the Closing Date (as defined in the 2010 SPA) ("**2010 Series A-2 Ownership**"), minus (B) the holder's (or such beneficial holder's) 2010 Series A-2 Ownership *times* the quotient, of which the numerator is the amount invested by such holder (or such beneficial holder) pursuant to the 2010 SPA and the denominator is the holder's (or such beneficial holder's) A-2 Percentage Ownership times $3,000,000. The remainder of such holder's (or any beneficial owner's) shares remained validly issued, fully paid, and non-assessable Series A-2 Preferred. All accrued dividends on the issued and outstanding shares of Series A-2 Preferred that were converted to Common Stock hereunder were forfeited upon such conversion.

(iii)     For example, if a holder of Series A-2 Preferred owned 10,000 shares of Series A-2 Preferred, which for purposes of this example represented 5% of the issued and outstanding shares of Series A-2 Preferred, but purchased only $120,000 of Series A-2 Preferred pursuant to the 2010 SPA (80% of such holder's A-2 Ownership Percentage of $150,000 (5% times $3,000,000)), then 2000 shares (or 20%) of the Series A-2 Preferred held by such holder were converted to Common Stock on a one for one basis.

(iv)     "**2010 A-2 Percentage Ownership**" shall mean the percentage obtained by the quotient, the numerator of which is the issued and outstanding shares of Series A-2 Preferred held by such holder immediately prior to the Closing Date as defined in the 2010 SPA, and denominator of which is the aggregate number of issued and outstanding shares of Series A-2 immediately prior to the Closing Date as defined in the 2010 SPA.

(v)     For the purposes of this ARTICLE VII, a "beneficial holder" shall mean an individual or entity who, although is not listed as the owner of record within the Corporation's stock registry, has the indirect or direct power to vote or to direct the voting of shares of the Corporation Stock, or to the power to dispose of shares of Corporation stock. The term "beneficial holder" includes individuals who control shares of Corporation stock held in a trust or through an individual retirement account.

13

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

(b)     Timing Of Conversion of Series A-2 Preferred for Preferred Shareholders Who Do Not Purchase Shares of Series A-2 Preferred or Purchase less than their A-2 Percentage Ownership.

(i)     If a holder of Series A-2 Preferred affirmatively waived such holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation as amended, and chose not to purchase shares of Series A-2 Preferred pursuant to the 2010 SPA, then each share of Series A-2 Preferred held by such holder (and beneficially owned by such holder) became one (1) share of validly issued, fully paid, and non-assessable Common Stock as of the Seventh Articles Effective Time.

(ii)    If a holder of Series A-2 Preferred did not waive the holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation, as amended, and did not purchase shares of Series A-2 Preferred pursuant to the 2010 SPA within thirty (30) days of the initial closing under the 2010 SPA, then each share of Series A-2 Preferred held by such holder (and beneficially owned by such holder) became one (1) share of validly issued, fully paid, and non-assessable Common Stock at the expiration of such thirty (30) day period.

(iii)   If a holder of Series A-2 Preferred did not waive the holder's preemptive rights under ARTICLE XI of the Corporation's Sixth Amended and Restated Articles of Incorporation, as amended, and purchased some shares of Series A-2 Preferred pursuant to the 2010 SPA within thirty (30) days of the initial closing under the 2010 SPA, but less than such holder's 2010 A-2 Percentage Ownership of the first $3,000,000 sold under the SPA, then the shares of Series A-2 Preferred held by such holder (and beneficially owned by such holder) either remained Series A-2 Preferred or converted into Common Stock pursuant to Section 7.2(a)(ii) at the expiration of such thirty (30) day period.

(c)     Purchase of 2010 A-2 Percentage Ownership.  For each holder (and beneficial holder) of Series A-2 Preferred that purchased such holder's (or such beneficial holder's) 2010 A-2 Percentage Ownership of the first $3,000,000 of shares of Series A-2 Preferred sold pursuant to the 2010 SPA, then for such holder (or for such beneficial holder) none of such holder's shares of Series A-2 Preferred were converted to Common Stock pursuant to this Section 7.2.

(d)     Fractional Shares of Converted Series A-2 Preferred.  If the automatic stock conversions in this Section 7.2 otherwise created fractional shares of stock, the Corporation paid in cash the value of fractions of a share to a holder instead of issuing fractional shares.

(e)     Certificates for Series A-2 Preferred.  Each certificate that prior to conversion set forth in this Section 7.2 represented a share or shares of Series A-2 Preferred thereafter represents that number of shares of Common Stock, in accordance with this Section 7.2, until such certificate was presented to the Corporation or its transfer agent for transfer or

14

reissue in which event the Corporation or its transfer agent issued one or more stock certificates representing the appropriate number of shares of Common Stock, as applicable.

(f)     Survival. All such changes to the Corporation's capital structure survived and continued to exist upon the filing of these Seventh Amended and Restated Articles of Incorporation.

## ARTICLE VIII.
## INDEMNIFICATION

8.1.     Generally. No director of the Corporation shall be liable to the Corporation or any of its shareholders for monetary damages for breach of fiduciary duty as a director; provided, however, that this provision does not eliminate the liability of a director (a) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Chapter 180 of the WBCL or (d) for any transaction from which the director derived an improper personal benefit. For purposes of the prior sentence, the term "damages" shall, to the extent permitted by law, include without limitation, any judgment, fine, amount paid in settlement, penalty, punitive damages, excise or other tax assessed with respect to an employee benefit plan, or expense of any nature (including, without limitation, counsel fees and disbursements). Each person who serves as a director of the Corporation while this ARTICLE VIII is in effect shall be deemed to be doing so in reliance on the provisions of this ARTICLE VIII, and neither the amendment or repeal of this ARTICLE VIII, nor the adoption of any provision of these Eighth Amended and Restated Articles of Incorporation inconsistent with this ARTICLE VIII, shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for, arising out of, based upon, or in connection with any acts or omissions of such director occurring prior to such amendment, repeal, or adoption of an inconsistent provision. The provisions of this ARTICLE VIII are cumulative and shall be in addition to and independent of any and all other limitations on or eliminations of the liabilities of directors of the Corporation, as such, whether such limitations or eliminations arise under or are created by any law, rule, regulation, bylaw, agreement, vote of shareholders or disinterested directors, or otherwise. If the WBCL is hereafter amended to permit further elimination or limitation of the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the WBCL as so amended. Any repeal or modification of this ARTICLE VIII by the shareholders of the Corporation or otherwise shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification. For purposes of this ARTICLE VIII, all references to a director shall also be deemed to refer to any person or persons, if any, who, pursuant to a provision of these Eighth Amended and Restated Articles of Incorporation, exercise or perform any of the powers or duties otherwise conferred or imposed upon the Board.

8.2.     Indemnification of Directors and Officers. The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise,

15

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

FILED DATE: 2/3/2021 4:15 PM  2020CH07179

against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding to the fullest extent permitted by law. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the actions or inactions of the person seeking indemnification under this Section 8.2 are not indemnified under this Section 8.2. For purposes of this ARTICLE VIII, any person who, pursuant to a provision in these Eighth Amended and Restated Articles of Incorporation, exercises or performs any of the powers or duties conferred or imposed upon the Board shall be entitled to all the benefits conferred upon directors and officers of the Corporation (including without limitation, the right to indemnification and advancement of expenses) set forth in this ARTICLE VIII.

8.3.    Derivative Actions. The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation; provided, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court or such other court shall deem proper.

8.4.    Indemnification in Certain Cases. To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 8.2 or 8.3 of this ARTICLE VIII, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

8.5.    Procedure. Any indemnification under Sections 8.2 and 8.3 of this ARTICLE VIII (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director or officer is proper in the circumstances because such person has met the applicable standard of conduct set forth in such Sections 8.2 and 8.3. Such determination shall be made (a) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (b) if such a quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so direct, by independent legal counsel in a written opinion, or (c) by the shareholders.

8.6.    Advances for Expenses. Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Corporation as authorized in this ARTICLE VIII.

16

1300995.9

8.7. <u>Rights Not Exclusive</u>. The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this ARTICLE VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

8.8. <u>Insurance</u>. The Corporation shall purchase and maintain insurance with coverage limits customary for similarly situated companies, but in no event with coverage limits of less than $3,000,000, on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this ARTICLE VIII.

8.9. <u>Definition of Corporation</u>. For the purposes of this ARTICLE VIII, references to "the Corporation" include all constituent corporations absorbed in a consolidation or merger as well as the resulting or surviving corporation so that any person who is or was a director or officer of such a constituent corporation or is or was serving at the request of such constituent corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise shall stand in the same position under the provisions of this ARTICLE VIII with respect to the resulting or surviving corporation as he would if he had served the resulting or surviving corporation in the same capacity.

8.10. <u>Survival of Rights</u>. The indemnification and advancement of expenses provided by, or granted pursuant to this ARTICLE VIII shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such a person. No subsequent amendment of this ARTICLE VIII shall diminish the rights hereunder of any director or officer with respect to any action taken or claim made prior to such amendment.

### ARTICLE IX.
### GENERAL

9.1. <u>Amendments to Bylaws</u>. In furtherance and not in limitation of the power conferred upon the Board by law, the Board shall have the power to make, adopt, alter, amend and repeal from time to time the bylaws of this Corporation subject to Section 6.8 herein. The shareholders shall also have the power to make, adopt, amend, alter, or repeal the Bylaws of the Corporation.

9.2. <u>Corporate Books</u>. The books of this Corporation may (subject to any statutory requirements) be kept outside the State of Wisconsin as may be designated by the Board or in the Bylaws of this Corporation.

9.3. <u>Action by Written Consent Prohibited if Registered</u>. If at any time this Corporation shall have a class of stock registered pursuant to the provisions of the Securities Act

17

of 1934, for so long as such class is so registered, any action by the shareholders of such class must be taken at an annual or special meeting of shareholders and may not be taken by written consent.

## ARTICLE X.
## PREEMPTIVE RIGHTS

The Corporation shall not issue, sell or exchange, or agree to issue, sell or exchange (collectively, "**Issue**," and any issuance, sale or exchange resulting therefrom, an "**Issuance**") any Common Stock Equivalents or any other shares of non-convertible Preferred Stock (other than Excluded Securities) except as authorized by the Board and in accordance with the following procedures:

10.1. <u>Generally</u>. The Corporation shall deliver (to the last known address on file with the Corporation for such shareholder) to each of the holders of the Preferred Stock a written notice (a "**Preemptive Notice**"), which shall (a) state the Corporation's intention to Issue Common Stock Equivalents to one or more Persons, the amount and type of Common Stock Equivalents to be Issued (the "**Issuance Stock**"), the purchase price therefor and a summary of the other material terms of the proposed Issuance and (b) offer each holder of Preferred Stock the option to acquire up to such holder's pro rata portion of the Issuance Stock (determined in the manner set forth below) (the "**Preemptive Offer**"). The Preemptive Offer shall remain open and irrevocable for the periods set forth below (and, to the extent the Preemptive Offer is accepted during such periods, until the consummation of the Issuance contemplated by the Preemptive Offer). Each holder of Preferred Stock shall have the right and option, for a period of thirty (30) days after delivery of the Preemptive Notice, subject to the extension of such period if approved by the Board in its sole discretion (the "**Preemptive Acceptance Period**"), to accept up to such holder's pro rata portion of the Issuance Stock at the purchase price and on the terms stated in the Preemptive Notice. Such acceptance shall be made by delivering a written notice to the Corporation by the holder of the Preferred Stock within the Preemptive Acceptance Period specifying the maximum number of shares of the Issuance Stock such holder will purchase (the "**Accepted Shares**"). Except as provided herein, no holder of Preferred Stock shall have the right to purchase more than such holder's pro rata portion of the Issuance Stock, such holder's pro rata portion of the Issuance Stock being the number of shares of Preferred Stock owned by such holder in proportion to the total number of outstanding shares of Preferred Stock. If less than all the Issuance Stock is requested for purchase by the holders of Preferred Stock, each such holder may take more than such holder's pro rata portion, but only as agreed by all holders of Preferred Stock who wish to purchase more than their pro rata portion of the Issuance Stock, as agreed in writing prior to the end of the Preemptive Acceptance Period.

10.2. <u>Expiration of Preemptive Acceptance Period</u>. If effective acceptance shall not be received pursuant to Section 10.1 above with respect to all of the Issuance Stock offered for sale pursuant to the Preemptive Notice, then the Corporation may Issue all or any portion of such Issuance Stock so offered for sale and not so accepted to a third party purchaser, at a price not less than the price, and on terms not more favorable to the purchaser thereof than the terms, stated in the Preemptive Notice at any time within 90 days after the expiration of the Preemptive Acceptance Period (the "**Issuance Period**"). In the event that all of the Issuance Stock is not

· FILED DATE: 2/3/2021 4:15 PM  2020CH07179

1300995.9

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

Issued by the Corporation during the Issuance Period, the right of the Corporation to Issue such unsold Issuance Stock shall expire and the obligations hereof shall be reinstated.

10.3. <u>Sales of Issuance Stock</u>. All sales of Issuance Stock to a holder of Preferred Stock subject to any Preemptive Notice shall be consummated contemporaneously at the offices of the Corporation on a mutually satisfactory Business Day within 30 days after the expiration of the Preemptive Acceptance Period, or at such other time and/or place as the Corporation and such holder may agree. The delivery of certificates or other instruments evidencing such Issuance Stock shall be made by the Corporation on such date against payment of the purchase price for such Issuance Stock.

10.4. <u>Preemptive Rights on IPO</u>. The provisions hereof shall not apply to any Issuance by the Corporation in connection with an IPO or any subsequent registered public offering of securities of the Corporation. The preemptive rights contained in this ARTICLE X shall terminate upon the earlier to occur of (a) the completion of a Qualified Public Offering; or (b) such time as the Corporation otherwise becomes subject to the reporting requirements of the Securities Exchange Act of 1934.

10.5. <u>Waiver</u>. Notwithstanding anything herein to the contrary, the rights and obligations of the holders of Preferred Stock and the Company set forth in this ARTICLE X may be waived in the following limited circumstances by obtaining the approval by vote or written consent of at least the holder or holders of more than 60% of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted basis: (a) in connection with the issuance of bonus shares for shareholders who provide collateral for the benefit of the Company which is deemed reasonably necessary by the Board of Directors; (b) in connection with the conversion of (i) the outstanding interest on bridge debt and (ii) the outstanding principal and interest on mezzanine debt; and (c) in connection with the conversion of other similar debt or other non-cash components in a financing round.

## ARTICLE XI.
## PREFERRED SHAREHOLDER DUTIES

The provisions of this ARTICLE XI are set forth to regulate and define the conduct of certain affairs of the Corporation as they may involve the preferred shareholders of the Corporation, and the powers, rights, duties and liabilities of the Corporation and its officers, directors and shareholders in connection therewith; <u>provided</u>, <u>however</u>, that nothing in this ARTICLE XI will prohibit the Corporation's ability to enter into contractual arrangements with a shareholder of the Corporation, which arrangements restrict such shareholder from engaging in activities otherwise allowed by this ARTICLE XI, and the following provisions shall be subject to any such contractual obligation of the Corporation.

11.1. <u>Specified Shareholders</u>. Except as any shareholder may otherwise agree in writing, each holder of shares of Preferred Stock of the Corporation who is not an officer or employee of the Corporation or controlled by an officer or employee of the Corporation (a "**Specified Shareholder**") shall have the right to, and shall have no duty hereunder to refrain from, engaging in the same or similar activities or lines of business as the Corporation, doing business with any potential or actual customer or supplier of the Corporation, or employing or

19

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

otherwise engaging any officer or employee of the Corporation. To the fullest extent permitted by law, neither a Specified Shareholder nor any officer or director thereof shall be liable to the Corporation or its other shareholders for breach of any fiduciary duty by reason of any such activities of such shareholder, or the participation therein of such shareholder. In the event that a Specified Shareholder acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both the Specified Shareholder and the Corporation, the Specified Shareholder shall have no duty to communicate or present such corporate opportunity to the Corporation and shall not be liable to the Corporation or its other shareholders for breach of any fiduciary duty by reason of the fact that such Specified Shareholder pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person, or does not communicate information regarding such corporate opportunity to the Corporation.

11.2.   Specified Directors. To the fullest extent permitted by law, in the event that a director of the Corporation who is also a director, officer or employee of a Specified Shareholder acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both the Corporation and such Specified Shareholder, such director of the Corporation shall not by reason of the fact that such Specified Shareholder or any of its affiliates pursues or acquires such corporate opportunity for itself or directs such corporate opportunity to another person (including, without limitation, such Specified Shareholder or any of its affiliates) or does not communicate information regarding such corporate opportunity to the Corporation: (a) be deemed to have breached the fiduciary duty of such director to the Corporation and its shareholders with respect to such corporate opportunity, (b) be liable to the Corporation or its other shareholders for breach of any fiduciary duty, (c) be deemed to have acted other than in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or (d) be deemed to have breached his or her duty of loyalty to the Corporation or its shareholders or to have derived an improper benefit; provided, however, that such director of the Corporation (i) obtained such knowledge other than in his or her capacity as a director of the Corporation, and (ii) and is not actively and directly involved in such opportunity on behalf of the Specified Shareholder.

## ARTICLE XII.
## DEFINITIONS

12.1.   "**Board**" means the Corporation's Board of Directors.

12.2.   "**Business Day**" means any day that is not a Saturday, Sunday or a day on which banking institutions in Madison, Wisconsin are not required to be open for business.

12.3.   "**Common Stock Equivalents**" means (a) shares of Common Stock; (b) rights, options or warrants of the Corporation convertible or exchangeable into, or exercisable for, shares of Common Stock; (c) equity or debt securities of the Corporation convertible or exchangeable into or exercisable for shares of Common Stock or other securities of the Corporation; or (d) any rights, options or warrants to acquire any such equity or debt securities referred to in (c) above.

12.4.   "**Common Stock Equivalents Outstanding**" means the aggregate of all shares of Common Stock Equivalents then outstanding on an as converted, exchanged or exercised basis,

20

but shall not mean any shares of capital stock then owned or held by or for the account of the Corporation or any of its Subsidiaries.

12.5. "**Common Stock Equivalent Price**" means, with respect to any Common Stock Equivalents, the per-share issue price of such shares of Common Stock Equivalents.

12.6. "**Excluded Securities**" means (a) any options to purchase shares of or shares of Common Stock or Common Stock Equivalents issued to employees, advisors or consultants pursuant to the Corporation's stock option plans and equity incentive plans in existence on the Series A-3 Issue Date (and any shares of Common Stock issued upon exercise thereof), which options and shares shall not exceed 165,237,178 shares of Common Stock (each of the plans referred to herein shall be referred to as an "**Approved Plan**"); (b) up to 6,195,346 shares of Common Stock issuable upon exercise of warrants held by Endeavor Capital Management, LLC or any of its affiliated entities; (c) up to 5,419,854 shares of Common Stock issuable upon exercise of warrants held by the Corporation's mezzanine note purchasers as approved by the Board pursuant to the Note Purchase Agreement dated July 16, 2009; (d) up to 713,945 shares of Series A-2 Stock issuable upon exercise of warrants held by certain shareholders; (e) up to 64,210,342 shares of Common Stock issuable upon exercise of warrants issued in connection with that certain Securities Purchase Agreement dated August 11, 2010; (f) up to 755,934 shares of Common Stock issuable upon exercise of warrants held by Madison Development Corporation; (g) shares of Common Stock or shares of Series A-3 Preferred issuable upon conversion, exchange or exercise of any Common Stock Equivalent outstanding as of the Eighth Articles Effective Time; (h) shares of Common Stock issuable upon conversion of the Series A-3 Preferred pursuant to Section 6.6; and (i) any shares of Series A-3 Preferred issuable upon the conversion of any debt financing as approved by the Board.

12.7. "**Fair Market Value**" of any property means the fair market value of such property as determined (unless expressly otherwise provided herein) by a nationally recognized accounting or appraisal firm selected by the Board.

12.8. "**IPO**" means an initial public offering of Common Stock.

12.9. "**Person**" means any individual, company, limited liability corporation, limited or general partnership, joint venture, association, joint-stock company or other business entity, trust, unincorporated organization or government or any agency or political subdivisions thereof.

12.10. "**Qualified IPO**" means an IPO pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, whereby (a) aggregate net proceeds to the Corporation are at least $25,000,000 (before payment of underwriters' discounts and commissions), (b) an initial offering price per share is equal to or greater than five times the Series A-3 Stated Value, and (c) following the offering the Corporation is listed on a national securities exchange.

12.11. "**Rights or Options**" means those Common Stock Equivalents described in clauses (b) and (d) of the definition therein.

12.12. "**Series A-3 Issue Date**" means the first date on which shares of Series A-3 Preferred are issued.

21

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

12.13. **"Series A-3 Liquidation Value"** means an amount per share of Series A-3 Preferred equal to (a) $20,000,000 divided by (b) the total number of issued and outstanding shares of Series A-3 Preferred on the date of the dissolution, liquidation or winding up.

12.14. **"Series A-3 Preferred"** means the Corporation's Series A-3 Convertible Preferred Stock, $0.001 par value.

12.15. **"Series A-3 Stated Value"** means $0.0391 per share.

12.16. **"Subsidiary of any Person"** means any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person.

*[Remainder of page intentionally left blank.]*

22

FILED DATE: 2/3/2021 4:15 PM    2020CH07179

## CERTIFICATION

The undersigned officer of SAI Advanced Power Solutions, Inc., a Wisconsin corporation, certifies that the foregoing Eighth Amended and Restated Articles of Incorporation of said Corporation, containing amendments requiring shareholder approval, were adopted with the requisite shareholder approval and in accordance with 180.1003 of the Wisconsin Statutes on December 12, 2013.

By: _____

Name: __Brad Bell_____

Title: __President_____

This document was drafted by
And should be returned to:

Kari Kaplan
Aronberg Goldgehn
330 N. Wabash, Suite 1700
Chicago, IL 60611

FILED DATE: 2/3/2021 4:15 PM 2020CH07179

RETURN ACKNOWLEDGEMENT TO:

$40.00 + $25.00

ADVANCED NATIONWIDE RESEARCH, LLC

Eop

PICK UP BASKET

ATTN: TRICIA TRAINOR

▲ Enter your return address within the brackets above
Phone number during the day: (608 ) 251-4712

STATE OF WISCONSIN
FILED

DEC 1 7 2013

DEPARTMENT OF
FINANCIAL INSTITUTIONS

Restated Articles of
Incorporation

Chap. 180

Increases Authorized Shares
    From: 621,781,120 shs
        ( 458,386,542 shs CS @ *.001pv )
        ( 163,394,578 shs Series A2 PS @ *.001pv )

    To: 749,827,812 shs
        ( 512,163,938 shs CS @ *.001pv )
        ( 237,663,874 shs Series A-3 PS @ *.001pv )

FILING FEE **$150.00**
OPTIONAL EXPEDITED SERVICE + **$25.00**

**DO NOT STAPLE**

Sec. 180.11045
and 180.1105,
Wis. Stats.

State of Wisconsin
DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Corporate & Consumer Services



### ARTICLES OF MERGER
**Domestic and Foreign For-Profit Corporations**

**1. Non-Surviving Parties to the Merger:**

| Corporation Name:<br><br>SAI Advanced Power Solutions, Inc. | Organized under the laws of<br>Wisconsin<br>(state or country) |
|---|---|

Does the above named non-surviving party have a fee simple ownership interest in any Wisconsin real estate?  ☐ Yes  ☒ No

**IMPORTANT:** If you answer yes, the surviving entity is required to file a report with the Wisconsin Dept. of Revenue under sec. 73.14 of the Wis. Stats. within 60 days after the effective date of the merger. **NOTE:** Sec. 73.14(2)(a) provides a penalty of $200 for each day that the report is late, not to exceed $7,500. You may access the form at: http://ww2.revenue.wi.gov/internet/merger.html

| Corporation Name:<br><br> | Organized under the laws of<br><br>(state or country) |
|---|---|

Does the above named non-surviving party have a fee simple ownership interest in any Wisconsin real estate?  ☐ Yes  ☐ No

**IMPORTANT:** If you answer yes, the surviving entity is required to file a report with the Wisconsin Dept. of Revenue under sec. 73.14 of the Wis. Stats. within 60 days after the effective date of the merger. **NOTE:** Sec. 73.14(2)(a) provides a penalty of $200 for each day that the report is late, not to exceed $7,500. You may access the form at: http://ww2.revenue.wi.gov/internet/merger.html

Schedule more non-surviving parties as an additional page and indicate whether the non-surviving party has a fee simple ownership interest in any Wisconsin real estate.

**2. Surviving Corporation:**

| Corporation Name:<br><br>SAI Merger, Inc. | Organized under the laws of<br>Illinois<br>(state or country) |
|---|---|

**3.** Indicate below if the surviving corporation is an indirect wholly owned subsidiary or parent:

☐ The surviving corporation is a Domestic or Foreign Business Corporation that is an indirect wholly owned subsidiary or parent and the merger was approved in accordance with sec. 180.11045 and the requirements of sec. 180.11045(2) have been satisfied.

☒ The surviving corporation is not a Domestic or Foreign Business Corporation that is an indirect wholly owned subsidiary or parent.

DFI/CORP/2001 (05/15)

718924-1     A9395T



FILED DATE: 2/3/2021 4:15 PM     2020CH07179

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

**4.** The plan of merger has been approved and adopted by each corporation that is a party to the merger as required under sec. 180.1103 or 180.1104, Wis. Stats., as applicable.

**5. A.** The articles of incorporation of the surviving corporation are amended as follows:

> Immediately following the Merger, the business of the Surviving Corporation shall operate under the name SAI Advanced Power Solutions, Inc.

## OR

**B.** If there are no amendments, indicate the name of the corporation that is a party to the merger whose articles of incorporation will be the articles of incorporation of the surviving corporation:

**6.** The executed plan of merger is on file at the principal place of business of the surviving corporation.

**7.** The surviving corporation will provide a copy of the plan of merger, upon request and without cost, to any shareholder of a corporation that was a party to the merger or, upon payment to the surviving corporation of an amount equal to the cost of producing the copy, to any other interested person.

**8.** (OPTIONAL) Effective Date and Time of Merger

These articles of merger, when filed, shall be effective on _____ (date) at _____ (time).

(An effective date declared under this article may not be earlier than the date the document is delivered to the department for filing, nor more than 90 days after its delivery. If no effective date and time is declared, the effective date and time will be determined by sec.180.0123.

**9.** Executed on ___12/19/2017___ (date) by the surviving corporation on behalf of all parties to the merger.

_____
(Signature)

Mark **(X)** below the title of the person executing the document.

Title: ☐ President OR ☑ Secretary or other officer title _____

___David Martin___
(Printed Name)

This document was drafted by: _____ Laura Geis _____.
(Name the individual who drafted the document)

DFI/CORP/**2001** (05/15)

FILED DATE: 2/3/2021 4:15 PM 2020CH07179

RETURN ACKNOWLEDGEMENT TO:

⌐ ADVANCED NATIONWIDE RESEARCH, LLC

PICK UP BASKET

ATTN: TRICIA TRAINOR

L

▲ Enter your return address within the brackets above
Phone number during the day: (608) 251-4712

**VERY IMPORTANT:**
**PLEASE CALL US BEFORE ANY REFUNDS ARE ISSUED. THANK YOU!**
**ADVANCED NATIONWIDE RESEARCH**
**608-251-4712**



For Office 

**State of Wisconsin**

**Department of Financial Institutions**

*Endorsement*

**ARTICLES OF MERGER Domestic and Foreign For-Profit Corporations - Ch. 180**

**SAI ADVANCED POWER SOLUTIONS, INC.**

**Received Date: 12/20/2017**                                **Filed Date: 12/21/2017**

Filing Fee:      $150.00

Expedited Fee: $25.00                                         Entity ID#: S046332

**Total Fee:      $175.00**

Merges: SAI ADVANCED POWER SOLUTIONS, INC. (01 S046332)
Into: UNL FGN

PAGE 4/7 REC'D 3/16/2018 4:44:28 PM [Central Daylight Time] PRD 082678813

FILED DATE: 2/3/2021 4:15 PM [Central Daylight Time] PRD 082678813 2020CH07179



**FILING FEE**

☑ OPTIONAL EXPEDITED
SERVICE

See Page 3
for filing fee

**+ $25.00**



**DO NOT STAPLE**

Ss. 178.50,
180.0124, 181.0124
& 183.0112
Wis. Stats.

State of Wisconsin
DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Corporate & Consumer Services

# ARTICLES OF CORRECTION

1. SAI Advanced Power Solutions, Inc.
_____

(Name of the corporation, limited liability company, or limited liability partnership **before** any correction that may be affected by these articles of correction)

2. Articles of Merger
_____ filed with the Department of Financial

(Describe the document)

Institutions on December 21, 2017 _____ (date) was

☒ Incorrect at the time of filing (*Complete items 1, 2, 3, 4 & 6*)

☐ Defectively executed (*Complete items 1, 2, 3 & 5*)

☐ Defective in attestation, seal, verification or acknowledgment (*Complete items 1, 2, 3 & 6*)

{  ( **X** ) Check any that apply

3. Describe the defect(s): (*Specify the incorrect statement and the reason why it is incorrect, or the manner in which the execution is defective.*)

The incorrect statements are the identification of "SAI Advanced Power Solutions, Inc." as the Non-Surviving Party to the Merger, and "SAI Merger, Inc." as the Surviving Corporation in Items 1 and 2, respectively. These statements were incorrect becasue the names of the Non-Surviving Party and the Surviving Corporation should have been reversed.

| 4. Enter the statement in its corrected condition: |
|---|
| Item 1: Corporation Name: SAI Merger, Inc.<br>        Organized under the laws of: Illinois<br><br>Item 2: Corporation Name: SAI Advanced Power Solutions, Inc.<br>        Organized under the laws of: Wisconsin |

DFI/CORP/**53** (04/15)



797420-1      CB628X

4.  Enter the statement in its corrected condition (cont'd):

5.  Make the corrected execution:

Executed on _____        _____
                    (Date)                              (Signature)

Select and mark (X) below the appropriate title      _____
of the person executing the document.                      (Printed name)

For a corporation                           For a limited liability company
Title: ☐ President  ☐ Secretary             Title: ☐ Member ☐ Manager  OR ☐ Organizer
or other officer title _____
                                            For a limited liability partnership
OR ☐ Incorporator                           Title: ☐ Partner

6. Executed on _March 12, 2018_             _____
                    (Date)                              (Signature)

Select and mark (X) below the appropriate title      _David Martin_____
of the person executing the document.                      (Printed name)

For a corporation                           For a limited liability company
Title: ☐ President  ☒ Secretary             Title: ☐ Member  OR ☐ Manager
or other officer title _____
                                            For a limited liability partnership
                                            Title: ☐ Partner

This document was drafted by _____Jerald Hollsky_____
                              (Name the individual who drafted the document)

DFI/CORP/53 (04/15)                                                    2

PAGE 7/7 RECD 3/16/2018 4:44:28 PM  2020CH07179

FILED DATE: 2/3/2021 4:15 PM [Central Daylight Time] PRD 082676813

# ARTICLES OF CORRECTION

```
┌                                              ┐
    Dane County Title Company, LLC      lsa
    UCC/Corporate Division
    901 S Whitney Way
    Madison, WI 53711
    UCC@danecountytitle.com
└                                              ┘
```

▲ Enter your return address within the bracket above.

**Phone number** during the day: ( 312 )  755  -  3176



For Office 

**State of Wisconsin**

**Department of Financial Institutions**

*Endorsement*

**ARTICLES OF CORRECTION - Ch. 180**

**SAI ADVANCED POWER SOLUTIONS, INC.**

**Received Date: 3/16/2018**                    **Filed Date: 3/19/2018**

Filing Fee:      $40.00

Expedited Fee: $25.00                            Entity ID#: S046332

**Total Fee:     $65.00**

Corrects the Articles of Merger, correcting the name of the surviving corporation to SAI ADVANCED POWER SOLUTIONS, INC. and the name of the non-surviving corporation to SAI MERGER, INC. effective December 20, 2017.

OOS# 201803165515147

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

# EXHIBIT B

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER
SOLUTIONS, INC.,

                    Plaintiff,

      v.

SHANE WOLFRAM,                        Case No. 2020 CH 07179

                Defendant,

and

E&I ENGINEERING CORPORATION

        Respondent in Discovery.

FILED DATE: 2/3/2021 4:15 PM  2020CH07179

## <u>AFFIDAVIT OF MICHAEL HARKIN</u>

    Michael Harkin, first being duly sworn, deposes and says that:

    1.    I am the President of E&I Engineering Corporation ("E&I"). I am over eighteen (18) years of age, and am competent to understand the oath related to this Affidavit. I am authorized to give this Affidavit in support of E&I's Motion to quash the Summons and dismiss E&I as a Respondent in Discovery. All matters and things contained within this Affidavit are within my personal knowledge or are contained in documents to which I have access in the ordinary course of business.

    2.    E&I is a corporation formed under the laws of the State of South Carolina with its principal, and only, place of business in Anderson, South Carolina.

    3.    E&I is not registered to do business in Illinois, and E&I does not maintain any kind of facility, production or otherwise, in Illinois. E&I does not have a mailing address in Illinois.

    4.    E&I does not own any real or personal property in Illinois.

FILED DATE: 2/3/2021 4:15 PM   2020CH07179

5.      E&I ships its goods to locations throughout the world and across the United States. In 2020, E&I shipped .001% of its total United States sales to Illinois.

6.      While E&I maintains a website, its website is not targeted to entities and/or individuals in Illinois. E&I does not engage in any internet activities specifically aimed at Illinois.

7.      E&I does not have any subsidiaries incorporated, or located, in Illinois. E&I also does not have any ownership interest in any entity incorporated, or located, in Illinois.

8.      E&I is a wholly owned subsidiary of E&I Engineering Ireland, Ltd. E&I Engineering Ireland, Ltd. is not incorporated in Illinois and does not have its principal place of business there. No person or entity with an ownership interest in E&I is located in Illinois.

9.      I have read the foregoing Affidavit of 2 typewritten pages and swear that it is true to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

_____

Michael Harkin

Sworn to and subscribed before me
this 2nd day of February, 2021.

NOTARY PUBLIC FOR SOUTH CAROLINA

MY COMMISSION EXPIRES: 7-24-28

Page **2** of **2**

FILED DATE: 2/3/2021 4:15 PM    2020CH07179

# EXHIBIT C

Case: 1:21-cv-01665 Document #: 1-1 Filed: 03/26/21 Page 165 of 219 PageID #:175

SAI ADVANCED POWER
SOLUTIONS, INC.,

                Plaintiff,

        v.

SHANE WOLFRAM,

                Defendant,

and

E&I ENGINEERING CORPORATION

              Respondent in Discovery.

Case No. 2020 CH 07179

FILED DATE: 2/11/2021 2:15 PM 2020CH07179

## AFFIDAVIT OF DAVID K. GENSON

David K. Genson, first being duly sworn, deposes and says that:

1.      I am the National Sales Manager of E&I Engineering Corporation ("E&I"). I am over eighteen (18) years of age, and am competent to understand the oath related to this Affidavit. I am authorized to give this Affidavit in support of E&I's Motion to quash the Summons and dismiss E&I as a Respondent in Discovery. All matters and things contained within this Affidavit are within my personal knowledge or are contained in documents to which I have access in the ordinary course of business.

2.      It is my understanding that SAI Advanced Power Solutions, Inc. ("SAI") contends in the above-captioned lawsuit that Shane Wolfram wrongfully assisted E&I in allegedly obtaining contracts to supply electrical switchgear for three (3) projects – (1) the Stack, Inc. Silicon Valley Project, (2) the CloudHQ, LLC Manassas Project, and (3) the Stack, Inc. Portland Project (collectively, the "Projects").

3.      With regard to the Stack, Inc. Silicon Valley Project, that project is located in

Silicon Valley, California.  It is not located in Illinois.  In E&I's efforts to solicit this project, no

meetings were held in Illinois and no contracts were entered with any individual or entity in

Illinois. E&I has not shipped goods to, or provided services in, Illinois in connection with this

project.

4.      With regard to the CloudHQ, LLC Manassas Project, that project is located in

Manassas, Virginia.  It is not located in Illinois.  In E&I's efforts to solicit this project, no meetings

were held in Illinois and no contracts were entered with any individual or entity in Illinois. E&I

has not shipped goods to, or provided services in, Illinois in connection with this project.

5.      With regard to the Stack, Inc. Portland Project, that project is located in Portland,

Oregon.  It is not located in Illinois.  In E&I's efforts to solicit this project, no meetings were held

in Illinois and no contracts were entered with any individual or entity in Illinois. E&I has not

shipped goods to, or provided services in, Illinois in connection with this project.

6.      As the National Sales Manager for E&I, I have personal knowledge of E&I's efforts

to solicit the Projects.  Shane Wolfram had no involvement in procuring the Projects for E&I, and

he did not provide any information to E&I that assisted E&I in procuring the Projects.

7.      E&I employs one (1) individual who works from home and lives in Illinois.  This

individual did not have any involvement in E&I's solicitation of the Projects.

8.      As the National Sales Manager for E&I, I am responsible for, in part, hiring

individuals for sales positions within E&I.  I have personal knowledge of the discussions between

Shane Wolfram and E&I regarding his potential future employment with E&I.   During the

discussions between E&I and Shane Wolfram regarding his potential employment with E&I, no

meetings occurred between E&I and Shane Wolfram in Illinois. Furthermore, no communications,

such as e-mails, texts, or phone calls, originated from Illinois. To the best of my knowledge, E&I did not communicate with Shane Wolfram regarding his potential future employment with E&I while Shane Wolfram was located in Illinois.

9.    I have read the foregoing Affidavit of 3 typewritten pages and swear that it is true to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

David K. Genson

Sworn to and subscribed before me
this 2ⁿᵈ day of February , 2021.

NOTARY PUBLIC FOR MARYLAND

MY COMMISSION EXPIRES: _____

SITI UMRAH RHETT
NOTARY PUBLIC
FREDERICK COUNTY
MARYLAND
MY COMMISSION EXPIRES 07-19-2023

Page **3** of **3**

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
Cook County, IL

FILED DATE: 2/1/2021 5:59 PM   2020CH07179

FILED
2/1/2021 5:59 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12056296

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC. | |
| Plaintiff, | |
| v. | Case No. 2020 CH 07179 |
| SHANE WOLFRAM, | |
| Defendant, | |
| and | |
| E&I ENGINEERING CORPORATION, | |
| Respondent in Discovery. | |

## VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707

I, Bonnie A. Lynch, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.      My full name is Bonnie Allen Lynch, my date of birth is March 11, 1983.  The address of offices from which I practice law and related email address and telephone numbers are as follows:

Haynsworth Sinkler Boyd, PA
ONE North Main Street, 2nd Floor (29601)
P.O. Box 2048
Greenville, SC 29602
864.240.3200
blynch@hsblawfirm.com

2.      I represent E&I Engineering Corporation and Shane Wolfram in *SAI Advanced Power Solutions, Inc. vs. Shane Wolfram and E&I Engineering Corporation*, Circuit Court of Cook County, Illinois, Case No. 2020-CH 07179.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).    I have not received a registration number from the ARDC.

FILED DATE: 2/1/2021 5:59 PM   2020CH07179

4(a).    I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number.

State of South Carolina
Bonnie Allen Lynch
Bar No. 77399

4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.       I have no office or other presence in Illinois for the practice of law.

6.       I submit to the disciplinary authority of the Supreme Court of Illinois.

7.       I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding.

8.       The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

Daniel Saeedi
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601-3713
ARDC Number 6296493

9.       I certify that I have served this Statement upon Benjamin E. Haskin and Nathan H. Lichtenstein, and that these parties are all entitled to service under this rule.

<u>Verification</u>

I verify the accuracy and completeness of each of the above statements.

s/ Bonnie A. Lynch

FILED DATE: 2/1/2021 5:59 PM   2020CH07179

# Exhibit

# Certificate of Good Standing

FILED DATE: 2/1/2021 5:59 PM   2020CH07179

# The Supreme Court of South Carolina

## Certificate of Good Standing

I, Daniel E. Shearouse, Clerk of the Supreme Court of South Carolina, do hereby certify that Bonnie Allen Lynch was duly sworn and admitted as an attorney in this state on November 17, 2008, and is currently a Regular Member of the South Carolina Bar in good standing.

DANIEL E. SHEAROUSE, CLERK

BY *Margaret C. McGee*
       Deputy Clerk for Bar Admissions

Columbia, South Carolina

January 14, 2021

FILED DATE: 2/1/2021 5:53 PM   2020CH07179

FILED
2/1/2021 5:53 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12056087

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER SOLUTIONS, INC.

        Plaintiff,

v.

SHANE WOLFRAM,

        Defendant,

and

E&I ENGINEERING CORPORATION,

        Respondent in Discovery.

Case No. 2020 CH 07179

## <u>VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707</u>

I, Denny P. Major, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1. My full name is Denny Parker Major, my date of birth is January 22, 1981. The address of offices from which I practice law and related email address and telephone numbers are as follows:

Haynsworth Sinkler Boyd, PA
ONE North Main Street, 2nd Floor (29601)
P.O. Box 2048
Greenville, SC 29602
864.240.3200
dmajor@hsblawfirm.com

2. I represent E&I Engineering Corporation and Shane Wolfram in *SAI Advanced Power Solutions, Inc. vs. Shane Wolfram and E&I Engineering Corporation*, Circuit Court of Cook County, Illinois, Case No. 2020-CH 07179.

3(a). I have not filed any other appearance pursuant to this rule during this calendar year.

3(b). I have not received a registration number from the ARDC.

FILED DATE: 2/1/2021 5:53 PM   2020CH07179

4(a).    I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number.

State of South Carolina
Denny Major
Bar No. 74907

4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.        I have no office or other presence in Illinois for the practice of law.

6.        I submit to the disciplinary authority of the Supreme Court of Illinois.

7.        I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding.

8.        The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

Daniel Saeedi
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601-3713
ARDC Number 6296493

9.        I certify that I have served this Statement upon Benjamin E. Haskin and Nathan H. Lichtenstein, and that these parties are all entitled to service under this rule.

<u>Verification</u>

I verify the accuracy and completeness of each of the above statements.

s/ Denny P. Major

FILED DATE: 2/1/2021 5:53 PM   2020CH07179

# Exhibit

# Certificate of Good Standing

FILED DATE: 2/1/2021 5:53 PM   2020CH07179

# The Supreme Court of South Carolina

## Certificate of Good Standing

I, Daniel E. Shearouse, Clerk of the Supreme Court of South Carolina, do hereby certify that Denny Major was duly sworn and admitted as an attorney in this state on November 13, 2007, and is currently a Regular Member of the South Carolina Bar in good standing.

DANIEL E. SHEAROUSE, CLERK

BY _Margaret C. McGee_

Deputy Clerk for Bar Admissions

Columbia, South Carolina

January 14, 2021

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED DATE: 2/1/2021 6:01 PM   2020CH07179

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
2/1/2021 6:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12056324

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC. | |
| Plaintiff, | |
| v. | Case No. 2020 CH 07179 |
| SHANE WOLFRAM, | |
| Defendant, | |
| and | |
| E&I ENGINEERING CORPORATION, | |
| Respondent in Discovery. | |

## <u>VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY PURSUANT TO SUPREME COURT RULE 707</u>

I, H. Sam Mabry III, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.     My full name is Hamlet Sam Mabry III, my date of birth is July 19, 1956. The address of offices from which I practice law and related email address and telephone numbers are as follows:

Haynsworth Sinkler Boyd, PA
ONE North Main Street, 2nd Floor (29601)
P.O. Box 2048
Greenville, SC 29602
864.240.3200
smabry@hsblawfirm.com

2.     I represent E&I Engineering Corporation and Shane Wolfram in *SAI Advanced Power Solutions, Inc. vs. Shane Wolfram and E&I Engineering Corporation*, Circuit Court of Cook County, Illinois, Case No. 2020-CH 07179.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).    I have not received a registration number from the ARDC.

FILED DATE: 2/1/2021 6:01 PM 2020CH07179

4(a). I list each jurisdiction of admission, including any state, territory, or commonwealth of the United States, the District of Columbia, or in a foreign country, and my full admission name and license number.

State of South Carolina
Hamlet Sam Mabry III
Bar No. 3490

4(b). I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5. I have no office or other presence in Illinois for the practice of law.

6. I submit to the disciplinary authority of the Supreme Court of Illinois.

7. I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding.

8. The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

Daniel Saeedi
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601-3713
ARDC Number 6296493

9. I certify that I have served this Statement upon Benjamin E. Haskin and Nathan H. Lichtenstein, and that these parties are all entitled to service under this rule.

<u>Verification</u>

I verify the accuracy and completeness of each of the above statements.

s/ H. Sam Mabry III

FILED DATE: 2/1/2021 6:01 PM   2020CH07179

# Exhibit

# Certificate of Good Standing

FILED DATE: 2/1/2021 6:01 PM   2020CH07179

# The Supreme Court of South Carolina

## Certificate of Good Standing

I, Daniel E. Shearouse, Clerk of the Supreme Court of South Carolina, do hereby certify that Hamlet Sam Mabry III was duly sworn and admitted as an attorney in this state on November 09, 1981, and is currently a Regular Member of the South Carolina Bar in good standing.

DANIEL E. SHEAROUSE, CLERK

BY _Margaret C. McGee_

Deputy Clerk for Bar Admissions

Columbia, South Carolina

January 14, 2021

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2402
Location: District 1 Court
    Cook County, IL

FILED
2/1/2021 4:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12055678

FILED DATE: 2/1/2021 4:57 PM   2020CH07179

**Appearance and Jury Demand \***

(12/01/20) CCG 0009

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ COUNTY   **DEPARTMENT/** __CHANCERY DIVISION__

SAI Advanced Power Solutions, Inc.
_____
                                     Plaintiff

          v.

Shane Wolfram and E&I Engineering Corporation
_____
                                    Defendant

Case No.   2020-CH-07179

Claimed $: _____

Return Date: _____   Time: _____

Court Date: _____   Room No.: _____

50 West Washington Blvd. Chicago, Illinois 60602

Address of Court District for Filing

### APPEARANCE AND JURY DEMAND \*

☑ General Appearance    ☐ 0900 - Fee Paid      ☐ 0904 - Fee Waived

                          ☐ 0908 - Trial Lawyers Appearance - No Fee

☐ Jury Demand \*      ☐ 1900 - Appearance and Jury Demand/Fee Paid    ☐ Twelve-person Jury

                          ☐ 1904 - Appearance and Jury Demand/No Fee Paid    ☐ Six-person Jury

The undersigned enters the appearance of:   ○ Plaintiff   ● Defendant

Litigant's Name:   Shane Wolfram and E&I Engineering Corporation
                    _____
Signature:   /s/ Daniel R. Saeedi
            _____

☑ Initial Counsel of Record    ☐ Pro Se (Self-represented)      ☐ 2810 Rule 707 Out-of-State Counsel
                                                                (pro hac vice)

☐ Additional Appearance    ☐ Substitute Appearance

○ Atty. No.:   29143      ○ Pro Se 99500

Name:   Daniel R. Saeedi | Taft Stettinius & Hollister LLP

Atty. for (if applicable):

Shane Wolfram and E&I Engineering Corporation

Address:   111 East Wacker Drive, Suite 2800

City:   Chicago

State:   IL   Zip:   60601   Phone:   312-840-4308

Primary Email:   dsaeedi@taftlaw.com

**\* Strike demand for trial by jury if not applicable.**

**IMPORTANT**

*Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attornies) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

Pro Se Only:
☐ I have read and agree to the terms of Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

/s/ Daniel R. Saeedi
_____
Attorney for   ○ Plaintiff   ● Defendant

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Return Date: No return date scheduled
Hearing Date: 2/11/2021 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
2/8/2021 3:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12139452
(12/01/20) CCG 0009

FILED DATE: 2/8/2021 3:29 PM 2020CH07179

Appearance and Jury Demand *

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ COUNTY **DEPARTMENT**/ CHANCERY DIVISION

SAI Advanced Power Solutions, Inc.
_____
                                             Plaintiff

v.

Shane Wolfram and E&I Engineering Corporation
_____
                                          Defendant

Case No.   2020-CH-07179

Claimed $: _____

Return Date: _____ Time: _____

Court Date: _____ Room No.: _____

50 West Washington Blvd. Chicago, Illinois 60602
Address of Court District for Filing

## APPEARANCE AND JURY DEMAND *

[✔] General Appearance
[ ] Jury Demand *

[ ] 0900 - Fee Paid
[ ] 0908 - Trial Lawyers Appearance - No Fee
[ ] 1900 - Appearance and Jury Demand/Fee Paid
[ ] 1904 - Appearance and Jury Demand/No Fee Paid

[ ] 0904 - Fee Waived

[ ] Twelve-person Jury
[ ] Six-person Jury

The undersigned enters the appearance of:  ( ) Plaintiff  (•) Defendant

Litigant's Name:  Shane Wolfram and E&I Engineering Corporation

Signature:  /s/ Bonnie A. Lynch

[✔] Initial Counsel of Record   [ ] Pro Se (Self-represented)   [ ] 2810 Rule 707 Out-of-State Counsel (pro hac vice)

[ ] Additional Appearance   [ ] Substitute Appearance

( ) Atty. No.: 29143   ( ) Pro Se 99500

Name:  Bonnie A. Lynch | Haynsworth Sinkler Boyd, P.A.

Atty. for (if applicable):
Shane Wolfram and E&I Engineering Corporation

Address:  One North Main, 2nd Floor

City:  Greenville

State:  SC   Zip:  29601   Phone:  864-240-3312

Primary Email:  blynch@hsblawfirm.com

**IMPORTANT**

*Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attornies) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

Pro Se Only:
[ ] I have read and agree to the terms of Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**\* Strike demand for trial by jury if not applicable.**
I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

/s/ Bonnie A. Lynch
_____
Attorney for  ( ) Plaintiff  (•) Defendant

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Return Date: No return date scheduled
Hearing Date: 2/11/2021 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
2/8/2021 3:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12139452
(12/01/20) CCG 0009

FILED DATE: 2/8/2021 3:29 PM  2020CH07179

Appearance and Jury Demand *

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ COUNTY    DEPARTMENT/_____ CHANCERY DIVISION

SAI Advanced Power Solutions, Inc.
_____
                              Plaintiff

v.

Shane Wolfram and E&I Engineering Corporation
_____
                              Defendant

Case No.    2020-CH-07179

Claimed $: _____

Return Date: _____ Time: _____

Court Date: _____ Room No.: _____

50 West Washington Blvd. Chicago, Illinois 60602

Address of Court District for Filing

## APPEARANCE AND JURY DEMAND *

☑ General Appearance
☐ Jury Demand *

☐ 0900 - Fee Paid
☐ 0908 - Trial Lawyers Appearance - No Fee
☐ 1900 - Appearance and Jury Demand/Fee Paid
☐ 1904 - Appearance and Jury Demand/No Fee Paid

☐ 0904 - Fee Waived

☐ Twelve-person Jury
☐ Six-person Jury

The undersigned enters the appearance of: ○ Plaintiff ● Defendant

Litigant's Name:   Shane Wolfram and E&I Engineering Corporation

Signature:   /s/ Denny P. Major

☐ Initial Counsel of Record
☑ Additional Appearance

☐ Pro Se (Self-represented)
☐ Substitute Appearance

☑ 2810 Rule 707 Out-of-State Counsel
    (pro hac vice)

○ Atty. No.: _____
○ Pro Se 99500

Name:   Denny P. Major | Haynsworth Sinkler Boyd, P.A.

Atty. for (if applicable):
Shane Wolfram and E&I Engineering Corporation

Address:   One North Main, 2nd Floor

City:   Greenville

State:   SC   Zip:   29601   Phone:   803-540-7923

Primary Email:   dmajor@hsblawfirm.com

**IMPORTANT**
*Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attornies) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

Pro Se Only:
☐ I have read and agree to the terms of Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**\* Strike demand for trial by jury if not applicable.**
I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

/s/ Denny P. Major
_____
Attorney for ○ Plaintiff ● Defendant

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Return Date: No return date scheduled
Hearing Date: 2/11/2021 9:30 AM - 9:30 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
2/8/2021 3:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12139452
(12/01/20) CCG 0009

FILED DATE: 2/8/2021 3:29 PM   2020CH07179

Appearance and Jury Demand *

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ COUNTY    DEPARTMENT/ _____ CHANCERY DIVISION

SAI Advanced Power Solutions, Inc.
_____
                                    Plaintiff

v.

Shane Wolfram and E&I Engineering Corporation
_____
                                   Defendant

Case No.   2020-CH-07179

Claimed $: _____

Return Date: _____ Time: _____

Court Date: _____ Room No.: _____

50 West Washington Blvd. Chicago, Illinois 60602

Address of Court District for Filing

## APPEARANCE AND JURY DEMAND *

☑ General Appearance
☐ Jury Demand *

☐ 0900 - Fee Paid
☐ 0908 - Trial Lawyers Appearance - No Fee
☐ 1900 - Appearance and Jury Demand/Fee Paid
☐ 1904 - Appearance and Jury Demand/No Fee Paid

☐ 0904 - Fee Waived

☐ Twelve-person Jury
☐ Six-person Jury

The undersigned enters the appearance of: ○ Plaintiff ● Defendant

Litigant's Name: Shane Wolfram and E&I Engineering Corporation

Signature: /s/ Sam H. Mabry III

☐ Initial Counsel of Record
☑ Additional Appearance

☐ Pro Se (Self-represented)
☐ Substitute Appearance

☑ 2810 Rule 707 Out-of-State Counsel
    (pro hac vice)

○ Atty. No.: _____    ○ Pro Se 99500

Name: Sam H. Mabry III | Haynsworth Sinkler Boyd, P.A.

Atty. for (if applicable):

Shane Wolfram and E&I Engineering Corporation

Address: One North Main, 2nd Floor

City: Greenville

State: SC    Zip: 29601    Phone: 864-240-3221

Primary Email: smabry@hsblawfirm.com

**IMPORTANT**

*Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attorneys) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

Pro Se Only:
☐ I have read and agree to the terms of Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**\* Strike demand for trial by jury if not applicable.**
I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

/s/ Sam H. Mabry III
_____
Attorney for ○ Plaintiff ● Defendant

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER
SOLUTIONS, INC.,

                Plaintiff,

      v.

SHANE WOLFRAM,                              Case No. 2020 CH 07179

                Defendant,

and

E&I ENGINEERING CORPORATION

                Respondent in Discovery.

## ORDER

        This cause is coming to be heard on (a) Defendant Shane Wolfram's ("Wolfram") Motion to Dismiss the Complaint, and (b) Respondent in Discovery E&I Engineering Corporation's ("E&I") Motion to Quash the Summons and Dismiss E&I as a Respondent in Discovery, due notice having been given and the Court being fully advised:

        IT IS HEREBY ORDERED THAT:

1.     The Court is deferring arguments based upon any alleged failure to plead under 2-615, and is setting a briefing schedule on E&I's and Wolfram's standing and personal jurisdiction arguments.

2.     The deadline for Plaintiff SAI Advanced Power Solutions, Inc. to respond to these arguments is March 11, 2021, and the deadline for E&I and Wolfram to reply is April 1, 2021. The court sets a hearing date of May 6, 2021 at 2:00 PM.

DATED: February 11, 2021             ENTERED:

JUDGE                               Judge's No.

                                  Allen Price Walker
                                  Associate Judge

Prepared By:
Daniel R. Saeedi, dsaeedi@taftlaw.com
Zachary R. Clark, zclark@taftlaw.com              Feb. 11, 2021
**TAFT STETTINIUS & HOLLISTER LLP**
111 E. Wacker Dr., Suite 2800
Chicago, IL 60601                       Circuit Court - 2071
312-527-4000
No. 29143

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| SAI ADVANCED POWER SOLUTIONS, INC., | |
| Plaintiff, | |
| v. | Case No. 2020 CH 07179 |
| SHANE WOLFRAM, | |
| Defendant, | |
| and | |
| E&I ENGINEERING CORPORATION, | |
| Respondent in Discovery. | |

**AGREED ORDER**

THIS MATTER coming before the court on the Parties' Agreed Order, the court being fully advised in the premises, IT IS HEREBY ORDERED:

1. Respondent in Discovery, E&I Engineering Corporation, is dismissed without prejudice with each party to retain its own fees and costs;

2. Plaintiff, SAI Advanced Power Solutions, Inc., is granted leave to issue an out of state subpoena to E&I Engineering Corporation pursuant to a separate order of court; and

3. All previously scheduled dates to stand.

_____
Honorable Allen P. Walker

Allen Price Walker
Associate Judge

Mar. 17, 2021

Circuit Court - 2071

Prepared by:
Nathan H. Lichtenstein (nlichtenstein@agdglaw.com)
Benjamin Haskin (bhaskin@agdglaw.com)
ARONBERG GOLDGEHN
Attorneys for Plaintiff
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
(312) 828-9600
30375

1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER SOLUTIONS, INC.,

                    Plaintiff,

      v.

SHANE WOLFRAM,

             Defendant,

and

E&I ENGINEERING CORPORATION,

        Respondent in Discovery.

Case No. 2020 CH 07179

## AGREED ORDER

THIS MATTER coming before the court on the Parties' Agreed Order, the court being fully advised in the premises, IT IS HEREBY ORDERED:

1.   Plaintiff, SAI Advanced Power Solutions, Inc., is granted leave to issue out-of-state-subpoenas in connection with this action. No further action by this Court is necessary to effectuate the intent of this Order. Plaintiff shall issue out-of-state subpoenas in accordance with the laws of Illinois and those laws promogulated under any state in which the out-of-state subpoena shall be domesticated including, but not limited to, a state's enactment of The Uniform Interstate Depositions and Discovery Act.

2.   Nothing in this Agreed Order is intended to, nor shall, be construed as waiving any rights E&I Engineering Corporation may otherwise have to object to producing documents or electronically stored information on the grounds of relevance or materiality, or requiring that documents or electronically stored information containing confidential information only be produced subject to the terms and conditions of a reasonable Protective Order.

3.   The court executed copy of this Order shall act as a certified copy.

Allen Price Walker
Associate Judge

Mar. 17, 2021

_____
Honorable Allen P. Walker

Circuit Court - 2071

Prepared by:
Nathan H. Lichtenstein (nlichtenstein@agdglaw.com)

1

Benjamin Haskin (bhaskin@agdglaw.com)
ARONBERG GOLDGEHN
Attorneys for Plaintiff
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
(312) 828-9600
30375

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
3/11/2021 3:24 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

12544377

SAI ADVANCED POWER SOLUTIONS,
INC.,

          Plaintiff,

    v.

SHANE WOLFRAM,

          Defendant,

    and

E&I ENGINEERING CORPORATION,

          Respondent in Discovery.

Case No. 2020 CH 07179

---

<u>**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT SHANE WOLFRAM'S MOTION TO DISMISS FOR LACK OF
PERSONAL JURISDICTION**</u>

Plaintiff, SAI Advanced Power Solutions, Inc. ("SAI"), by and through its attorneys, Aronberg Goldgehn Davis & Garmisa, for its Response in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction filed by Defendant Shane Wolfram, states as follows:

**I. INTRODUCTION**

From 2013 until 2020, Defendant Shane Wolfram ("Wolfram") served as SAI's U.S. Vice President of Sales. During that time Wolfram maintained regular contact and telephonic and email communication with SAI's employees and operations in Illinois, including working in SAI's Illinois office (the only office SAI maintains) at least once a month. The two employment contracts which are at the center of this dispute were executed by Wolfram in SAI's Illinois office, including a non-compete and solicitation agreement that prevented Wolfram from contacting and soliciting certain of SAI's customers for a period of six months after the termination of his employment with SAI.

In January 2020 Wolfram began discussions with E&I Engineering Corporation ("E&I"), a competitor of SAI in the switchgear industry. Five months later, in May 2020, Wolfram

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

submitted his notice of resignation and went to work for E&I. Almost immediately after Wolfram joined E&I, E&I obtained three switchgear contracts that SAI expected to and was advised that it would receive. Wolfram had participated and assisted in SAI's bids for each of the three projects prior to his resignation (Wolfram was SAI's principal point of contact with these customers) and he almost certainly contacted and solicited them on behalf of E&I in violation of the covenants in his employment contract.

SAI filed suit against Wolfram for breaching the non-solicitation provisions in his employment contracts (Count I), misappropriation of trade secrets (Count II), and breach of fiduciary duty (Count III). Wolfram's contention that this Court lacks personal jurisdiction over him is without merit, and is belied by the overwhelming evidence of his continuous contact and communication with SAI's employees and operations in Illinois.[1] Wolfram's Motion to Dismiss for a lack of personal jurisdiction should be denied.

## II. FACTUAL BACKGROUND

**A.    SAI operates out of and in Illinois**

SAI is a designer, manufacturer, and supplier of custom-made electrical switchgear. (Complaint ¶ 7) Its customers include government facilities, health care providers, data centers, Fortune 500 companies, and international OEM customers. (*Id*.) In 2012, Plaintiff's parent company, Soft Switching Technologies Corporation was sold, leaving SAI Advanced Power Solutions, Inc., as a non-operating company in Wisconsin and Switchboard Apparatus, Inc., as the operating company in Illinois. **Exhibit A**, Affidavit of David Martin, ¶ 4. Switchboard Apparatus, Inc., is an Illinois corporation that operates and does business in Illinois as SAI Advanced Power

---

[1] Defendant also filed a Section 2-615 Motion to Dismiss Plaintiff's claims for violation of the Illinois Trade Secret Act and breach of fiduciary duty, which the Court ordered to be addressed after briefing on the alleged lack of personal jurisdiction.

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

Solutions, Inc. (*Id*. at 5)  Switchboard Apparatus, Inc., is licensed to do business in Illinois.[2] (*Id*.;

**Exhibit B**)

From 2011 until March 2019, SAI's office was located in Elmhurst, Illinois (the "Elmhurst

Office"). (Exhibit A at 7)  In March 2019, SAI relocated to Franklin Park, Illinois (the "Franklin

Park Office" and collectively with the Elmhurst Office, the "Illinois Office"). (*Id*. at 8)  SAI has

never had any offices besides the Illinois Office. (*Id*. at 9)  All of SAI's operations and employees

(besides the limited few who are authorized to work remotely) operate out of the Illinois Office,

including the SAI sales team, application engineering, project management, mechanical

engineering, electrical engineering, production, shipping and receiving, finance, human resources,

information technology, and legal. (*Id*. at 10)  David Martin ("Martin"), Vice President of Finance,

and Brad Bell ("Bell"), President of the Mission Critical Business Unit, each have an office and

work exclusively out of the Illinois Office. (*Id*. at 11; **Exhibit E**, Affidavit of Brad Bell, ¶¶ 4-6)

All SAI administrative tasks are performed out of the Illinois Office, requiring all

employees to contact the Illinois office to resolve problems involving payroll, medical benefits,

and retirement plans. (Exhibit A, ¶ 12)  SAI processes payroll from the Illinois office and uses an

Illinois bank. (*Id*. at 13)  All of SAI's physical and electronic files are kept and stored in the Illinois

Office, including but not limited to: (a) customer files and contact information; (b) project

specifications; (c) SAI bids; and (d) product specifications and pricing. (*Id*. at 14)  SAI's servers

are located in the Illinois Office and e-mails are managed and electronically stored in the Illinois

Office. (*Id*. at 15)

---

[2] Plaintiff will be seeking leave under 735 ILCS 5/2-401(b) to correct the misnomer and identify Plaintiff as Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc.

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

**B.      Wolfram is hired and maintains a continuous presence in the Illinois Office**

Wolfram was hired by SAI as its U.S. Vice President of Sales in March 2012.  (*Id*. at 16;
Exhibit B at 7)  Wolfram's duties and responsibilities as U.S. Vice President of Sales included,
among other things: (a) overseeing the sale of SAI's products and services within and outside of
the United States; (b) supervising all of SAI's sales employees, sales managers, and field
engineers; (c) developing, maintaining, and servicing new and existing client relations; and (d)
interacting with SAI's customers to sell and market SAI's bids and proposals.  (Complaint ¶ 10)
Wolfram was the primary point of contact between SAI and its customers during the process in
which SAI would respond to a request for a proposal (an "RFP").  (Complaint ¶ 12)  Wolfram
would ordinarily receive an RFP on behalf of SAI and participate in SAI's internal meetings to
discuss the scope and specifications of the project.  (Complaint ¶ 13)

Because Wolfram's duties as Vice President of Sales required frequent travel, SAI
permitted him to work primarily from his home in Sun Prairie, Wisconsin.  (Exhibit A, ¶16)
Wolfram accessed SAI's network through a virtual private network ("VPN") that enabled Wolfram
to connect and access SAI's internal document management and e-mail system as if he was
physically located in the Illinois Office.  (*Id*. at 17)

Wolfram was physically present in the Illinois Office constantly and for a variety of reasons
over the course of his nine-year employment with SAI that are far too numerous and frequent to
itemize.  (Exhibit A at 18)  Between 2012 and 2019, Wolfram would come to the Illinois Office
approximately once or twice a month to meet with members of the application and engineering
team and to check in on the production of certain projects.[3]  (*Id*. at 19)  Wolfram ordinarily made
"rounds" in the office and would meet with Martin.  (*Id*. at 20)  Wolfram attended a sales review

---

[3] Wolfram's regular appearances in the Illinois Office tapered off in early 2020 as he began discussions with E&I
about possible employment, and the COVID-19 pandemic triggered travel restrictions.

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

meeting in the Franklin Park Office approximately every quarter from 2013 through 2019, and nearly every internal meeting between Wolfram and members of the sales, engineering, and project management teams to discuss SAI's receipt and response to RFP's took place in the Illinois Office. (*Id*. at 21)  Wolfram sent multiple e-mails to SAI employees on a daily basis and likely made a number of phone calls.  (*Id*. at 22; Exhibit E at 11)

**C.    Wolfram executes a non-compete agreement in the Elmhurst Office**

In or about the early summer of 2012, SAI requested that Wolfram sign a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement").  (Exhibit E at 8)  Wolfram negotiated the terms of the Non-Solicitation Agreement over several e-mails with SAI's in-house counsel, and he executed the Non-Solicitation Agreement in the Illinois Office. (*Id*. at 10; **__Exhibit C__**)

Under the terms of the Non-Solicitation Agreement, Wolfram agreed, among other things, that for a period of six months following the termination of his employment with SAI: (a) not to be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (b) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue-producing client of SAI.  (Complaint ¶ 15; Exhibit C)  Wolfram also agreed not to, directly or indirectly, use or disclose any Confidential Information obtained during the course of his employment with SAI and to use his best efforts to safeguard such information.  (Complaint ¶ 16; Exhibit C)  The Non-Solicitation Agreement also included a prohibition not to solicit, encourage, or have contact with any of SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at a competitor for a period of twelve months following Wolfram's termination of employment with SAI.  (Complaint ¶ 18; Exhibit C)

5

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

**D.      Wolfram assists with SAI's response to Stack and Cloud RFPs**

Between September 2019 and April 2020, SAI received and submitted bids in response to RFPs from: (1) Holder Construction, LLC ("Holder") to bid on a project for Stack Inc. ("Stack") for the design and manufacture of switchgear for a data center located in Silicon Valley (the "Stack Silicon Valley Project"); (2) CloudHQ LLC ("Cloud") to provide switchgear for a data center located in Manassas, Virginia (the "Cloud Manassas Project"); and (3) Stack for a data center in Portland, Oregon (the "Stack Portland Project").  (Complaint ¶¶ 22, 31 and 34)  Wolfram was extensively involved in preparing SAI's bids for the Stack Silicon Valley Project, Cloud Manassas Project, and Stack Portland Project, and sent and received multiple emails with SAI's engineering and project management teams in the Illinois Office in connection with these projects.  (*Id*. at 25, 33 and 37; Exhibit A at 24)  Based upon a forensic examination of Wolfram's SAI email account for the period of January 1, 2019, through April 30, 2020, Wolfram sent and received approximately 5,105 emails related to Stack and 3,515 emails related to Cloud.[4]  (Exhibit A at 23)  Wolfram likely also met with SAI's application engineering team in the Illinois Office to finalize SAI's quotes and send them to the customers.  (*Id*. at 24)

Unbeknownst to SAI at the time and based upon a subsequent review of phone records from Wolfram's SAI-issued cell phone, Wolfram began discussions with E&I as far back as January 2020.  (Exhibit E at 12)  SAI believes that Wolfram shared SAI Confidential Information with E&I during these phone conversation and while still employed by SAI, including the specifics of SAI's proposals for the Cloud Manassas Project, the Stack Portland Project, and the Stack Silicon Valley Project.  (Complaint ¶ 43)  SAI also believes that Wolfram promoted or otherwise

---

[4] Between January 1, 2019, through April 30, 2020, Wolfram sent and received approximately 11,154 emails related to four of Plaintiff's top revenue generating clients: Cloud, Stack, Coresite, and Iron Mountain.

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

marketed E&I's switchgear proposals over that of SAI while still employed by SAI.  (Complaint ¶ 45)

**E.      Wolfram resigns from SAI and negotiates and executes his separation in Illinois**

On May 15, 2020, Wolfram tendered a notice of resignation from SAI effective May 29, 2020.  (Exhibit A at 25; Exhibit E at 14)  Martin thereafter drafted a separation agreement (the "Separation Agreement") from the Franklin Park Office to facilitate Wolfram's departure from SAI.  (*Id*.)  Wolfram then met with Bell in the Franklin Park Office to discuss and negotiate the terms of Wolfram's separation, including: (1) whether SAI would provide Wolfram a waiver to work for a competitor: E&I; (2) the identify of SAI's top ten revenue-generating clients that would be subject to the non-solicitation provisions pursuant to Section 2(c) of the Non-Solicitation Agreement; and (3) SAI's payment of commission to Wolfram.  (Exhibit E at 15)  Following Wolfram's negotiation with Bell, Martin amended and finalized the Separation Agreement, and Wolfram executed the Separation Agreement in the Franklin Park Office with Bell present. (Exhibit A at 26; Exhibit E at 16; **Exhibit D)**

**F.      Wolfram joins E&I**

Wolfram began work as the E&I Vice President of U.S. Sales in June 2020.  (Complaint ¶ 46)  On or about September 30, 2020, Wolfram met and had dinner with Bob Brown, the SAI Director of Customer Success, in Oak Park, Illinois.  (*Id*. at 50)  Upon information and belief, the intended purpose of this meeting was to convince Mr. Brown to leave his employment and to join Wolfram at E&I.  (*Id*.)  At least six SAI employees have been contacted or otherwise solicited to leave SAI and to join E&I and Wolfram is believed to have been directly or indirectly involved in the solicitation of the SAI employees in violation of the terms of the Non-Solicitation Agreement. (*Id*. at 51)

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

In the months following Wolfram's hiring, E&I was awarded the three projects that Wolfram had originally bid on behalf of SAI, which included: (1) the Cloud Manassas Project that had an approximate value of $3.9 million and would generate gross profit in the approximate amount of $1.6 million; (2) the Stack Portland Project that had an initial value of approximately $800,000 with the two-year exclusive right to provide equipment worth an estimated $20 to $30 million; and (3) the equipment portion for the Silicon Valley Project that had an approximate value of $14 million and would generate gross profit in the approximate amount of $5.74 million.  (*Id.* at 57-58, 67-69 and 70-75)  SAI believes and has alleged that Wolfram was instrumental in E&I obtaining these three projects by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack and Cloud on behalf of E&I, and using or relying upon the Confidential Information, including SAI's pricing and structure for the projects.  (*Id.* at 56, 68 and 72)

## III. STANDARD

The plaintiff bears the burden of establishing a *prima facie* basis upon which jurisdiction over an out-of-state resident may be exercised.  *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 561 (1st Dist. 2006).  To determine whether the plaintiff has set forth a *prima facie* case for jurisdiction, the trial court must consider the uncontroverted pleadings, documents, and affidavits, as well as any facts asserted by the defendant that have not been contradicted by the plaintiff.  *Cardenas Mktg. Network, Inc. v. Pabon*, 2012 IL App (1st) 111645, ¶ 28.  Any conflicts in the pleadings and affidavits must be resolved in the plaintiff's favor for purposes of determining whether jurisdiction has been established.  *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051, ¶ 10.  Personal jurisdiction over an out-of-state defendant may only be exercised if the defendant has certain "minimum contacts" with the forum state so that requiring the defendant to defend in the forum does not offend "traditional notions of fair play and substantial justice."

8

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

*Zazove v. Pelikan, Inc.*, 326 Ill. App. 3d 798, 803 (1st Dist. 2001), *citing Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 315 (1945).

## IV. ARGUMENT

Personal jurisdiction is the authority of the court "to bring a person into its adjudicative process." *Campbell,* 2018 IL App (1st) 173051 at ¶ 11, *citing In re M.W.*, 232 Ill. 2d 408, 416, (2009). The Illinois's long-arm statute governs the exercise of personal jurisdiction over a nonresident defendant and provides multiple bases for exercising that jurisdiction, including if the cause of action arises from, among other things: (i) the transaction of business in Illinois; (ii) the commission of a tortious act in Illinois; or (iii) the making or performance of any contract or promise substantially connected with Illinois. *Zamora v. Lewis*, 2019 IL App (1st) 181642, ¶ 43, *citing* 735 ILCS 5/2-209(a)(1)(2) and (7). Section (c) of the long-arm statute permits the court to exercise personal jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States, which convey personal jurisdiction to the fullest extent consistent with due process. *Id.*, citing 7355/2-209(c).

There are two categories of personal jurisdiction: general and specific. *Campbell,* 2018 IL App (1st) 173051 at ¶ 11. General jurisdiction is all-purpose and requires a defendant to have affiliations with the forum state that are so continuous and systematic as to render him or her essentially at home there. *Aspen American Insurance*, 2017 IL 121281, ¶¶ 14, 16. Specific jurisdiction is case-specific. *Id.* ¶ 14. For a forum to exercise specific jurisdiction consistent with due process, the defendant's litigation-related conduct must create a substantial connection with the forum state. *Zamora,* 2019 IL App (1st) 181642 at ¶ 43. In this case, the entirety of the parties' course of dealing and transactions took place in Illinois, subjecting Wolfram to specific personal jurisdiction.

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

**A.      The Court has specific jurisdiction over Wolfram because SAI's claims arise out of his employment in Illinois**

Specific jurisdiction is "case-linked," so that the suit must arise out of or relate to the defendant's contacts with the forum.  *Tata Int'l Metals, (Americas) Ltd. v. Kurt Orban Partners, LLC*, 2020 WL 5056398, at *3 (N.D. Ill. Aug. 27, 2020), *citing Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1780 (2017).  The court can exercise specific jurisdiction when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities.  *Id.*, *citing Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014).

**1.      The negotiation, execution, and performance of the Non-Solicitation Agreement and Separation Agreement took place in Illinois**

Specific jurisdiction in a claim for breach of contract examines all of the dealings between the parties in regards to the disputed contract.  *Tata Int'l Metals,* 2020 WL 5056398, at *3, *citing RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997).  Courts look at several factors to determine if the breach of contract claim has the necessary nexus to Illinois, including: (1) whether the contract was negotiated or executed in Illinois and whether it was to be performed in Illinois; (2) whether payment was to be made in Illinois; (3) whether the defendant was ever physically present in Illinois in connection with the contract; (4) whether the Illinois plaintiff or the out-of-state defendant initiated the transaction; (5) and the occurrence of telephone calls or other communications to and from Illinois.  *Id.*

The negotiation and execution of a contract in Illinois is, by itself, ordinarily sufficient to confer jurisdiction.  *See Sullivan v. Bickler*, 360 F. Supp. 3d 778, 785-86 (N.D. Ill. 2019) (finding specific jurisdiction for breach of contract claim where the contract was negotiated and signed in Illinois).  *Elorac, Inc. v. Sanofi-Aventis Canada Inc.*, 2014 WL 7261279, at *7 (N.D. Ill. Dec. 19, 2014) ("Because the provisions of the [contract] were so heavily negotiated in Chicago . . . it

10

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

becomes more significant in the jurisdictional analysis."); *Promero, Inc. v. Mammen*, No. 02 C 1191, 2002 WL 31455970, at \*5 (N.D. Ill. Nov. 1, 2002) ("Because the alleged contract was negotiated in part in Illinois and at the time the parties should have expected that performance would occur in Illinois, jurisdiction over the defendants in Illinois is proper[.]"); *Torco Oil Co. v. Innovative Thermal Corp.*, 730 F. Supp. 126, 132 (N.D. Ill. 1989) (finding that a single meeting in Illinois "in furtherance of the contract, is the most significant jurisdictional fact that supersedes all other considerations" where the parties discussed the contract in detail and agreed upon revisions).

Continuous communications, including e-mail and phone calls, related to the contract into Illinois similarly heavily favor the exercise of personal jurisdiction. *Lukas Mktg. v. Prince George's Cmty. Coll.*, 2013 WL 5818592, at \*6 (N.D. Ill. Oct. 29, 2013) (exercising personal jurisdiction where the defendant "initiated significant phone, e-mail, and mail contacts with [the plaintiff] in Illinois throughout the formation of the contract"); *Vasilj v. Duzich*, No. 07 C 5462, 2008 WL 2062371, at \*4 (N.D. Ill. May 13, 2008) (finding that regular communications from the defendant into Illinois were a significant factor in establishing minimum contacts).

In *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694 (N.D. Ill. 2014), the court found that a former employee's breach of contract claim "arose out of her contact with Illinois" due to sustained communications with an Illinois competitor over a three-month period, including phone calls and e-mails.  In *Abbott Labs., Inc. v. BioValve Techs., Inc.,* 543 F. Supp. 2d 913, 921 (N.D. Ill. 2008), two visits by a Delaware corporation's employees to Illinois as well as ongoing e-mail and telephone communication with the corporation's Illinois facilities and employees merited the exercise of personal jurisdiction.  The court found that the sustained contact over the course of several months is "not random, fortuitous, or attenuated" and that sustained e-mail and telephone communications is sufficient to establish the requisite connection between the defendant and the

forum state because it is an "inescapable fact of modern commercial life." *Id.  See also Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 355 (E.D. Pa. 2016) (finding specific jurisdiction over employer's claims against former employee who is alleged to have violated restrictive covenant, but did not live or work in forum state, based on the employee's use and reliance on back office personnel management, such as payroll and benefit administration that operated out of forum state office).

In *Tower Communications Expert, LLC v. TSC Constr., LLC*, 2018 WL 5624268, at *1 (N.D. Ill. Oct. 30, 2018)–the principal case relied upon by Wolfram–the court declined to exercise specific jurisdiction over two former employees because the only significant relationship between the employees and Illinois was a choice of law clause in their employment contract.  The court emphasized that there was no evidence that the contracts were negotiated or executed in Illinois or that any performance of the contracts or course of dealing took place in Illinois.  *Id.* at *6.  The opposite is true here, as the negotiation and execution of the contracts took place in Illinois and the parties' course of dealing and performance of employment occurred primarily in Illinois.

The facts and circumstances of Wolfram's nine-year employment with SAI palpably support specific jurisdiction in Illinois.  These contacts include: (1) the negotiation and execution of the Non-Solicitation Agreement in Illinois; (2) the negotiation and execution of the Separation Agreement in Illinois; (3) continuous e-mail and telephone contact with SAI employees in the Illinois office for over nine years, from 2011 to 2020; (4) daily access to the SAI servers in Illinois via the VPN from 2011 to 2020; and (5) Wolfram's numerous in-person appearances in the Illinois Office for employment purposes, including sales review meetings and internal meetings from 2011 to 2020.  Each of these contacts, on their own, would likely be sufficient for the Court to exercise personal jurisdiction; collectively, they are overwhelming.  Wolfram's employment with SAI

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

necessitated a nearly daily interaction with employees and physical and electronic files located in Illinois, and he is alleged to have breached two employment contracts that he negotiated and executed in Illinois. This is more than sufficient for the Court to exercise specific jurisdiction over Wolfram.

### 2. The commission of torts in Illinois also confers specific personal jurisdiction

Personal jurisdiction is also proper when a nonresident defendant's intentional tortious actions are aimed at the forum state, cause harm to the plaintiff in the forum state, and the defendant knows such harm is likely to be suffered. *Zep, Inc. v. First Aid Corp.*, 2010 WL 1195094, at *6 (N.D. Ill. Mar. 19, 2010). This inquiry focuses on whether the conduct underlying the claim was purposely directed at the forum state. *Sullivan*, 360 F. Supp. 3d at 784.

In *TEKsystems,* the court found that a company established personal jurisdiction over a former employee's claim for misappropriation of trade secrets based upon the employee's wrongful solicitation of another employee in the forum state and encouragement to misappropriate customer information.[5] *TEKsystems*, 2008 WL 5155667, at *3. In *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 2017 WL 4340123, at *3 (N.D. Ill. Sept. 29, 2017), the court ruled that it had personal jurisdiction over an Illinois company's claims that a former employee (who worked remotely in Oregon) breached her fiduciary duty and misappropriated confidential information because all of the allegations against the former employee stemmed from the employment with the Illinois employer. The court found that although the employee worked remotely, she still regularly accessed the company's networks and communicated with her supervisors and colleagues in Illinois to carry out her job duties. *Id*. at *4.

---

[5] The court disregarded the defendant's denial of the allegations since all factual disputes are resolved in favor of the plaintiff. *Id.*

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

Specific jurisdiction is proper in this case because, just like in *Opus*, the tort claims arise out of Wolfram's employment with SAI in Illinois; the fact that he worked remotely does not deprive the court of jurisdiction since he regularly communicated with SAI employees, both through e-mail and in person. Moreover, the confidential information that Wolfram is alleged to have misappropriated, including but not limited to the project and pricing specifications for the Stack Silicon Valley, Stack Portland, and Cloud Manassas Projects, were maintained and stored in the Franklin Park Office, and Wolfram personally solicited an SAI employee (in violation of his Non-Solicitation Agreement) in Illinois. Wolfram's tortious conduct took place and was felt exclusively in Illinois, therefore subjecting him to personal jurisdiction in Illinois.

**B.   The exercise of personal jurisdiction does not offend the notions of fair play and substantial justice**

The final inquiry in the court's personal jurisdiction analysis is whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Tata Int'l Metals*, 2020 WL 5056398, at *5. The following factors are relevant: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Tamburo*, 601 F.3d at 709. A defendant who purposefully directed his activities at forum that seeks to defeat jurisdiction must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Tata Int'l Metals*, 2020 WL 5056398, at *5.

In this case, it is not unreasonable or unexpected to subject Wolfram to the jurisdiction of this Court based upon his nine years of working for and communicating with SAI in Illinois. *See Wedi Corp. v. Seattle Glass Block Window, Inc.*, 2018 WL 1794771, at *4 (N.D. Ill. Apr. 16, 2018)

FILED DATE: 3/11/2021 3:24 PM  2020CH07179

(explaining that the defendant established a continuing relationship with the plaintiff and communicated with its headquarters in Illinois as part of that relationship which took place over several years, so defendant was on notice that it might be subject to suit in Illinois).  Requiring Wolfram to litigate this case in Illinois is also not particularly burdensome.  *See, e.g., Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 54 (7th Cir. 1996) (noting that it is usually not unfair to force a defendant to defend a lawsuit in a state in which it has engaged in economic activity).  Lastly, Illinois has a strong interest in providing a forum for contracts executed and performed in Illinois and torts committed or suffered in Illinois.  *Montel Aetnastak*, 998 F. Supp. 2d at 713-14.

WHEREFORE, Plaintiff, SAI Advanced Power Solutions, Inc., respectfully requests that the Court deny Defendant Shane Wolfram's Motion to Dismiss based upon an alleged lack of personal jurisdiction, and grant such other relief as the Court deems just and proper.

SAI ADVANCED POWER
SOLUTIONS, INC.

By:  /s/ *Benjamin E. Haskin*
      One of Its Attorneys

Nathan H. Lichtenstein, Esq.
nlichtenstein@agdglaw.com
Benjamin E. Haskin, Esq.
bhaskin@agdglaw.com
ARONBERG GOLDGEHN DAVIS & GARMISA
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
312-828-9600
Attorney No. 30375
4822-3583-2797v5

DocuSign Envelope ID: 98EC23E8-2ED7-42BE-8054-35354CCFD532

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

SAI ADVANCED POWER SOLUTIONS, INC.,

                   Plaintiff,

      v.

SHANE WOLFRAM,

              Defendant,

and

E&I ENGINEERING CORPORATION,

              Respondent in Discovery.

Case No. 2020 CH 07179

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

## AFFIDAVIT OF DAVID MARTIN

I, David Martin, under penalty of perjury, hereby affirm the following facts to the best of my knowledge:

1.      I am over 18 years of age, am duly authorized to make this Affidavit, and have personal knowledge of all facts stated herein, and/or have obtained such knowledge through my review of relevant records.

2.      I am the Vice President of Finance of Switchboard Apparatus, Inc. d/b/a as SAI Advanced Power Solutions, Inc ("SAI") and I have the authority to execute this Affidavit on behalf of SAI.

3.      As the Vice President of Finance of SAI, I am familiar with all aspects of the company and its business operations.

4.      In or around 2012, SAI's parent company, Soft Switching Technologies, Corporation., was sold, leaving SAI Advanced Power Solutions, Inc. as a non-operating parent company in Wisconsin and Switchboard Apparatus, Inc. as the operating company in Illinois.

# EXHIBIT A

DocuSign Envelope ID: 98EC23E8-2ED7-42BE-8054-35354CCFD532

FILED DATE: 3/11/2021 3:24 PM    2020CH07179

5.      Switchboard Apparatus, Inc. operates and does business in Illinois as SAI Advanced Power Solutions, Inc.

6.      Switchboard Apparatus, Inc. is licensed to do business in Illinois.  A copy of its certificate of good standing is attached to the SAI's Response in Opposition to the Motion to Dismiss as **Exhibit B**.

7.      From 2011 until March 2019, SAI's office was located in Elmhurst, Illinois (the "Elmhurst Office").

8.      In March 2019, SAI relocated to Franklin Park, Illinois (the "Franklin Park Office" and collectively with the Elmhurst Office, the "Illinois Office").

9.      SAI has never had any offices besides the Illinois Office.

10.     All of SAI's operations and employees (besides the limited few who are authorized to work remotely) operates out of the Illinois Office, including the SAI sales team, application engineering, project management, mechanical engineering, electrical engineering, production, shipping and receiving, finance, human resource, information technology, and legal.

11.     I have always worked exclusively out of the Illinois Office.

12.     All SAI administrative tasks are performed out of the Illinois Office, requiring all employees to contact the Illinois office to resolve problems involving payroll, medical benefits, and retirement plans.

13.     SAI processes payroll from the Illinois office and uses an Illinois bank.

14.     All of SAI's physical and electronic files are kept and stored in the Illinois Office, including but not limited to: (a) customer files and contact information; (b) project specifications; (c) SAI bids; and (d) product specifications and pricing.

DocuSign Envelope ID: 98EC23E8-2ED7-42BE-8054-35354CCFD532

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

15.     SAI's servers are located in the Illinois Office and e-mails are managed and electronically stored in the Illinois Office.

16.     Defendant Shane Wolfram ("Wolfram") was hired by SAI as its U.S. Vice President of Sales in March, 2012 and because duties as Vice President of Sales required frequent travel, he was permitted to work primarily from his home in Sun Prairie, Wisconsin.

17.     Wolfram accessed SAI's network through a virtual private network ("VPN") that enabled Wolfram to connect and access SAI's internal document management and e-mail system as if he was physically located in the Illinois Office.

18.     Wolfram was physically present in the Illinois Office constantly and for a variety of reasons over the course of his nine-year employment with Plaintiff that are far too numerous and frequent to itemize.

19.     Between 2012 and 2019, Wolfram would come to the Illinois Office approximately once or twice a month to meet with members of the application and engineering team and to check in on the production of certain projects.

20.      Wolfram ordinarily made "rounds" in the office to say hello to his colleagues, including me.

21.     Wolfram attended a sales review meeting in the Franklin Park Office approximately every quarter from 2011 through 2019, and nearly every internal meeting between Wolfram and members of the sales, engineering, and project management teams to discuss Plaintiff's receipt and response to requests for proposals took place in the Illinois Office.

22.     Wolfram's job required him to, and he did, send and received emails from SAI employees in the Illinois office on a regular basis. I sent and received approximately 2 - 10 emails per month with Wolfram during the entirety of his employment with SAI.

DocuSign Envelope ID: 98EC23E8-2ED7-42BF-8054-35354CCFD532

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

23.     Based upon a forensic examination of Wolfram's email account for the period of January 1, 2019 through April 30, 2020, Wolfram sent and received approximately 5,105 emails related to Stack and 3,515 emails related to Cloud. During the same period, Wolfram sent and received approximately 11,154 emails related to four of SAI's top revenue generating clients: Cloud, Stack, Coresite and Iron Mountain.

24.     Wolfram necessarily had to send and receive dozens, if not hundreds, of emails from SAI employees related to the Stack Silicon Valley Project, Cloud Manassas Project and Stack Portland Project and likely met with SAI's application and engineering team in the Illinois Office to finalize and send the quotes to the customers.

25.     Wolfram tendered a notice of resignation from SAI on May 15, 2020, and soon thereafter I drafted a separation agreement (the "Separation Agreement") from the Franklin Park Office as proposed terms of Wolfram's separation.

26.     I subsequently amended the Separation Agreement following a conversation between Wolfram and Brad Bell and sent the final draft back to Wolfram to be executed, which he did.  A true and accurate copy of the Separation Agreement is attached to SAI's Response in Opposition to Wolfram's Motion to Dismiss as **Exhibit D.**

*FURTHER AFFIANT SAYETH NOT*

DocuSign Envelope ID: 98EC23E8-2ED7-42BE-8054-35354CCFD532

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Dated: March _____, 2020
    3/10/2021

By: David Martin

4816-9584-9183, v. 2

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

*File Number*          6690-837-2



# To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that I am the keeper of the records of the Department of Business Services. I certify that*

SWITCHBOARD APPARATUS, INC., A DOMESTIC CORPORATION, INCORPORATED UNDER THE LAWS OF THIS STATE ON MARCH 24, 2009, APPEARS TO HAVE COMPLIED WITH ALL THE PROVISIONS OF THE BUSINESS CORPORATION ACT OF THIS STATE, AND AS OF THIS DATE, IS IN GOOD STANDING AS A DOMESTIC CORPORATION IN THE STATE OF ILLINOIS.



*In Testimony Whereof, I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this* 4TH *day of* MARCH *A.D.* 2021 .

Authentication #: 2106303040 verifiable until 03/04/2022

Authenticate at: http://www.cyberdriveillinois.com

*Jesse White*

SECRETARY OF STATE

**EXHIBIT B**

FILED
4/8/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179
11432201

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
Cook County, IL

# CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

I, Shane Wolfram, hereby enter into this Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement") with SAI Advanced Power Solutions, Inc. (the "Company"). I acknowledge that my position as the Company's Vice President of Sales has given me and will continue to give me access to information which the Company regards as proprietary and/or confidential and which, if disclosed by me in contravention of this Agreement would cause permanent, incalculable and irreparable injury and damage to the Company. I further acknowledge that I also have been given and will continue to be given the opportunity to gain close knowledge of and possible influence over clients and employees of the Company, which I would not have had contact with but for my employment with the Company. I acknowledge that I therefore possess the good will of the Company and that this Agreement is necessary to protect the Company against unfair loss of said confidential information, clients, employees and/or good will. Accordingly, so that there will be no misunderstanding in the future regarding these matters, I have voluntarily entered into this Agreement. I agree that I have received adequate consideration for my agreeing to be bound by the terms of this Agreement, including, but not limited to, my participation in the new 2012 Sales Bonus Plan applicable to my position and my continued employment with the Company.

1. <u>Non-Disclosure/Confidentiality</u>. Unless otherwise instructed or authorized in writing by an Executive Officer of the Company, I agree that I will not, at any time during or after the period of my employment, directly or indirectly copy, use, disclose, publish or divulge to any person any Confidential Information (as defined below in this Agreement), and will use my best efforts to safeguard such Confidential Information.

The phrase "Confidential Information" means any and all information disclosed to or known by me as a consequence of or through my employment with the Company, which is not generally known outside the Company, relating to the Company's business in the electrical distribution equipment industry, including but not limited to inventions, products, services, equipment, devices, methods of operations or doing business, processes, formulas, drawings, blueprints, photographs, slides, motion pictures, videotapes, computer software programs, passwords, reports, analyses, data bases, spreadsheets and all related documentation, notes and flow charts, regardless of medium, computer data and storage media, trade secrets, pricing information and lists, clients and prospects, client and prospect lists, proprietary or confidential information pertaining to clients and prospects, vendors and potential vendors, vendor lists, suppliers and potential suppliers, supplier lists, employee and personnel compensation, data, information and files, business and marketing plans, ideas, or strategies, financial performance and projections, financial and accounting information and analyses, financial statements, budget information, purchasing, marketing and analytical studies, and cost data, which I may have previously acquired, accessed or developed or which I may subsequently acquire, have access to or develop in connection with or as a result of my employment with the Company.

Upon termination of my employment with the Company (for any reason), I will, prior to my separation, immediately deliver all Company information, including any and all Confidential Information, to the Company, including any and all copies thereof. I understand that this

FILED DATE: 3/29/2020 2:34 PM   2020CH07179

**EXHIBIT C**

FILED DATE: 3/9/2020 2:34 PM   2020CH07179

Agreement shall remain in full force and effect with respect to the clauses which require me to perform or not to perform certain actions after termination of my employment.

      2.   <u>Non-Competition and Non-Solicitation</u>.  I acknowledge and agree that as the Company's Vice President of Sales, my duties and responsibilities include, but are not limited to, overseeing the sale of the Company's products and services within and outside of the United States, and directly supervising all of the Company's sales employees, including, but not limited to the Company's Sales Managers, who are responsible for selling the Company's products and services in the Company's Eastern, Central, and Western sales regions, and the Company's Field Sales Engineers, who are responsible for assisting with the sales of assigned products in all of the Company's sales regions. I further acknowledge and agree that in my role as the Company's Vice President of Sales, I not only have access to but have acquired and will continue to acquire substantial knowledge regarding the Company's confidential business information, including all of the Company's clients and prospects within and outside of the United States, client and prospect lists, and proprietary or confidential information pertaining to all of the Company's clients and prospects; the Company's pricing information and lists; the Company's business, marketing and sales plans, efforts, ideas, or strategies; the Company's current products and products in development; and the compensation paid to the Company's sales employees; among other confidential information identified in Section 1 above. I further acknowledge and agree that in my role as the Company's Vice President of Sales, I have gained close knowledge of and influence over the Company's employees and all of the Company's clients within and outside of the United States, which I would not have but for my employment with the Company.

      I therefore further acknowledge and agree that each of the provisions of this Agreement are reasonable and necessary to preserve and protect the legitimate business interests of the Company, including its client and employee relationships, Confidential Information, its present and potential business activities, and the economic benefits derived therefrom. With these principles in mind, I specifically acknowledge and agree as follows:

      a.   that the relationships between the Company and its clients are of a near permanent nature and have, in most instances, been cultivated over an extensive period of time with considerable time, money and effort expended and that the information which I will have access to is of a confidential and proprietary nature, and the good will of the Company and its client relationships which I have enjoyed or will continue to enjoy while employed by the Company are significant and valuable to the Company.

      b.   that, in light of the previously mentioned provisions in paragraph 2 and 2.a., during my employment by the Company and for a period of six (6) months following my voluntary or mutually agreed termination of employment with the Company, I will not, either directly or indirectly, in any capacity be employed by, perform services for, or have any business interest in any Competing Business if: (1) my duties or services at the Competing Business are similar to duties or services I performed for the Company; (2) my duties or services at the Competing Entity involve the sale or marketing of switch gears or other electrical distribution equipment products and services sold by the Company; (3) my duties or services at the Competing Business would include managing or supervising individuals engaged in duties or services similar to the duties and services I performed for the Company; or (4) doing so would involve the actual or threatened unauthorized use or disclosure of the Company's Confidential

FILED DATE: 3/9/2020 2:34 PM  2020CH07179

Information. A "Competing Business" for purposes of this Agreement includes the following entities and any of their current or future parent, sister, affiliated or successor entities: ASCO Power Technologies - Global HQ (a division of Emerson Network Power) currently at 50 Hanover Road, Florham Park, NJ; the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of GE Zenith Controls currently at 830 W 40th Street, Chicago, IL 60609; IEM / Industrial Electric Manufacturing currently at 48205 Warm Springs Blvd., Fremont, CA; the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of ISO-Eaton Corporation, Corporate Headquarters currently at 1111 Superior Avenue E, Cleveland, OH; Russell Electric currently at 1435 Brown Street, Bettendorf, IA ; and the competing business in the Switchgear lines of products and services of Square D / Schneider Electric currently at 1415 South Roselle Road, Palatine, IL 60067.

        c.     that because of the Company's valuable interest in its client relationships, during my employment and for a period of six (6) months following my termination of employment with the Company (for any reason), I will not directly or indirectly solicit, service, have contact with, or divert any entity which is a client of the Company and among the top ten revenue producing client accounts for the period of the last twelve (12) months of my employment of SAI.

        d.     that in order to protect the Company's relationships with its employees, during my employment with the Company and for a period of twelve (12) months following the termination of my employment (for any reason), I will not solicit, encourage or have contact with any of the Company's employees for the purpose of encouraging them to end their employment with the Company and/or to join me as a partner, agent, employee or otherwise in a Competing Business.

        3.    <u>Injunctive Relief</u>. I acknowledge that a breach of any of the covenants contained in this Agreement would cause irreparable harm to the Company's business and that monetary damages would be difficult or impossible to ascertain and will not afford an adequate remedy. Therefore, in the event of any such breach or threatened breach, in addition to such other remedies which may be provided by law, the Company shall have the right to enforce this Agreement by way of a temporary and/or permanent injunction, in which case I will be required to pay the Company's legal fees, expenses and costs incurred in bringing such an action against me/or in any action involving the enforcement or validity of this Agreement.

        4.    <u>Extension of Post-Employment Restrictions</u>. In the event I fail to abide by any of the provisions contained in paragraph 2 above, the six (6)-month time period contained therein shall be extended by the period of time in which I had failed to abide by said paragraph(s).

        5.    <u>Advance Notice of Prospective Employment</u>. I agree that during the term of my employment with the Company and for a six-month period following the termination of my employment (for whatever reason), prior to accepting employment with, or agreeing to perform services for any Competing Business, I will notify the Company in writing of my intentions in this regard so as to provide the Company with the opportunity to assess whether my prospective employment or retention or any other actions I have taken in conjunction with my prospective

FILED DATE: 3/9/2020 2:34 PM   2020CH07179

employment may potentially violate any provisions of this Agreement. I further agree to notify any entity to which I am offered employment or retention, of the existence of this Agreement.

6. <u>Employment At-Will</u>. I acknowledge and agree that nothing contained in this Agreement is intended to alter the fact that my employment with the Company is *at-will*, and *I further acknowledge and agree that my employment may be terminated at the will of either party, at any time for any reason not prohibited by law*.

7. <u>No Waiver</u>. I agree, however, that the Company's determination not to enforce this Agreement as to specific violations shall not operate as a waiver or release of my obligations hereunder.

8. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, legal representatives, successors and assigns.

9. <u>Severability</u>. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties, regardless of who drafted the Agreement. The parties believe the time restrictions herein to be reasonable to protect business activity. However, in the event that a court of competent jurisdiction deems any provisions hereof to be unreasonable, void or unenforceable, such provision(s) shall be deemed severed from the remainder of the Agreement, which shall continue in all other respects to be valid and enforceable. Any such provision(s) of this Agreement declared void, unreasonable or unenforceable shall be deemed revised to the minimum amount necessary in order to be valid and enforceable.

10. <u>Applicable Law/Complete Agreement</u>. This Agreement and all of my obligations under it shall be governed by, construed and enforced under the laws of the State of Illinois. This Agreement constitutes the complete Agreement of the parties concerning its subject matter, and may be amended only by a written instrument executed by me and an Executive Officer of the Company hereto or our respective successors, assigns, executors, administrators, legal representatives or heirs.

11. <u>Acknowledgment</u>. I hereby acknowledge that I have read the foregoing Agreement, that I fully understand and accept the terms hereof, and that the Company gave me the opportunity to consult with an attorney or some other third party to explain the meaning of the terms of this Agreement prior to signing the Agreement.

IN WITNESS WHEREOF, I and the Company, by its duly authorized representative, have signed this Confidentiality, Non-Competition and Non-Solicitation Agreement.

SHANE WOLFRAM
VICE PRESIDENT OF SALES

By: _____

Date: _____ 7/25/12

SAI ADVANCED POWER SOLUTIONS, INC.

By: _____

Date: _____ 7/25/12

5

Return Date: No return date scheduled
Hearing Date: 4/8/2021 9:30 AM - 9:30 AM
Courtroom Number: 2809
Location: District 1 Court
      Cook County, IL

FILED
12/9/2020 2:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020CH07179

11432201

FILED DATE: 12/9/2020 2:57 PM   2020CH07179

| | |
|---|---|
| Date: | May 27, 2020 |
| To: | Shane Wolfram, VP Sales |
| From: | David Martin – VP – Shared Services |

Subject:     <u>Terms of Separation for Shane Wolfram from SAI Advanced Power Solutions</u>

1) Confidentiality, Non-Competition and Non-Solicitation - The terms of this final separation agreement are consistent with the Confidentiality, Non-Competition and Non-Solicitation Agreement signed by Shane and the Company on July 25, 2012 (attached) with the following exceptions:

2) The Company agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group) under the following conditions:

    a. Shane will abide by the the Confidentiality, Non-Competition and Non-Solicitation Agreement, Section 2.c:

        i. Holder
        ii. Cloud
        iii. Coresite
        iv. Iron Mountain
        v. Stack
        vi. APC
        vii. Piller
        viii. Capital Power
        ix. BL Harbert
        x. Toshiba

    b. Company Equipment – Shane will return the following equipment in working order along with appropriate passwords and instructions on how to access necessary information:

        i. Computer(s)
        ii. Phone (s)
        iii. Other _____

    c. Final settlement – the company will payout the following to settle all compensation requirements:

        i. All accrued PTO
        ii. Any un-reimbursed expenses



**EXHIBIT D**

FILED DATE: 3/9/2020 2:34 PM   2020CH07179

   iii.  Commission Earned but unpaid - $123,408.26 less $12,000.00 paid in May = $111,408.26.

       1.  This Balance will be paid $12,000 / month until completely paid

       2.  The Company will make its best efforts to repay this balance earlier if possible.

Shane Wolfram                  SAI Advanced Power Solutions

Date: ____5/28/2020____        Date: ____5/28/2020____

DocuSign Envelope ID: 13CEF3D8-D646-4588-859E-1AB50AD0C20A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

SAI ADVANCED POWER SOLUTIONS, INC.,

                Plaintiff,

     v.

SHANE WOLFRAM,

            Defendant,

and

E&I ENGINEERING CORPORATION,

         Respondent in Discovery.

Case No. 2020 CH 07179

### AFFIDAVIT OF BRAD BELL

I, Brad Bell, under penalty of perjury, hereby affirm the following facts to the best of my knowledge:

1.     I am over 18 years of age, am duly authorized to make this Affidavit, and have personal knowledge of all facts stated herein, and/or have obtained such knowledge through my review of relevant records.

2.     I am the President of the Mission Critical Business Unit of Switchboard Apparatus, Inc. d/b/a as SAI Advanced Power Solutions, Inc ("SAI") and I have the authority to execute this Affidavit on behalf of SAI.

3.     As the President of the Mission Critical Business Unit of SAI, I am familiar with all aspects of the company and its business operations.

4.     From 2011 until March 2019, SAI's office was located in Elmhurst, Illinois (the "Elmhurst Office").

5.     In March 2019, SAI relocated to Franklin Park, Illinois (the "Franklin Park Office" and collectively with the Elmhurst Office, the "Illinois Office").



**EXHIBIT E**

DocuSign Envelope ID: 13CEF3D8-D646-45B8-859E-1AB50AD0C20A

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

6.      I have always worked exclusively out of the Illinois Office.

7.      Defendant Shane Wolfram ("Wolfram") was hired by SAI as its U.S. Vice President of Sales in March 2012.

8.      In or about the early summer of 2012, SAI requested that Wolfram sign a certain Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement").

9.      Wolfram negotiated the terms of the Non-Solicitation Agreement over several e-mails with SAI's in-house counsel.

10.     I then witnessed Wolfram execute the Non-Solicitation Agreement in my office in the Elmhurst Office.  A true and accurate copy of the Non-Solicitation Agreement is attached to SAI's Response in Opposition to Wolfram's Motion to Dismiss as **Exhibit C.**

11.     Wolfram's job required him to, and he did, send and received emails from SAI employees in the Illinois office on a regular basis. I sent and received approximately 1-2 emails per week with Wolfram during the entirety of his employment with SAI.

12.     Based upon a review of Wolfram's phone records of his SAI-issued cell phone conducted after Wolfram resigned from SAI, Wolfram began discussions with E&I Engineering Corporation ("E&I") as far back as January 2020.

13.     The records also revealed that Wolfram made calls to key SAI employees almost immediately after he spoke to E&I.

14.     Wolfram tendered a notice of resignation from SAI on May 15, 2020, and soon thereafter, David Martin ("Martin") drafted a separation agreement (the "Separation Agreement") from the Franklin Park Office as proposed terms of Wolfram's separation.

DocuSign Envelope ID: 13CEF5D8-D646-4588-859E-1AB50AD0C20A

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

15.     I then met with Wolfram in the Franklin Park Office to discuss and negotiate the terms of his separation, including: (1) whether SAI would provide him a waiver to work for a competitor: E&I; (2) the identify of SAI's top ten revenue-generating clients that would be subject to the non-solicitation provisions pursuant to Section 2(c) of the Non-Solicitation Agreement; and (3) SAI's payment of commission to Defendant.

16.     Following this meeting, Martin amended and finalized the Separation Agreement and Wolfram executed the Separation Agreement in the Franklin Park Office in my presence. A true and accurate copy of the Separation Agreement is attached to SAI's Response in Opposition to Wolfram's Motion to Dismiss as **Exhibit D.**

*FURTHER AFFIANT SAYETH NOT*

DocuSign Envelope ID: 13CEF5D8-D646-45B8-859E-1AB50AD0C20A

FILED DATE: 3/11/2021 3:24 PM   2020CH07179

## <u>VERIFICATION</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Dated: March 10th, 2020

DocuSigned by:

C6ED7AE2E99B497...

_____

By: Brad Bell

4830-0453-7823, v. 2