**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SWITCHBOARD APPARATUS, INC. d/b/a SAI ADVANCED POWER SOLUTIONS, INC., | Case No. 1:21-cv-01665 |
| Plaintiff, | |
| v. | |
| SHANE WOLFRAM, | |
| Defendant. | |

### AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc. ("SAI"), by and through its attorneys, Aronberg Goldgehn Davis & Garmisa, for its complaint against Shane Wolfram ("Defendant"), states as follows:

### NATURE OF THE ACTION

1.      This is an action by SAI for injunctive relief and monetary damages against its former employee, Shane Wolfram ("Wolfram"), resulting from the wrongful solicitation of SAI customers and use of SAI proprietary information in violation of Wolfram's employment contracts and the Illinois Trade Secrets Act.  In July 2012, SAI entered into a non-compete and non-solicitation agreement with Wolfram, its U.S. Vice President of Sales, that prohibits Wolfram from, among other things, soliciting or contacting any of SAI's top ten revenue-generating clients or soliciting SAI employees to leave their employment with SAI and to join Wolfram at a competitor.  Wolfram resigned from SAI in May 2020 and began employment with E&I, a direct competitor of SAI in the switchgear industry.

2.      Almost immediately after Wolfram commenced his employment with E&I, E&I's domestic switchgear sales experienced rapid growth, including new contracts and business relations with three of SAI's top revenue-generating clients that Wolfram was prohibited from

contacting or soliciting. The circumstances and timing in which E&I obtained new contracts from SAI customers strongly infers Wolfram's wrongful use of his personal relationships and knowledge of SAI's confidential information in furtherance of E&I's business interests, both during and after his employment with SAI. Wolfram has also, directly and indirectly, contacted and solicited SAI employees to leave their employment with SAI and join him at E&I. Wolfram's wrongful and unlawful conduct entitles SAI to monetary damages and injunctive relief enjoining continuing breaches.

## PARTIES, JURISDICTION AND VENUE

3.       SAI is an Illinois corporation with its principal place of business in Franklin Park, Illinois.

4.       Wolfram is an individual who resides in Sun Prairie, Wisconsin.

5.       E&I is a South Carolina corporation with its United States headquarters located in Anderson, South Carolina.

6.       Jurisdiction and venue are proper in Cook County, Illinois, because Wolfram and E&I transact business in Cook County, Illinois and a substantial part of the events giving rise to this action took place in Cook County, Illinois.

## FACTUAL BACKGROUND

### A.       SAI hires Wolfram as U.S. Vice President of Sales

7.       SAI is a designer, manufacturer, and supplier of custom-made electrical switchgear, with customers including government facilities, health care providers, data centers, Fortune 500 companies, and international OEM customers.

8.       An electrical switchgear is a centralized collection of circuit breakers, fuses, and switches that protects, controls, and isolates electrical equipment.

9.       SAI hired Wolfram as its U.S. Vice President of Sales in August 2011.

10.     Wolfram's duties and responsibilities as SAI's U.S. Vice President of Sales included, among other things: (a) overseeing the sale of SAI products and services within and outside of the United States; (b) supervising all SAI sales employees, sales managers, and field engineers; (c) developing, maintaining, and servicing new and existing client relations; and (d) interacting with SAI customers to sell and market SAI bids and proposals.

11.     In his capacity as U.S. Vice President of Sales, Wolfram had access to, and acquired knowledge of, SAI's confidential and proprietary business information (the "Confidential Information"), including but not limited to: (a) the contact information for all existing and prospective SAI clients within and outside of the United States, including specific individuals within SAI's customers who had decision-making authority; (b) SAI's proprietary pricing information; (c) SAI's business, marketing, and sales plans and strategies; (d) SAI'S existing and in-development products; (e) the compensation paid to SAI employees; and (f) all other information not generally known outside of SAI relating to its business in the electrical switchgear industry.

12.     Wolfram was the primary point of contact between SAI and its customers during the process in which SAI would respond to a request for a proposal (an "RFP").

13.     Wolfram would ordinarily receive an RFP on behalf of SAI and participate in SAI internal meetings to discuss the scope and specifications of the project.

14.     Wolfram had knowledge of SAI's pricing formula and procedure for creating a proposal based upon the cost and specifications of a project, and was required to and did review each proposal so that he could interact with customers and answer their questions.

**B.     The Non-Compete and Non-Solicitation Agreement**

15.     On or about July 25, 2012, SAI and Wolfram entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement") whereby

3

Wolfram agreed, among other things, that for a period of six months following the termination of his employment with SAI: (a) not to be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (b) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue-producing client of SAI. A copy of the Non-Solicitation Agreement is attached as **Exhibit A**.

16.    Wolfram also agreed not to, directly or indirectly, use or disclose any Confidential Information obtained during the course of his employment with SAI and to use his best efforts to safeguard such information.

17.    Pursuant to Paragraph 4 of the Non-Solicitation Agreement, the six-month restrictive period does not begin, and is extended, during any period of time in which Wolfram is in breach of any of the restrictive covenants contained in the Non-Solicitation Agreement.

18.    The Non-Solicitation Agreement also included a prohibition not to solicit, encourage, or have contact with any of SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at a competitor for a period of twelve months following Wolfram's termination of employment with SAI.

19.    The Non-Solicitation Agreement acknowledged that the relationship between SAI and its customers is of a near-permanent nature that has been cultivated over a number of years with considerable time, effort, and expense, and that the Confidential Information and the goodwill of SAI are of significant value to SAI.

20.    Contemporaneously with and in consideration for the execution of the Non-Solicitation Agreement, Wolfram was offered to, and did, participate in SAI's 2012 Sales Bonus Plan.

C.    **SAI is awarded the contract for the Stack Silicon Valley Project**

21.    Wolfram remained employed by SAI as the U.S. Vice President of Sales through May 29, 2020, during which time he, among other things, was involved in the cultivation of new and additional business relationships on behalf of SAI and continued to use and obtain additional Confidential Information.

22.    In September 2019, SAI received a request for proposal from Holder Construction, LLC ("Holder") to bid on a project for Stack Inc. ("Stack") for the design and manufacture of switchgear for a data center located in Silicon Valley (the "Stack Silicon Valley Project").

23.    The specification provided to SAI for the Stack Silicon Valley Project did not list or otherwise identify E&I as a potential switchgear provider.

24.    SAI submitted its proposal for the Stack Silicon Valley Project on or around October 2, 2019.

25.    Wolfram reviewed and had specific knowledge of SAI's proposal for the Stack Silicon Valley Project and interacted and communicated with Stack representatives about SAI's proposal.

26.    In or about February 2020, SAI was advised that it had received the contract for the Stack Silicon Valley Project.

27.    Holder informed SAI that it would issue a contract to SAI for the engineering cost of the Stack Silicon Valley Project and it would later issue change orders for the sale of the equipment once the funding for the project was in place.

28.    The issuance of a contract for the engineering cost of the contract with the subsequent issuance of change orders for the equipment is a common arrangement that enables the project to proceed before all funding has been received.

29.     SAI is not aware of a single instance in the switchgear industry in which the recipient of the engineering portion of a contract did not also provide the switchgear equipment for the project.

30.     On or about February 6, 2020, SAI executed a contract in the amount of $26,000 (the "Silicon Valley Contract") to provide the engineering for the Stack Silicon Valley Project.

**D.      SAI and Wolfram respond to RFPs by Cloud and Stack**

31.     In March 2020, SAI received an RFP from CloudHQ LLC ("Cloud") to provide switchgear for a data center located in Manassas, Virginia (the "Cloud Manassas Project").

32.     SAI submitted its proposal for the Cloud Manassas Project in or about April 2020.

33.     Wolfram reviewed and had knowledge of SAI's proposal for the Cloud Manassas Project and interacted and communicated with Cloud representatives about SAI's proposal.

34.     In April 2020, SAI received another RFP from Stack for a data center in Portland, Oregon (the "Stack Portland Project").

35.     The Stack Portland Project includes the exclusive right to provide all equipment for the data center for two years following the execution of a contract.

36.     SAI submitted its proposal for the Stack Portland Project in or about May 2020.

37.     Wolfram reviewed and had knowledge of SAI's proposal for the Stack Portland Project and interacted and communicated with Stack representatives about SAI's proposal.

**E.      Wolfram resigns from SAI**

38.     On May 15, 2020, Wolfram tendered a notice of resignation from his position as SAI U.S. Vice President of Sales, effective May 29, 2020.

39.     Wolfram advised SAI that he had received and accepted an offer from another company for the position of Vice President of Sales for U.S. Operations and reaffirmed in writing his obligation to abide by the Non-Solicitation Agreement.  Wolfram requested that SAI provide

him a list of SAI's top ten revenue-producing accounts over the previous twelve months pursuant to Paragraph 2(c) of the Non-Solicitation Agreement.

40.     Wolfram thereafter informed SAI that his new employer was E&I, a direct competitor of SAI in the designing and manufacturing of switchgear.

41.     On or about May 28, 2020, SAI and Wolfram executed a separation agreement (the "Separation Agreement") in which SAI agreed to waive its objection to Wolfram working for E&I as a direct competitor, provided that Wolfram abide by Section 2(c) of the Non-Solicitation Agreement not to directly or indirectly solicit, service, or contact any of SAI's top ten revenue-generating clients that were listed on the Separation Agreement ("Restricted Customers"), including but not limited to Holder, Stack, and Cloud.  A copy of the Separation Agreement is attached as **Exhibit B**.

**F.      Wolfram communications with E&I and Cloud**

42.     Unbeknownst to SAI at the time and based upon a subsequent review of phone records, Wolfram began discussions with E&I as far back as January, 2020.

43.     SAI believes that Wolfram shared SAI Confidential Information with E&I during these phone conversation and while still employed by SAI, including the specifics of SAI's proposals for the Cloud Manassas Project, Stack Portland Project and Stack Silicon Valley Project.

44.     SAI's review of Wolfram's SAI issued phone also identified numerous calls from Wolfram to Cloud almost immediately after Wolfram spoke to E&I.

45.     SAI believes that Wolfram contacted Cloud to promote, sell or otherwise market E&I's switchgear proposals over that of SAI.

**G.      Wolfram joins E&I and solicits SAI employees**

46.     Wolfram began work as the E&I Vice President of U.S. Sales in June 2020.

47.     Under the terms of the Non-Solicitation Agreement, Wolfram was required to provide, and is believed to have provided, E&I a copy of his Non-Solicitation Agreement and Separation Agreement prior to commencing his employment with E&I.

48.     On or about June 10, 2020, Philip O'Doherty, Managing Director of E&I, called Mr. Wolfram's SAI-issued cell phone unaware that it had been returned to SAI and asked what it would take to get "Bob" to join Wolfram at E&I.

49.     Upon information and belief, Wolfram was and is working with Mr. O'Doherty in soliciting SAI employees to leave their employment with SAI and to join him at E&I.

50.     On or about September 30, 2020, Wolfram met and had dinner with Bob Brown, the SAI Director of Customer Success for, upon information and belief, the intended purpose of convincing Mr. Brown to leave his employment and to join Mr. Wolfram at E&I.

51.     At least six SAI employees have been contacted or otherwise solicited to leave SAI and to join E&I.

52.     Wolfram is believed to be directly or indirectly involved in the solicitation of the SAI employees in violation of the terms of the Non-Solicitation Agreement.

**H.     Wolfram's contact and solicitation of Cloud leads to E&I's receipt of the Cloud Manassas Project**

53.     On September 30, 2020, Brian O'Hara, the Cloud Vice President of Electrical Infrastructure, sent a text message to Wolfram's SAI-issued cell phone unaware that it had been returned to SAI, advising Wolfram that E&I was not receiving an unrelated contract from Cloud.

54.     The text message evidences that Wolfram continued to contact, service, and likely solicit Cloud on behalf of E&I.

55.     In late August or early September 2020, Wolfram traveled to Ashburn, Virginia, which is the location of a Cloud data center and, upon information and belief, met with

representatives of Cloud and discussed, among other possible topics, E&I's proposal for the Cloud Manassas Project.

56.     Wolfram is believed to have used or otherwise relied upon SAI's Confidential Information, including, but not limited to, the pricing, structure, and specification of SAI's bid for the Cloud Manassas Project in making or otherwise discussing E&I's proposal for the Cloud Manassas Project.

57.     Cloud awarded E&I the contract for the Cloud Manassas Project.

58.     The Cloud Manassas Project has an approximate value of $3.9 million and would generate gross profit in the approximate amount of $1.6 million.

**I.     SAI's expectancy to provide the equipment under the Stack Silicon Valley Contract and to receive the contract for the Stack Portland Project**

59.     In June 2020, Stack requested that SAI expedite the production and delivery of switchgear for a project located in Chicago, Illinois, and advised SAI that if it was able to do so, SAI would be given priority for the Stack Portland Project.

60.     SAI fulfilled Stack's expedited request.

61.     In July 2020, Holder informed SAI that Stack had made a significant scope change to the Silicon Valley Project that doubled the cost and requested a revised proposal for the cost to provide the switchgear equipment.

62.     SAI submitted its revised proposal to provide the equipment for the Silicon Valley Project.

63.     Holder thereafter requested that SAI reduce its proposal by approximately $600,000 to correspond to the price charged by SAI for the Chicago project, which involved less shipping and other processing charges.

64.     SAI nonetheless accommodated the request by applying certain discounts and reductions.

65.     The revised proposal was submitted as a part of the Silicon Valley Contract that SAI had already received; SAI does not and did not believe that Stack requested proposals to provide the equipment for the Stack Silicon Valley Project from other switchgear providers.

66.     SAI believed that its revised proposal to provide the switchgear for the Stack Silicon Valley Project would be awarded as change orders to the Silicon Valley Contract.

**J.      E&I receives the Stack Portland and Silicon Valley equipment contracts**

67.     In or about September 2020, Stack awarded E&I the Stack Portland Project.

68.     Upon information and belief, Wolfram was instrumental in E&I obtaining the Stack Portland Project by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack on behalf of E&I and using or relying upon the Confidential Information, including SAI's pricing and structure for the Stack Portland Project.

69.     The Stack Portland Project has an initial value of approximately $800,000 and the two-year exclusive right to provide equipment is worth an estimated $20 to $30 million.

70.     On September 23, 2020, SAI was informed that E&I had been awarded a contract to provide the equipment for the Silicon Valley Project (the "Silicon Valley Equipment Contract").

71.     SAI had been previously advised that it had won and was receiving the entire contract for the Stack Silicon Valley Project, which included both the engineering cost and the sale of equipment.

72.     Upon information and belief, Wolfram was instrumental in E&I obtaining the Silicon Valley Equipment Contract by, directly or indirectly, soliciting, contacting, or otherwise servicing Stack on behalf of E&I and using or relying upon the Confidential Information, including SAI's pricing and structure for the Silicon Valley Equipment Contract.

73.     SAI had never been awarded only the engineering portion of a contract without supplying the equipment for the project.

74.     SAI is not aware of any other instance in the switchgear industry in which a company was awarded only the engineering portion of a contract without supplying the corresponding equipment.

75.     The Silicon Valley Equipment Contract has an approximate value of $14 million and would generate gross profit in the approximate amount of $5.74 million.

76.     Upon information and belief, E&I is using or otherwise relying upon SAI's engineering design for the Silicon Valley Project to fulfill its obligations under the Silicon Valley Equipment Contract.

**K.     The Cease and Desist Letter**

77.     On October 22, 2020, SAI, through its attorneys, sent letters to Wolfram and E&I demanding that each cease and desist from: (a) the solicitation of SAI employees; (b) further solicitation or contact, directly or indirectly, with the Restricted Customers; or (c) otherwise, directly or indirectly, causing a violation of the Non-Compete Agreement and Separation Agreement.  A copy of the October 22, 2020, letters are attached as **Exhibit C**.

78.     Wolfram and E&I, through their attorney, responded to the cease and desist letters by denying any wrongdoing.

<div align="center">

**COUNT I**
**Breach of the Contract**
**SAI v. Wolfram**

</div>

79.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 78 above, as though fully set forth herein.

80.     The Non-Solicitation and Separation Agreements are valid and enforceable contracts that prohibit Wolfram from, among other things: (a) directly or indirectly soliciting,

<div align="center">

11

</div>

servicing, or having contact with any of the Restricted Customers, including but not limited to Holder, Stack, and Cloud; (b) directly or indirectly using or disclosing any Confidential Information obtained during the course of his employment with SAI; and (c) soliciting, encouraging, or having contact with any of SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at a competitor.

81.     Wolfram breached the Non-Solicitation Agreement and Separation Agreement by, among other things:

       a.     Using or disclosing, directly or indirectly, Confidential Information obtained during the course of his employment with SAI in furtherance of E&I's efforts to obtain business from Stack, Cloud and Holder.

       b.     Soliciting, encouraging, or having contact with SAI's employees for the purpose of encouraging them to leave their employment with SAI and to join Wolfram at E&I;

       c.     Soliciting, servicing, or having contact with the Restricted Customers, including but not limited to Holder, Cloud, and Stack;

82.     Wolfram's breaches are continuous and ongoing.

83.     As a result of Wolfram's ongoing breaches, the six-month restrictive period in the Non-Solicitation has been extended and has not yet begun.

84.     SAI has performed its obligations under the Non-Solicitation Agreement and the Separation Agreement.

85.     As a direct and proximate result of Wolfram's continuous breaches of the Non-Solicitation Agreement and the Separation Agreement, SAI has sustained and is likely to continue to sustain damages in the form of lost profits and customer relationships, and has been irreparably

injured, including injury to its goodwill and reputation, resulting in, among other things, loss of revenue and profits and diminished goodwill.

86.     SAI has no adequate remedy at law for Wolfram's ongoing and continuous breaches and Wolfram will continue to breach the terms of the Non-Solicitation Agreement and the Separation Agreement unless enjoined by the Court with an order declaring that the six-month restrictive period has yet to begin and has been extended by Wolfram's ongoing breaches.

87.     The threat of future injury to SAI and its business requires the issuance of injunctive relief to prevent Wolfram's continued misconduct.

<div align="center">

**COUNT II**
**Misappropriation of Trade Secrets in Violation of the**
**Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* ("ITSA")**
**SAI v. Wolfram**

</div>

88.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 87 above, as though fully set forth herein.

89.     SAI's Confidential Information, which contains protectable trade secrets, consists of, among other things, the following:

    a.    Customer lists;

    b.    Contact information for SAI customers, including specific individuals within SAI's customers who had decision-making authority;

    c.    SAI existing and in-development products;

    d.    SAI formulas for pricing and proposals;

    e.    SAI business/marketing plans and strategies; and

    f.    Profit margins, pricing, and financial information of SAI and its customers.

90.     The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper

means by, another person who can obtain economic value from the disclosure or use of the information.

91.    SAI has made reasonable efforts to preserve the secrecy of its Confidential Information, including but not limited to, requiring employees who have access to Confidential Information to sign an employment agreement that includes confidentiality, non-solicitation, and non-competition provisions.  Additionally, SAI restricts access to its electronically stored Confidential Information with individualized logins and passwords.

92.    After signing the Non-Solicitation Agreement (which contained the confidentiality provision), Wolfram gained access to SAI's trade secrets in the course of his employment with SAI.

93.    Wolfram misappropriated, used, and/or disclosed the Confidential Information without SAI's authorization in an attempt to benefit himself and E&I.

94.    Wolfram knew or had reason to know at the time of disclosure or use that the knowledge of the Confidential Information was derived through improper means in violation of Section 2(b)(1) of the ITSA because, among other things, the disclosure occurred after Wolfram's execution of the Non-Solicitation agreement that restricted such disclosure.

95.    Wolfram's misappropriation of SAI's Confidential Information is and was willful and malicious.

96.    Wolfram's misappropriation of SAI's Confidential Information has harmed SAI by diverting or threatening to divert business away from SAI and by diluting the value of SAI's Confidential Information.

97.    As a result of Wolfram actions, SAI has and will continue to suffer lost business opportunities, customers, profits, and goodwill.

## COUNT III
## Breach of Fiduciary Duty
## SAI v. Wolfram

98.     SAI re-alleges and incorporates by reference the allegations of Paragraphs 1 through 97 above, as though fully set forth herein.

99.     As an employee of SAI, Wolfram owed a duty of loyalty to his employer and its goodwill and reputation.  Moreover, by virtue of his employment with SAI, Wolfram owed SAI duties of honesty and candor in the performance of his services.

100.    While still employed by SAI, Wolfram breached those duties by, among other things: (1) soliciting or otherwise contacting customers of SAI to promote, market or sell E&I switchgear proposals over that of SAI; (2) disclosing SAI Confidential Information to E&I without authorization; and (3) interfering with SAI's business relationships and expectancies.

101.    SAI has incurred and will continue to incur damages as a result of Wolfram's breach of his duty of loyalty and SAI is entitled to any and all equitable and legal remedies that this Court may deem just and proper, including, without limitation, the return to SAI of all compensation paid to Wolfram from the date of his first disloyal act, as well as all other damages suffered by SAI as a result of Wolfram's breach of his duties to SAI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc., requests the following relief:

1.     An injunction ordering Defendant Shane Wolfram to immediately cease the ongoing breaches of the Non-Solicitation Agreement and Separation Agreement, and declaring that the six-month restrictive period has not yet begun;

2.      An Order awarding actual and compensatory damages, with pre-judgment and post-judgment interest, for Defendant Shane Wolfram's breach of the Non-Solicitation Agreement and Separation Agreement;

3.      An Order awarding actual and compensatory damages and disgorgement of compensation, with pre-judgment and post-judgment interest, for Defendant Shane Wolfram's breach of fiduciary duties;

4.      An Order awarding the costs and expenses, including reasonable attorneys' fees and costs incurred by SAI in connection with this action against Defendant Shane Wolfram pursuant to the Non-Solicitation Agreement;

5.      An Order awarding actual loss, unjust enrichment, and the costs and expenses of this action, including reasonable attorneys' fees, against Defendant Shane Wolfram for the misappropriation of SAI's trade secrets under the ITSA;

6.      An Order awarding punitive damages against Defendant Shane Wolfram for the willful and malicious misappropriation of SAI's trade secrets under the ITSA and willful breach of fiduciary duty; and

7.      All such other relief as the Court deems just and proper.

<div style="margin-left:50%">

SWITCHBOARD APPARATUS, INC.
d/b/a SAI ADVANCED POWER
SOLUTIONS, INC.
By: /s/ *Benjamin E. Haskin*
        One of Its Attorneys

</div>

Nathan H. Lichtenstein, Esq. (ARDC #1655469)
nlichtenstein@agdglaw.com
Benjamin E. Haskin, Esq. (ARDC #6306126)
bhaskin@agdglaw.com
ARONBERG GOLDGEHN DAVIS & GARMISA
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
312-828-9600
Attorney No. 30375
4848-6133-1939v4

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on the 5th day of April, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties who have filed an appearance in this lawsuit by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

         By:   <u>   */s/ Benjamin E. Haskin*   </u>
              Attorney for SWITCHBOARD
              APPARATUS, INC. d/b/a SAI
              ADVANCED POWER SOLUTIONS, INC.

## CONFIDENTIALITY, NON-COMPETITION AND
## NON-SOLICITATION AGREEMENT

I, Shane Wolfram, hereby enter into this Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement") with SAI Advanced Power Solutions, Inc. (the "Company"). I acknowledge that my position as the Company's Vice President of Sales has given me and will continue to give me access to information which the Company regards as proprietary and/or confidential and which, if disclosed by me in contravention of this Agreement would cause permanent, incalculable and irreparable injury and damage to the Company. I further acknowledge that I also have been given and will continue to be given the opportunity to gain close knowledge of and possible influence over clients and employees of the Company, which I would not have had contact with but for my employment with the Company. I acknowledge that I therefore possess the good will of the Company and that this Agreement is necessary to protect the Company against unfair loss of said confidential information, clients, employees and/or good will. Accordingly, so that there will be no misunderstanding in the future regarding these matters, I have voluntarily entered into this Agreement. I agree that I have received adequate consideration for my agreeing to be bound by the terms of this Agreement, including, but not limited to, my participation in the new 2012 Sales Bonus Plan applicable to my position and my continued employment with the Company.

1. <u>Non-Disclosure/Confidentiality</u>. Unless otherwise instructed or authorized in writing by an Executive Officer of the Company, I agree that I will not, at any time during or after the period of my employment, directly or indirectly copy, use, disclose, publish or divulge to any person any Confidential Information (as defined below in this Agreement), and will use my best efforts to safeguard such Confidential Information.

The phrase "Confidential Information" means any and all information disclosed to or known by me as a consequence of or through my employment with the Company, which is not generally known outside the Company, relating to the Company's business in the electrical distribution equipment industry, including but not limited to inventions, products, services, equipment, devices, methods of operations or doing business, processes, formulas, drawings, blueprints, photographs, slides, motion pictures, videotapes, computer software programs, passwords, reports, analyses, data bases, spreadsheets and all related documentation, notes and flow charts, regardless of medium, computer data and storage media, trade secrets, pricing information and lists, clients and prospects, client and prospect lists, proprietary or confidential information pertaining to clients and prospects, vendors and potential vendors, vendor lists, suppliers and potential suppliers, supplier lists, employee and personnel compensation, data, information and files, business and marketing plans, ideas, or strategies, financial performance and projections, financial and accounting information and analyses, financial statements, budget information, purchasing, marketing and analytical studies, and cost data, which I may have previously acquired, accessed or developed or which I may subsequently acquire, have access to or develop in connection with or as a result of my employment with the Company.

Upon termination of my employment with the Company (for any reason), I will, prior to my separation, immediately deliver all Company information, including any and all Confidential Information, to the Company, including any and all copies thereof. I understand that this

1

**EXHIBIT A**

Agreement shall remain in full force and effect with respect to the clauses which require me to perform or not to perform certain actions after termination of my employment.

2. <u>Non-Competition and Non-Solicitation</u>. I acknowledge and agree that as the Company's Vice President of Sales, my duties and responsibilities include, but are not limited to, overseeing the sale of the Company's products and services within and outside of the United States, and directly supervising all of the Company's sales employees, including, but not limited to the Company's Sales Managers, who are responsible for selling the Company's products and services in the Company's Eastern, Central, and Western sales regions, and the Company's Field Sales Engineers, who are responsible for assisting with the sales of assigned products in all of the Company's sales regions. I further acknowledge and agree that in my role as the Company's Vice President of Sales, I not only have access to but have acquired and will continue to acquire substantial knowledge regarding the Company's confidential business information, including all of the Company's clients and prospects within and outside of the United States, client and prospect lists, and proprietary or confidential information pertaining to all of the Company's clients and prospects; the Company's pricing information and lists; the Company's business, marketing and sales plans, efforts, ideas, or strategies; the Company's current products and products in development; and the compensation paid to the Company's sales employees; among other confidential information identified in Section 1 above. I further acknowledge and agree that in my role as the Company's Vice President of Sales, I have gained close knowledge of and influence over the Company's employees and all of the Company's clients within and outside of the United States, which I would not have but for my employment with the Company.

I therefore further acknowledge and agree that each of the provisions of this Agreement are reasonable and necessary to preserve and protect the legitimate business interests of the Company, including its client and employee relationships, Confidential Information, its present and potential business activities, and the economic benefits derived therefrom. With these principles in mind, I specifically acknowledge and agree as follows:

a. that the relationships between the Company and its clients are of a near permanent nature and have, in most instances, been cultivated over an extensive period of time with considerable time, money and effort expended and that the information which I will have access to is of a confidential and proprietary nature, and the good will of the Company and its client relationships which I have enjoyed or will continue to enjoy while employed by the Company are significant and valuable to the Company.

b. that, in light of the previously mentioned provisions in paragraph 2 and 2.a., during my employment by the Company and for a period of six (6) months following my voluntary or mutually agreed termination of employment with the Company, I will not, either directly or indirectly, in any capacity be employed by, perform services for, or have any business interest in any Competing Business if: (1) my duties or services at the Competing Business are similar to duties or services I performed for the Company; (2) my duties or services at the Competing Entity involve the sale or marketing of switch gears or other electrical distribution equipment products and services sold by the Company; (3) my duties or services at the Competing Business would include managing or supervising individuals engaged in duties or services similar to the duties and services I performed for the Company; or (4) doing so would involve the actual or threatened unauthorized use or disclosure of the Company's Confidential

Information. A "Competing Business" for purposes of this Agreement includes the following entities and any of their current or future parent, sister, affiliated or successor entities: ASCO Power Technologies - Global HQ (a division of Emerson Network Power) currently at 50 Hanover Road, Florham Park, NJ; the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of GE Zenith Controls currently at 830 W 40th Street, Chicago, IL 60609; IEM / Industrial Electric Manufacturing currently at 48205 Warm Springs Blvd., Fremont, CA; the competing business in the Automatic Transfer Switch and Switchgear lines of products and services of ISO-Eaton Corporation, Corporate Headquarters currently at 1111 Superior Avenue E, Cleveland, OH; Russell Electric currently at 1435 Brown Street, Bettendorf, IA ; and the competing business in the Switchgear lines of products and services of Square D / Schneider Electric currently at 1415 South Roselle Road, Palatine, IL 60067.

        c.     that because of the Company's valuable interest in its client relationships, during my employment and for a period of six (6) months following my termination of employment with the Company (for any reason), I will not directly or indirectly solicit, service, have contact with, or divert any entity which is a client of the Company and among the top ten revenue producing client accounts for the period of the last twelve (12) months of my employment of SAI.

        d.     that in order to protect the Company's relationships with its employees, during my employment with the Company and for a period of twelve (12) months following the termination of my employment (for any reason), I will not solicit, encourage or have contact with any of the Company's employees for the purpose of encouraging them to end their employment with the Company and/or to join me as a partner, agent, employee or otherwise in a Competing Business.

      3.    <u>Injunctive Relief</u>. I acknowledge that a breach of any of the covenants contained in this Agreement would cause irreparable harm to the Company's business and that monetary damages would be difficult or impossible to ascertain and will not afford an adequate remedy. Therefore, in the event of any such breach or threatened breach, in addition to such other remedies which may be provided by law, the Company shall have the right to enforce this Agreement by way of a temporary and/or permanent injunction, in which case I will be required to pay the Company's legal fees, expenses and costs incurred in bringing such an action against me/or in any action involving the enforcement or validity of this Agreement.

      4.    <u>Extension of Post-Employment Restrictions</u>. In the event I fail to abide by any of the provisions contained in paragraph 2 above, the six (6)-month time period contained therein shall be extended by the period of time in which I had failed to abide by said paragraph(s).

      5.    <u>Advance Notice of Prospective Employment</u>. I agree that during the term of my employment with the Company and for a six-month period following the termination of my employment (for whatever reason), prior to accepting employment with, or agreeing to perform services for any Competing Business, I will notify the Company in writing of my intentions in this regard so as to provide the Company with the opportunity to assess whether my prospective employment or retention or any other actions I have taken in conjunction with my prospective

employment may potentially violate any provisions of this Agreement. I further agree to notify any entity to which I am offered employment or retention, of the existence of this Agreement.

6. <u>Employment At-Will</u>. I acknowledge and agree that nothing contained in this Agreement is intended to alter the fact that my employment with the Company is *at-will*, and *I further acknowledge and agree that my employment may be terminated at the will of either party, at any time for any reason not prohibited by law*.

7. <u>No Waiver</u>. I agree, however, that the Company's determination not to enforce this Agreement as to specific violations shall not operate as a waiver or release of my obligations hereunder.

8. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, legal representatives, successors and assigns.

9. <u>Severability</u>. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties, regardless of who drafted the Agreement. The parties believe the time restrictions herein to be reasonable to protect business activity. However, in the event that a court of competent jurisdiction deems any provisions hereof to be unreasonable, void or unenforceable, such provision(s) shall be deemed severed from the remainder of the Agreement, which shall continue in all other respects to be valid and enforceable. Any such provision(s) of this Agreement declared void, unreasonable or unenforceable shall be deemed revised to the minimum amount necessary in order to be valid and enforceable.

10. <u>Applicable Law/Complete Agreement</u>. This Agreement and all of my obligations under it shall be governed by, construed and enforced under the laws of the State of Illinois. This Agreement constitutes the complete Agreement of the parties concerning its subject matter, and may be amended only by a written instrument executed by me and an Executive Officer of the Company hereto or our respective successors, assigns, executors, administrators, legal representatives or heirs.

11. <u>Acknowledgment</u>. I hereby acknowledge that I have read the foregoing Agreement, that I fully understand and accept the terms hereof, and that the Company gave me the opportunity to consult with an attorney or some other third party to explain the meaning of the terms of this Agreement prior to signing the Agreement.

4

IN WITNESS WHEREOF, I and the Company, by its duly authorized representative, have signed this Confidentiality, Non-Competition and Non-Solicitation Agreement.

SHANE WOLFRAM
VICE PRESIDENT OF SALES

By: _____

Date: _____ 7/25/12

SAI ADVANCED POWER SOLUTIONS,
INC.

By: _____

Date: _____ 7/25/12

5

Date:         May 27, 2020

To:           Shane Wolfram, VP Sales

From:         David Martin – VP – Shared Services


Subject:      <u>Terms of Separation for Shane Wolfram from SAI Advanced Power Solutions</u>


1) Confidentiality, Non-Competition and Non-Solicitation - The terms of this final separation agreement are consistent with the Confidentiality, Non-Competition and Non-Solicitation Agreement signed by Shane and the Company on July 25, 2012 (attached) with the following exceptions:

2) The Company agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group) under the following conditions:

    a. Shane will abide by the the Confidentiality, Non-Competition and Non-Solicitation Agreement, Section 2.c:

        i. Holder

        ii. Cloud

        iii. Coresite

        iv. Iron Mountain

        v. Stack

        vi. APC

        vii. Piller

        viii. Capital Power

        ix. BL Harbert

        x. Toshiba

    b. Company Equipment – Shane will return the following equipment in working order along with appropriate passwords and instructions on how to access necessary information:

        i. Computer(s)

        ii. Phone (s)

        iii. Other _____

    c. Final settlement – the company will payout the following to settle all compensation requirements:

        i. All accrued PTO

        ii. Any un-reimbursed expenses

**EXHIBIT B**

iii. Commission Earned but unpaid - $123,408.26 less $12,000.00 paid in May = $111,408.26.
   1. This Balance will be paid $12,000 / month until completely paid
   2. The Company will make its best efforts to repay this balance earlier if possible.


Shane Wolfram

Date: 5/28/2020

SAI Advanced Power Solutions

Date: 5/28/2020



**ARONBERG GOLDGEHN**

Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Ave., Suite 1700
Chicago, Illinois 60611-3586
TEL: 312-828-9600
FAX: 312-828-9635
www.agdlaw.com

SANDRA A. AGUILERA
MARK D. ANDERSON
STACI BALBIRER
CHRISTOPHER J. BANNON
LISA J. BRODSKY
JAMES A. CHRISTMAN
CATHERINE CONNELLY-WARREN
M. CHIP DE PRETER
JAY A. FRANK
AMY RAPOPORT GIBSON
PAUL A. GILMAN
THOMAS K. HANEKAMP
JERRY HOLISKY
DAVID A. JOHNSON
JULIE A. JOHNSON
AMBER O. LAFEVERS
LINDSAY P. LOLLIO

ELIZABETH OLEN LAZZARA
NATHAN H. LICHTENSTEIN
MITCHELL J. MELAMED
DOUGLAS C. MURRAY
CHRISTOPHER W. NIRO
WILLIAM L. NIRO
TIMOTHY R. NELSON
R. TIMOTHY NOVEL
NED S. ROBERTSON
BERNARD A. SCHLIFKE
STEVEN M. SCHOLL
JOHN C. SCIACCOTTA
VANESSA E. SEILER
ROBERT N. SODIKOFF
BLOOMA STARK
SHARON S. ZABAN
MICHAEL A. ZASLAVSKY

MARYAM H. ARFEEN
GENC ARIFI
KRISTINA D. DIESNER
BENJAMIN HASKIN
BLAKE S. KOCIAN
SAMUEL R. LEIST
NICOLE MILLER
MICHAEL S. NELSON
ZACHARIAH SNYDER
MARK A. SWANTEK

OF COUNSEL
WILLIAM J. GARMISA
MITCHELL S. GOLDGEHN
MICHAEL HAYES SR
HENRY M. MORRIS
ALAN S. WERNICK

WRITER'S DIRECT DIAL NUMBER:

312-755-3184

OUR FILE NUMBER:

017026.000100

October 22, 2020

***VIA EMAIL (philip@e-i-eng.com)***

Mr. Philip O'Doherty
Managing Director
E&I Engineering Group

Re:     *Cease and Desist–Violation of Shane Wolfram Confidentiality, Non-Competition*
        *and Non-Solicitation Agreement–and Litigation Hold*

Dear Mr. O'Doherty:

This firm represents SAI Advanced Power Solutions, Inc. ("SAI"). The purpose of this letter is to demand that E&I Engineering Group (E&I) immediately cease and desist from: (1) tortiously interfering with SAI and Shane Wolfram's Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Compete Agreement") and May 29, 2020, Separation Agreement (the "Separation Agreement"); (2) tortiously interfering with SAI's prospective economic opportunities; and (3) exploiting or otherwise using SAI's confidential trade secrets to infringe upon SAI's well-developed customer relationships. A separate letter that is being sent to Mr. Wolfram individually is attached and includes copies of the Non-Compete Agreement and Separation Agreement. ***This letter shall also serve as formal notice of E&I's legal obligation to take steps to ensure the preservation of all documents and information including, but not limited to, emails and text messages relevant to the matters described below***.

**E&I Aids and Induces Shane Wolfram to Breach his Employment Contracts**

It has become apparent that E&I recruited and hired Mr. Wolfram for the purpose of exploiting Mr. Wolfram's knowledge of SAI employees, operations, and customers in furtherance of E&I's effort to mimic SAI's switchgear operations and salesforce. The subsequent hiring of former SAI employees as well as the solicitation of numerous other SAI employees substantiates E&I's endeavor to model its U.S. switchgear operations after SAI.

**EXHIBIT C**

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 2



SAI first learned of E&I's objective when you called Mr. Wolfram's cell phone unaware that it had been returned to SAI and asked what it would take to get "Bob" to join Mr. Wolfram at E&I. SAI was unaware at the time, however, that this only scratched the surface of E&I's larger scheme to exploit Mr. Wolfram's internal and external contacts and confidential information to expand E&I's U.S. switchgear operations and pilfer SAI's customers without any concern as to whether doing so breached the Non-Compete Agreement and Separation Agreement. Mr. Wolfram was required to provide E&I a copy of his employment agreements pursuant to Paragraph 5 of the Non-Compete Agreement and we presume that he did, thereby making E&I culpable and liable for all damages caused by his wrongful conduct.

The circumstances and timing in which E&I secured the Portland and Silicon Valley projects from Stack Infrastructure, Inc. ("Stack"), as well as the MCC6 project from CloudHQ LLC ("Cloud") substantiates E&I's exploitation of Mr. Wolfram's personal relationships and contacts in furtherance of its business interests. Mr. Wolfram was SAI's primary point of contact with Stack, Holder Construction Group, LLC ("Holder"), and Cloud, and was intimately involved in preparing SAI's proposals for each of these projects prior to resigning and joining E&I. Notably, E&I was not listed as a switchgear provider on the initial and subsequent specifications for the Silicon Valley project, which would ordinarily foreclose any possibility of obtaining the equipment portion of the contract. Yet, that is exactly what happened and SAI was justifiably surprised when it was informed that the contract had been awarded to E&I. The fact that Mr. Wolfram left SAI and joined E&I in the period between SAI's proposals–and its award of the engineering portion of the Silicon Valley project–and E&I's unexpected receipt of each of these contracts strongly suggests that E&I has taken advantage of the confidential information and client relationship Mr. Wolfram developed at SAI to cultivate a new relationship with Stack, Holder, and Cloud; a blatant violation of both the Non-Solicitation Agreement and the Separation Agreement.

It strains credulity to believe that E&I decided to pursue switchgear business with significant new customers (Stack and Cloud) without consulting with, receiving information from, or otherwise soliciting the assistance of the one person now in E&I's organization who had a business relationship with those customers–Shane Wolfram. This conduct not only exposes Mr. Wolfram to liability for monetary damages and injunctive relief for his breach of the Non-Compete Agreement and Separation Agreement, but subjects E&I to the same for, among other wrongful conduct, violation of the Illinois Deceptive Trade Practices Act, tortious interference with contract, and tortious interference with business relations. Moreover, E&I's knowledge of Mr. Wolfram's contractual obligations and willful inducement to breach those obligations is the precise degree of moral culpability that merits an award of punitive damages.

## Demand to Cease and Desist

On behalf of SAI, we demand that E&I immediately cease and desist from using Mr. Wolfram in any capacity for: (a) the solicitation of SAI employees; (b) further solicitation or contact, directly or indirectly, with the Restricted Customers; or (c) otherwise, directly or indirectly, causing a violation of the Non-Compete Agreement and Separation Agreement. E&I is obligated to abide by the restrictions in the Non-Compete Agreement and Separation Agreement for six months following the date Mr. Wolfram and E&I cease the illegal conduct.

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 3



Mr. Wolfram's breaches of the Non-Solicitation Agreement and the Separation Agreement in concert with E&I's knowledge and assistance of the same has caused SAI significant monetary damages, including but not limited to lost profits and lost business opportunities. Based upon the value of the contracts E&I has obtained through the wrongful contact with the Restricted Customers and use of SAI's confidential information–$14 million for the Stack Silicon Valley project, $20 million over two years for the Stack Portland project, and $3.9 million for the Cloud MCC6 project–SAI has easily sustained damages in excess of $10 million. These damages will continue to increase in the event that E&I does not take immediate corrective action. SAI reserves its right to seek injunctive relief and monetary damages against E&I for, among other things, violation of the Illinois Deceptive Trade Practices Act, tortious interference with contract, and tortious interference with prospective economic advantage, and to pursue any and all other rights and remedies available at law or in equity.

## Litigation Hold

In light of SAI's claims and causes of action against E&I, we demand that E&I, and all of its employees, including but not limited to you and David Genson, agents, officers, shareholders, and others acting or purporting to act on its behalf, including counsel (collectively, the "Custodians") immediately take steps to ensure the preservation of all documents and information including, but not limited to, electronically-stored information ("ESI"), which is potentially relevant to SAI's claims and causes of action against E&I. E&I is required to preserve such information in accordance with this litigation hold letter.

Potentially relevant information includes paper records, emails, text messages, and other ESI that are in any way related to E&I and Mr. Wolfram's breach of the Non-Compete Agreement and the Separation Agreement, which include the following:

1.  All communications sent or received by Mr. Wolfram;

2.  All communications by the Custodians: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) which relate to either the Silicon Valley 02 Project or the MCC6 project;

3.  All notes and memoranda confirming, summarizing, or reflecting communications Mr. Wolfram had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

4.  All notes and memoranda confirming, summarizing or reflecting communications the Custodians had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 4



5.      All documents, including but not limited to, quotes, proposals, bids, solicitations, meeting requests, marketing materials, or advertisements sent by Mr. Wolfram or the Custodians to any of the Restricted Customers.

The timeframe for retention and preservation of the records is <u>January 1, 2019 to the present</u>.

In light of the foregoing, E&I must take the following affirmative steps to ensure that all documents and ESI potentially relevant are preserved:

1.      Identify the people or entities who have or may have potentially relevant documents or ESI. E&I should promptly inform those people and entities of their possession of potentially relevant data and instruct them not to delete or alter any such information. If it is possible to segregate such information, that may be preferable. E&I should also inform appropriate system administrators and other information technology personnel of the necessity of preserving potentially relevant ESI.

2.      Identify sources of potentially relevant documents and ESI and preserve them. When identifying sources of documents and ESI, E&I should bear in mind that such documents and data may include, but are not limited to, text files, spreadsheets, power points, e-mails, letters, faxes, notes, text messages, meeting agendas and minutes, memoranda, summaries, databases, calendar entries, data from accounting applications (i.e. QuickBooks files), video files, photographs, contact and relationship management data, computer system activity logs, internet usage files, network access information, backup and archival files, data compilations, electronically imaged documents and others. Be sure to identify and review all computers, network servers, removable media, handheld devices, tablets, smartphones, voice mail, and backup tapes which could contain potentially relevant information.

3.      Make copies of any active files containing relevant data and preserve them separately. It is important to segregate relevant data because it will permit us to efficiently image or duplicate the data for discovery purposes at a later date.

4.      If the Custodians use online, cloud storage, and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation.

5.      Discontinue any automatic or routine features or protocols for deletion or modification of ESI in order to avoid the deletion or alteration of data potentially relevant to the Lawsuit. Examples of such automatic or routine features or protocols include, without limitation: (a) purging the contents of e-mail repositories by age, capacity, or other criteria; (b) using data or media wiping, disposal, erasure, or encryption utilities or devices; (c) overwriting, erasing, destroying or discarding back-up media; and (d) running antivirus or other programs effecting wholesale metadata alteration.

Mr. Philip O'Doherty
E&I Engineering Group
October 22, 2020
Page 5



  *Please note that allowing potentially relevant documents or ESI to be destroyed or discarded can subject you to severe civil and/or criminal penalties. The possible sanctions include both monetary and litigation-specific penalties, such as a finding that the unavailable ESI would have been unfavorable to the defendants' position in any potential lawsuit*.

       Sincerely,

       ARONBERG GOLDGEHN DAVIS & GARMISA

    By: _____

         Benjamin E. Haskin

Encl.
cc:  Jerry Holisky, Esq.
   David Martin

4830-3380-5518v2



Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Ave., Suite 1700
Chicago, Illinois 60611-3586
TEL: 312-828-9600
FAX: 312-828-9635
www.agdglaw.com

SANDRA A. AGUILERA
MARK D. ANDERSON
STACI BALBIRER
CHRISTOPHER J. BANNON
LISA J. BRODSKY
JAMES A. CHRISTMAN
CATHERINE CONNELLY-WARREN
M. CHIP DE PRETER
JAY A. FRANK
AMY RAPOPORT GIBSON
PAUL A. GILMAN
THOMAS K. HANEKAMP
JERRY HOLISKY
DAVID A. JOHNSON
JULIE A. JOHNSON
AMBER O. LAFEVERS
LINDSAY P. LOLLIO

ELIZABETH OLEN LAZZARA
NATHAN H. LICHTENSTEIN
MITCHELL J. MELAMED
DOUGLAS C. MURRAY
CHRISTOPHER W. NIRO
WILLIAM L. NIRO
TIMOTHY R. NELSON
R. TIMOTHY NOVEL
NED S. ROBERTSON
BERNARD A. SCHLIFKE
STEVEN M. SCHOLL
JOHN C. SCIACCOTTA
VANESSA E. SEILER
ROBERT N. SODIKOFF
BLOOMA STARK
SHARON S. ZABAN
MICHAEL A. ZASLAVSKY

MARYAM H. ARFEEN
GENC ARIFI
KRISTINA D. DIESNER
BENJAMIN HASKIN
BLAKE S. KOCIAN
SAMUEL R. LEIST
NICOLE MILLER
MICHAEL S. NELSON
ZACHARIAH SNYDER
MARK A. SWANTEK

OF COUNSEL
WILLIAM J. GARMISA
MITCHELL S. GOLDGEHN
MICHAEL HAYES SR
HENRY M. MORRIS
ALAN S. WERNICK

OUR FILE NUMBER:

WRITER'S DIRECT DIAL NUMBER:

312-755-3184                                                                017026.000100

October 22, 2020

**_VIA EMAIL (sswolfram1212@gmail.com)_**

Mr. Shane Wolfram
Vice President of U.S. Sales
E&I Engineering Group

> Re:    _Cease and Desist–Breach of Confidentiality, Non-Competition and Non-Solicitation Covenants–and Litigation Hold_

Dear Mr. Wolfram:

This firm represents SAI Advanced Power Solutions, Inc. ("SAI"). The purpose of this letter is to demand that you, individually and on behalf of E&I Engineering Group (E&I), immediately cease and desist from: (1) using or otherwise relying on the information, knowledge, and client relations acquired during your tenure as SAI Vice President of Sales to compete against SAI; and (2) soliciting employees of SAI to join you at E&I. _**This letter shall also serve as formal notice of your legal obligation to take steps to ensure the preservation of all documents and information including, but not limited to, emails and text messages relevant to the matters described below.**_

**Your Breach of the Non-Solicitation and Separation Agreements**

As you may recall, you signed SAI's Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement") whereby you agreed, among other things, not to use or disclose any Confidential Information (as that term is defined in the Non-Compete Agreement) obtained during the course of your employment with SAI to compete against SAI. A copy of the Non-Solicitation Agreement is enclosed for your reference. Moreover, you agreed that for a period of six (6) months following the termination of your employment with SAI: (1) not to be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (2) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 2



producing client of SAI. ***Pursuant to Paragraph 4 of the Non-Solicitation Agreement***, ***the six-month restrictive period does not begin (and is in fact extended) during any period of time you are in breach of any of the restrictive covenants contained in the Non-Solicitation Agreement***. The Non-Solicitation Agreement also prohibits you from soliciting or encouraging SAI employees to end their employment with SAI and to join you in a competing business.

On May 15, 2020, you resigned as Vice President of Sales of SAI, effective May 29, 2020, and thereafter negotiated and signed a separation agreement (the "Separation Agreement"), in which SAI agreed to waive its objection to you working for E&I, a direct competitor, and identified ten of its top customers (the "Restricted Customers"), including CloudHQ LLC ("Cloud"), Stack Infrastructure Inc. ("Stack"), and Holder Construction Group LLC ("Holder") that were subject to the restrictions in the Non-Solicitation Agreement. A copy of the Separation Agreement is attached for your reference.

The series of events that began shortly after your departure from SAI and continuing today leaves little doubt that at the time you signed the Separation Agreement that you had, and continue to have, no intention of abiding by the terms of either the Non-Solicitation Agreement or the Separation Agreement (collectively the "Agreements"). Your arrival at E&I conspicuously coincided with the rapid growth of its domestic electrical switchgear operations and development of new client relationships, including Stack, Cloud, and Holder. The timing of these events is strong evidence that you participated in E&I's successful campaign to obtain new switchgear business from Stack and Cloud given that you were SAI's primary point of contact for each and E&I had no switchgear experience with either company prior to your arrival.

By disregarding your obligations under the Agreements and soliciting or otherwise contacting the Restricted Customers, you have, at a minimum, aided E&I in obtaining: (i) the Stack Portland project; (ii) the Stack Silicon Valley project; and (iii) the MCC6 project from Cloud. Indeed, your involvement in preparing SAI's quotes for each of these projects during you tenure at SAI and E&I's subsequent procurement of these projects leads to the inescapable conclusion that you provided material assistance and guidance to E&I and used SAI's confidential and proprietary information in doing do. SAI conditioned its approval of your request to join a competitor upon your agreement not to compete and do business with the Restricted Customers and your blatant indifference to upholding your end of the bargain will carry significant legal ramifications.

SAI is also aware of your attempt to solicit SAI employees to leave their employment with SAI and to join you at E&I, which also violates the Non-Solicitation Agreement. A phone call SAI received from Philip O'Doherty, Managing Director of E&I, on your SAI-issued cell phone shortly after your resignation seeking assistance in recruiting "Bob" provided direct evidence of E&I's strategy: to raid SAI's engineering department and bring a significant portion of them with you to work at E&I. The sheer number of SAI employees who have been solicited to join E&I further substantiates your involvement, as does your recent encounter with the aforementioned Bob Brown.

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 3



## Demand to Cease and Desist

On behalf of SAI, we demand that you immediately cease and desist from: (a) soliciting, contacting or otherwise communicating with Stack, Cloud, and Holder, as well as all other Restricted Customers; (b) soliciting SAI employees; and (c) otherwise, directly or indirectly, violating the Non-Solicitation Agreement and the Separation Agreement in any manner. You are required to abide by these obligations for six months following the date you cease the illegal conduct.

Your breaches of the Non-Solicitation Agreement and the Separation Agreement has caused SAI significant monetary damages, including but not limited to lost profits and lost business opportunities. Based upon the value of the contracts E&I has obtained through your wrongful contact with the Restricted Customers and use of SAI's confidential information–$14 million for the Stack Silicon Valley project, $20 million over two years for the Stack Portland project and $3.9 million for the Cloud MCC6 project–SAI has easily sustained damages in excess of $10 million. These damages will continue to increase in the event you do not take immediate corrective action. SAI reserves its right to seek injunctive relief and monetary damages against you for, among other things, breach of contract and a violation of the Illinois Deceptive Trade Practices Act and to pursue any and all other rights and remedies available at law or in equity.

## Litigation Hold

In light of SAI's claims and causes of action against you, we demand that you, and others acting or purporting to act on your behalf, including counsel and any employees, agents, officers, directors, or shareholders of E&I (collectively, the "Custodians") immediately take steps to ensure the preservation of all documents and information including, but not limited to, electronically-stored information ("ESI"), which is potentially relevant to SAI's claims and causes of action against you. This includes your personal email address, cell phone, and social media activity. You are required to preserve such information in accordance with this litigation hold letter.

Potentially relevant information includes paper records, emails, text message and other ESI that are in any way related to your breaches of the Non-Compete Agreement and the Separation Agreement, which include the following:

1. All communications by a Custodian: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

2. All notes and memoranda confirming, summarizing, or reflecting communications a Custodian had: (1) with any of the Restricted Customers, including but not limited to Stack, Cloud, and Holder; or (2) that relate to either the Silicon Valley 02 Project or the MCC6 project;

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 4



3.     All documents, including but not limited to, quotes, proposals, bids, solicitations, meeting requests, marketing materials, or advertisements sent by a Custodian to any of the Restricted Customers.

The timeframe for retention and preservation of the records is <u>January 1, 2019 to the present</u>.

In light of the foregoing, you must take the following affirmative steps to ensure that all potentially relevant documents and ESI are preserved:

1.     Identify the people or entities who have or may have potentially relevant documents or ESI. You should promptly inform those people and entities of their possession of potentially relevant data and instruct them not to delete or alter any such information. If it is possible to segregate such information, that may be preferable. You should also inform appropriate system administrators and other information technology personnel of the necessity of preserving potentially relevant ESI.

2.     Identify sources of potentially relevant documents and ESI and preserve them. When identifying sources of documents and ESI, you should bear in mind that such documents and data may include, but are not limited to, text files, spreadsheets, power points, e-mails, letters, faxes, notes, text messages, meeting agendas and minutes, memoranda, summaries, databases, calendar entries, data from accounting applications (i.e. QuickBooks files), video files, photographs, contact and relationship management data, computer system activity logs, internet usage files, network access information, backup and archival files, data compilations, electronically imaged documents and others. Be sure to identify and review all computers, network servers, removable media, handheld devices, tablets, smartphones, voice mail, and backup tapes which could contain potentially relevant information.

3.     Make copies of any active files containing relevant data and preserve them separately. It is important to segregate relevant data because it will permit us to efficiently image or duplicate the data for discovery purposes at a later date.

4.     If the Custodians use online, cloud storage, and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation.

5.     Discontinue any automatic or routine features or protocols for deletion or modification of ESI in order to avoid the deletion or alteration of data potentially relevant to the Lawsuit. Examples of such automatic or routine features or protocols include, without limitation: (a) purging the contents of e-mail repositories by age, capacity, or other criteria; (b) using data or media wiping, disposal, erasure, or encryption utilities or devices; (c) overwriting, erasing, destroying or discarding back-up media; and (d) running antivirus or other programs effecting wholesale metadata alteration.

Mr. Shane Wolfram
E&I Engineering Group
October 22, 2020
Page 5



     *Please note that allowing potentially relevant documents or ESI to be destroyed or discarded can subject you to severe civil and/or criminal penalties.  The possible sanctions include both monetary and litigation-specific penalties, such as a finding that the unavailable ESI would have been unfavorable to the defendants' position in any potential lawsuit*.

               Sincerely,

               ARONBERG GOLDGEHN DAVIS & GARMISA

               By: _____

                    Benjamin E. Haskin

Encl.

cc:    Jerry Holisky, Esq.
       David Martin

4822-1152-5326v4