IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SWITCHBOARD APPARATUS, INC. d/b/a SAI ADVANCED POWER SOLUTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHANE WOLFRAM, <br><br> Defendant. | Case No. 1:21-cv-01665 |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc. ("SAI"), by and through its attorneys, Aronberg Goldgehn, for its Response in Opposition to the Motion to Dismiss filed by Defendant Shane Wolfram, states as follows:

**I. INTRODUCTION**

Wolfram's Motion to Dismiss over-simplifies SAI's allegations by ignoring the specific wrongful acts alleged in the Complaint, including: (1) Wolfram's disclosure of SAI's proposals for the Stack Silicon Valley, Stack Portland, and the Cloud Manassas Projects, both before and after his resignation; and (2) Wolfram's communications with SAI customers during the final months of his employment to promote the products and services of his soon-to-be-employer, E&I Engineering Corp. ("E&I") over those of SAI. SAI is not attempting to prevent Wolfram from pursuing his livelihood; SAI is seeking redress for Wolfram's unauthorized and unlawful disclosure of its confidential project proposals to E&I, SAI's competitor that was awarded the contracts for each of these projects shortly after Wolfram began working for them. Wolfram's contention that SAI has not sufficiently described the existence of the trade secrets is baseless and easily disprovable (the three above-identified project proposals) as is his claim that SAI has not alleged facts supporting the misappropriation of this information to E&I. And as to Count III,

Wolfram breached his fiduciary duty of loyalty to SAI by promoting E&I over SAI in the final months while he was still employed by SAI. For these reasons, and as more fully explained below, Wolfram's Motion to Dismiss should be denied.

## II. FACTS ALLEGED IN THE COMPLAINT

**A.     SAI hires Wolfram as Vice President of U.S. Sales**

SAI is an Illinois corporation that designs, manufactures, and supplies custom-made electrical switchgear. Its customers include government facilities, health care providers, data centers, Fortune 500 companies, and international OEM customers.[1] (Amended Complaint ¶ 7) SAI hired Wolfram as its U.S. Vice President of Sales in August 2011. (*Id*. at ¶ 9) Wolfram's duties and responsibilities as SAI's U.S. Vice President of Sales included, among other things: (a) overseeing the sale of SAI products and services within and outside of the United States; (b) supervising all SAI sales employees, sales managers, and field engineers; (c) developing, maintaining, and servicing new and existing client relations; and (d) interacting with SAI customers to sell and market SAI bids and proposals. (*Id*. at ¶ 10)

Wolfram operated as the primary point of contact between SAI and its customers when SAI would respond to a request for a proposal (an "RFP") for the design, sale, and installation of switchgear equipment. (*Id*. at ¶¶ 12-13) Upon receipt of an RFP, Wolfram would participate in internal meetings to discuss the scope and specifications of the project, and would have detailed knowledge about confidential and proprietary pricing formulas and procedures for creating a proposal based upon the cost and specifications of a project. (*Id*. at ¶ 14)

On or about July 25, 2012, SAI and Wolfram entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Confidentiality Agreement") whereby

---

[1] An electrical switchgear is a centralized collection of circuit breakers, fuses, and switches that protects, controls, and isolates electrical equipment. (Amended Complaint ¶ 8)

Wolfram agreed, among other things: (1) that for a period of six months following the termination of his employment with SAI: (a) not to be employed by a direct competitor of SAI and not to engage in similar duties and services; and (b) not to, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue-producing client of SAI; and (2) not to, directly or indirectly, use or disclose any Confidential Information obtained during the course of his employment with SAI and to use his best efforts to safeguard such information.[2] (*Id*. at ¶¶ 15-18; Complaint Exhibit A)

**B.     Wolfram participates in SAI's preparation of three responses to RFPs**

In the final eight months of his employment with SAI, Wolfram participated in SAI's response to three RFPs that are pertinent to this case: (1) a request for proposal to bid on a project for Stack Inc. ("Stack") for the design and manufacture of switchgear for a data center located in Silicon Valley (the "Stack Silicon Valley Project") in September 2019; (2) an RFP from CloudHQ LLC ("Cloud") to provide switchgear for a data center located in Manassas, Virginia (the "Cloud Manassas Project") in March 2020; and (3) an RFP from Stack for a data center in Portland, Oregon (the "Stack Portland Project") in April 2020. (*Id*. at ¶¶ 22-15; 31-37)  Wolfram reviewed and had detailed knowledge of each of the above responses and communicated with Stack/Cloud representatives about SAI's proposal. (*Id*.)  In or about February 2020, SAI was advised that it would receive the contract for the engineering portion of the Stack Silicon Valley Project and that it would later receive change orders for the sale of the equipment once the funding was in place. (*Id*. at ¶¶ 26-28)  The issuance of a contract for the engineering cost of the contract with the subsequent issuance of change orders for the equipment is a common arrangement that enables the project to proceed before all funding has been received. (*Id*.)  SAI is not aware of a single instance

---

[2] Confidential Information is defined on page 1 of the Confidentiality Agreement.  Complaint Exhibit A.

3

in the switchgear industry in which the recipient of the engineering portion of a contract did not also provide the switchgear equipment for the project. (*Id*.)

C. **Wolfram communicates with and promotes E&I before resigning from SAI**

On May 15, 2020, Wolfram tendered a notice of resignation to SAI in order to begin employment with E&I as its Vice President of Sales for U.S. Operations. (*Id*. at ¶ 38) SAI and Wolfram entered into a separation agreement (the "Separation Agreement") in which SAI agreed to waive its objection to Wolfram working for E&I as a direct competitor, provided that Wolfram, among other things, reaffirm his obligation to abide by the confidentiality provisions of the Confidentiality Agreement and agree not to directly or indirectly solicit, service, or contact any of SAI's top ten revenue-generating clients, including but not limited to Holder, Stack, and Cloud. (*Id*. at ¶ 41; Complaint, Exhibit B)

Unbeknownst to SAI at the time, and based upon a subsequent review of phone records, Wolfram had begun discussions with E&I as far back as January 2020. (*Id*. at ¶ 42) SAI believes that Wolfram shared confidential information with E&I during these phone conversations and while still employed by SAI, including the designs, pricing, and specifications of SAI's proposals for the Cloud Manassas Project, the Stack Portland Project, and the Stack Silicon Valley Project– a belief substantiated by E&I's unexpected award of each of these contracts. (*Id*. at ¶¶ 43, 57, 67 and 70) SAI's review of Wolfram work-issued phone also identified numerous calls from Wolfram to Cloud almost immediately after Wolfram spoke to E&I. (*Id*. at ¶ 44) SAI believes Wolfram contacted Cloud to promote, sell, or otherwise market E&I's switchgear proposals over those of SAI. (*Id*. at ¶ 45)

D. **E&I receives the contracts for the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project after Wolfram begins his employment**

Wolfram began work as the E&I Vice President of U.S. Sales in June 2020. (*Id.* at ¶ 46) In late August or early September 2020, Wolfram traveled to Ashburn, Virginia, the location of a Cloud data center and, upon information and belief, met with representatives of Cloud and discussed, among other possible topics, E&I's proposal for the Cloud Manassas Project. (*Id.* at ¶ 55) Wolfram is believed to have used or otherwise relied upon SAI's Confidential Information, including, but not limited to, the pricing, structure, and specifications of SAI's bid for the Cloud Manassas Project, in making or otherwise discussing E&I's proposal for the Cloud Manassas Project. (*Id.* at ¶ 56) Cloud subsequently awarded E&I the contract for the Cloud Manassas Project. (*Id.* at ¶ 57)

In or about September 2020, Stack awarded E&I the Stack Portland Project. (*Id.* at ¶ 67) This was a shock to SAI since it had been promised the contract after expediting a different project for Stack. (*Id.* at ¶¶ 59-66) Wolfram is believed to have been instrumental in E&I obtaining the Stack Portland Project by directly or indirectly soliciting, contacting, or otherwise servicing Stack on behalf of E&I, and by using the Confidential Information, including SAI's pricing and structure for the Stack Portland Project. (*Id.* at ¶ 68) On September 23, 2020, SAI was informed that E&I had been awarded a contract to provide the equipment for the Silicon Valley Project (the "Silicon Valley Equipment Contract"). (*Id.* at ¶ 70) This too was a shock to SAI because: (1) SAI had been previously advised that it had won and was receiving the entire contract for the Stack Silicon Valley Project, which included both the engineering cost and the sale of equipment; and (2) E&I had not been disclosed as a potential switchgear provider on any of the specifications issued for the Stack Silicon Valley Project. (*Id.* at ¶¶71, 23) Wolfram is believed to have been instrumental in E&I obtaining the Silicon Valley Equipment Contract by directly or indirectly soliciting,

5

contacting, or otherwise servicing Stack on behalf of E&I, and by using or relying upon the Confidential Information, including SAI's pricing and structure for the Silicon Valley Equipment Contract. (*Id*. at ¶ 72)

### III. STANDARD OF REVIEW

In ruling on a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true, and the court is to draw all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011), *citing Bell At. Corp. v. Twombly*, 550 U.S. 544,547 (2007)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, but plaintiffs must make sufficient 'factual allegations . . . to raise [their] right to relief above the speculative level.'" *Id*. at 1964-65. "[I]t is not incumbent on the plaintiff to plead specific facts." *Kubas v. Standard Parking Corp. IL*, 594 F. Supp. 2d 1029, 1031 (N.D. Ill. 2009). Therefore, dismissal under Fed. R. Civ. P. 12(b)(6) is only appropriate if "the factual detail in a complaint . . . [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

### IV. ARGUMENT

**A.    SAI's allegations that Wolfram disclosed SAI's project proposals states a cause of action under the ITSA**

To state a claim for misappropriation of a trade secret under the ITSA, a plaintiff must plead that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation. *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817 (N.D. Ill. 2014), *citing Liebert Corp. v. Mazur,* 357 Ill. App. 3d 265, 293 (2005). SAI alleges facts in support of each element.

1. **<u>SAI sufficiently alleges that Wolfram misappropriated project specifications and pricing</u>**

A plaintiff is only required to describe a trade secret in general terms at the pleading stage. *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831 (N.D. Ill. 2019). Whether a plaintiff has adequately alleged the existence of a trade secret is a fact-intensive analysis, but courts have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms. *Covenant Aviation Sec.,* 15 F. Supp. 3d 813 at 818, *citing GoHealth, LLC v. Simpson,* No. 13 C 2334, 2013 WL 6183024, at *12 (N.D. Ill. Nov. 26, 2013) (identification of trade secret as processes, systems, and technology that allowed a call center to respond quickly was adequate to state a claim); *Papa John's Int'l v. Rezko,* 446 F. Supp. 2d 801, 812 (N.D. Ill. 2006) (claim can proceed although it is "unclear which trade secrets of the 'Papa John's System' were misappropriated").

The identification of "specific types of business information" is sufficient to plead the existence of a trade secret, including specific bids and proposals. *Covenant Aviation Sec.,* 15 F. Supp. 3d at 818. Price quotes and proposals are commonly recognized as confidential trade secrets because: (1) project/customer-specific information is generated through a relationship with the customer, including the rates paid for specific services provided for specific equipment; and (2) the disclosure of the prices offered by a competitor provides a competitive advantage to the recipient by enabling it to make a more attractive bid. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 712 (N.D. Ill. 2009). Customer-specific slide decks and pitches that are tailored to a specific customer similarly constitute trade secrets because they were developed for a singular customer. *Vendavo, Inc. v. Long*, 397 F. Supp. 3d at 1134.

Wolfram's argument that SAI has only listed general categories of allegedly confidential information (MTD, p. 5) is inaccurate. The complaint alleges that: (1) prior to his resignation from

SAI, Wolfram had acquired detailed knowledge of SAI's proposals for the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project, including the data center designs, equipment, and pricing; and (2) Wolfram divulged the project specifications in the months leading up to his departure from SAI as well as after he joined E&I in order to provide E&I a competitive advantage.[3] Remarkably, each of these projects were awarded to E&I after Wolfram's transition between the two companies, including the Stack Silicon Valley Project, for which SAI had already been awarded the engineering portion of the contract. In fact, E&I was not even listed as a switchgear provider on any of the project specifications provided to SAI.

Unlike the collection of cases cited by Wolfram in footnote 5 of the MTD, SAI is not relying upon "blanket generalizations" or vague references to specifications within thousands of pages of allegedly confidential information. SAI alleges that Wolfram misappropriated the specifications, designs, and pricing to three specific projects, the details of which Wolfram acquired as U.S. Vice President of Sales. These are not generic corporate information with an unknown origin, but rather customer and project-specific information that SAI generated in the competitive bidding process to win the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project. This is far more detailed and specific than the vague references to customer lists, generic pricing structures, or in-development products that Wolfram relies upon as being insufficient to qualify as a trade secret. MTD, p. 6, *citing Packaging v. Hein*, 2015 WL 6164957, (N.D. Ill. Oct. 20, 2015); *JMP-Newcor Int'l, Inc. v. Sourcing Sols., Inc.*, 1996 WL 754131 (N.D. Ill. Dec. 31, 1996); *Segerdahl Corp. v. Ferruzza*, 2018 WL 828062 (N.D. Ill. Feb. 10, 2018).

---

[3] Discovery may, and likely will, support that Wolfram misappropriated additional sources of confidential information, but SAI's claims are predicated on the misappropriation of the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project proposals.

8

The identification of the three customer-specific projects, including the respective specifications, designs, pricing, and proposals, is sufficient to plead the existence of a trade secret. See *SKF USA, Inc.*, 636 F. Supp. 2d at 712.

### 2. SAI took reasonable steps to safeguard its proposals

The determination of whether measures taken by a trade secret owner are sufficient to satisfy the ITSA's reasonableness standard is ordinarily a question of fact for the jury. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 725 (7th Cir. 2003). The reasonableness of safeguard precautions can only be determined as a matter of law "in an extreme case" because the analysis depends on a balancing of costs and benefits that will vary from case to case. *Id.*, *citing Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) ("But only in an extreme case can what is a reasonable precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved."); *Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 943 (7th Cir. 1996) ("whether or not the actions [plaintiff] actually took were sufficient to satisfy the ITSA's reasonableness standard was a question for the jury").

The requirement that an employee execute a nondisclosure or confidentiality agreement is important evidence of reasonable steps. *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 842 (C.D. Ill. 2014). The execution of such an agreement, together with evidence that the employee understood the obligation to keep the information confidential, is ordinarily sufficient to satisfy the reasonable safeguard requirement of the ITSA. *Id.*, *citing Gillis Associated Indus. v. Cari-All, Inc.,* 206 Ill. App. 3d 184) In *Bauknecht,* the court held that the employee's execution of a confidentiality agreement together with an admission obtained in discovery was sufficient evidence of reasonable safeguards to withstand a motion for summary judgement. *Id*. at 842; s*ee*

9

*also Vendavo, Inc. v. Long*, 397 F. Supp. 3d at 1136 (holding that plaintiff also protected its confidential information by requiring its employees to sign non-disclosure agreements prohibiting them from revealing any proprietary knowledge they received during their respective employment and contract negotiation and implemented technological security).

*Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 17 C 923, 2018 WL 1156246, at *2 (N.D. Ill. Mar. 5, 2018) (cited by Wolfram on page 8 of his motion) is inapposite; the employer in that case based its ITSA claim on broad categories of information stored on its network that the court found was not sufficiently identified in order to constitute a trade secret. Based upon the breadth of information alleged to have been misappropriated, the court ruled that the plaintiff did not allege any protective measures to maintain the secrecy of the unspecific information. *Id.* * 3. That is not the case here, as SAI's claim is centered on the specific proposals Wolfram divulged to E&I that are, by their competitive nature, confidential. *See Covenant,* 15 F. Supp. 3d 813, 818 (information employees treat as highly confidential supports elements of reasonable safeguard).

SAI required, and Wolfram executed, a confidentiality agreement requiring Wolfram to maintain the confidentiality of its proprietary information, which includes the pricing, products, and design of its proposals which are not known or disclosed outside of SAI. Wolfram participated in SAI's internal procedure to create the three proposals based upon the project specifications, and was the principal point of contact with Stack, Holder, and Cloud regarding the proposals. It is absurd to suggest that Wolfram, the U.S. Vice President of Sales in charge of overseeing all U.S. products, services, and sales employees, did not consider SAI's project proposals as confidential. Wolfram knew that the disclosure of SAI's proposals would give E&I a competitive advantage, which it took advantage of to obtain each of the three contracts.

Contrary to Wolfram's argument, SAI's consent for Wolfram to work for E&I did not waive its right to expect Wolfram to maintain confidentiality; to the contrary, SAI's consent was expressly conditioned on the Wolfram's obligation to maintain confidentiality. The Separation Agreement placed an additional safeguard of confidentiality and did not, as Wolfram suggests, forfeit this right.

### 3. SAI alleges that Wolfram misappropriated its confidential information prior to and/or after his resignation

The second element of a claim under the ITSA requires a plaintiff to allege that the defendant misappropriated the trade secret. *Bauknecht*, 71 F. Supp. 3d at 844 (C.D. Ill. 2014). Contrary to Wolfram's argument, SAI pleads all the necessary facts in support of misappropriation, including: (1) the specific trade secrets misappropriated – SAI's proposals for the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project; (2) the facts and circumstances supporting the misappropriation; and (3) the improper means used.

SAI alleges that Wolfram disclosed the specifics of SAI's proposals for the Cloud Manassas Project, the Stack Portland Project, and the Stack Silicon Valley Project during two periods. First, SAI alleges that the information was revealed and discussed in the many phone calls between Wolfram and E&I in the months prior to his departure. These calls were not discovered until SAI investigated Wolfram's work-issued phone after his departure. SAI also alleges that Wolfram used and relied upon SAI's proposals and project specifications during its solicitation and pitches for the same projects. This knowledge and information provided E&I with a remarkable and grossly unfair advantage, which resulted in its being awarded the contract for each of the projects.

Wolfram's disclosure of SAI's proposals was achieved through "improper means" because: (1) the Confidentiality Agreement and the Separation Agreement prohibited such a

11

disclosure; and (2) Wolfram was not authorized to disclose the proposals to a competitor. *See Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 WL 2782818, at *3 (N.D. Ill. July 16, 2008), *citing* 765 ILCS 1065(b)(2)(B); *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 13 C 3767, 2013 WL 5974731, at *4. In *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (cited by Wolfram on pp 11-12 of the Motion to Dismiss), the court held the plaintiff did not sufficiently allege the misappropriation of a trade secret because: (1) defendant acquired the alleged trade secrets – customer information such as purchase history, preferences, and pricing – through the normal course of his employment; and (2) plaintiff did not allege that the defendant disclosed the allegedly misappropriated customer information after the termination of his employment. Unlike the plaintiff in *Packaging Corp.,* SAI alleges that the Wolfram disclosed the project proposals through improper means.

The ITSA's definition of improper means includes the breach of a confidentiality agreement or duty to maintain secrecy. *Bauknecht*, 71 F. Supp. 3d 819, 844, *citing* 765 ILCS 1065 /2(a) ("Improper means includes . . . breach . . . of a confidential relationship or other duty to maintain secrecy or limit use."). Wolfram's disclosure of the three project proposals breaches the confidentiality obligations in the Confidentiality Agreement and therefore satisfied this standard. Moreover, there is no dispute that Wolfram was not authorized to disclose SAI's proposals to a competitor who was pursuing the same projects. *See Lumenate Techs., LP v. Integrated Data Storage, LLC*, 13 C 3767, 2013 WL 5974731, at *4 (misappropriation by unauthorized disclosure or use occurs when a defendant uses the alleged trade secrets or discloses them to others for purposes other than serving the interests of the owner of that information).

Courts recognize that a trade secret case can rarely be proved by convincing direct evidence. *Lumenate,* 2013 WL 5974731, at *5, *citing PepsiCo, Inc. v. Redmond,* No. 94 C 6838,

1996 WL 3965, at *15 (N.D. Ill. Jan 2, 1996) ("In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place."); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) ("because direct evidence of theft and use of trade secrets is often not available, the plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence"). Allegations of suspicious circumstances supported by facts is sufficient to plead misappropriation of a trade secret. *Lumenate,* 2013 WL 5974731, at *5. The complaint alleges in detail how Wolfram acquired the information, when and why he disclosed the information to E&I, and the highly suspicious facts that Wolfram began discussion with E&I months before resigning from SAI and that E&I won the contracts for each of these projects. Wolfram's August/September, 2020 meeting with Cloud, which violated the non-solicitation terms of the Confidentiality and Separation Agreement, is equally indicative of Wolfram' inevitable disclosure of SAI's response to the Cloud Manassas Project. SAI also alleges that Wolfram used the information in furtherance of E&I's business interests, first by providing the specifications to E&I, and then as an employee of E&I in furtherance of E&I's efforts to win the contracts. SAI has adequately stated a cause of action under the ITSA.

**B.      SAI's cause of action for breach of fiduciary duty is reliant upon the marketing and promotion of E&I over SAI, not the disclosure of the project specifications**

The ITSA only preempts causes of action predicated on the misuse of confidential information. *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001). Common law claims based upon alternative theories, such as the breach of a duty of loyalty, are independent of the ITSA and remain viable. *Id*. (allegations that defendant violated fiduciary duty by usurping a corporate opportunity for his own benefit was not preempted by the ITSA). A cause of action

13

for breach of fiduciary duty should not be dismissed if the court cannot determine whether the breach of duty relates to the disclosure of trade secrets. *Covenant Aviation Sec,* 15 F. Supp. 3d at 821.

Contrary to Wolfram's argument, SAI's cause of action for breach of fiduciary duty is not based on the unauthorized disclosure of SAI's project proposals. Instead, SAI alleges that during the months preceding Wolfram's resignation, Wolfram contacted SAI's customers, including Cloud, to promote, sell, or otherwise market E&I's switchgear proposals over that of SAI. SAI is not alleging that Wolfram necessarily relied upon SAI's proposals in these calls, only that Wolfram promoted and touted E&I over SAI. This could have been accomplished in a number of ways that did not involve trade secrets, including promises about E&I's performance, pricing, and capability to satisfy larger projects, as well as disparaging comments about SAI's performance and capability. Contrary to Wolfram's argument, SAI is not required, or able, to provide the substance of these calls because that information can only be obtained in discovery.

As U.S. Vice President of Sales, Wolfram owed SAI a duty of loyalty. *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69. The promotion of the products and services of a competitor that Wolfram would soon join–and from whom he had likely already accepted an offer of employment–over those of his current employer is a breach of fiduciary duty. *Id.* (a fiduciary cannot act inconsistently with his agency or trust); *Advantage Mktg. Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 30 (recognizing that diversion of corporate opportunity is a breach of fiduciary duty).

Even if SAI's proposals for the Stack Silicon Valley Project, the Stack Portland Project, and the Cloud Manassas Project are not classified as confidential trade secrets (and SAI maintains they were for all the reasons set forth above), the disclosure of the project specifications to a

14

competitor during Wolfram's employment is support of a breach of the duty of loyalty. *See Combined Metals of Chicago Ltd. P'ship v. Airtek, Inc.*, 985 F. Supp. 827, 830 (N.D. Ill. 1997) (the ITSA does not preempt a breach of fiduciary duty claim where the disclosed information is not a trade secret).

In *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 905 (N.D. Ill. 2019) (cited by Wolfram on page 13 of the Motion to Dismiss), the court held that the plaintiff's inability to establish that disclosed information constituted a trade secret would preclude a claim for breach of fiduciary duty that was based solely on the disclosure of confidential information. That is not the case here, as SAI's claim is based upon a breach of the duty of loyalty, which also includes (if the proposals are not trade secrets), Wolfram's sharing the proposals with E&I while employed by SAI to provide E&I a competitive advantage. *See id.*, *citing Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005) ("[f]or example, an assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record"). SAI has adequately alleged a claim for breach of fiduciary independent of its claim under the ITSA.

WHEREFORE, Plaintiff, SAI Advanced Power Solutions, Inc., respectfully requests that the Court deny Defendant Shane Wolfram's Motion to Dismiss and grant such other relief as the Court deems just and proper.

                                                SWITCHBOARD APPARATUS, INC.
                                                d/b/a SAI ADVANCED POWER
                                                SOLUTIONS, INC.

                                                By: /s/ *Benjamin E. Haskin*
                                                          One of Its Attorneys

Nathan H. Lichtenstein, Esq. (ARDC #1655469)
nlichtenstein@agdglaw.com
Benjamin E. Haskin, Esq. (ARDC #6306126)
bhaskin@agdglaw.com
ARONBERG GOLDGEHN DAVIS & GARMISA
330 North Wabash Avenue, Suite 1700
Chicago, Illinois 60611
312-828-9600
Attorney No. 30375
4841-4077-1048v2

## **CERTIFICATE OF SERVICE**

I certify that on the 10th day of May, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties who have filed an appearance in this lawsuit by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: */s/ Benjamin E. Haskin*
Attorney for SWITCHBOARD
APPARATUS, INC. d/b/a SAI
ADVANCED POWER SOLUTIONS, INC.