IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc., <br> Plaintiff, <br><br> v. <br><br> Shane Wolfram, <br> Defendant. | No. 21 C 1665 <br><br> Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion to dismiss [19] is denied.

## STATEMENT

**Facts**

The following allegations are taken as true for purposes of this motion to dismiss. Plaintiff SAI is a designer, manufacturer, and supplier of custom-made electrical switchgear, with customers including government facilities, health-care providers, data centers, Fortune 500 companies, and international OEM (original equipment manufacturer) customers. An electrical switchgear is a centralized collection of circuit breakers, fuses, and switches that protects, controls, and isolates electrical equipment. SAI hired defendant Shane Wolfram as its U.S. Vice President of Sales in August 2011. Wolfram's duties and responsibilities included, among other things: (a) overseeing the sale of SAI products and services within and outside of the United States; (b) supervising all SAI sales employees, sales managers, and field engineers; (c) developing, maintaining, and servicing new and existing client relations; and (d) interacting with SAI customers to sell and market SAI bids and proposals.

Wolfram had access to, and acquired knowledge of, SAI's confidential and proprietary business information (the "Confidential Information"), including but not limited to: (a) the contact information for all existing and prospective SAI clients within and outside of the United States, including specific individuals within SAI's customers who had decision-making authority; (b) SAI's proprietary pricing information; (c) SAI's business, marketing, and sales plans and strategies; (d) SAI'S existing and in-development products; (e) the compensation paid to SAI employees; and (f) all other information not generally known outside of SAI relating to its business in the electrical switchgear industry. Wolfram was the primary point of contact between SAI and its customers during the process in which SAI would respond to a request for a proposal (an "RFP"). Wolfram had knowledge of SAI's pricing formula and procedure for creating a proposal based upon the cost and specifications of a project and reviewed each proposal so that he could interact with customers and answer their questions.

On or about July 25, 2012, SAI and Wolfram entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Non-Solicitation Agreement") whereby Wolfram agreed, among other things, that for a period of six months following the termination of his employment with SAI, he would: (a) not be employed by a direct competitor of SAI and engage in similar duties and services, including the sale or marketing of switchgear or other electrical distribution products; and (b) not, directly or indirectly, solicit, service, or have contact with any entity that is a top ten revenue-producing client of SAI. Wolfram also agreed not to, directly or indirectly, use or disclose any Confidential Information obtained during his employment with SAI and to use his best efforts to safeguard such information.

Wolfram remained employed by SAI as its U.S. Vice President of Sales through May 29, 2020, during which time he, among other things, was involved in the cultivation of new business relationships on behalf of SAI and continued to use and obtain additional Confidential Information. On October 2, 2019, SAI submitted a proposal to Holder Construction, LLC for SAI to supply switchgear for a data center located in Silicon Valley for Stack, Inc. (the "Stack SV Project"). In February 2020, SAI learned it was awarded at least part of the Stack SV Project. In April and May 2020, SAI submitted proposals to supply switchgear for data centers in Manassas, Virginia (the "Cloud Manassas Project") and Portland, Oregon (the "Stack Portland Project"). E&I, Wolfram's new employer as discussed below, ultimately was awarded the Stack Portland Project, the Cloud Manassas Project, and the equipment portion of the Stack SV Project.[1]

On May 15, 2020, Wolfram tendered a notice of resignation from his position as SAI U.S. Vice President of Sales, effective May 29, 2020. Wolfram advised SAI that he had received and accepted an offer from another company for the position of Vice President of Sales for U.S. Operations and reaffirmed in writing his obligation to abide by the Non-Solicitation Agreement. Wolfram requested that SAI provide him a list of SAI's top ten revenue-producing accounts over the previous twelve months pursuant to Paragraph 2(c) of the Non-Solicitation Agreement. Wolfram thereafter informed SAI that his new employer was E&I, a direct competitor of SAI in the designing and manufacturing of switchgear. On or about May 28, 2020, SAI and Wolfram executed a separation agreement (the "Separation Agreement") in which SAI agreed to waive its objection to Wolfram working for E&I as a direct competitor, provided that Wolfram abide by Section 2(c) of the Non-Solicitation Agreement not to directly or indirectly solicit, service, or contact any of SAI's top ten revenue-generating clients that were listed on the Separation Agreement, including but not limited to individuals associated with the Stack SV Project, the Stack Portland project, and the Cloud Manassas Project.

---

[1] According to SAI, "[o]n September 23, 2020, SAI was informed that E&I had been awarded a contract to provide the equipment for the [Stack] Silicon Valley Project." (Pl.'s Resp., Dkt. # 25, at 5) (citing Am. Compl., Dkt. # 10, at ¶ 70). SAI goes on to state that "[t]his . . . was a shock to SAI because: (1) SAI had been previously advised that it had won and was receiving the entire contract for the Stack Silicon Valley Project, which included both the engineering cost and the sale of equipment; and (2) E&I had not been disclosed as a potential switchgear provider on any of the specifications issued for the Stack Silicon Valley Project." *Id*.

Unbeknown to SAI at the time and based upon a subsequent review of phone records, Wolfram began discussions with E&I as far back as January 2020. SAI believes that Wolfram, while still employed by SAI, shared Confidential Information with E&I during these phone conversations, including the specifics of SAI's proposals for the Stack SV Project, the Stack Portland Project, and the Cloud Manassas Project. SAI's review of Wolfram's SAI-issued phone also identified numerous calls from Wolfram to individuals associated with the Cloud Manassas Project almost immediately after Wolfram spoke to E&I. SAI believes that Wolfram contacted those individuals to promote, sell, or otherwise market E&I's switchgear proposals over that of SAI.

In June 2020, Philip O'Doherty was Managing Director of E&I. Around that time, unaware that Wolfram's SAI-issued cell phone had been returned to SAI, O'Doherty called the number and asked what it would take to get "Bob" to join Wolfram at E&I. On or about September 30, 2020, Wolfram met and had dinner with Bob Brown, SAI's Director of Customer Success. SAI alleges, upon information and belief, that the purpose of the dinner meeting was to convince Brown to leave SAI and join Wolfram at E&I. At least six SAI employees have been contacted or otherwise solicited to leave SAI and join E&I. Wolfram is believed to be directly or indirectly involved in the solicitation of the SAI employees, in violation of the terms of the Non-Solicitation Agreement.

In its amended complaint, SAI alleges three counts against Wolfram: breach of contract (Count I); misappropriation of trade secrets under the Illinois Trade Secrets Act ("ITSA") (Count II); and breach of fiduciary duty (Count III). Wolfram moves to dismiss Counts II and II for failure to state a claim.

**Standard**

In order to survive dismissal under Rule 12(b)(6), the plaintiff "must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations are accepted as true at the pleading stage, but 'allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion.'" *Id*. (citation omitted). "[A]ll this means is that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015) (internal quotation marks omitted).

**Analysis**

Wolfram asserts that SAI has not sufficiently pleaded an ITSA claim and that ITSA preempts the breach of fiduciary duty claim. "To prevail on a claim for misappropriation of a trade secret under" ITSA, SAI "must demonstrate that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business." *Learning Curve*

*Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). ITSA defines "trade secret" as follows:

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

According to Wolfram, SAI has not properly pleaded the existence of trade secrets, as that term is defined by ITSA, referring to the complaint's allegation that "Confidential Information," consisted of, among other things, customer contact information, pricing, business/marketing plans and strategies, existing and in-development products, profit margins and financial information, and employee compensation. Wolfram argues that these broad categories do not satisfy Rule 12(b)(6). *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1130 (N.D. Ill. 2019) ("As numerous courts have explained, where a plaintiff suggests that general categories of information are trade secrets, the lack of specificity greatly reduces its chances of demonstrating that a defendant has misappropriated its trade secrets.").

But, as noted by Plaintiff in its response to the motion to dismiss, the complaint also alleges that "prior to his resignation from SAI, Wolfram had acquired detailed knowledge of SAI's proposals for the Stack SV Project, the Stack Portland Project, and the Cloud Manassas Project, including the data center designed, equipment, and pricing, and (2) . . . divulged the project specifications in the months leading up to his departure from SAI as well as after he joined E&I in order to provide E&I a competitive advantage." (Pl.'s Resp., Dkt. # 25, at 7-8.) Plaintiff further notes that the complaint alleges that "each of these projects w[as] awarded to E&I after Wolfram's transition between the two companies, including the Stack Silicon Valley Project, for which SAI had already been awarded the engineering portion of the contract" and that "E&I was not even listed as a switchgear provider on any of the project specifications provided to SAI." (*Id.*)[2] In other words, SAI alleges that Wolfram knew pricing and design

---

[2] To the extent these exact allegations are not included in the complaint, SAI may add them in response to the motion to dismiss because they expand upon and are consistent with the allegations already made. *See UNA Worldwide, LLC v. Orsello*, No. 12 C 3429, 2012 WL 6115661, at *3 (N.D. Ill. Dec. 10, 2012) ("The Seventh Circuit has held that plaintiffs may add additional facts in their response to a motion to a motion to dismiss *if* 'the facts are consistent with the allegations of the complaint.'") (citation and internal quotation marks omitted and emphasis in original).

information that he shared with E&I both prior to and after his departure from SAI, which gave E&I a competitive advantage in responding to the requests for proposals for the Stack SV Project, the Stack Portland Project, and the Cloud Manassas Project. These allegations go beyond the broad categories cited by Plaintiff and are sufficiently specific to allege that information purportedly taken by Wolfram had economic value[3] such that it constituted a trade secret under ITSA. *See Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) ("While it is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated, trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets.") (internal quotation marks, alterations and citations omitted).

Wolfram also argues that SAI does not allege that it took reasonable steps to protect the secrecy of the relevant information. As an initial matter, "whether [SAI] took sufficient steps to protect its trade secrets, . . . is . . . a factual inquiry that is unfitting at the motion-to-dismiss stage." *Liion, LLC v. Vertiv Grp. Corp.*, No. 18 C 6133, 2019 WL 1281977, at *2 (N.D. Ill. Mar. 20, 2019). SAI must simply have alleged facts making it plausible that the relevant information was the "subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." SAI relies on the Confidentiality Agreement it required Wolfram to sign approximately one year into his employment.[4] *See First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 842 (C.D. Ill. 2014) ("Nondisclosure agreements, such as the confidentiality agreement that [the defendant] signed, are important evidence of reasonable steps [to ensure information remains secret].") . Wolfram contends that because SAI expressly allowed him to work for E&I when he left SAI, it essentially relinquished any claim of confidentiality. However, while Wolfram's Separation Agreement included a provision in which SAI agreed to waive any objection to Wolfram's working for a competitor, it was with the proviso that Wolfram would continue to abide by the Non-Solicitation Agreement with respect to certain of SAI's customers, including Holder (Stack SV Project), Stack (Portland Stack Project), and Cloud (the Cloud Manassas Project), the customers at issue in this case. (Dkt. # 1, Ex. A, at 26.)

The Non-Solicitation Agreement contains the following language:

> I further acknowledge and agree that in my role as the Company's Vice President of Sales, I not only have access to but have acquired and will continue to acquire substantial knowledge regarding the Company's confidential business information, including all of the Company's clients and prospects within and outside of the United States, client and prospect lists, and proprietary or confidential information pertaining to all of the Company's clients and prospects;

---

[3] According to a cease-and-desist letter attached to the complaint, SAI claims that its damages amount to over $10 million as a result of the contracts lost to E&I. (Dkt. # 1, Ex. A, at 30.)
[4] Wolfram argues that the agreements he signed are not properly invoked here because they were with SAI Advanced Power Solutions, Inc., not Switchboard Apparatus, Inc., the actual plaintiff in this case. (Def.'s Reply, Dkt. # 26, at 7.) But the amended complaint and the caption on the docket list the plaintiff as Switchboard Apparatus, Inc. d/b/a SAI Advanced Power Solutions, Inc., the same entity.

the Company's pricing information and lists; the Company's business, marketing and sales plans, efforts, ideas, or strategies; [and] the Company's current products and products in development. . . . I further acknowledge and agree that in my role as the Company's Vice President of Sales, I have gained close knowledge of and influence over the Company's employees and all of the Company's clients within and outside of the United States, which I would not have but for my employment with the company.

(Dkt. # 1, Ex. A, at 22.) The relevant provision goes on to state that Wolfram acknowledges that "the relationships between the Company and its clients are of a near permanent nature, and have, in most instances, been cultivated over an extensive period of time with considerable time, money and effort expended . . . ." (*Id*.) In the Non-Disclosure/Confidentiality section of the Non-Solicitation Agreement, Wolfram agreed that he "will not, at any time during or after the period of [his] employment, directly or indirectly, copy, use disclose, publish or divulge to any person any Confidential Information (as defined . . . in this Agreement), and will use [his] best efforts to safeguard such Confidential Information." (*Id*. at 21.) Finally, Wolfram agreed that upon termination of his employment with the Company for any reason, he would "immediately deliver all Company information, including any and all Confidential Information, to the Company, including any and all copies thereof." (*Id*.) Contrary to Wolfram's assertion, SAI need not allege that it has complied with purported "best practices" in terms of protecting confidential information. At the motion-to-dismiss stage, the allegations set forth above are sufficient to plead that SAI made efforts reasonable under the circumstances to protect the secrecy of the Confidential Information.

Wolfram also contends that because the purportedly-misappropriated Confidential Information was part of SAI's previously-submitted bids to third-party customers, it lost its trade-secret designation because it could be shared by those customers. This argument is unpersuasive in light of another court's recognition that "the notion that 'the ability of customers to share [ ] information' destroys the confidentiality of that information 'has been explicitly rejected by Illinois Courts.'" *Vendavo*, 397 F. Supp. 3d at 1132 (citation omitted). For these reasons, the motion to dismiss the ITSA count on the ground that SAI has not alleged that it made reasonable efforts to secure the secrecy of its Confidential Information is denied.

Finally, Wolfram argues that SAI has not appropriately alleged that Wolfram actually misappropriated any trade secrets. "Misappropriation of trade secrets occurs one of three ways: by improper acquisition, unauthorized disclosure, or unauthorized use." *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *4 (N.D. Ill. Nov. 11, 2013). According to the complaint, Wolfram revealed Confidential Information regarding SAI's responses to the relevant RFPs both while employed at SAI and after he started working at E&I, which violated the Non-Solicitation and Separation Agreements. SAI alleges that the information Wolfram provided to E&I gave it a significant competitive advantage, thus allowing it to secure the lucrative contracts at issue. Accordingly, SAI alleges unauthorized disclosure of the Confidential Information in violation of Wolfram's contractual obligations to SAI. To the extent Wolfram contends that SAI alleges no facts supporting the theory that Wolfram disclosed any information, "SAI alleges that the information was revealed and discussed in the many phone calls between Wolfram and E&I in the months prior to his departure." (Pl.'s Resp., Dkt. #

6

25, at 11.) SAI further alleges that Wolfram used and relied upon his knowledge of SAI's proposals in pitching the same customers for E&I. (*Id*.)

"Courts . . . have repeatedly recognized that plaintiffs in trade secret cases can rarely prove misappropriation by convincing direct evidence." *Lumenate,* 2013 WL 5974731, at *5. If, as SAI alleges, Wolfram engaged in conduct that was in violation of his agreements with SAI, it is unlikely that Wolfram would have been open or direct in doing so. Thus, "plaintiffs [in ITSA cases]. . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place." *Id*. (citation and internal quotation marks omitted). At the motion-to-dismiss stage, an ITSA plaintiff is even less likely to have such information. While SAI's allegations are not detailed, they are sufficient "to present a story that holds together." *Runnion,* 786 F.3d at 526 (citation and internal quotation marks omitted).[5]

Wolfram next moves to dismiss SAI's claim of breach of fiduciary duty on the ground that it is preempted by ITSA. "[A]ll common law claims based on misappropriation of trade secrets were codified, and preempted, by ITSA." *ExactLogix, Inc. v. JobProgress, LLC*, No. 3:18-CV-50213, 2020 WL 7490233, at *9 (N.D. Ill. Dec. 21, 2020). "In deciding the preemption issue, courts need not determine whether the alleged trade secret is in fact a trade secret." *Id*. "Courts merely assess whether the common law claim is based on the misappropriation of an alleged trade secret." *Id*. According to SAI, even if the information Wolfram shared with E&I is not considered a trade secret, Wolfram breached his duty of loyalty by sharing the relevant information with E&I while employed by SAI. "Courts applying Illinois law have construed the duty of loyalty to prohibit officers or employees from improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006). Because SAI's breach of fiduciary duty claim is, as alleged, based on Wolfram's breach of the duty of loyalty by "promot[ing] and tout[ing] E&I over SAI" while still employed by SAI, (Pl.'s Resp., Dkt. # 25, at 14), the Court denies Wolfram's motion to dismiss the claim as preempted by ITSA. *See Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005) (an "assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record.").

Moreover, Wolfram's assertion that the count fails to state a claim is denied. SAI sufficiently alleges facts supporting a plausible claim of Wolfram's breach of the duty of loyalty.

---

[5] Wolfram also asserts that the Court should reject SAI's "furtive" attempts to rely on the inevitable-disclosure doctrine, by which "'a plaintiff may prove a claim of [threatened] trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.'" *Lumenate,* 2013 WL 5974731, at *5 (citation omitted and alteration in *Lumenate*). But the Court does not understand SAI to be alleging threatened disclosure, only actual disclosure.

7

For the reasons stated above, Wolfram's motion to dismiss is denied.

**Date**:  June 7, 2021

_Ronald A. Guzmán_
**Ronald A Guzmán**
**United States District Judge**