**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SWITCHBOARD APPARATUS, INC., d/b/s SAI ADVANCED POWER SOLUTIONS, INC., Plaintiffs, v. SHANE WOLFRAM, Defendant. | ) ) ) ) ) ) ) ) ) ) ) | No. 21 C 1665 Magistrate Judge M. David Weisman |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Wolfram's motion for summary judgment [190] is granted in part and denied in part. The Court grants Wolfram's motion as to Switchboard Apparatus, Inc.'s ("SAI") promissory fraud claim and denies it as to SAI's claims for breach of contract, breach of fiduciary duty[1], and violation of the Illinois Trade Secrets Act. Status hearing set for 9/25/24 at 9:15 a.m. The parties shall confer prior to the status hearing and be prepared to discuss trial dates and whether they request a continued settlement conference.

### I.      Facts

On November 11, 2021, in accordance with the provisions of 28 U.S.C. § 636(c), the parties consented to have this Court conduct all proceedings in this case, including trial, and order the entry of a final judgment. (Dkt. # 53.) The Court sets forth some facts here and discusses other facts as necessary in the Analysis section of the order. Determining an undisputed set of facts in this case is challenging considering each side's own interpretation of various communications and testimony.

*Wolfram's Communications with E&I.* Wolfram worked for SAI from around 2010 until June of 2020. During his employment, Wolfram acted as Vice President of Sales or in a similar role. Wolfram's job duties included oversight of sales, including mission critical sales, and the team he worked with responded to requests for proposals from SAI's customers, which included Cloud, Holder, and Stack. As part of his employment with SAI, Wolfram signed a Confidentiality, Non-Competition and Non-Solicitation Agreement.

---

[1] Although the breach of fiduciary duty claim remains, as discussed in the Analysis section, to the extent the breach of fiduciary duty claim is based on Wolfram's purported interference with SAI's business relationships, the Court grants summary judgment to Wolfram.

In about September 2019, Wolfram began discussing employment with E&I Engineering Corp. ("E&I") through Dave Genson, a sales manager at E&I.[2] At the time he discussed employment with E&I, Wolfram understood that E&I wished to become more involved in the U.S. medium voltage switchgear market. At an October 2019 meeting, Wolfram met with Genson for a couple of hours and toured the E&I factory to gain an understanding of E&I's capabilities. Wolfram thinks that he and Genson did not discuss anything about SAI other than Wolfram "being employed there." Genson testified that the purpose of the visit was to have Wolfram observe E&I's manufacturing environment.

Wolfram met with E&I personnel again in December 2019 and toured the E&I facility to gain more of an in-depth understanding of how E&I operated, including having a discussion of fabrication capabilities and the operation of its factory. Wolfram testified at his deposition that during this visit, he compared and contrasted SAI's capabilities with E&I's and discussed one of SAI's products. (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep., Dkt. # 205-2, at 91.) ("I think that a question was asked as to the arc-resistant gear first and then if SAI had a product that matched with the need for a two-breaker design in the U.S. . . . I said, yes, SAI does have a product in the low kVA, where they can stack breakers.").

A subsequent meeting in or around February 2019 was scheduled to last over six hours and included E&I's medium voltage team. (*Id*., Ex B, Wolfram Dep. Ex. 9, Dkt. # 205-2, at Page 121 of 307.) The agenda for the meeting included a discussion with Wolfram about E&I's plan to launch products in the medium voltage switchgear space—the same space occupied by SAI. (*Id.*, Ex. B, Wolfram Dep. Exs. 8-10, Pages 118-126 of 307.)[3] Before the meeting, E&I asked Wolfram to obtain and provide technical information regarding SAI's products and markets, to which

---

[2] In 2012, when Wolfram signed the Confidentiality, Non-Competition and Non-Solicitation Agreement, E&I did not compete with SAI for sales in the switchgear marketplace, and it was not considered a competitor of SAI. (Pl.'s Stmt. Add. Facts, Ex. A., Martin Dep., Dkt. # 205-1, at 80:7-82:4.)

[3] In a January 27, 2020 email from Philip O'Doherty, Managing Director at E&I, to Genson and Wolfram, O'Doherty states:

> Dave/Shane
>
> . . . I can get 2 of our MV team to SC to discuss a detailed plan for US MV Projects to Utility and Private Sector customers. I think we need 3 hours on this specific issue and I believe we need 3/4 hours on the other discussion points brought up by Shane in his detailed email which we have responded to . . . .
>
> Can you let me know c [sic] if dinner on Sun. 9 Feb is possible and then 730am start and 4pm finish on Mon 10 Feb. I am staying to finalise [sic] launching the MV rollout plan with the MV team in SC also before flying to West Coast . . . .

(Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep. Ex. 9, Dkt. # 205-2, at Page 121 of 307.)

Wolfram responded that he would seek out "friendly engineers" to obtain some of the information for E&I. (*Id*., Ex. B, Wolfram Dep. Ex. 10, at Page 123 of 307.)

*Customer Contacts*. After Wolfram joined E&I, E&I was ultimately awarded certain projects it had been pursuing, including the Stack Silicon Valley Project, Stack Portland Project, Cloud Manassas Project and the Stack Strategic Supply Chain Program (the "Projects"). Representatives from Cloud and Stack confirmed that, among other considerations, pricing, lead times, manufacturing capabilities, and delivery schedule impacted the decision to award these projects to E&I. At the time that Wolfram began discussing potential employment with E&I, SAI and E&I both sold equipment to CloudHQ, and E&I and SAI worked together with respect to the integration of certain products. Indeed, Wolfram first raised the issue of potential employment with E&I while discussing the integration issue with Genson.

As discussed more fully in the Analysis section of this order, Wolfram received a commission of $8,047.97 (1/4% of a $3,219,189 contract price) for the Cloud MCC6 project, which E&I secured after Wolfram began working for the company. While Wolfram asserts the commission was earned through sales secured by his direct reports' efforts, SAI contends that it was based on work Wolfram himself performed with respect to these projects, in violation of his Separation Agreement. For example, SAI notes that shortly after he joined E&I, Wolfram was included on numerous emails related to the Cloud MCC6 project. On June 19, 2020, Genson emailed O'Doherty and others to inform them that Wolfram was going to help E&I find a project manager for the Cloud MCC6 project. (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep. Ex. 28, Dkt. # 205-2, at Page 191 of 307.) On June 22, 2020, Wolfram emailed Genson about this same project, asking "when are we talking about this one? Please keep me posted." (*Id*., Wolfram Dep. Ex. 29, Dkt. # 205-2, at Page 192 of 307.) Genson responded: "Nothing yet from the team. I think Micky is reviewing timetable and production slots. They have their production meetings at 9:00. I'll follow up after my 10:00 meeting." (*Id*.) In July 2020, Genson sent Wolfram three different email exchanges about the Cloud MCC6 project. (*Id*., Wolfram Dep. Exs. 29, 31, 32, Dkt. # 205-2, at Page 192-193, 233-237 of 307.)

Hundreds of emails might be sent among team members and vendors on projects such as the Stack Silicon Valley project. Wolfram testified that when he received an email from Genson attaching what appeared to be documents relating to Stack, he did not open the attachment because the subject line of the email suggested the contents of the attachment concerned subject matter covered by the Non-Solicitation Agreement. SAI disputes that Wolfram did not open email attachments, pointing to relevant emails that include Wolfram as an addressee. (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep., Dkt. # 205-2, at 158:14-161:15, 166:16-169:1, 191:2-193:4; *id*. at Exs. 34-35, 36, 37; *id*., Ex. C, Genson Dep., Dkt. # 205-4, at Exs. 34-35, 37, 39, 50.) Genson testified that he was unaware of Wolfram providing E&I with any information about SAI's bidding, proposal, pricing, or formulas for the Projects. While Wolfram testified that he asked not to be copied or did not respond when e-mails were sent regarding the Projects, he acknowledged receiving emails regarding the Projects that he should not have received pursuant to the terms of his Confidentiality, Non-Competition and Non-Solicitation Agreement while employed at E&I. (*See, e.g*., Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep., Dkt. # 205-2, at 154) (Q: "So is it your testimony, then, that it was inappropriate for you, based on your separation agreement with SAI, to have received this email?" A: "Yes."); (*Id.* at 161 (Q: "Did you ever have a call with Mr. Genson

3

or any follow-up conversation following receipt of this email . . . ?" A: " . . . I don't recall if I had a separate conversation with Dave, saying why do you keep on copying me on this stuff?").

Individuals from Stack and CloudHQ with knowledge of the Stack Silicon Valley, Stack Portland, and Cloud Manassas projects testified that Wolfram was not involved in E&I's bidding those contracts. (Def.'s Stmt. Facts, Ex. J, VanderZanden Dep., at 106:16-107:12; *id.*, Ex. K, O'Hara Dep., Dkt. # 196-11, at 87:15-88:11.) However, Stack's corporate representative, Matthew Vanderzanden, testified only that Stack was not aware that Wolfram had joined E&I until sometime after he joined the company. (Def.'s Stmt. Facts, Ex. J, VanderZanden Dep., Dkt. # 196-10, at 106:16-107:12.) Similarly, CloudHQ's corporate representative, Brian O'Hara, testified only that he was not aware of Wolfram being "involved in any process that [O'Hara] was involved in with E&I" regarding the Cloud MCC6 Project. (Def.'s Stmt. Facts, O'Hara Dep., Ex. K, Dkt. # 196-11, at 87:24-88:7.) Stack's corporate representative testified that Wolfram had no impact on Stack's decision to award E&I the Stack Silicon Valley and Stack Portland contracts. (Def.'s Stmt. Facts, Ex. J, VanderZanden Dep., Dkt. # 196-10, at 106:16-107:12.) SAI does not dispute VanderZanden's testimony, but notes that factors such as price, performance of the gear and company capabilities played a role in Stack's decision to award these projects to E&I and not SAI. (*Id.*) Thus, the fact that E&I customers were not aware of Wolfram's role does not mean that he was not involved.

*Separation Agreement.* SAI and Wolfram signed the Separation Agreement on May 28, 2020. When Wolfram left SAI, he returned his company cell phone to SAI after deleting all text messages and call logs he deemed personal. According to SAI, Wolfram's phone contained company information, which should have been returned to SAI rather than deleted pursuant to Wolfram's Non-solicitation Agreement, which provided: "Upon termination of my employment with the Company (for any reason), I will, prior to my separation, immediately deliver all Company information, including any and all Confidential Information, to the Company, including any and all copies thereof." (Def.'s Stmt. Facts, Non-Solicitation Agreement, Ex. B, Dkt. # 196-2, at ¶ 1, pp. 1-2.)

After Wolfram left SAI, his SAI-issued cell phone received text and voicemail messages, including a voicemail message from someone named Phil asking "what will it take to get Bob over here" or words to that effect. While there is no direct evidence that Philip O'Doherty was the person who left the message on Wolfram's SAI phone, SAI contends that conclusion is supported by circumstantial evidence, such as Wolfram's past communications with O'Doherty. In addition, sometime in June 2020, Brian O'Hara, the Cloud Vice President of Electrical Infrastructure, texted or called Wolfram's SAI-issued cell phone, advising Wolfram that E&I was not receiving a contract (unrelated to this case) from Cloud.

## II. Standard

Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.* When

4

reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### III. Analysis

SAI alleges claims for breach of two contracts: a Confidentiality, Non-Competition and Non-Solicitation Agreement and the agreement entered upon Wolfram's departure from SAI (the "Separation Agreement"), promissory fraud, breach of Wolfram's common law fiduciary duties, and violations of the Illinois Trade Secrets Act. Wolfram seeks summary judgment on all of Plaintiff's claims, asserting that SAI's claims fail as a matter of law and the factual contentions it relies on are insufficient to support SAI's claims.

#### A. Breach of Contract

##### 1. *Enforceability of the Separation Agreement*

Wolfram first contends that the Separation Agreement is void and unenforceable because it lacks consideration. Wolfram's argument focuses on the following language in the Separation Agreement: "The Company agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group) . . . ." Wolfram contends that because E&I is not listed as a "Competing Business," as defined by the parties under the earlier Confidentiality, Non-Competition and Non-Solicitation Agreement, SAI was not entitled to object to Wolfram's employment with E&I, so its forbearance from objecting could not have constituted consideration for the Separation Agreement.

Even assuming for purposes of this motion that the term "definitive competitor" (lower case) in the Separation Agreement is a "Competing Business" (upper case) as that term is defined in the Confidentiality, Non-Competition and Non-Solicitation Agreement, Wolfram's argument ignores that the Separation Agreement expressly states that "[t]he terms of this final separation agreement are consistent with the Confidentiality, Non-Competition and Non-Solicitation Agreement signed by Shane and the Company on July 25, 2012 (attached) *with the following exceptions*." (Def.'s Stmt. Facts, Ex. E.5, Non-Solicitation Agreement, Dkt. # 148-2, at Page 2 of 3) (emphasis added). Immediately following this carve out is the sentence relevant here— "[t]he Company agrees to waive its objection to Shane departing SAI and going to work for a definitive competitor (E&I Engineering Group) . . . ." Thus, the plain language of the Separation Agreement expressly states that the characterization of E&I as a "definitive competitor" is an *exception* to the Confidentiality, Non-Competition and Non-Solicitation Agreement. Accordingly, Wolfram's reliance on the definition of "Competing Business" in the Confidentiality, Non-Competition and Non-Solicitation Agreement to inform the term "definitive competitor" in the Separation Agreement is misplaced

In any event, as SAI notes, "a promise to forgo pursuit of a legal claim will be determined to be adequate consideration to support formation of a contract even if the claim is invalid,

provided that it is asserted in good faith." *Stopka v. Am. Family Mut. Ins. Co., Inc.*, No. 10 C 6034, 2012 WL 2115495, at *8 (N.D. Ill. June 7, 2012). Wolfram argues that "the Court has before it evidence [that SAI's belief] was not a good faith" one because "SAI knew or should have known that its claim that E&I was a 'Competing Business' was meritless." (Def.'s Reply, Dkt. # 216, at 3.) But, as just explained, the characterization of E&I as a "definitive competitor" is an *exception* to the Confidentiality, Non-Competition and Non-Solicitation Agreement defined term "Competing Business." Accordingly, Wolfram has not pointed to evidence establishing that SAI's belief that it was foregoing a claim against Wolfram was not in good faith. *See Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n,* 898 N.E.2d 216, 230, 325 (Ill. App. Ct. 2008) ("a promise to forgo pursuit of a legal claim will be determined to be adequate consideration to support formation of a contract even if the claim is invalid, provided that it is asserted in good faith"). Wolfram's lack of consideration argument fails.

2. *Wage Payment and Collection Act*

Wolfram next contends that the separation agreement was void as illegal under Section 9 of the Illinois Wage Payment and Collection Act ("Wage Act"), 820 ILCS 115/9, which states:

> In case of a dispute over wages, the employer shall pay, without condition and within the time set by this Act, all wages or parts thereof, conceded by him to be due, leaving to the employee all remedies to which he may otherwise be entitled as to any balance claimed. The acceptance by an employee of a disputed paycheck shall not constitute a release as to the balance of his claim and *any release or restrictive endorsement required by an employer as a condition to payment shall be a violation of this Act and shall be void*.

820 ILCS 115/9. As an initial matter, Section 9 expressly applies to claims related to a "dispute over wages." The Separation Agreement was not executed in resolution of a dispute over wages, but "was to clarify the top ten [customers], get in writing a recommitment to non-solicitation and non-competition, and make sure that [Wolfram] understood what obligation he had to the company in terms of equipment and information to provide back to [SAI]." (Pl's. Stmt. Add. Facts, Ex. A, Martin Dep., Dkt. # 205-1, at 95:4-24.) Martin testified that SAI would have owed Wolfram the compensation and commissions listed in the Separation Agreement and would have paid those amounts even without the agreement. (*Id*. at 94:16-18, 96:14-25, 97:1-9.) Nor was any release impermissible. While "settlement of claims in the form of a release signed by an employee *relating to an employer's violation of the Act* is not permissible," *Schultze v. ABN AMRO, Inc.*, 83 N.E.3d 1053, 1062 (Ill. App. Ct. 2017), to the extent the Separation Agreement includes a release by Wolfram,[4] he specifically contends that any release was in regards to "his right to work for E&I free and clear of the restrictions applicable to 'Competing Businesses' contained in the Non-Solicitation Agreement" and that "*arguing otherwise is merely semantics*." (Def.'s Reply, Dkt. # 216, at 8) (emphasis added). Thus, Wolfram's argument that the Separation Agreement violates

---

[4] After a review of the Separation Agreement, the Court cannot identify any release provided by Wolfram in that document.

the Wage Act is unavailing. Because the Court finds that Wolfram's Wage Act argument fails on the merits, it need not address SAI's contention that Wolfram waived the Wage Act argument by not raising it before summary judgment.

3. *Evidence of Breach*[5]

Wolfram next asserts that the evidence of his purported bad acts is insufficient to support SAI's breach of contract claims and contends that he is entitled to summary judgment because "the facts are consistent with what happens every day—an employee switched employers." (Def.'s Reply, Dkt. # 216, at 21). But this assertion ignores this Court's role on summary judgment, which is not to "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, this Court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Id.*

a. *Disclosure of Confidential Information*

The Confidentiality, Non-Solicitation and Non-Competition Agreement and the Separation Agreement prohibited Wolfram from disclosing any confidential information obtained during the course of his employment with SAI. As previously outlined, it is undisputed that Wolfram met on several occasions with personnel at E&I while he was still employed at SAI. While Wolfram testified that he discussed only "non-confidential aspects of the switchgear industry" with E&I before accepting employment there, (Def.'s Reply, Dkt. # 216, at 21), SAI disputes that position, pointing to several pieces of evidence. On January 26, 2020, for example, before Wolfram's third trip to E&I, O'Doherty emailed Wolfram telling him that he wanted to have a detailed discussion about E&I's plan to launch products in the medium voltage switchgear space, which was a market sector in which SAI competed. (*Id.*, Ex. B, Wolfram Dep. Ex 8, Dkt. # 205-2, at Page 118 of 307.) The following day, O'Doherty again emailed Wolfram and told him that he believed their strategic conversation would last at least three hours, (*id.*, Wolfram Dep. Ex. 9, Dkt. # 205-2, at 121 of 307), and they would need another three to four hours to discuss "other issues." (*Id.*)[6]

---

[5] The parties discuss numerous communications and excerpts of deposition testimony in arguing their positions regarding what the evidence demonstrates. Given the Court's conclusion that issues of fact preclude summary judgment, the Court does not discuss all the evidence cited by both parties.

[6] SAI also refers to a December 9, 2019 email, after Wolfram made the first of three visits to E&I's U.S. headquarters, in which Genson indicated to O'Doherty that he had "the distinct impression that we are miles ahead of SAI on the capability side." (Pl.'s Stmt. Add. Facts, Ex. C, Genson Dep. Ex. 5, Dkt. # 205-3, at Page 108 of 345.) While SAI contends that Genson "could not recall" what gave him that impression, (*id.*, Genson Dep. at 38:17-21), this assertion fails to account for all Genson's testimony on the issue. On further questioning, Genson testified that he had that impression based on the "response of seeing [Wolfram] react to what he was exposed to during our tour," and that "it was like a kid going to Disney World for the first time[] and seeing the difference between whatever his exposure was and to what he's seeing in front of him at [E&I]." (*Id.*) Reviewing Genson's testimony in full, the Court finds it does not support an inference that

SAI also points to a February 7, 2020, email from O'Doherty asking Wolfram to provide answers to several technical and market-related questions to ensure that E&I's medium voltage offerings had "all the features [E&I] needed to target both the Utility and Data Center /Commercial/Industrial/Infrastructure Markets." (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep. Ex. 10, Dkt. # 205-2, at 123 of 307.) In this email, O'Doherty also asked Wolfram to provide E&I with answers about double stack cubicles[7] and told him "[E&I] really want[ed] to know what are the norms that will win the business." (*Id.*) Wolfram responded that he would "talk to some friendly engineers and see what specs" he could pull.[8] (*Id.*) Wolfram further advised: "Utility information will be more difficult to come by as that is a long and difficult market entrance process." (*Id.*) O'Doherty then asked for pricing information: "Shane, [w]e are reviewing our sell prices for the US market [and] we would be interested in your feedback on typical costs per cubicle? Lots to discuss!" (*Id.*) SAI also points out that Wolfram disclosed SAI's solution for entering the medium-voltage market in September 2020, which included confidential technical information about how SAI designed its single or double stack non-AR offering and the process it used to implement this process for its customers. (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep. Ex. 38, Dkt. # 205-2, at Page 305 of 307.)

In addition, prior to his departure from SAI, Wolfram deleted all text messages and call log information from his SAI-issued cell phone. SAI notes that:

---

Wolfram disclosed confidential information. Yet, as noted herein, other evidence does support a reasonable inference as to this point.

[7] Wolfram testified that "double stack cubicles" refer to "a medium voltage section that houses two breakers stacked vertically." (Pl.'s Stmt. Add. Facts, Ex. B, Wolfram Dep., Dkt. # 205-2, at 72:9-13.)

[8] Wolfram contends that "[n]othing in this email exchange suggests that Wolfram was being asked for or ultimately provided any confidential information [to] SAI." (Def.'s Mem. Supp. Mot. Summ. J., Dkt. # 195, at 15.) Notably, Wolfram does not cite to any authority or engage in any application of the facts to the law in support of this statement. The Court takes this opportunity to note that Wolfram's reply brief contains much more fulsome arguments and substantially more citations to authority that are essentially absent from his opening motion for summary judgment. "[A]rguments a party supports with legal authority for the first time" in a reply brief are forfeited. *In re Khan*, 20 B 17315, 2021 WL 5121894, at *2 (Bankr. N.D. Ill. Sept. 7, 2021) (citing *Vanco v. Mancini*, 495 F. Supp. 3d 712, 726 (N.D. Ill. 2020)) (holding that parties could not cure their failure to cite legal authority in their opening brief by citing it in their reply). Wolfram comes dangerously close to having forfeited reliance on SAI's failure to establish that the information Wolfram may have disclosed was confidential under the Non-Solicitation Agreement. On the same note, however, SAI is equally lacking in its citations to authority, particularly with respect to the issue of confidential information. "Parties who want favorable judicial decisions have a responsibility to help courts reach them by making clear, thorough, well-reasoned, and – most important here – adequately supported arguments." *In re Khan*, No. 20 B 17315, 2021 WL 5121894, at *2 (Bankr. N.D. Ill. Sept. 7, 2021) (emphasis omitted).

> Illinois case law is . . . clear in holding that a defendant's elimination of computer files (which [defendant] admits he did on his company cell phone, and which might have revealed his improper transfer of company information), also allows for an inference of misappropriation. Likewise, a defendant's stated reason for deleting company files may be discounted where it is not credible, which is also the case here.

*Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *11 (N.D. Ill. Sept. 8, 2017) (citation omitted). While the Court agrees with Wolfram that SAI is not entitled to an inference of disclosure or misconduct based on the deletion, it is relevant to the extent that Wolfram was required to return all SAI company information upon his departure, and the SAI-issued phone received messages after Wolframs' departure from what may have been E&I employees, referring to "getting Bob over here." SAI posits that "Bob" could have been SAI employee Bob Brown. Wolfram asserts, without citation to authority, that without being able to "definitively identify" who left a voicemail or who the voicemail was about, it is inadmissible and therefore cannot be considered on summary judgment.

Although Wolfram offers his own view of how the evidence should be interpreted, contending that testimony SAI cites in support of its response is "too vague" to be a basis for concluding that Wolfram disclosed confidential information, (Def's Reply, Dkt. # 216, at 10), or that SAI exaggerates and mischaracterizes testimony or evidence, such arguments further indicate that summary judgment is inappropriate given the opposing interpretations of the facts. Viewing the facts in a light most favorable to SAI, the Court finds that sufficient evidence exists from which a jury could find for SAI on breach of the Non-Competition Agreement.

### b. Solicitation of SAI Customers

With respect to solicitation of SAI customers, the Confidentiality, Non-Solicitation and Non-Competition Agreement and the Separation Agreement prohibited Wolfram from directly or indirectly soliciting, servicing or having contact with Cloud, Holder or Stack, companies with which SAI did business. After Wolfram joined E&I, it won contracts with these three companies. Cloud's and Stack's corporate representatives testified that a combination of pricing, lead times, manufacturing capabilities and delivery schedules impacted their decisions to award the Stack Silicon Valley Project, the Stack Portland Project, the Cloud Manassas Project, and the Stack Supply Chain Program to E&I. Wolfram was privy to these aspects of the bids from his time at SAI, (Def.'s Stmt. Facts, Ex. A, Wolfram Dep., Dkt. # 196-1, at 27:20-31:3), and received numerous emails on these projects while at E&I. In addition to what has already been discussed, for example, on June 4, 2020, Genson sent Wolfram an email with E&I's proposal for the Stack Portland project.

While Wolfram testified that he did not know why he was copied on the email and does not recall discussing it with Genson, Wolfram received commissions for orders received for Wolfram's direct reports and their networks, irrespective of whether he personally worked on those projects. For the third quarter of 2020, Wolfram received a commission of $8,047.97 (1/4% of a $3,219,189 contract price) for the Cloud MCC6 project. He asserts that this bonus was paid solely

9

as a commission from direct reports and not because of any work he performed on or for the Cloud MCC6 project. (*Id*. at 173:17-181:16.) Yet, Cloud was Genson's client, and Wolfram testified that at the time he started at E&I, Genson was not one of his direct reports. (*Id*. at 113.) While these facts indicate that Wolfram was not entitled to any compensation for the contract, Wolfram received the commission 23 days after the started at E&I. (*Id*. at 177.) Wolfram testified that a reorganization, which made Genson one of his direct reports, occurred at some point within six months of his start date, but he did not know when that occurred. (*Id*. at 178-181.) Although Wolfram attributed his receipt of the commission to a "paperwork snafu," (*id*. at 179), this circumstance, coupled with the circumstantial evidence outlined above, creates a genuine issue of material fact as to whether Wolfram was involved in soliciting an SAI client during his negotiated non-solicitation period.

The parties discuss other emails with their own interpretations of what they show, (Pl.'s Resp., Dkt. # 204, at 22; Def.'s Reply, Dkt. # 216, at 16-17), but viewing the evidence in a light most favorable to SAI, Wolfram's motion for summary judgment must be denied as to the breach of the Non-Solicitation and Separation Agreement contract counts.

B. Breach of Fiduciary Duty

"To recover for a breach of fiduciary duty, Illinois law require[s] the plaintiff[ ] to establish the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by the breach." *Alonso v. Weiss*, 932 F.3d 995, 1001 (7th Cir. 2019). An employee's duty of loyalty to a company "may prohibit officers and employees from improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Taylor Made Express, Inc. v. Kidd*, No. 21 C 2903, 2024 WL 197231, at *9 (N.D. Ill. Jan. 18, 2024) (citation and internal quotation marks omitted).

According to SAI, Wolfram breached his fiduciary duties by 1) soliciting or otherwise contacting customers of SAI to sell E&I's products; 2) disclosing SAI's confidential information to E&I; and 3) interfering with SAI's business relationships and expectancies. (3d Am. Compl., Dkt. # 148, ¶¶ 136-139.) Wolfram's only challenge to this claim is that there is no or insufficient evidence that Wolfram solicited customers, disclosed confidential information, or interfered with SAI's business relationships while owing SAI a fiduciary duty. The Court agrees that SAI offers no evidence of Wolfram interfering with business relationships; accordingly, to the extent the breach of fiduciary duty claim is based on Wolfram's interference with SAI's business relationships, the Court grants summary judgment to Wolfram. As to solicitation of customers and disclosing confidential information, given that the breach of fiduciary duty claim rests on the same disputed evidence as the breach of contract claim, the Court denies Wolfram's motion for summary judgment on the breach of fiduciary duty claim for the same reasons discussed above.

C. Promissory Fraud

"As a general rule, Illinois law does not recognize actions for 'promissory fraud'—i.e., a false statement of intent regarding future conduct, under a contract for example, rather than present or past facts." *Aylin & Ramtin, LLC v. Barnhardt*, No. 19 C 3402, 2024 WL 325384, at *10 (N.D.

10

Ill. Jan. 29, 2024). "However, there is an exception for misrepresentations that were made as part of a scheme to defraud." *Id*. (citation omitted). "[T]he Seventh Circuit has interpreted the word 'scheme' to mean that 'promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.'" *Id*. (citation omitted). "To invoke the scheme exception, the plaintiff must allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012). "Such evidence would include a 'a pattern of fraudulent statements, or one particularly egregious fraudulent statement.'" *Id*. (citation omitted). "Promissory fraud claims are generally disfavored because 'anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed.'" *Nat'l Painting, Inc. v. PPG Architectural Finishes, Inc.*, No. 14 C 8054, 2015 WL 1593008, at *3 (N.D. Ill. Apr. 1, 2015) (quoting *Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir. 1992)).

SAI does not point to one particularly egregious fraudulent statement. Rather, SAI contends that the record demonstrates that Wolfram planned to breach the Separation Agreement from the beginning and deceived SAI into signing the agreement so that he and E&I could further their scheme of diverting Cloud, Holder, and Stack projects away from SAI. The Court does not find that Wolfram's statement to E&I that he wanted to keep the same "customer base" (which, according to SAI, includes Cloud, Holder, and Stack) when he joined E&I and his deletion of text messages and communications prior to returning his phone to SAI constitute specific, objective manifestations of fraudulent intent sufficient to demonstrate a scheme to divert business from Cloud, Holder, and Stack. *See Bower*, 978 F.2d at 1012 ("To prove that a defendant made a promise without intending to keep it, a plaintiff 'must be able to point to specific, objective manifestations of fraudulent intent'") (citation omitted). Regardless, in support of its argument opposing summary judgment on the breach of contract claim, SAI contends that it executed the Separation Agreement to "get in writing a *recommitment* to non-solicitation and non-competition." (Pl's. Stmt. Add. Facts, Ex. A, Martin Dep., Dkt. # 205-1, at 95:4-24) (emphasis added). As such, SAI cannot demonstrate its reliance on Wolfram's purported promise not to solicit customers because SAI believed it already had a commitment from Wolfram not to do that, as set forth in the original Confidentiality, Non-Solicitation and Non-Competition Agreement. *See Bower*, 978 F.2d at 1011 (promissory fraud occurs when "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the *other party relies on it to its detriment*") (emphasis added).

Accordingly, Wolfram's motion for summary judgment on the promissory fraud claim is granted.

D. Violation of the Illinois Trade Secrets Act ("ITSA")

A claim for misappropriation of a trade secret under the ITSA requires a plaintiff to show that (1) a trade secret existed,[9] (2) the trade secret was misappropriated, and (3) the owner of the

---

[9] The ITSA defines a trade secret as:

trade secret was damaged by the misappropriation." *Timken Gears & Servs., Inc. v. Brad Foote Gear Works, Inc.*, No. 24 CV 60, 2024 WL 3201274, at *3 (N.D. Ill. June 27, 2024). The entirety of Wolfram's argument is that the "evidence that Wolfram used any [confidential] information is . . . , insufficient to withstand summary judgment" because Wolfram denied having used or disclosed confidential information and Dave Genson of E&I testified at his deposition that Wolfram did not share any confidential information with him or, to his knowledge, E&I. (Def.'s Mem. Supp. Summ. J., Dkt. # 195, at 19-20.)

As another court in this district noted:

> "It is frequently true in trade secret cases that misappropriation and misuse can rarely be proved by convincing direct evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (cleaned up). "In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Id.* "[C]ircumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *JTH Tax LLC v. Grabowski*, 2021 WL 3857794, at *6 (N.D. Ill. 2021); *see also PolyOne Corp. v. Lu*, 2018 WL 4679577, at *11 (N.D. Ill. 2018).

*Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17 C 5826, 2023 WL 5334638, at *26 (N.D. Ill. Aug. 18, 2023). Referring to this authority, SAI contends that the direct and circumstantial evidence discussed above with respect to its breach of contract claims, including Wolfram's deletion of communications from his cell phone prior to returning it, supports a finding that a genuine issue of material fact exists as to whether Wolfram violated the ITSA.

Wolfram's failure to engage in any legal analysis or apply the facts to the relevant law in his opening brief means that he has waived his argument regarding ITSA. *See United States v. Adams*, 625 F.3d 371, 378 (7th Cir. 2010) (failing to develop argument in any meaningful way waives that argument); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived."). Moreover, because Wolfram does not address the ITSA claim at all in his reply, he has forfeited any argument challenging SAI's response. *See Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*, No. 17

---

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2.

C 6285, 2019 WL 3037075, at *9 (N.D. Ill. July 11, 2019) ("Syncreon failed to address these issues at all in its reply brief, and it has thus forfeited the point for purposes of summary judgment.").

Accordingly, Wolfram's motion for summary judgment on the ITSA claim is denied.

### IV. Conclusion

For the reasons stated below, Wolfram's motion for summary judgment is granted in part and denied in part. Wolfram's motion for summary judgment is granted as to SAI's promissory fraud claim and denied as to SAI's claims for breach of contract, violation of the Illinois Trade Secrets Act, and breach of fiduciary duty.

Date: September 12, 2024

**M. David Weisman**
**United States Magistrate Judge**